# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF NORTH CAROLINA

# DURHAM DIVISION

| | |
|---|---|
| DANIELLE SEAMAN, individually and on behalf of all others similarly situated,<br><br>       Plaintiff<br><br>  v.<br><br>DUKE UNIVERSITY; DUKE UNIVERSITY HEALTH SYSTEM, INC.; and DOES 1-20,<br><br>       Defendants. | Case No. 1:15-cv-462<br><br><br>**COMPLAINT—CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ACTION ...........................................................................1

II. JURISDICTION AND VENUE ..........................................................................2

III. THE PARTIES...................................................................................................2

    A.  Plaintiff .................................................................................................2

    B.  Defendants ............................................................................................2

    C.  Unnamed Co-Conspirators....................................................................3

IV. CLASS ACTION ALLEGATIONS ...................................................................4

V.  FACTUAL ALLEGATIONS .............................................................................6

    A.  Trade and Commerce .............................................................................6

    B.  Competition For Medical Facility Faculty and Staff in North
        Carolina.................................................................................................7

    C.  Defendants and Their Co-Conspirators Entered Into an Ongoing
        Agreement Not to Hire Each Other's Medical Facility Faculty and
        Staff.....................................................................................................11

    D.  The Agreement Among Defendants and Their Co-Conspirators
        Was Concealed From All Members of the Proposed Class,
        Including Plaintiff. ..............................................................................12

    E.  Defendants' Conspiracy Suppressed Wages of Plaintiff And The
        Proposed Class, and Suppressed Their Mobility. .....................................16

FIRST CLAIM FOR RELIEF ......................................................................................17

SECOND CLAIM FOR RELIEF .................................................................................19

PRAYER FOR RELIEF ...............................................................................................20

JURY DEMAND ..........................................................................................................22

1238926.6

Plaintiff Danielle M. Seaman, M.D., individually and on behalf of a class of similarly situated individuals, hereby states and alleges the following against Defendants Duke University ("Duke"), Duke University Health System ("DUHS") and DOES 1-20 (collectively, "Defendants"):

## I.  SUMMARY OF THE ACTION

1.  This class action challenges an illegal conspiracy among Duke, DUHS, and co-conspirators the University of North Carolina ("UNC") and the University of North Carolina Health Care System ("UNC Health"), to suppress the compensation of their employees.  Without the knowledge or consent of their employees, Defendants' senior administrators and deans entered into express agreements to eliminate or reduce competition among them for skilled medical labor, including medical facility faculty.  This conspiracy consists of an agreement that Duke and DUHS will not hire or attempt to hire certain medical facility faculty and staff employed by UNC or UNC Health, and vice-versa.

2.  The intended and actual effect of this agreement is to suppress employee compensation, and to impose unlawful restrictions on employee mobility.  Because Duke/DUHS and UNC/UNC Health are the two largest academic medical systems in North Carolina, and indeed two of the largest employers in the state, their no-hire agreement has reduced competition for medical facility faculty and certain staff, thereby suppressing faculty and staff pay.

3.  Defendants' conspiracy and agreement has restrained trade, and are *per se* unlawful under federal and North Carolina law.  Plaintiff seeks injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

- 1 -

## II. JURISDICTION AND VENUE

4.      Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

5.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337, and 1367.

6.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and all Defendants reside in North Carolina.

7.      Defendants are subject to the jurisdiction of this Court because all Defendants are residents of North Carolina and reside in this District.

## III. THE PARTIES

### A. Plaintiff

8.      Plaintiff Dr. Danielle M. Seaman is a citizen and resident of the State of North Carolina.  Dr. Seaman is a radiologist specializing in cardiothoracic imaging.

9.      Plaintiff has been and continues to be employed by Duke University as an Assistant Professor of Radiology at Duke University School of Medicine, from 2011 to the present.  Dr. Seaman has been and continues to be injured in her business or property by reason of the violations alleged herein.

### B. Defendants

10.     Defendant Duke University is a private, tax-exempt, non-profit university with its principal place of business in Durham, North Carolina, that owns and operates educational and research facilities, including the Duke University School of Medicine.

- 2 -

11.     Defendant Duke University Health System is a tax-exempt, non-profit corporation organized and controlled by Duke University, with its principal place of business in Durham, North Carolina.  DUHS operates three hospitals in the Raleigh-Durham area, as well as a physician network consisting of twenty primary care physician practices throughout the state and five urgent care facilities in Durham and Wake counties.  DUHS provides hundreds of millions of dollars of financial support to Duke annually, primarily aimed at funding the Duke School of Medicine.

12.     According to DUHS's recent financial statements, "the operating agreement between [Duke] and [DUHS] provides for certain common administrative services, human resources policies and practice, fiduciary responsibility, investment policies, and support for the School of Medicine."

13.     Duke and DUHS are collectively referred to herein as "the Duke Entities."

14.     Plaintiff alleges on information and belief that DOES 1-20, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  DOES 1-20 are residents of the State of North Carolina and are corporate officers, members of the boards of directors and boards of trustees, deans, or senior administrators of Duke University and Duke University Health System.  Plaintiff is presently unaware of the true names and identities of those defendants sued herein as DOES 1-20.  Plaintiff will amend this Complaint to allege the true names of the DOE defendants when she is able to ascertain them.

C.     **Unnamed Co-Conspirators**

15.     Co-conspirator UNC is a public, multi-campus university incorporated under statute by the North Carolina General Assembly.  *See generally* N.C. Gen. Stat. § 116-1, *et seq.*  UNC owns and operates numerous educational and research facilities across 17 campuses, including the UNC Chapel Hill School of Medicine.  UNC operates

- 3 -

throughout North Carolina, with its principal place of business in Chapel Hill, Orange County, North Carolina.

16.     Co-conspirator UNC Health is a non-profit integrated health care system, created by statute and "governed and administered as an affiliate enterprise of The University of North Carolina." *See* N.C. Gen. Stat. § 116-37.  UNC Health is a large medical services system that includes five hospitals and multiple emergency and urgent care facilities in the Chapel Hill area, a network of community medical practices across the state, a home health agency and hospice program, and an air and ground transportation system that provides helicopter service statewide and ambulance transport in the Raleigh, Durham, and Chapel Hill areas.  Its principal place of business is Chapel Hill, Orange County, North Carolina.

17.     UNC and UNC Health are collectively referred to herein as "the UNC Entities."

## IV.    CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action on behalf of herself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Proposed Class is defined as follows:

> All natural persons employed by Defendants and their co-conspirators in the United States during the period from January 1, 2012 through the present (the "Class Period") as a faculty member, physician, nurse, or other skilled medical employee.  Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior executives of Defendants and their co-conspirators who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

19.     Plaintiff does not, as yet, know the exact size of the Proposed Class because such information is in the exclusive control of Defendants and their co-conspirators.

- 4 -

Upon information and belief, based upon the nature of the trade and commerce involved, and the reported numbers of faculty members and medical staff employed by Duke University School of Medicine, Duke University Health System, UNC Chapel Hill School of Medicine, and UNC Health Care, there are thousands of Class members. Joinder of all members of the Class, therefore, is not practicable.

20.     The questions of law or fact common to the Class include but are not limited to:

        a.     whether Defendants' conduct has violated the Sherman Act;

        b.     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

        c.     whether Defendants' conduct has violated N.C. Gen. Stat. §§ 75-1 and 75-2;

        d.     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of N.C. Gen. Stat. §§ 75-1 and 75-2;

        e.     whether Defendants have fraudulently concealed their conduct;

        f.     whether Defendants' conspiracy and associated agreements have restrained trade, commerce, or competition for skilled labor among Defendants and their co-conspirators;

        g.     whether Plaintiff and the Proposed Class have suffered antitrust injury or have been threatened with injury;

        h.     the difference between the total compensation Plaintiff and the Proposed Class received from Defendants and their co-conspirators, and the total compensation Plaintiffs and the Class would have received from Defendants and their co-conspirators in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein; and

1238926.6

i.        the type and measure of damages suffered by Plaintiff and the Proposed Class.

21.     These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

22.     Plaintiff's claims are typical of the claims of the Proposed Class.

23.     Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class.

24.     Plaintiff has retained counsel experienced in antitrust and class action litigation to represent herself and the Proposed Class.

25.     Defendants and their co-conspirators have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

26.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual members of the Proposed Class would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court.

## V.     FACTUAL ALLEGATIONS

### A.     Trade and Commerce

27.     During the Class Period, Defendants and their co-conspirators employed members of the Proposed Class in North Carolina, including in this judicial district.

28.     Conduct by Defendants and their co-conspirators has substantially affected interstate commerce throughout North Carolina and the United States, and has caused antitrust injury throughout North Carolina and the United States.

- 6 -

**B.    Competition For Medical Facility Faculty and Staff in North Carolina**

29.    Defendants and their co-conspirators are the dominant and pre-eminent employers of skilled medical labor in North Carolina.

30.    According to statistics self-reported to the American Association of Medical Colleges, Duke employs 196 basic medical research faculty and 1,207 clinical faculty, totaling 1,403 employees.

31.    On its website Duke University states that "[Duke University School of Medicine] consists of more than 2,000 academic and clinical faculty in 33 departments, centers, and Institutes," the large majority of whom are medical doctors and/or scientists. Also according to its website, "Duke is the largest employer in Durham County and the second-largest private employer in North Carolina."  While the total number of physicians and medical staff employed by DUHS is not publicly available, Duke's website states that "Duke University Health System has approximately 16,627 full-time employees."

32.    The UNC Chapel Hill School of Medicine maintains 512 persons on its payroll. According to statistics self-reported by faculty to the American Association of Medical Colleges, UNC Chapel Hill School of Medicine employs approximately 1,500 faculty members, who include physicians employed at UNC's hospitals and UNC Health facilities.  According to its website, UNC Chapel Hill School of Medicine employs 1,553 full-time faculty and 199 part-time faculty.

33.    In a properly functioning and lawfully competitive labor market, Defendants and their co-conspirators would compete for physician faculty members and medical staff by hiring current employees of each other.  This competition would include Defendants soliciting or accepting applicants from UNC and UNC Health Care into available positions and vice-versa, so-called lateral hiring.

- 7 -

34.     Through lateral hiring, an academic or medical institution is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.  By contrast, hiring faculty and staff directly out of a training program—including medical school, residency, fellowship, nursing school, and others—comes with none of those benefits, and the hiring institution must invest significant resources into identifying, assessing, and training new faculty and staff members.  For these reasons and others, lateral hiring is a key form of competition among academic and medical institutions, particularly for highly trained and highly skilled medical doctors and scientists, as well as specialized and highly trained nursing and technical staff.

35.     Competition for workers via lateral hiring has a significant impact on faculty and staff compensation in a variety of ways.  First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain valuable medical faculty and staff.  If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, or may be receptive to recruiting by a rival employer.  Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all. Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities.  Preemptive retention measures thus lead to increased compensation for all employees.

36.     Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain employees who are likely

- 8 -

1238926.6

to join a competitor institution. This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its faculty and staff by increasing compensation levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

37. Third, because many staff are highly specialized and integrated into teams tied to specific faculty members and groups, faculty who move to positions at different institutions often bring with them nurses, technicians, and other medical staff. Just as competition forces employers to preemptively raise compensation to retain faculty members who might otherwise seek employment elsewhere, it also encourages increased compensation for related support staff. Thus, increased movement of medical faculty not only increases the compensation for those faculty members, but also for the support staff who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

38. The positive compensation effects of hiring faculty and staff from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the anticompetitive agreements alleged herein. Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all faculty and staff of the participating institutions.

39. Defendants carefully monitor and manage their internal compensation levels to achieve certain goals, including:

      a. maintaining approximate compensation parity among employees within the same employment categories (for example, among Assistant Professors);

b.     maintaining certain compensation relationships among employees across different employment categories (for example, among Assistant Professors relative to Associate Professors);

c.     maintaining high employee morale and productivity;

d.     retaining employees; and

e.     attracting new and talented employees.

40.     To accomplish these objectives, Defendants and their co-conspirators set baseline compensation levels for different employee categories that apply to all employees within those categories. Defendants and their co-conspirators also compare baseline compensation levels across different employee categories. Defendants and their co-conspirators update baseline compensation levels regularly.

41.     While Defendants sometimes engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level. The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it. In either case, suppression of baseline compensation will result in suppression of total compensation.

42.     In addition to compensation and benefits, possibilities for advancement for Defendants' and their co-conspirators' medical faculty are strictly controlled by their respective tenure policies. Although individual faculty members may be considered for appointment or promotion, the timeline and procedures for advancement to tenure-eligible positions and for achieving tenure are controlled by the bylaws and faculty handbooks of Duke and UNC. The highest faculty rank at both Duke and UNC is "Professor," and there is no possibility for promotion above that rank.

43.     Thus, if operating under competitive and lawful conditions, Defendants and their co-conspirators would use lateral hiring as an important tool for

recruiting and retaining skilled labor, and the use of lateral hiring among Defendants and their co-conspirators would impact and increase total compensation and mobility of their employees.

      C.      **Defendants and Their Co-Conspirators Entered Into an Ongoing Agreement Not to Hire Each Other's Medical Facility Faculty and Staff.**

     44.     Defendants' conspiracy has consisted of an express agreement between Defendants and their co-conspirators that the Duke Entities and the UNC Entities would not hire certain skilled medical employees, including faculty, employed by the other. The full scope of the agreement will be determined through discovery. Upon information and belief, the agreement initially occurred between Nancy C. Andrews, M.D., Ph.D., Dean of Duke School of Medicine, and William L. Roper, M.D., M.P.H., Dean of the UNC Chapel Hill School of Medicine. Dean Andrews also serves as a member of the DUHS Board of Directors, and Dean Roper serves as CEO of UNC Health. The agreement has been recognized, ratified and enforced since that time. The agreement will be referred to hereafter as the "no-hire agreement."

     45.     Defendants and their co-conspirators expressly agreed that the only permitted exception to their agreement would be for faculty who are granted a promotion simultaneous to their hiring. For example, at both Duke and UNC, a faculty member with the rank of "Assistant Professor" can become eligible over time for promotion to the rank of "Associate Professor." Under the agreement entered into between Defendants and their co-conspirators, an Assistant Professor at Duke cannot be hired by UNC unless she is hired into a position at the Associate Professor rank or higher, and vice versa.

     46.     Because the highest level of advancement for medical faculty at both UNC and Duke is that of "Professor," the agreement not to hire allowed no exception for faculty at that rank. As to faculty at that rank, the agreement among Defendants and their

- 11 -

co-conspirators constituted a blanket refusal to hire from any other party to the conspiracy.

47.     Defendants entered into the express agreement and entered into the overarching conspiracy with knowledge of the other Defendants' participation and the participation of their co-conspirators, and with the intent of accomplishing the conspiracy's objective: to reduce employee compensation and mobility through eliminating competition for skilled labor.

### D.     The Agreement Among Defendants and Their Co-Conspirators Was Concealed From All Members of the Proposed Class, Including Plaintiff.

48.     Defendants and their co-conspirators actively concealed their anticompetitive agreement from all members of the Proposed Class, including Plaintiff. But for Plaintiff's own experience seeking employment at UNC, and UNC's refusal to hire her because of the no-hire agreement, Plaintiff would remain unaware of its existence.

49.     As summarized below, Plaintiff's experience seeking employment at UNC illustrates the effect of the agreement not to hire on all members of the Proposed Class. In particular, members of the Proposed Class have been and continue to be unable to seek or accept positions for which they are qualified, without their knowledge or consent.

### 1.     Plaintiff Dr. Seaman, While Employed by Duke, Desired and Applied for a Faculty Position at UNC.

50.     On or about December 2011, Plaintiff Dr. Seaman was employed as an Assistant Professor of Radiology at Duke School of Medicine in the Cardiothoracic Imaging group.  At that time, she contacted the Chief of Cardiothoracic Imaging at the UNC Chapel Hill School of Medicine's Radiology Department.  In that email she stated: "I understand that you are not currently hiring, but may be looking to hire someone in the future.  If so, I would certainly be interested."

- 12 -

1238926.6

51.     UNC's Chief of Cardiothoracic Imaging responded to Plaintiff's email, stating:

> Danielle,
>
> Thanks very much for sending along your CV, which I have reviewed and will keep in my file.
>
> [A UNC faculty member] speaks very highly of you.
>
> I anticipate having a faculty position open up in our Chest Division beginning July, 2013, although one could become available sooner if [one of two faculty members] decide[s] to retire.
>
> Will keep you in the loop. In the meantime, let me know if you would like to meet informally sometime. Perhaps we could meet over lunch and I could show you around our department.

52.     On or about July 2012, UNC's Chief of Cardiothoracic Imaging again emailed Plaintiff regarding the possibility of employment at UNC's School of Medicine. He stated:

> Danielle,
>
> Hope you are well.   If you continue to have interest in learning more about a potential future cardiothoracic imaging position at UNC, now would be a good time to meet in person.
>
> Do you have any availability for lunch and informal visit of the department next Wednesday, August 8 or Thursday, August 9?

Following further email exchange, Plaintiff visited the UNC School of Medicine campus on or about August 9, 2012, during which time she toured the Department of Radiology, met with the Chief of Cardiothoracic Imaging, and participated in an informal interview lunch.

53.     Following Plaintiff's visit to the UNC School of Medicine campus, on or about August 11, 2012, the Chief of Cardiothoracic imaging again emailed her and indicated a desire to hire her should a lateral position become available:

- 13 -

1238926.6

Danielle,

It was a pleasure meeting and getting to know you. I believe that you would fit in very nicely with our cardiothoracic imaging group at Carolina. I will be sure to keep you apprised should a position become available.

**2.** **Plaintiff Dr. Seaman Was Rejected as an Applicant at UNC Explicitly Due to the Agreement Not to Hire, and Was Told She Was Too Junior to Be Considered for a Promotion.**

54. More than two years later, or about February 2015, Plaintiff again contacted UNC's Chief of Cardiothoracic Imaging, indicating that she was "very interested in applying" for an advertised position as a Thoracic Radiologist at UNC.

55. The Chief of Cardiothoracic Imaging responded, stating that he was prohibited from hiring her:

Dear Danielle,

Thank you for your continued interest in our department. I remember you well and certainly enjoyed your previous visit with us.

I agree that you would be a great fit for our cardiothoracic imaging division. Unfortunately, **I just received confirmation today from the Dean's office that lateral moves of faculty between Duke and UNC are not permitted. There is reasoning for this "guideline" which was agreed upon between the deans of UNC and Duke a few years back**. I hope you understand.

Please be assured that your inquiry into our faculty position will continue to be kept in strict confidence by me.

Congratulations on your recent Junior Faculty Teaching Award. I wish you much continued success in your academic career.

(Emphasis added.)

56. Plaintiff Dr. Seaman responded to the above email and expressed frustration and disappointment, noting "there are only two academic centers in this area where I could work, and I am already at one of them."

- 14 -

57. Several weeks later, on or about April 5, 2015, the Chief of Cardiothoracic Imaging responded to Plaintiff Dr. Seaman's email, confirming that Defendants and their co-conspirators entered into the agreement expressly to suppress labor prices and competition, in response to a previous attempt by Duke to recruit a number of UNC faculty:

> Dear Danielle,
>
> . . .
>
> In answer to your question, **the "guideline" was generated in response to an attempted recruitment by Duke a couple of years ago of the entire UNC bone marrow transplant team; UNC had to generate a large retention package to keep the team intact**.

(emphasis added.)  On or about the date Plaintiff learned she would not be considered for an Assistant Professor position at UNC, she emailed a colleague employed by the UNC Department of Radiology.  The colleague responded, stating that both the Chief of Cardiothoracic Imaging and the Chairman of the Department of Radiology had confirmed the existence of the no-hire agreement "**between UNC and Duke deans that they would not hire each other's faculty in a lateral move—only way they can hire each other's faculty is if there is an upward move, ie a promotion.**" (Emphasis added.)  In addition to confirming the existence of the agreement, Plaintiff Dr. Seaman's colleague expressed her evaluation that Plaintiff Dr. Seaman was the best applicant for the position, stating: "I told [the Chief of Cardiothoracic Imaging] that you're a way stronger candidate than either of the 2 folks that we have interviewed for the job."

58. Plaintiff Dr. Seaman again emailed her colleague to express interest in applying for an Associate Professor position, which would constitute a promotion from her position as an Assistant Professor, in order to join UNC.  The colleague responded saying that it was highly unlikely she would be able to obtain a promotion:

> Well, I actually thought about it re: your becoming an

- 15 -

associate professor. Don't think I could sell it at this point, it's too soon and you're probably not ready.

59. Due to the agreement between Defendants and their co-conspirators, Plaintiff Dr. Seaman was unable to seek and obtain employment at the other of the two available employers of medical facility faculty in the area, and indeed one of the two largest and most prestigious such employers in North Carolina.

### E. Defendants' Conspiracy Suppressed Wages of Plaintiff And The Proposed Class, and Suppressed Their Mobility.

60. As Plaintiff's experience illustrates, Defendants reduced competition among themselves for certain skilled medical employees by entering into the no-hire agreement alleged herein. Defendants and their co-conspirators entered into, implemented, and policed the no-hire agreement with the intent and effect of fixing the compensation of their medical facility faculty and staff at artificially low levels.

61. First, the no-hire agreement eliminated competitive pressure for the Duke Entities and the UNC Entities to preemptively raise the compensation of Plaintiff and members of the Proposed Class, because there was no threat of attractive positions becoming available at the competing institutions. The no-hire agreement thus artificially depressed compensation for Plaintiff and all members of the Proposed Class.

62. Second, because the agreement eliminated the primary competitors for lateral hires of certain skilled medical employees, the Duke Entities and UNC Entities were relieved from competitive pressure to increase the compensation of Plaintiff and the Proposed Class. Both the Duke Entities and UNC Entities could therefore retain Plaintiff and members of the Proposed Class at artificially depressed compensation levels because even if more highly compensated positions became available at their chief competitor, members of the Proposed Class would be unable to seek those positions.

63. Third, because Defendants and their co-conspirators constitute the preeminent employers for skilled medical labor in the region, the agreement drastically

- 16 -

increased the costs for Plaintiff and others to seek or accept employment elsewhere. To change positions, Plaintiff would have to incur significant relocation costs to work at a similarly regarded institution in another state, or accept employment at a less prestigious institution nearby. Defendants and their co-conspirators were thus able to retain Plaintiff and members of the Proposed Class at artificially low compensation levels by increasing costs associated with changing employers.

64. Defendants' conspiracy was an ideal tool to suppress their employees' compensation. Whereas agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all employees in a common and predictable fashion) was simple to implement and easy to enforce.

65. Plaintiff and members of the Proposed Class were harmed by the no-hire agreement alleged herein. The reduction of competition and suppression of compensation and mobility had a cumulative effect on all members of the Proposed Class.

66. Without this class action, Plaintiff and the Proposed Class have been and will be unable to obtain compensation for the harm they suffered, and Defendants and their co-conspirators will retain the benefits of their unlawful conspiracy.

## FIRST CLAIM FOR RELIEF
### (*Violation of the Sherman Act, § 1*)

67. Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows.

- 17 -

68.     Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Beginning no later than January 1, 2012 and continuing through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

69.     Defendants' and their co-conspirators' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for certain skilled medical employees.

70.     As a direct and proximate result of Defendants' and their co-conspirators' combinations and contracts to restrain trade and eliminate competition for certain skilled medical employees, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

71.     The unlawful agreements between Defendants and their co-conspirators have had the following effects, among others:

        a.     competition among Defendants and their co-conspirators for skilled labor has been suppressed, restrained, and eliminated; and

        b.     Plaintiff and members of the Proposed Class have received lower compensation from Defendants and their co-conspirators than they otherwise would have received in the absence of Defendants' and their co-conspirators' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

72.     The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or

- 18 -

done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

73.    Defendants' and their co-conspirators contracts, combinations and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

74.    Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, a declaration that such agreement is unlawful, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## SECOND CLAIM FOR RELIEF
### *(Violation of N.C. Gen. Stat. §§ 75-1 & 75-2)*

75.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows.

76.    Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.  Beginning no later than January 1, 2012 and continuing at least through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

77.    Defendants' and their co-conspirators' agreements have included concerted action and undertakings among the Defendants and their co-conspirators with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Proposed Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for skilled labor.

1238926.6

78.     As a direct and proximate result of Defendants' and their co-conspirators' combinations and contracts to restrain trade and eliminate competition for certain skilled medical employees, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

79.     The unlawful agreements between Defendants and their co-conspirators have had the following effects, among others:

a.      competition among Defendants and their co-conspirators for certain skilled medical employees has been suppressed, restrained, and eliminated; and

b.      Plaintiff and Class members have received lower compensation from Defendants and their co-conspirators than they otherwise would have received in the absence of Defendants' and their co-conspirators' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

80.     The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

81.     Defendants' and their co-conspirators' contracts, combinations and/or conspiracies are *per se* violations of N.C. Gen. Stat. §§ 75-1 and 75-2.

82.     Accordingly, Plaintiffs and members of the Class seek three times their damages caused by Defendants' violations of N.C. Gen. Stat. §§ 75-1 and 75-2, the costs of bringing suit, reasonable attorneys' fees, a declaration that such agreement is unlawful, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment on her behalf and

1238926.6

that of the Proposed Class by adjudging and decreeing that:

A.      This action may be maintained as a class action, with Plaintiff as the designated Class representative and their counsel as Class counsel;

B.      Defendants and their co-conspirators have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2, and that Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C.      The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2;

D.      Plaintiff and the members of the Proposed Class she represents recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants and their co-conspirators, complained of herein, and that judgment be entered against Defendants for the amount so determined;

E.      Judgment be entered against Defendants and in favor of Plaintiff and each member of the Proposed Class she represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

F.      For prejudgment and post-judgment interest;

G.      For injunctive relief, declaring the no-hire agreement among Defendants and their co-conspirators unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward;

H.      For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.      For attorneys' fees;

J.      For costs of suit; and

K.      For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated:  June 9, 2015                 Respectfully submitted,

    */s/ Robert M. Elliot*
        Robert M. Elliot

Robert M. Elliot
N.C. State Bar No. 7709
ELLIOT MORGAN PARSONAGE, PLLC
426 Old Salem Rd.
Brickenstein-Leinbach House
Winston-Salem, NC  27101
Telephone:  (336) 724-2828
Facsimile:  (336) 724-3335
rmelliot@emplawfirm.com

Kelly M. Dermody (pro hac vice)
Brendan P. Glackin (pro hac vice)
Dean M. Harvey (pro hac vice)
Martin D. Quiñones (pro hac vice)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
kdermody@lchb.com
bglackin@lchb.com
dharvey@lchb.com
mquinones@lchb.com

*Counsel for Plaintiff and the Proposed Class*

1238926.6