# EXHIBIT A

# <u>SETTLEMENT AGREEMENT</u>

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement" or "Settlement") is made and entered into on  August 21, 2017, by and between:  (a) Dr. Danielle Seaman individually and the proposed class of individuals she seeks to represent ("Proposed Settlement Class," defined below), on the one hand; and (b) Defendant Dr. William L. Roper and additional proposed Defendants University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System (collectively, the "Settling Defendants"), on the other hand.

**WHEREAS,** Dr. Seaman is an individual and representative plaintiff in the action captioned *Seaman v. Duke University, et al.*, Case No. 15-cv-00462-CCE-JLW (M.D.N.C.) (the "Action");

**WHEREAS,** on August 21, 2015, Dr. Seaman filed a First Amended Complaint (Dkt. 15) that alleges, among other things, that the Settling Defendants entered into an agreement with Duke University and Duke University Health System, Inc. to restrict hiring from each other in violation of federal and state antitrust laws;

**WHEREAS,** the First Amended Complaint seeks injunctive relief against Dr. Roper in his official capacity, and the Proposed Second Amended Complaint (attached as Exhibit A) seeks injunctive relief against the remaining Settling Defendants;

**WHEREAS**, Dr. Seaman and the Settling Defendants (collectively the "Settling Parties") have engaged in substantial arm's-length negotiations in an effort to resolve all claims that have been, or could have been, asserted in the Action;

**WHEREAS**, the Settling Defendants have denied and continue to deny that they engaged in any wrongdoing of any kind, or that they violated or breached any law,

regulation, or duty owed to Dr. Seaman, and they further deny that they have liability as a result of any and all allegations made in the First Amended Complaint or Proposed Second Amended Complaint. The Settling Defendants are entering into the Settlement Agreement to eliminate the burdens, distractions, expense, and uncertainty of further litigation; and

**WHEREAS,** based on their analysis of the benefits provided to the Proposed Settlement Class by the Settlement Agreement, including the fact that the agreed-upon injunctive relief is substantially broader than the relief that would be provided to Dr. Seaman and the Proposed Settlement Class with respect to the Settling Defendants in the event that Dr. Seaman and the Proposed Settlement Class prevailed at trial against Dr. Roper, and that the discovery cooperation agreed-upon herein will assist Dr. Seaman in her pursuit of damages from the remaining Defendants, Dr. Seaman and her counsel believe that it is in the interests of all members of the Proposed Settlement Class to resolve finally and completely their claims against the Settling Defendants and that the terms of the Settlement Agreement are in the best interests of the Proposed Settlement Class and are fair, reasonable, and adequate; and

**WHEREAS,** the Parties further agree that the Agreement, the fact of this Settlement, any of the terms in the Settlement Agreement, any statement made in the negotiation thereof, and any documents filed in support of the Settlement shall not constitute, or be offered, received, or construed as, an admission, finding, or evidence of (i) wrongdoing, (ii) violation of any statute or law, (iii) liability on the claims or allegations in the Action on the part of any Settling Parties, or (iv) lack of immunity from the claims and allegations in the Action, and shall not be used by any person for any purpose whatsoever

2

in any legal proceeding, including but not limited to arbitrations, other than a proceeding to enforce the terms of the Settlement Agreement.

**NOW, THEREFORE,** in consideration of the promises, agreements, covenants, representations, and warranties set forth herein, and other good and valuable consideration provided for herein, the Settling Parties agree to a full, final and complete settlement of the Action on the following terms and conditions:

## I. GENERAL TERMS OF THE SETTLEMENT AGREEMENT

### A. Definitions

In addition to terms identified and defined elsewhere in this Settlement Agreement, and as used herein, the terms below shall have the following meanings:

1. "Court" means the United States District Court for the Middle District of North Carolina.

2. "Defendants" means Duke University, Duke University Health System, Inc., and Dr. William L. Roper.

3. "Duke" and / or "Duke Defendants" mean Defendants Duke University and Duke University Health System, Inc.

4. "Effective Date" is the effective date of the Settlement Agreement, as defined in Section II.E herein.

5. "Final Approval" means the order of the Court granting final approval of the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e).

6. "Final Approval Hearing" or "Fairness Hearing" means the hearing at which the Court will consider Dr. Seaman's motion for judgment and final approval of the Settlement.

1345570.4

7.     "First Amended Complaint" means the First Amended Complaint filed in the Action on August 12, 2015 (Dkt. 15).

8.     "Notice" means the Notice of Proposed Settlement of Class Action Lawsuit and Fairness Hearing, attached as Exhibit B, which will be emailed to Proposed Class Members and otherwise published as described herein.

9.     "Order and Final Judgment of Dismissal" means the Order which shall be entered by the Court as described in Section II.D herein.

10.    "Preliminary Approval" means the Court's Order preliminarily approving the Settlement, the Plan of Notice, the form of Notice, and other related matters.

11.    "Released Claims" means those claims specified in Section IV.

12.    "Released Parties" means Dr. Roper, the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System, and all of their respective current and former agents, employees, trustees, officers, directors, attorneys, affiliates and governing bodies.

13.    "Settlement," "Agreement," and "Settlement Agreement" each mean the instant settlement terms agreed to by the Settling Parties as reflected in this Settlement Agreement and attachments hereto.

14.    "Settlement Class" means all natural persons employed by Duke University, Duke University Health System, Inc., the University of North Carolina at Chapel Hill (including the University of North Carolina School of Medicine), and the University of North Carolina Health Care System and in the United States from January 1, 2012 through to August 21, 2017 (the "Class Period").  Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior

4

administrators of Defendants and their co-conspirators who entered into the alleged agreements, any Defendant's or Settling Defendant's legal representatives in connection with this action (including any person affiliated with any law firm representing any Defendant or Settling Defendant in connection with this action), and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

15. "Settlement Class Counsel" means the law firms of Lieff Cabraser Heimann & Bernstein, LLP and Elliot Morgan Parsonage, PLLC.

16. "Settling Defendants" means Defendant Dr. William L. Roper and additional proposed Defendants University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System.

17. "Settling Defendants' Counsel" means the law firms of Brooks, Pierce, McLendon, Humphrey & Leonard LLP and Robinson, Bradshaw & Hinson, P.A.

18. "Settling Parties" means Plaintiff Dr. Danielle Seaman, on the one hand, and the Settling Defendants, on the other.

**B.** **Best Efforts to Effectuate the Settlement**

Dr. Seaman and the Settling Defendants agree to cooperate and work together in order to effectuate this Settlement, including after it has received Final Approval, as set forth in Section II.D.

## II. COURT APPROVAL OF SETTLEMENT AND CLASS NOTICE

**A.** **Preliminary Approval and Notice of Settlement**

1. Dr. Seaman, by and through Settlement Class Counsel, shall file with the Court a motion for Preliminary Approval of the Settlement and Exhibits to the Settlement Agreement, which will include a proposed Preliminary Approval Order, a proposed Notice

5

of Proposed Settlement of Class Action Lawsuits and Fairness Hearing ("Notice"), and a proposed Second Amended Complaint. The Settling Defendants will then provide timely notice of such submission pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b).

2.      In the event that the Court preliminarily approves the Settlement, the Settling Parties shall, in accordance with Rule 23(c)(2) of the Federal Rules of Civil Procedure, provide the Settlement Class with Notice as ordered by the Court.

3.      If the Court denies the motion for Preliminary Approval without leave to file a revised motion for Preliminary Approval, and appellate review is not sought or is denied, the case will proceed as if no settlement had been attempted, and the Settling Parties shall be returned to their respective procedural postures, i.e., *status quo* as of August 21, 2017, so that the Settling Parties may take such litigation steps that Dr. Seaman or the Settling Defendants otherwise would have been able to take absent the pendency of this Settlement Agreement.

4.      Within twenty (20) days after the date of the Preliminary Approval Order:

a.      Settlement Class Counsel shall create and maintain a case-specific website containing the notice, settlement agreement, and other relevant case documents, at Settlement Class Counsel's expense.

b.      Settlement Class Counsel and Settling Defendants will jointly issue a press release containing a link to the case-specific website.

c.      At their expense, the Settling Defendants will send an email to their employees who are members of the Settlement Class, informing them of the proposed Settlement, and providing a link to the case-specific website (or, if different, the form of

6

notice ordered by the Court). The email will be in the form previously provided to Settlement Class Counsel.

### B.     <u>Objections</u>

Unless the Court provides otherwise, objections to the Settlement, if any, must be submitted in writing, and must include a detailed description of the basis of the objection. Objections must be mailed to Settlement Class Counsel and be postmarked on or before a date certain to be specified on the Notice, which will be forty-five (45) days after the notice was initially provided. No one may appear at the Final Approval Hearing for the purpose of objecting to the Settlement without first having filed and served his or her objection(s) in writing postmarked on or before forty-five (45) days after the notice was initially provided.

### C.     <u>Certification of Settlement Class</u>

1.      Dr. Seaman, by and through Settlement Class Counsel, shall file with the Court a motion for certification of the Settlement Class, pursuant to Federal Rule of Civil Procedure 23(b)(2), explaining how the Settling Defendants have allegedly "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Solely for purposes of the Settlement, the Settling Parties stipulate and agree to (a) certification of the Action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the Class; (b) certification of Dr. Seaman as Class Representative; and (c) appointment of Settlement Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. Such stipulation and agreement shall not constitute any admission or acknowledgement by the Settling Defendants that certification of a class for trial or for any other purpose is appropriate.

1345570.4

### D. <u>Final Approval</u>

1.      Prior to the Final Approval Hearing, on the date set by the Court, Dr. Seaman, through Settlement Class Counsel, shall submit a motion for final approval by the Court of the Settlement between the Settling Parties and the entry of an Order granting Final Approval of the Settlement that:

      a.      finds the Settlement and its terms to be fair, reasonable and adequate within the meaning of Rule 23(e) of the Federal Rules of Civil Procedure and directing its consummation pursuant to its terms;

      b.      finds that the Notice given constitutes due, adequate and sufficient notice, and meets the requirements of due process and any applicable laws;

      c.      directs that the Action be dismissed with prejudice as against the Settling Defendants, without costs to the Settling Parties;

      d.      approves the release of claims specified herein as binding and effective as to all Settlement Class Members permanently barring and enjoining all Settlement Class Members from asserting any Released Claims (as defined in Section IV);

      e.      reserves exclusive and continuing jurisdiction over the Settlement, and the administration, consummation and interpretation of this Settlement Agreement; and

      f.      directs that an Order and Final Judgment of Dismissal with prejudice be entered as between the Settling Parties in the Action.

2.      If so required by the Court in connection with approval of the Settlement, the Settling Parties agree to accept non-material or procedural changes to this Settlement Agreement.  However, the Settling Parties are not obligated to accept any substantive change to their respective obligations.

8

### E. Effective Date of the Settlement

The Settlement shall become final and effective upon the occurrence of all of the following ("Effective Date"):

1. The Settlement receives Final Approval by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

2. As provided for in Section II.D herein, entry is made of the Order and Final Judgment of Dismissal; and

3. Completion of any appeal(s) from the Court's Order and Final Judgment of Dismissal and/or Order Granting Final Approval of the Settlement (including any such order on remand from a decision of an appeals court). If no appeal is filed from the Court's order finally approving the Settlement under Rule 23(e) of the Federal Rules of Civil Procedure, the Effective Date shall be the date on which the time for any such appeals has lapsed.

## III. CONSIDERATION FOR SETTLEMENT

### A. Injunctive Relief

1. The Settling Defendants agree to the injunctive relief as set forth in the Consent Decree, attached as Exhibit C.

### B. Discovery Cooperation

1. The Settling Defendants, through counsel, agree to make Dr. Roper and up to four other current employees available for one-day informal interviews or depositions (at Plaintiff's discretion), not to exceed seven (7) hours, regarding the issues raised in the First Amended Complaint. Those individuals interviewed (but not deposed) will, if requested, provide truthful declarations regarding knowledge they may have regarding agreement(s) to restrict competition between Duke, UNC, and any other competing

1345570.4

employer for employees, if any, including disclosure to or approval or supervision by officials of the State of North Carolina. Such interviews will be recorded or transcribed, and will take place promptly after Plaintiff has had an opportunity to review the documents and data the Settling Defendants produce. Any interviews or depositions of any such person that have already taken place count against this number.

2. The Settling Defendants, through counsel, will assist Settlement Class Counsel in providing information and data in their possession relevant to the existence of agreements or policies to restrict competition between Duke, UNC, and any other competing employer for employees, if any, including disclosure to or approval or supervision by officials of the State of North Carolina, subject to the Protective Order and consistent with applicable law.

3. That information and data shall include the production of relevant documents (subject to the ESI Stipulation, and the parties' agreement on search parameters (e.g., time period, search terms)) of the following:

      a.      Chancellor Carol Folt;

      b.      Former Chancellor Holden Thorp;

      c.      Former Chancellor James Moeser;

      d.      Executive Vice Chancellor and Provost Jim Dean;

      e.      Former Executive Vice Chancellor and Provost Bruce W. Carney;

      f.      Former Executive Vice Chancellor and Provost Bernadette Gray Little;

      g.      Former Executive Vice Chancellor and Provost Robert Shelton;

      h.      Dr. William Roper;

1345570.4

i.      Dr. Wesley Burks (Executive Dean of the University of North Carolina School of Medicine);

j.      Dr. Jeffrey Houpt (former Dean of the University of North Carolina School of Medicine);

k.      Dr. Marschall Runge (former Executive Dean of the University of North Carolina School of Medicine);

l.      Dr. Paul Molina (Vice Chair of Radiology of the University of North Carolina School of Medicine);

m.      Dr. Matthew Mauro (Chair of Radiology of the University of North Carolina School of Medicine);

n.      Dr. Shelton Earp (Director of UNC Cancer Care; former Director of UNC Lineberger Comprehensive Cancer Center of the University of North Carolina School of Medicine);

o.      Dr. Laura Heyneman (former Associate Professor at the University of North Carolina School of Medicine);

p.      Harvey Lineberry (Associate Dean for Human Resources at the University of North Carolina School of Medicine);

q.      UNC Health Care Board minutes and other materials;

r.      Allen Daugird, President, UNC Health;

s.      Chris Ellington, President, UNC Health Care Network Hospitals; EVP and CFO, UNC Hospitals;

t.      David Strong,  UNC Health Care;

u.      Gary Park, President, UNC Hospitals;

1345570.4

v.     John Lewis, EVP and CFO, UNC Health Care; former COO, UNC

Faculty Physicians; and

w.     William J. Rotella, VP HR, UNC Health Care.

4.     The Settling Defendants agree to use previously agreed-upon search terms applied to all emails collected from the above-listed custodians (except emails from specified email addresses and domains which the parties have agreed may be removed from the review database due to, *e.g.*, lack of relevance), which emails were collected without date restrictions.  The Settling Defendants agree that they will not withhold any responsive document(s) they find on the basis that the document(s) pertain to any hiring or solicitation restriction with educational or medical institutions aside from Duke.  The Settling Defendants previously agreed to provide responsive documents on a rolling basis to be completed 30 days after the parties first entered into a settlement term sheet, and a privilege log regarding all withheld and responsive documents within two weeks after completing production of documents.  The Settling Defendants certified substantial completion of document production on April 24, 2017, and provided a privilege log on May 8, 2017.

5.     Upon request, the Settling Defendants will make one or more witnesses available to authenticate documents they have produced.  Additionally, the Settling Defendants will be available, on an informal basis, to answer questions and provide explanations regarding data sets that are produced such as questions about the definition of terms used in the data, the units of measure contained in the data, and the relationship between data fields, all such communications to be coordinated through counsel for the

1345570.4

Settling Defendants. The Settling Defendants agree to respond to such requests within seven days, which requests should come through counsel.

6. If documents produced or testimony provided in this litigation identifies an individual as having knowledge of an alleged agreement regarding soliciting, hiring, or terms of compensation involving the Settling Defendants, then that individual will be added as a custodian whose relevant documents shall be produced pursuant to the method described in subparagraph III.B.3 above.

7. Further, if documents produced or testimony provided in this litigation identifies up to two additional individuals as having material information about compensation that (i) is relevant to the alleged impact of an agreement regarding soliciting, hiring, or terms of compensation, and (ii) has not already provided to the Plaintiff, then those individuals will be added as a custodian whose relevant documents shall be produced pursuant to the method described in subparagraph III.B.3 above.

8. The Settling Defendants will provide Settlement Class Counsel with the following data reports, subject to the Protective Order and consistent with applicable law:

a. A report containing demographic data about employees of the UNC School of Medicine as of the end of each calendar year from 2007 to present. This report will include each employee's name, job code, job title, compensation (base compensation, supplemental compensation, race, gender, age, total compensation (excluding benefits)), department, and (when available) highest educational degree attained. The Settling Defendants produced this data on April 17 and 27, 2017.

b. A report containing demographic data about employees of the UNC Health Care System as of the end of each calendar year from 2012 to present. This report

1345570.4

will include each employee's name, employee ID, job code, job description, status, compensation (hourly rate, total regular earnings, race, gender, age, and total bonus pay (excluding benefits)), department, and location of the employee's department or group. This report will include data on all employees on the payroll of the UNC Medical Center. It will not include data on employees of other entities within the UNC Health Care System. The Settling Defendants produced this data on May 2, 2017.

c. A report from UNC Health Care System's archived data containing demographic data about employees of the UNC Health Care System as of the end of each calendar year from 2007 to 2011. This report will include each employee's name, employee ID, job code, job description, hourly rate, race, gender, age, and department. The Settling Defendants produced this data on April 27, 2017.

## IV. RELEASE

1. Upon the Effective Date, Dr. Seaman and each member of the Settlement Class (the "Releasors") release all claims against the Released Parties whether federal or state, known or unknown, asserted or unasserted, regardless of legal theory, arising from or related to the facts, activities, or circumstances alleged in the proposed Second Amended Complaint or any other purported agreement to restrict competition for or compensation of Settlement Class Members. For the avoidance of doubt, this agreement shall not be construed to release any local, state, or federal claim arising out of allegations of discrimination, or personal or bodily injury, and shall not be construed to release any product defect, discrimination, or personal or bodily injury, and shall not be construed to release any local, state or federal claim arising out of allegations of unlawful or unpaid overtime, or violations of ERISA or similar statutes that are unrelated to the facts, activities, or circumstances alleged in the proposed Second Amended Complaint.

14

## V.    OTHER CONDITIONS

### A.    Settlement Does Not Become Effective

In the event that the Settlement Agreement is terminated, is not finally approved (following the exhaustion of any appellate review) or does not become effective for any reason, judgment is not entered in accordance with this Agreement, or such judgment does not become final, then (a) this Settlement Agreement shall be null and void and of no force and effect, and (b) any release pursuant to Section IV herein shall be of no force or effect. In such event, the case will proceed as if no settlement has been attempted, and the Settling Defendants shall be returned to their respective procedural postures, i.e., *status quo* as of August 21, 2017, so that the Settling Parties may take such litigation steps that the Settling Parties otherwise would have been able to take absent the pendency of this Settlement.

### B.    Preservation of Rights

The Settling Parties expressly reserve all of their rights, contentions and defenses if this Settlement does not become final and effective in accordance with the terms of this Settlement Agreement.  The Settling Parties further agree that this Settlement Agreement, whether or not it shall become effective pursuant to Section IV.E herein, and any and all negotiations, documents and discussions associated with it shall be without prejudice to the rights of any party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by any Settling Defendant, any Released Party, or any other Defendant, and shall not be deemed or construed to be an admission or evidence of the truth of any of the claims or allegations made in the Action, whether in this case or any other action or proceeding.  The Settling Parties further acknowledge and agree that the negotiations and discussions that led to this Settlement are fully protected from disclosure by Federal Rule of Evidence 408.

1345570.4

C. **Authority to Settle**

The undersigned represent and warrant each has authority to enter into this Settlement Agreement on behalf of the party indicated below his or her name.

D. **No Assignment**

The Settling Parties represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Action or any related action, and they further represent and warrant that they know of no such assignments or transfers on the part of any Settlement Class Member.

E. **Binding Effect**

This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties and the Released Parties.

F. **Mistake**

In entering and making this Agreement, the Settling Parties assume the risk of any mistake of fact or law. If the Settling Parties, or any of them, should later discover that any fact they relied upon in entering into this Agreement is not true, or that their understanding of the facts or law was incorrect, the Settling Parties shall not be entitled to seek rescission of this Agreement, or otherwise attack the validity of the Agreement, based on any such mistake. This Agreement is intended to be final and binding upon the Settling Parties regardless of any mistake of fact or law.

G. **Advice of Counsel**

Except as set forth in this Agreement, the Settling Parties represent and warrant that they have not relied upon or been induced by any representation, statement or disclosure of the other Settling Parties or their attorneys or agents, but have relied upon their own

16

1345570.4

knowledge and judgment and upon the advice and representation of their own counsel in entering into this Agreement. Each Settling Party warrants to the other Settling Parties that it has carefully read this Agreement, knows its contents, and has freely executed it. Each Settling Party, by execution of this Agreement, represents that it has been represented by independent counsel of its choice throughout all negotiations preceding the execution of this Agreement.

## H. Integrated Agreement

This Settlement Agreement, including exhibits, contain the entire, complete, and integrated statement of each and every term and provision of the Settlement Agreement agreed to by and among the Settling Parties. This Settlement Agreement shall not be modified in any respect except by a writing executed by the undersigned in the representative capacities specified, or others who are authorized to act in such representative capacities.

## I. Headings

The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

## J. No Drafting Presumption

All counsel to all Settling Parties hereto have materially participated in the drafting of this Settlement Agreement. No party hereto shall be considered to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

1345570.4

### K. Consent to Jurisdiction and Choice of Exclusive Forum

Any and all disputes arising from or related to the Settlement must be brought by a Settling Defendant, a Released Party, Dr. Seaman, and/or each member of the Settlement Class, exclusively in the Court. Settling Defendants, Dr. Seaman and each member of the Settlement Class hereby irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability or interpretation of this Settlement Agreement, including, without limitation, any suit, action, proceeding or dispute relating to the release provisions herein, except that (a) this paragraph shall not prohibit any Released Party from asserting in the forum in which a claim is brought that the release herein is a defense, in whole or in part, to such claim, and (b) in the event that such a defense is asserted in that forum and this Court determines that it cannot bar the claim, this paragraph shall not prohibit the determination of the merits of the defense in that forum.

### L. Enforcement of Settlement

Nothing in this Settlement Agreement prevents Settling Defendants or any Released Party from enforcing or asserting any release herein, subject to the provisions of Section V.A herein. Notwithstanding any other provision of this Settlement Agreement, this Settlement Agreement and the releases contained herein may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or attempted by Dr. Seaman or a Settlement Class Member with respect to any Released Claims and may be filed, offered and received into evidence and otherwise used for such defense.

1345570.4

**M.**     **Severability**

In the event any one or more of the provisions of this Settlement Agreement shall for any reason be held to be illegal, invalid or unenforceable in any respect, such illegality, invalidity or unenforceability shall not affect any other provision if Settling Defendants' Counsel and Settlement Class Counsel mutually agree to proceed as if such illegal, invalid, or unenforceable provision had never been included in the Settlement Agreement.

**N.**     **Execution in Counterparts**

This Settlement Agreement may be executed in counterparts. Facsimile or PDF signatures shall be considered as valid signatures as of the date they bear.

**O.**     **Calculation of Time**

To the extent that any timeframe set out in this Settlement Agreement is ambiguous, said ambiguity shall be resolved by applying the conventions contained in Rule 6 of the Federal Rules of Civil Procedure.

**P.**     **Representations to the Court About Settlement Negotiations**

The Settling Parties confirm, and will so represent to the Court, that these settlement negotiations were arm's-length and that there are no commitments between the Settling Parties beyond what is in the Settlement. The Settling Parties agree this Settlement is beneficial to the Settlement Class and will not represent otherwise to the Court.

1345570.4

IN WITNESS WHEREOF, the Settling Parties hereto through their fully authorized representatives have agreed to this Settlement Agreement.

**ACCEPTED AND AGREED:**

Dated: August 21, 2017

_____
Dean M. Harvey

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

*Counsel for Plaintiff Dr. Danielle Seaman and the Proposed Settlement Class*

Dated: August 21, 2017

_____
Clinton R. Pinyan

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

*Counsel for Defendant Dr. Roper*

Dated: August 21, 2017

_____
Lawrence C. Moore, III

ROBINSON BRADSHAW & HINSON, P.A.

*Counsel for the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System*

20

1345570.4

IN WITNESS WHEREOF, the Settling Parties hereto through their fully authorized representatives have agreed to this Settlement Agreement.

**ACCEPTED AND AGREED:**

Dated: August 21, 2017

_____
Dean M. Harvey

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

*Counsel for Plaintiff Dr. Danielle Seaman and the
Proposed Settlement Class*

Dated: August 21, 2017

_____
Clinton R. Pinyan

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

*Counsel for Defendant Dr. Roper*

Dated: August 21, 2017

_____
Lawrence C. Moore, III

ROBINSON BRADSHAW & HINSON, P.A.

*Counsel for the University of North Carolina at Chapel
Hill, the University of North Carolina School of
Medicine, and the University of North Carolina Health
Care System*

20

1345570.4

# EXHIBIT A

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

## DURHAM DIVISION

|  |  |
|---|---|
| DANIELLE SEAMAN, individually and on behalf of all others similarly situated,<br><br>       Plaintiff<br><br>   v.<br><br>DUKE UNIVERSITY, DUKE UNIVERSITY HEALTH SYSTEM; THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; THE UNIVERSITY OF NORTH CAROLINA SCHOOL OF MEDICINE; THE UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM; AND WILLIAM L. ROPER; and DOES 1-20,<br><br>       Defendants. | Case No. 1:15-cv-00462-CCE-JLW<br><br><br><br>**SECOND AMENDED COMPLAINT—CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1268092.7

Case 1:15-cv-00462-CCE-JLW   Document 83-1   Filed 08/25/17   Page 24 of 67

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ...................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................2

III.    THE PARTIES...........................................................................................................3

      A.     Plaintiff .........................................................................................................3

      B.     Defendants ....................................................................................................3

      C.     Unnamed Co-Conspirators...........................................................................4

IV.    CLASS ACTION ALLEGATIONS .........................................................................5

V.     FACTUAL ALLEGATIONS ....................................................................................7

      A.     Trade and Commerce ...................................................................................7

      B.     Competition For Medical Facility Faculty and Staff in North Carolina......................................................................................................7

      C.     Defendants and Their Co-Conspirators Entered Into an Ongoing Agreement Not to Hire Each Other's Medical Facility Faculty and Staff..................................................................................................12

      D.     The Agreement Among Defendants and Their Co-Conspirators Was Concealed From All Members of the Proposed Class, Including Plaintiff. .................................................................................13

      E.     Defendants' Conspiracy Suppressed Wages of Plaintiff And The Proposed Class, and Suppressed Their Mobility. ....................................17

FIRST CLAIM FOR RELIEF ...............................................................................................19

SECOND CLAIM FOR RELIEF *(VIOLATION OF THE SHERMAN ACT § 1)* AS TO THE UNC ENTITIES ONLY.........................................................................21

THIRD CLAIM FOR RELIEF ...............................................................................................21

PRAYER FOR RELIEF .........................................................................................................23

JURY DEMAND .....................................................................................................................24

-i-

Plaintiff Danielle M. Seaman, M.D., individually and on behalf of a class of similarly situated individuals, hereby states and alleges the following against Defendants Duke University ("Duke"); Duke University Health System ("DUHS"); Dr. William L. Roper, M.D., M.P.H., in his official capacity as Dean and Vice-Chancellor of Medical Affairs for University of North Carolina at Chapel Hill School of Medicine and Chief Executive Officer of the University of North Carolina Health Care System; the University of North Carolina at Chapel Hill ("UNC"); the University of North Carolina School of Medicine ("UNC School of Medicine"); the University of North Carolina Health Care System ("UNC Health"); and DOES 1-20 (collectively, "Defendants"):

## I.     SUMMARY OF THE ACTION

1.      This class action challenges an illegal conspiracy among Duke, DUHS, Dr. Roper, UNC, UNC School of Medicine, and UNC Health, to suppress the compensation of each organization's employees.  Without the knowledge or consent of their employees, Defendants and senior administrators and deans at Duke, DUHS, UNC, UNC School of Medicine, and UNC Health, entered into express agreements to eliminate or reduce competition among them for skilled medical labor, including medical facility faculty. This conspiracy consists of an agreement that Duke and DUHS will not hire or attempt to hire certain medical facility faculty and staff employed by UNC or UNC Health, and vice-versa.

2.      The intended and actual effect of this agreement is to suppress employee compensation, and to impose unlawful restrictions on employee mobility.  Because Duke/DUHS and UNC/UNC Health are the two largest academic medical systems in North Carolina, and indeed two of the largest employers in the state, their no-hire

- 1 -

agreement has reduced competition for medical facility faculty and certain staff, thereby suppressing faculty and staff pay.

3.      Defendants' conspiracy and agreement has restrained trade, and are *per se* unlawful under federal and North Carolina law.  Plaintiff seeks injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

## II.      <u>JURISDICTION AND VENUE</u>

4.      Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

5.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337, and 1367.

6.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and all Defendants reside in North Carolina.

7.      Defendants are subject to the jurisdiction of this Court because all Defendants are residents of North Carolina and reside in this District.

8.      Defendants Dr. Roper, UNC, UNC School of Medicine, and UNC Health consent to jurisdiction for purposes of the Settlement Agreement and the Consent Decree.

- 2 -

## III. THE PARTIES

### A. Plaintiff

9.     Plaintiff Dr. Danielle M. Seaman is a citizen and resident of the State of North Carolina.  Dr. Seaman is a radiologist specializing in cardiothoracic imaging.

10.    Plaintiff has been and continues to be employed by Duke University as an Assistant Professor of Radiology at Duke University School of Medicine, from 2011 to the present.  Dr. Seaman has been and continues to be injured in her business or property by reason of the violations alleged herein.

### B. Defendants

11.    Defendant Duke University is a private, tax-exempt, non-profit university with its principal place of business in Durham, North Carolina, that owns and operates educational and research facilities, including the Duke University School of Medicine.

12.    Defendant Duke University Health System is a tax-exempt, non-profit corporation organized and controlled by Duke University, with its principal place of business in Durham, North Carolina.  DUHS operates three hospitals in the Raleigh-Durham area, as well as a physician network consisting of twenty primary care physician practices throughout the state and five urgent care facilities in Durham and Wake counties.  DUHS provides hundreds of millions of dollars of financial support to Duke annually, primarily aimed at funding the Duke School of Medicine.

13.    According to DUHS's recent financial statements, "the operating agreement between [Duke] and [DUHS] provides for certain common administrative services, human resources policies and practice, fiduciary responsibility, investment policies, and support for the School of Medicine."

14.    Duke and DUHS are collectively referred to herein as "the Duke Entities."

- 3 -

15.     Defendant Dr. William L. Roper serves in his official capacity as Dean of the UNC Chapel Hill School of Medicine, and Vice-Chancellor of Medical Affairs.

16.     Defendant UNC is a public university incorporated under North Carolina law and a constituent institution of the University of North Carolina System, which was created pursuant to statute by the North Carolina General Assembly.  *See generally* N.C. Gen. Stat. § 116-1, *et seq*.  The UNC School of Medicine is a constituent institution of UNC.  Both UNC and the UNC School of Medicine have their  principal place of business in Chapel Hill, Orange County, North Carolina.

17.     Defendant University of North Carolina Health Care System is an integrated health care system, created by statute and "governed and administered as an affiliate enterprise of The University of North Carolina."  *See* N.C. Gen. Stat. § 116-37.  UNC Health is a large medical services system that includes multiple hospitals, other clinical facilities, and health care services in the Chapel Hill area and across the state.  Its principal place of business is Chapel Hill, Orange County, North Carolina.

18.     UNC, UNC School of Medicine, and UNC Health are collectively referred to herein as "the UNC Entities."

**C.     Unnamed Co-Conspirators**

19.     Plaintiff alleges on information and belief that DOES 1-20, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  DOES 1-20 are residents of the State of North Carolina and are corporate officers, members of the boards of directors and boards of trustees, deans, or senior administrators of Duke University and Duke University Health System.  Plaintiff is presently unaware of the true names and identities

- 4 -

of those defendants sued herein as DOES 1-20.  Plaintiff will amend this Complaint to allege the true names of the DOE defendants when she is able to ascertain them.

## IV.    CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action on behalf of herself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Proposed Class is defined as follows:

> All natural persons employed by Defendants and their co-conspirators in the United States during the period from January 1, 2012 through the present (the "Class Period") as a faculty member, physician, nurse, or other skilled medical employee.  Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior executives of Defendants and their co-conspirators who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

21.    Plaintiff does not, as yet, know the exact size of the Proposed Class because such information is in the exclusive control of Defendants and their co-conspirators. Upon information and belief, based upon the nature of the trade and commerce involved, and the reported numbers of faculty members and medical staff employed by Duke University School of Medicine, Duke University Health System, UNC Chapel Hill School of Medicine, and UNC Health, there are thousands of Class members.  Joinder of all members of the Class, therefore, is not practicable.

22.    The questions of law or fact common to the Class include but are not limited to:

a.    whether Defendants' conduct has violated the Sherman Act;

b.    whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

- 5 -

1268092.7

c.     whether Defendants' conduct has violated N.C. Gen. Stat. §§ 75-1 and 75-2;

d.     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of N.C. Gen. Stat. §§ 75-1 and 75-2;

e.     whether Defendants have fraudulently concealed their conduct;

f.     whether Defendants' conspiracy and associated agreements have restrained trade, commerce, or competition for skilled labor among Defendants and their co-conspirators;

g.     whether Plaintiff and the Proposed Class have suffered antitrust injury or have been threatened with injury;

h.     the difference between the total compensation Plaintiff and the Proposed Class received from Defendants and their co-conspirators, and the total compensation Plaintiff and the Class would have received from Defendants and their co-conspirators in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein; and

i.     the type and measure of damages suffered by Plaintiff and the Proposed Class.

23.     These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

24.     Plaintiff's claims are typical of the claims of the Proposed Class.

25.     Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class.

26.     Plaintiff has retained counsel experienced in antitrust and class action litigation to represent herself and the Proposed Class.

27.     Defendants and their co-conspirators have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

28.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual members of the Proposed Class would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court.

## V.     FACTUAL ALLEGATIONS

### A.     Trade and Commerce

29.     During the Class Period, Defendants and their co-conspirators employed members of the Proposed Class in North Carolina, including in this judicial district.

30.     Conduct by Defendants and their co-conspirators has substantially affected interstate commerce throughout North Carolina and the United States, and has caused antitrust injury throughout North Carolina and the United States.

### B.     Competition For Medical Facility Faculty and Staff in North Carolina

31.     Defendants and their co-conspirators are the dominant and pre-eminent employers of skilled medical labor in North Carolina.

32.     According to statistics self-reported to the American Association of Medical Colleges, Duke employs 196 basic medical research faculty and 1,207 clinical faculty, totaling 1,403 employees.

- 7 -

33.     On its website Duke University states that "[Duke University School of Medicine] consists of more than 2,000 academic and clinical faculty in 33 departments, centers, and Institutes," the large majority of whom are medical doctors and/or scientists. Also according to its website, "Duke is the largest employer in Durham County and the second-largest private employer in North Carolina." While the total number of physicians and medical staff employed by DUHS is not publicly available, Duke's website states that "Duke University Health System has approximately 16,627 full-time employees."

34.     The UNC School of Medicine maintains 512 persons on its payroll. According to statistics self-reported by faculty to the American Association of Medical Colleges, UNC School of Medicine employs approximately 1,500 faculty members, who include physicians employed at UNC's hospitals and UNC Health facilities. According to its website, UNC School of Medicine employs 1,553 full-time faculty and 199 part-time faculty.

35.     In a properly functioning and lawfully competitive labor market, Defendants and would compete for physician faculty members and medical staff by hiring current employees from each other, so-called lateral hiring.

36.     Through lateral hiring, an academic or medical institution is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. By contrast, hiring faculty and staff directly out of a training program—including medical school, residency, fellowship, nursing school, and others—comes with none of those benefits, and the hiring institution must invest significant resources into identifying, assessing, and training new faculty and staff

- 8 -

members.  For these reasons and others, lateral hiring is a key form of competition among academic and medical institutions, particularly for highly trained and highly skilled medical doctors and scientists, as well as specialized and highly trained nursing and technical staff.

37.    Competition for workers via lateral hiring has a significant impact on faculty and staff compensation in a variety of ways.  First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain valuable medical faculty and staff.  If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, or may be receptive to recruiting by a rival employer.  Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all. Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities.  Preemptive retention measures thus lead to increased compensation for all employees.

38.    Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain employees who are likely to join a competitor institution.  This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its faculty and staff by increasing compensation

- 9 -

levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

39. Third, because many staff are highly specialized and integrated into teams tied to specific faculty members and groups, faculty who move to positions at different institutions often bring with them nurses, technicians, and other medical staff. Just as competition forces employers to preemptively raise compensation to retain faculty members who might otherwise seek employment elsewhere, it also encourages increased compensation for related support staff. Thus, increased movement of medical faculty not only increases the compensation for those faculty members, but also for the support staff who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

40. The positive compensation effects of hiring faculty and staff from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the anticompetitive agreements alleged herein. Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all faculty and staff of the participating institutions.

41. Defendants carefully monitor and manage their internal compensation levels to achieve certain goals, including:

   a. maintaining approximate compensation parity among employees within the same employment categories (for example, among Assistant Professors);

   b. maintaining certain compensation relationships among employees across different employment categories (for example, among Assistant Professors relative to Associate Professors);

- 10 -

c.      maintaining high employee morale and productivity;

d.      retaining employees; and

e.      attracting new and talented employees.

42.      To accomplish these objectives, Defendants and their co-conspirators set baseline compensation levels for different employee categories that apply to all employees within those categories. Defendants and their co-conspirators also compare baseline compensation levels across different employee categories. Defendants and their co-conspirators update baseline compensation levels regularly.

43.      While Defendants sometimes engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level. The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it. In either case, suppression of baseline compensation will result in suppression of total compensation.

44.      In addition to compensation and benefits, possibilities for advancement for Defendants' and their co-conspirators' medical faculty are strictly controlled by their respective tenure policies. Although individual faculty members may be considered for appointment or promotion, the timeline and procedures for advancement to tenure-eligible positions and for achieving tenure are controlled by the bylaws and faculty handbooks of Duke and UNC. The highest faculty rank at both Duke and UNC is "Professor," and there is no possibility for promotion above that rank.

45.      Thus, if operating under competitive and lawful conditions, Defendants and their co-conspirators would use lateral hiring as an important tool for recruiting and retaining skilled labor, and the use of lateral hiring among Defendants and

- 11 -

their co-conspirators would impact and increase total compensation and mobility of their employees.

   C.   **Defendants and Their Co-Conspirators Entered Into an Ongoing Agreement Not to Hire Each Other's Medical Facility Faculty and Staff.**

46.    Defendants' conspiracy has consisted of an express agreement between Defendants and their co-conspirators that the Duke Entities and the UNC Entities would not hire certain skilled medical employees, including faculty, employed by the other.  The full scope of the agreement will be determined through discovery.  Upon information and belief, the agreement initially occurred between Nancy C. Andrews, M.D., Ph.D., Dean of Duke School of Medicine, and Defendant Roper.  Dean Andrews also serves as a member of the DUHS Board of Directors, and Dean Roper serves as CEO of UNC Health, as stated above.  The agreement has been recognized, ratified and enforced since that time.  The agreement will be referred to hereafter as the "no-hire agreement."

47.    Defendants and their co-conspirators expressly agreed that the only permitted exception to their agreement would be for faculty who are granted a promotion simultaneous to their hiring.  For example, at both Duke and UNC, a faculty member with the rank of "Assistant Professor" can become eligible over time for promotion to the rank of "Associate Professor."  Under the agreement entered into between Defendants and their co-conspirators, an Assistant Professor at Duke cannot be hired by UNC unless she is hired into a position at the Associate Professor rank or higher, and vice versa.

48.    Because the highest level of advancement for medical faculty at both UNC and Duke is that of "Professor," the agreement not to hire allowed no exception for faculty at that rank.  As to faculty at that rank, the agreement among Defendants and their

- 12 -

co-conspirators constituted a blanket refusal to hire from any other party to the conspiracy.

49.     Defendants entered into the express agreement and entered into the overarching conspiracy with knowledge of the other Defendants' participation and the participation of their co-conspirators, and with the intent of accomplishing the conspiracy's objective: to reduce employee compensation and mobility through eliminating competition for skilled labor.

### D.     The Agreement Among Defendants and Their Co-Conspirators Was Concealed From All Members of the Proposed Class, Including Plaintiff.

50.     Defendants and their co-conspirators actively concealed their anticompetitive agreement from all members of the Proposed Class, including Plaintiff. But for Plaintiff's own experience seeking employment at UNC, and UNC's refusal to hire her because of the no-hire agreement, Plaintiff would remain unaware of its existence.

51.     As summarized below, Plaintiff's experience seeking employment at UNC illustrates the effect of the agreement not to hire on all members of the Proposed Class. In particular, members of the Proposed Class have been and continue to be unable to seek or accept positions for which they are qualified, without their knowledge or consent.

### 1.     Plaintiff Dr. Seaman, While Employed by Duke, Desired and Applied for a Faculty Position at UNC.

52.     On or about December 2011, Plaintiff Dr. Seaman was employed as an Assistant Professor of Radiology at Duke School of Medicine in the Cardiothoracic Imaging group.  At that time, she contacted the Chief of Cardiothoracic Imaging at the UNC Chapel Hill School of Medicine's Radiology Department.  In that email she stated:

- 13 -

"I understand that you are not currently hiring, but may be looking to hire someone in the future. If so, I would certainly be interested."

53. UNC's Chief of Cardiothoracic Imaging responded to Plaintiff's email, stating:

> Danielle,
>
> Thanks very much for sending along your CV, which I have reviewed and will keep in my file.
>
> [A UNC faculty member] speaks very highly of you.
>
> I anticipate having a faculty position open up in our Chest Division beginning July, 2013, although one could become available sooner if [one of two faculty members] decide[s] to retire.
>
> Will keep you in the loop. In the meantime, let me know if you would like to meet informally sometime. Perhaps we could meet over lunch and I could show you around our department.

54. On or about July 2012, UNC's Chief of Cardiothoracic Imaging again emailed Plaintiff regarding the possibility of employment at UNC's School of Medicine. He stated:

> Danielle,
>
> Hope you are well. If you continue to have interest in learning more about a potential future cardiothoracic imaging position at UNC, now would be a good time to meet in person.
>
> Do you have any availability for lunch and informal visit of the department next Wednesday, August 8 or Thursday, August 9?

Following further email exchange, Plaintiff visited the UNC School of Medicine campus on or about August 9, 2012, during which time she toured the Department of Radiology, met with the Chief of Cardiothoracic Imaging, and participated in an informal interview

- 14 -

lunch.

55.     Following Plaintiff's visit to the UNC School of Medicine campus, on or about August 11, 2012, the Chief of Cardiothoracic imaging again emailed her and indicated a desire to hire her should a lateral position become available:

> Danielle,
>
> It was a pleasure meeting and getting to know you. I believe that you would fit in very nicely with our cardiothoracic imaging group at Carolina. I will be sure to keep you apprised should a position become available.

**2.     Plaintiff Dr. Seaman Was Rejected as an Applicant at UNC Explicitly Due to the Agreement Not to Hire, and Was Told She Was Too Junior to Be Considered for a Promotion.**

56.     More than two years later, or about February 2015, Plaintiff again contacted UNC's Chief of Cardiothoracic Imaging, indicating that she was "very interested in applying" for an advertised position as a Thoracic Radiologist at UNC.

57.     The Chief of Cardiothoracic Imaging responded, stating that he was prohibited from hiring her:

> Dear Danielle,
>
> Thank you for your continued interest in our department. I remember you well and certainly enjoyed your previous visit with us.
>
> I agree that you would be a great fit for our cardiothoracic imaging division. Unfortunately, **I just received confirmation today from the Dean's office that lateral moves of faculty between Duke and UNC are not permitted. There is reasoning for this "guideline" which was agreed upon between the deans of UNC and Duke a few years back**. I hope you understand.
>
> Please be assured that your inquiry into our faculty position will continue to be kept in strict confidence by me.
>
> Congratulations on your recent Junior Faculty Teaching Award. I wish you much continued success in your academic

- 15 -

career.

(Emphasis added.)

58.     Plaintiff Dr. Seaman responded to the above email and expressed frustration and disappointment, noting "there are only two academic centers in this area where I could work, and I am already at one of them."

59.     Several weeks later, on or about April 5, 2015, the Chief of Cardiothoracic Imaging responded to Plaintiff Dr. Seaman's email, confirming that Defendants and their co-conspirators entered into the agreement expressly to suppress labor prices and competition, in response to a previous attempt by Duke to recruit a number of UNC faculty:

> Dear Danielle,
>
> . . .
>
> In answer to your question, **the "guideline" was generated in response to an attempted recruitment by Duke a couple of years ago of the entire UNC bone marrow transplant team; UNC had to generate a large retention package to keep the team intact**.

(emphasis added.)  On or about the date Plaintiff learned she would not be considered for an Assistant Professor position at UNC, she emailed a colleague employed by the UNC Department of Radiology.  The colleague responded, stating that both the Chief of Cardiothoracic Imaging and the Chairman of the Department of Radiology had confirmed the existence of the no-hire agreement "**between UNC and Duke deans that they would not hire each other's faculty in a lateral move—only way they can hire each other's faculty is if there is an upward move, ie a promotion.**" (Emphasis added.)  In addition to confirming the existence of the agreement, Plaintiff Dr. Seaman's colleague expressed her evaluation that Plaintiff Dr. Seaman was the best applicant for the position, stating: "I

- 16 -

told [the Chief of Cardiothoracic Imaging] that you're a way stronger candidate than either of the 2 folks that we have interviewed for the job."

60. Plaintiff Dr. Seaman again emailed her colleague to express interest in applying for an Associate Professor position, which would constitute a promotion from her position as an Assistant Professor, in order to join UNC. The colleague responded saying that it was highly unlikely she would be able to obtain a promotion:

> Well, I actually thought about it re: your becoming an associate professor. Don't think I could sell it at this point, it's too soon and you're probably not ready.

61. Due to the agreement between Defendants and their co-conspirators, Plaintiff Dr. Seaman was unable to seek and obtain employment at the other of the two available employers of medical facility faculty in the area, and indeed one of the two largest and most prestigious such employers in North Carolina.

**E.** **Defendants' Conspiracy Suppressed Wages of Plaintiff And The Proposed Class, and Suppressed Their Mobility.**

62. As Plaintiff's experience illustrates, Defendants reduced competition among themselves for certain skilled medical employees by entering into the no-hire agreement alleged herein. Defendants and their co-conspirators entered into, implemented, and policed the no-hire agreement with the intent and effect of fixing the compensation of their medical facility faculty and staff at artificially low levels.

63. First, the no-hire agreement eliminated competitive pressure for the Duke Entities and the UNC Entities to preemptively raise the compensation of Plaintiff and members of the Proposed Class, because there was no threat of attractive positions becoming available at the competing institutions. The no-hire agreement thus artificially depressed compensation for Plaintiff and all members of the Proposed Class.

- 17 -

64.     Second, because the agreement eliminated the primary competitors for lateral hires of certain skilled medical employees, the Duke Entities and UNC Entities were relieved from competitive pressure to increase the compensation of Plaintiff and the Proposed Class.  Both the Duke Entities and UNC Entities could therefore retain Plaintiff and members of the Proposed Class at artificially depressed compensation levels because even if more highly compensated positions became available at their chief competitor, members of the Proposed Class would be unable to seek those positions.

65.     Third, because Defendants and their co-conspirators constitute the preeminent employers for skilled medical labor in the region, the agreement drastically increased the costs for Plaintiff and others to seek or accept employment elsewhere.  To change positions, Plaintiff would have to incur significant relocation costs to work at a similarly regarded institution in another state, or accept employment at a less prestigious institution nearby.  Defendants and their co-conspirators were thus able to retain Plaintiff and members of the Proposed Class at artificially low compensation levels by increasing costs associated with changing employers.

66.     Defendants' conspiracy was an ideal tool to suppress their employees' compensation.  Whereas agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all employees in a common and predictable fashion) was simple to implement and easy to enforce.

67.     Plaintiff and members of the Proposed Class were harmed by the no-hire agreement alleged herein.  The reduction of competition and suppression of

1268092.7

compensation and mobility had a cumulative effect on all members of the Proposed Class.

68.     Without this class action, Plaintiff and the Proposed Class have been and will be unable to obtain compensation for the harm they suffered, and Defendants and their co-conspirators will retain the benefits of their unlawful conspiracy.

**FIRST CLAIM FOR RELIEF**
*(Violation of the Sherman Act, § 1)*
**As to Defendants Duke and DUHS Only**

69.     Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants Duke and DUHS and each of them as follows.

70.     Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Beginning no later than January 1, 2012 and continuing through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

71.     Defendants' and their co-conspirators' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for certain skilled medical employees.

72.     As a direct and proximate result of Defendants' and their co-conspirators' combinations and contracts to restrain trade and eliminate competition for certain skilled

- 19 -

medical employees, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

73.     The unlawful agreements between Defendants and their co-conspirators have had the following effects, among others:

a.     competition among Defendants and their co-conspirators for skilled labor has been suppressed, restrained, and eliminated; and

b.     Plaintiff and members of the Proposed Class have received lower compensation from Defendants and their co-conspirators than they otherwise would have received in the absence of Defendants' and their co-conspirators' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

74.     The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

75.     Defendants' and their co-conspirators contracts, combinations and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

76.     Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, a declaration that such agreement is unlawful, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

- 20 -

## SECOND CLAIM FOR RELIEF
### *(Violation of the Sherman Act § 1)*
### As to the UNC Entities Only

77.     Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows.

78.     In all the acts and omissions alleged herein, Defendant William L. Roper acted in his official capacity as an official of the state of North Carolina.

79.     By entering into and engaging in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the UNC Entities have engaged in and continues to engage in an ongoing violation of federal law.

80.     Accordingly, as to Defendant Roper and the other UNC Entities, Plaintiff and members of the Proposed Class seek a declaration that such agreement is unlawful, and a permanent injunction enjoining the UNC Entities from ever again entering into similar agreements in violation of Section 1 of the Sherman Act, as well as the costs of bringing suit, and reasonable attorneys' fees.


## THIRD CLAIM FOR RELIEF
### *(Violation of N.C. Gen. Stat. §§ 75-1 & 75-2)*
### As to Defendants Duke and DUHS Only

81.     Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants Duke and DUHS, and each of them as follows.

- 21 -

82.     Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.  Beginning no later than January 1, 2012 and continuing at least through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

83.     Defendants' and their co-conspirators' agreements have included concerted action and undertakings among the Defendants and their co-conspirators with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Proposed Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for skilled labor.

84.     As a direct and proximate result of Defendants' and their co-conspirators' combinations and contracts to restrain trade and eliminate competition for certain skilled medical employees, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

85.     The unlawful agreements between Defendants and their co-conspirators have had the following effects, among others:

      a.     competition among Defendants and their co-conspirators for certain skilled medical employees has been suppressed, restrained, and eliminated; and

      b.     Plaintiff and Class members have received lower compensation from Defendants and their co-conspirators than they otherwise would have received in the absence of Defendants' and their co-conspirators' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

- 22 -

86.     The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

87.     Defendants' and their co-conspirators' contracts, combinations and/or conspiracies are *per se* violations of N.C. Gen. Stat. §§ 75-1 and 75-2.

88.     Accordingly, Plaintiff and members of the Class seek three times their damages caused by Defendants' violations of N.C. Gen. Stat. §§ 75-1 and 75-2, the costs of bringing suit, reasonable attorneys' fees, a declaration that such agreement is unlawful, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on her behalf and that of the Proposed Class by adjudging and decreeing that:

A.     This action may be maintained as a class action, with Plaintiff as the designated Class representative and their counsel as Class counsel;

B.     Defendants and their co-conspirators have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2, and that Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C.     The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2;

D.     Plaintiff and the members of the Proposed Class she represents recover threefold the damages determined to have been sustained by them as a result of the

- 23 -

conduct of Defendants and their co-conspirators, complained of herein, and that judgment be entered against Defendants Duke and DUHS for the amount so determined;

E.      Judgment be entered against Defendants Duke and DUHS and in favor of Plaintiff and each member of the Proposed Class she represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

F.      For prejudgment and post-judgment interest;

G.      For injunctive relief, declaring the no-hire agreement among Defendants and their co-conspirators unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward;

H.      For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.      For attorneys' fees;

J.      For costs of suit; and

K.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

- 24 -

Dated: [_____], 2017                    Respectfully submitted,


                                            _____/s/_____
                                                Robert M. Elliot

                                            Robert M. Elliot
                                            N.C. State Bar No. 7709
                                            ELLIOT MORGAN PARSONAGE, PLLC
                                            426 Old Salem Rd.
                                            Brickenstein-Lainbach House
                                            Winston-Salem, NC 27101
                                            Telephone: (336) 724-2828
                                            Facsimile: (336) 724-3335
                                            rmelliot@emplawfirm.com


                                            Kelly M. Dermody (pro hac vice)
                                            Dean M. Harvey (pro hac vice)
                                            Anne B. Shaver (pro hac vice)
                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
                                            San Francisco, CA 94111-3339
                                            Telephone: (415) 956-1000
                                            Facsimile: (415) 956-1008
                                            kdermody@lchb.com
                                            dharvey@lchb.com
                                            ashaver@lchb.com

                                            Abbye R. Klamann (pro hac vice)
                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            250 Hudson Street, 8th Floor
                                            New York, NY 10013-1413
                                            Telephone: (212) 355-9500
                                            Facsimile: (212) 355-9592
                                            aklamann@lchb.com


                                            *Counsel for Plaintiff and the Proposed Class*


                                            - 25 -

# EXHIBIT B

Re: LEGAL NOTICE OF SETTLEMENT OF CLASS ACTION

## NOTICE OF PROPOSED SETTLEMENT OF ANTITRUST CLASS ACTION AND FAIRNESS HEARING

*Dr. Seaman v. Duke University, et al.*, Case No. 15-cv-00462-CCE-JLW (M.D.N.C.)

### *A federal court authorized this Notice. This is not a solicitation from a lawyer.*

**Why did I get this notice?** This Notice is about a proposed partial settlement of a class action lawsuit against Duke University, Duke University Health System, the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Dr. William L. Roper, in his official capacity (together, the "Parties").

The proposed settlement is with the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Dr. William L. Roper (collectively, the "UNC Defendants"). Duke University and Duke University Health System (together, the "Duke Defendants") have not settled. They remain in the case, which is ongoing.

You received this notice because you are a member of the proposed settlement class. To receive more complete information about the proposed settlement, you should visit [WEBSITE].

**What is the case about?** The case challenges an alleged agreement between the Duke Defendants and the UNC Defendants not to compete for certain employees of the other (the "No-Hire Agreement"). Plaintiff Dr. Danielle Seaman filed this case on her own behalf, and on behalf of a proposed class, seeking injunctive relief to end the alleged No-Hire Agreement, and to obtain monetary relief from the Duke Defendants. Dr. Seaman alleges that the No-Hire Agreement violates state and federal antitrust laws, and resulted in suppressed mobility and compensation of certain employees of Duke and UNC. The Duke Defendants and the UNC Defendants deny these allegations. Dr. Seaman is not seeking money damages in the settlement with the UNC Defendants because money damages are not available due to UNC's role as a state agency. However, Seaman's claims for money damages against the Duke Defendants have not been settled, and those claims will continue in the litigation on behalf of the entire proposed Class, whether the Class members worked at Duke or UNC.

**Who is in the Settlement Class?**
All natural persons employed by the Duke Defendants or the UNC Defendants, in the United States, from January 1, 2012 through August 21, 2017. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior administrators of Defendants and their co-conspirators who entered into the alleged agreements, any Defendant's or Settling Defendant's legal representatives in connection with this action (including any person affiliated with any law firm

representing any Defendant or Settling Defendant in connection with this action), and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

**What are the benefits of the settlement?**  The settlement provides for all of the relief that Dr. Seaman would have sought at trial from the UNC Defendants.  First, the UNC Defendants have agreed to implement a variety of measures to ensure that they do not enter into or enforce any unlawful no-hire agreement or similar restraint on competition. The UNC Defendants have agreed not to enforce provisions contained within existing consulting or services agreements that prohibit employee solicitation, except in limited circumstances explained in the settlement.  Second, the settlement requires the UNC Defendants to cooperate in providing documents, data and testimony to Dr. Seaman as she continues to pursue her case against the Duke Defendants.

**Does the settlement provide money to Dr. Seaman or her lawyers?**  No money will be provided to Dr. Seaman or her lawyers as part of this settlement.

**Can I comment on or object to the settlement?**  Yes.  You can comment on or object to the settlement by mailing a written comment or objection to Dean M. Harvey at Lieff, Cabraser, Heimann & Bernstein, LLP, 29th Floor, 275 Battery Street, San Francisco, CA 94111.  Comments or objections must be mailed and postmarked no later than [DATE]. The fairness hearing will be held on [DATE] at [TIME].  The location of the fairness hearing will be Courtroom [_], United States District Court, 324 W. Market Street, Greensboro, NC 27401.  You or your attorney (if you choose to hire one) may appear at the hearing by mailing a notice and entry of appearance to the Court.  Notices and entries of appearance must be mailed and postmarked no later than [DATE].

**Please do not contact the Court, Duke University, Duke University Health System, the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, or Dr. William L. Roper with questions about the settlement.**

# EXHIBIT C

| | |
|---|---|
| DANIELLE SEAMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>DUKE UNIVERSITY, DUKE UNIVERSITY HEALTH SYSTEM; THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; THE UNIVERSITY OF NORTH CAROLINA SCHOOL OF MEDICINE; THE UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM; AND WILLIAM L. ROPER,<br><br>Defendants. | Case No. 1:15-cv-00462<br><br><br>**CONSENT DECREE** |

# I. __INTRODUCTION__

Dr. Danielle Seaman, on her own behalf and on behalf of a proposed settlement class defined herein ("Settlement Class"), agrees to this Consent Decree with the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Dr. William L. Roper in his official capacity as Dean of the University of North Carolina School of Medicine and CEO of the University of North Carolina Health Care System (collectively the "UNC Defendants") (with the UNC Defendants and Dr. Seaman collectively referred to as the "Settling Parties").  The Settling Parties have entered into this Consent Decree to resolve all issues between the Settlement Class and the UNC Defendants, in such a way as to avoid further expensive and protracted litigation.

# II. __STATEMENT OF DISPUTE__

On June 9, 2015, Dr. Seaman filed a complaint against Defendants Duke University and Duke University Health System ("Duke Defendants"), alleging that the Duke Defendants, on the one hand, and the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Dr. William L. Roper, on the other hand, agreed not to hire each other's skilled medical workers (except when a lateral hire would include a promotion, such as hiring an assistant professor into an associate professor position) (the "No-Hire Agreement").  (Dkt. 1.)  Dr. Seaman alleged that the No-Hire Agreement violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes Sections 75-1 and 75-2, and sought injunctive and

monetary relief for herself and for a proposed class.  Dr. Seaman identified Dr. Roper, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System as co-conspirators, but not as Defendants.  (Dkt. 1 at ¶¶ 15-16.)

On August 12, 2015, Dr. Seaman filed a First Amended Complaint alleging an additional claim for injunctive relief against Dr. Roper in his official capacity as Dean of the University of North Carolina School of Medicine and CEO of the University of North Carolina Health Care System.  (Dkt. 15.)  Defendants moved to dismiss the First Amended Complaint, arguing that the alleged No-Hire Agreement was immune from antitrust challenge under the state action doctrine.  (Dkt. 29 and 31.)  Dr. Seaman opposed the motions.  (Dkt. 32)  After oral argument and supplemental briefing, the Court denied the motions to dismiss on February 12, 2016, certified an issue for immediate appeal pursuant to 28 U.S.C. § 1292(b), and stayed discovery.  (Dkt. 39.) Defendants filed petitions for permission to appeal with the Fourth Circuit, and Dr. Seaman filed an answer opposing the petitions.  On June 3, 2016, the Fourth Circuit panel denied Defendants' petition, which also effectively lifted the discovery stay.  (Dkt. 50 and 51.)

The Settling Parties recognize that, while Dr. Seaman pursues her individual and representative claims for monetary relief against the Duke Defendants, the only claim against the UNC Defendants is a claim for injunctive relief against Dr. Roper in his official capacity.  With this Consent Decree, Dr. Roper and the UNC Defendants agree to provide not only the injunctive relief that Dr. Seaman would have sought against Dr.

Roper at trial, but also additional injunctive relief that is significantly broader in scope than what would have been possible even in the event of success at trial. In addition, the UNC Defendants have agreed to provide discovery to Dr. Seaman, to assist in her ongoing pursuit of monetary relief from the Duke Defendants on behalf of herself and the proposed class. In order to effectuate this Consent Decree and the Settlement, Dr. Seaman has filed herewith a proposed Second Amended Complaint that names the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System as additional UNC Defendants (with Dr. Roper).

After careful review and consideration, Dr. Seaman's counsel and Dr. Seaman, for herself and on behalf of the proposed Settlement Class, have concluded that the proposed Settlement, including this Consent Decree, is fair, reasonable, adequate, and provides immediate relief for the Settlement Class. Dr. Seaman's counsel and Dr. Seaman also believe that the Settlement, including this Consent Decree, is in the best interest of the Settlement Class based on all the facts and circumstances.

The UNC Defendants do not admit to any wrongdoing or violation of the law or that they are liable to Dr. Seaman or to any member of the Settlement Class in any way. They have entered into this Consent Decree and the Settlement for the purpose of resolving this litigation. Further, this Consent Decree is not an admission that the UNC Defendants do not have immunity to the claims released.

The Settling Parties consent to the entry of this Decree.

III.    **JURISDICTION**

This Court has jurisdiction over the subject matter of this action and over the UNC Defendants.  The UNC Defendants consent to the exercise of the Court's jurisdiction for the purpose of entering and enforcing this Consent Decree.

IV.    **PROHIBITED CONDUCT**

The UNC Defendants are prohibited from attempting to enter into, entering into, maintaining or enforcing any agreement with any other person to in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, hiring, or otherwise competing for employees of the other person.

V.    **CONDUCT NOT PROHIBITED**

Nothing in Section IV shall prohibit a UNC Defendant and any other person from attempting to enter into, entering into, maintaining or enforcing a no-direct-solicitation provision, provided the no direct solicitation provision is:

1.    contained within existing and future employment or severance agreements with the UNC Defendant's employees;

2.    reasonably necessary for mergers or acquisitions, consummated or unconsummated, investments, or divestitures, including due diligence related thereto;

3.      reasonably necessary for contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies or providers of temporary employees or contract workers;

4.      reasonably necessary for the settlement or compromise of legal disputes; or

5.      reasonably necessary for (i) contracts with providers or recipients of services other than those enumerated in subparagraphs 1 - 4 above; or (ii) the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities.

All no-direct-solicitation provisions that relate to written agreements described above in this Section V, that a UNC Defendant enters into, renews, or affirmatively extends after the date of entry of this Consent Decree shall:

1.      identify, with specificity, the agreement to which it is ancillary;

2.      be narrowly tailored to affect only employees who are anticipated to be directly involved in the agreement;

3.      identify with reasonable specificity the employees who are subject to the agreement;

4.      contain a specific termination date or event; and

5. be signed by all parties to the agreement, including any modifications to the agreement.

For all no-direct-solicitation provisions that relate to unwritten agreements described above in this Section V, that a UNC Defendant enters into, renews, or affirmatively extends after the date of entry of this Consent Decree, the UNC Defendant shall maintain documents sufficient to show:

1. the specific agreement to which the no-direct-solicitation provision is ancillary;

2. the employees, identified with reasonable specificity, who are subject to the no-direct-solicitation provision; and

3. the provision's specific termination date or event.

The UNC Defendants shall not be required to modify or conform, but shall not enforce, any no direct solicitation provision to the extent it violates this Consent Decree if the no direct solicitation provision appears in the UNC Defendants' consulting or services agreements in effect as of the date of this Consent Decree (or in effect as of the time a UNC Defendant acquires an entity that is a party to such an agreement).

Nothing in Section IV shall prohibit a UNC Defendant from unilaterally deciding to adopt a policy not to consider applications from employees of another person, or to solicit, cold call, recruit or hire employees of another person, provided that the UNC Defendants are prohibited from requesting that any other person adopt, enforce, or

maintain such a policy, and are prohibited from pressuring any other person to adopt, enforce, or maintain such a policy.

## VI.    **REQUIRED CONDUCT**

The University of North Carolina at Chapel Hill ("UNC-CH"), the University of North Carolina School of Medicine (the "School of Medicine"), and the University of North Carolina Health Care System ("UNC Health" and, together with UNC-CH and the School of Medicine, the "UNC Entities"), shall:

1. furnish a copy of this Consent Decree within sixty days of entry of the Consent Decree to the chancellor, vice chancellor, vice president for human resources, provost, vice-provosts, deans, and senior associate deans;

2. furnish a copy of this Consent Decree to any person who succeeds to a position described above in this Section VI within thirty days of that succession;

3. annually brief each person described above in this Section VI on the meaning and requirements of this Consent Decree and the antitrust laws;

4. obtain from each person described above in this Section VI, within 60 days of that person's receipt of the Consent Decree, a certification that he or she (i) has read and, to the best of his or her ability, understands and agrees to abide by the terms of this Consent

Decree; (ii) is not aware of any violation of the Consent Decree that has not been reported to a UNC Defendant; and (iii) understands that any person's failure to comply with this Consent Decree may result in civil or criminal contempt of court against each UNC Defendant and/or any person who violates this Consent Decree;

5.    provide employees reasonably accessible notice of the existence of all agreements covered by Section V and entered into by a UNC Defendant;

6.    maintain (i) a copy of all agreements covered by Section V; and (ii) a record of certifications received pursuant to this Section; and

7.    upon written request from Dr. Seaman's counsel, but no more than once annually, provide to Dr. Seaman's counsel a certification verifying compliance with the Consent Decree. Dr. Seaman's counsel shall address such requests as follows: (1) for UNC-CH and the School of Medicine, to: Office of University Counsel, University of North Carolina at Chapel Hill, 222 East Cameron Avenue, 110 Bynum Hall, Campus Box #9105, Chapel Hill, NC 27599-9105; and (2) for UNC Health, to: UNC Health Care System, Legal and Risk Management Department, 101 Manning Drive, Medical Wing E, 2nd Floor, Chapel Hill, NC 27514. Copies of all such requests shall be provided simultaneously to counsel for the UNC Entities, addressed

as follows: Lawrence C. Moore, Esq., Robinson, Bradshaw &

Hinson, P.A., 101 North Tryon Street, Suite 1900, Charlotte, NC

28246 (LMoore@robinsonbradshaw.com). The UNC Entities'

obligation hereunder shall be deemed satisfied by providing Dr.

Seaman's counsel with a signed verification within 30 days of

receipt of the request stating that the relevant institution is at that

time in compliance with the Consent Decree; no further detail from

the UNC Entities shall be required, and Dr. Seaman's counsel is not

entitled under this section to any further inquiry or discovery. Dr.

Seaman's counsel shall make no use of any such verification, or the

failure of the UNC Entities to provide such a verification, other than

in a proceeding to enforce the Consent Decree.

If a chancellor, vice chancellor, provost, vice-provost, vice president for human

resources, dean, or senior associate dean learns of any violation or potential violation of

any of the terms and conditions contained in this Consent Decree, the UNC Defendant

involved shall promptly take appropriate action to terminate or modify the activity so as

to comply with this Consent Decree and maintain all documents related to any violation

or potential violation of this Consent Decree.

## VII. DISCOVERY COOPERATION

The UNC Defendants, through counsel, have agreed to cooperate in providing discovery regarding the ongoing litigation against the Duke Defendants, as provided in the Settlement Agreement filed herewith.

## VIII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Consent Decree to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Consent Decree, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## IX. EXPIRATION OF CONSENT DECREE

Unless this Court grants an extension, this Consent Decree shall expire five (5) years from the date of its approval by the Court.

Dated: August 21, 2017

Dean M. Harvey

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

*Counsel for Plaintiff Dr. Danielle Seaman and the Proposed Settlement Class*

Dated: August 21, 2017

_____

Clinton R. Pinyan

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

*Counsel for Defendant Dr. Roper*

Dated: August 21, 2017

_____

Lawrence C. Moore, III

ROBINSON BRADSHAW & HINSON, P.A.

*Counsel for the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, and the University of North Carolina Health Care System*

Dated: August 21, 2017

_____

Clinton R. Pinyan

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

*Counsel for Defendant Dr. Roper*

Dated: August 21, 2017

_____

Lawrence C. Moore, III

ROBINSON BRADSHAW & HINSON, P.A.

*Counsel for the University of North Carolina at Chapel
Hill, the University of North Carolina School of
Medicine, and the University of North Carolina Health
Care System*