IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DANIELLE SEAMAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:15-CV-462 |
| DUKE UNIVERSITY, DUKE UNIVERSITY HEALTH SYSTEM, WILLIAM L. ROPER, and DOES 1-20, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In 2015, Dr. Danielle Seaman, a radiologist at Duke University, inquired about a posted opening in the UNC radiology department. Via email, the UNC department head told her that he had confirmed that the deans at Duke and UNC had agreed not to permit lateral moves of faculty between Duke and UNC. She has sued Duke and UNC, alleging that this agreement not to hire the other's medical school faculty violates the antitrust laws and suppressed compensation throughout the defendants' medical schools and healthcare facilities. She seeks to certify a class of faculty, physicians, nurses, and skilled medical staff that worked for the defendants.

The plaintiff has met the class certification standards in Rule 23(a) and Rule 23(b)(3) for faculty members. Inclusion of non-faculty in the class, however, would inject issues that cannot be resolved based on the proof offered for the faculty case,

would cause significant confusion at trial, and would raise difficult manageability problems. Therefore, the Court will grant the motion, in part, to certify the proposed class to the extent it includes faculty. The Court will deny the motion for class certification as to all other proposed class members.

## BACKGROUND

The plaintiff Dr. Seaman was an Assistant Professor of Radiology at Duke University School of Medicine from 2011 to 2016. Doc. 85 at ¶ 2. The defendants are Duke University, Duke University Health Systems, Dr. William Roper, the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System and Does 1-20.

Dr. Seaman applied for a position at UNC in 2015. In response, a UNC radiology department chief told her in an email that "lateral moves of faculty between Duke and UNC are not permitted" due to a "'guideline' which was agreed upon between the deans of UNC and Duke a few years back." Doc. 88-62 at 2.

Dr. Seaman alleges that the defendants conspired and agreed that the Duke defendants would not hire or attempt to hire faculty[1] employed by the UNC defendants,

---

[1] Dr. Seaman's expert defines "faculty" to include employees who have an academic appointment at the Duke or UNC Schools of Medicine. Doc. 94 at ¶ 14. There was some question about whether physicians without an academic appointment should be included in the faculty category. The plaintiff is not sure whether the no-hire agreement was applied to physicians without an academic appointment, Doc. 187 at 83-84, and these physicians were included in Dr. Seaman's non-faculty analysis. *See id*. at 6-7. For these reasons, the Court considers physicians that do not have an academic appointment at the Duke or UNC Schools of Medicine to be non-faculty.

and vice-versa.[2]  The only exception to this alleged agreement was for faculty who received a promotion when they were hired.  Doc. 109 at ¶ 47.  Dr. Seaman alleges that the defendants historically have had the no-hire agreement, but that the agreed-to hiring restraints were "tighten[ed] up" in 2012 following the Duke defendants attempt to recruit the UNC bone marrow transplant physician faculty.  Doc. 93 at 17; *see also* Doc. 109 at ¶ 59.  According to Dr. Seaman, the no-hire agreement suppressed compensation for the defendants' faculty, physicians, nurses, and other skilled medical staff.

After discovery on the class certification issue was complete, Dr. Seaman and the UNC defendants settled.  The Court approved the settlement.[3]

As against the Duke defendants and pursuant to Federal Rule of Civil Procedure 23, Dr. Seaman asks the Court to certify the following class:

> All natural persons employed by Defendants and their co-conspirators in the United States during the period from January 1, 2012 through the present (the "Class Period") as a faculty member, physician, nurse, or other skilled medical employee. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior executives

---

[2] In her complaint, Dr. Seaman alleges that the no-hire agreement extended to "skilled medical labor, including medical facility faculty," *see* Doc. 109 at ¶ 1; however, in her class certification briefing and supporting expert reports she only alleges that the no-hire agreement restricted recruitment of faculty. *See, e.g.*, Doc. 93 at 12-20.  At the hearing, Dr. Seaman's counsel confirmed it had no direct evidence of an agreement as to non-faculty and admitted the only circumstantial evidence was the evidence about the agreement as to faculty.  Doc. 187 at 23-24.  The Court will evaluate the facts for purposes of class certification under the more limited allegations provided in Dr. Seaman's class certification briefing.

[3] The Court has approved a class settlement between Dr. Seaman, class plaintiffs, and the following defendants: Dr. William Roper, the University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine and the University of North Carolina Health Care System.  Doc. 185.  Final judgment has been entered on claims between these parties as well.  Doc. 186.  The settlement class has a different class definition from the proposed class at issue in the pending motion. *See* Doc. 81 at 1-2; Doc. 108 at 2-3 (defining settlement class).

of Defendants and their co-conspirators who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

Doc. 87 at 1. Dr. Seaman also asks the Court to appoint her as class representative and Lieff, Cabraser, Heimann & Bernstein, LLP, and Elliot Morgan Parsonage, P.A., as class counsel.

## OVERVIEW OF QUESTION PRESENTED

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).[4] To show that a case falls within the exception, the plaintiff "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

As threshold matters, the putative class representative must show that she is a member of the proposed class, *see* Fed. R. Civ. P. 23(a), and must establish that the members of the proposed class are "readily identifiable" or "ascertainab[le]." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). The plaintiff must then establish that the case satisfies all four requirements of Rule 23(a) and fits into at least one of the three subsections of Rule 23(b). *Comcast*, 569 U.S. at 33. Here, the plaintiff relies on Rule 23(b)(3), which requires that common issues predominate and that a class action is the superior method for resolution of the issues.

---

[4] The Court omits internal citations and quotation marks from all cited cases in this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n. 6 (4th Cir. 2017).

The Duke defendants do not seriously contend that the requirements of Rule 23(a) are not met, and the dispute centers on whether common issues predominate and the related question of manageability. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). To establish an antitrust violation, a plaintiff must prove (1) a violation of antitrust law, (2) impact to the plaintiff caused by the violation, and (3) damages sustained by the plaintiff. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).

Dr. Seaman contends that the predominance requirement is met because all three elements of the antitrust claim—violation, impact, and damages—can be proven with common evidence for all class members. The Duke defendants contend that antitrust impact and damages cannot be proven with common evidence and that individual issues on these claim elements will predominate such that class certification is not appropriate.

**ANALYSIS**

## I. RULE 23(b)

There are two requirements under Rule 23(b)(3): predominance and superiority. *EQT*, 764 F.3d at 357. These requirements relate to the manageability of a class action, which is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise." *See Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977) (en banc). For this reason, trial courts have "a wide range of discretion" in evaluating whether the requirements of Rule 23(b)(3) have been met. *Id.*; *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979) (noting that district courts "have

broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions).

The predominance requirement is satisfied when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *see also* Fed. R. Civ. P. 23(b)(3). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). In practice, the predominance requirement asks whether a trial meant to resolve class-wide issues is manageable or whether it is likely to devolve into a series of mini-trials examining questions specific to individual plaintiffs. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 328-29 (4th Cir. 2006) (upholding district court's denial of class certification).

"The superiority requirement ensures that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Thorn*, 445 F.3d at 319; *see also* Fed. R. Civ. P. 23(b)(3). This inquiry looks at whether the class action "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Dr. Seaman must provide evidentiary proof that the requirements of Rule 23(b)(3) are met. *Comcast*, 569 U.S. at 33. This Court must rigorously assesses that evidence and

make findings as to whether the Rule 23 requirements have been met, *Gariety,* 368 F.3d at 359, and, where necessary, it must "resolve a genuine legal or factual dispute relevant to determining the requirements." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).[5] However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). Rather, "the merits of a claim may be considered only when relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Persuasiveness of the class-wide evidence is, in general, a matter for a jury. *Tyson Foods*, 136 S.Ct at 1049.[6]

## A. Antitrust Violation

Both parties will present common evidence to determine whether the defendants did, or did not, enter into a no-hire agreement that violated Section 1 of the Sherman Antitrust Act. As previously mentioned, Dr. Seaman received an e-mail from a UNC School of Medicine department chief that indicates there was an agreement with Duke not to hire each other's faculty. Doc. 88-62 at 2. In addition, Dr. Seaman will rely on

---

[5] The findings stated in this Order apply only to the motion for class certification. *See Gariety*, 368 F.3d at 366 (noting that if the jury or factfinder's "finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment.").

[6] Of course, if no reasonable juror could believe the class-wide evidence, Dr. Seaman would lack common proof. *Tysons Food*, 136 S. Ct at 1049 (comparing class certification standards to standards for summary judgment and directed verdict). That does not appear to be the case on the current record, and any arguments that Dr. Seaman's evidence fails to prove some elements of her claim can be addressed at summary judgment or at trial. *Id.* at 1047.

testimony from the defendants' employees as well as the defendants' internal and external correspondence discussing recruitment to prove that the no-hire agreement existed and was enforced. *See* Doc. 93 at 12-20 (citing depositions of Dr. Roper, Dr. Molina, John Burness, and defendants' correspondence). Likewise, Duke has indicated that it will dispute the existence of the no-hire agreement with common evidence, such as testimony from the employees alleged to have made and enforced the agreement. *See* Doc. 187 at 78-81. There is no indication that individual questions will arise in determining whether the defendants violated the Sherman Act. The Court finds that the issue of antitrust violation is a common question that will be addressed with common proof for all proposed class members.

### B. Antitrust Impact and Damages for Faculty

#### 1. Impact

Antitrust impact is "injury [that] reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Dr. Seaman asserts that common evidence can be used to demonstrate that the alleged no-hire agreement had an antitrust impact on all or nearly all of the proposed class members because the agreement suppressed the class members' compensation.

Dr. Seaman contends that the no-hire agreement had an antitrust impact on faculty compensation in two ways. First, she asserts that because of the no-hire agreement the UNC and Duke defendants did not have to provide preemptive compensation increases for faculty that otherwise would have been needed to ensure employee retention, which

8

suppressed compensation across the faculty. *See, e.g.*, Doc. 94 at ¶¶ 44, 59, 62, 72, 83 (plaintiff's expert Dr. Leamer explaining economic theory of impact). Second, she asserts that the defendants' internal equity structures—policies and practices that are alleged to have ensured relatively constant compensation relationships between employees— spread the individual harm of decreased lateral offers and corresponding lack of retention offers to all faculty, thus suppressing compensation faculty-wide. *See, e.g.* Doc. 94 at ¶¶ 63, 68, 71, 81-82. Dr. Seaman has presented documentary and testimonial evidence and expert reports that include economic theory, statistical modeling, and data to support her theories, which are summarized below. Collectively, this evidence supports her theories that the alleged no-hire agreement caused preemptive faculty-wide compensation suppression and individual faculty compensation suppression that spread to all faculty through the defendants' internal equity structures.

As explained below, these antitrust impact theories and the proffered evidence in support of the theories are common to all faculty: proving either theory for a single faculty class member would prove it for all, without the need for individual inquiry. The Court therefore finds that Dr. Seaman's theories of anti-trust impact to faculty present common questions for which common proof will be proffered.

### a. The relationship between lateral hiring and faculty compensation

Dr. Seaman offers evidence that the Duke and UNC defendants were unique competitors for faculty who want to remain in the Durham/Chapel Hill area and that restrictions on lateral hiring between the two would limit preemptive and retroactive

compensation increases causing compensation suppression for all faculty.[7] *See* Doc. 93 at 11-12, 21-22. The former President of Duke University and the Dean of the Medical School at UNC acknowledge in their testimony that the Duke and UNC medical schools are each other's closest peers, and an internal Duke analysis shows the Duke medical school's next closest competitor for faculty is 300 miles away. *See* Doc. 96-5 at 6, 9 (deposition testimony of former president of Duke University); Doc. 88-8 at 99 (Dr. Roper testifying that the "amount of [competitive] sensitivity is inverse to the geographic distance"). Further, Dr. Seaman's experts, Dr. Leamer and Dr. Cappelli, reviewed the competitive nature of the relationship between the Duke and UNC medical schools and opined that their geographic proximity and similar rankings makes them each other's main competitors for physicians who want to live in the Durham-Chapel Hill area. *See, e.g.,* Doc. 95 at ¶¶ 22-25; Doc. 94 at ¶¶ 16-24; Doc. 151 at ¶¶ 12-20.

Dr. Leamer and Dr. Cappelli offer opinions about how lateral hiring affects compensation generally and how it applies to the defendants, concluding that lateral hiring competition between the defendants would encourage the defendants to preemptively increase compensation to retain faculty. *See* Doc. 94 at ¶ 57; Doc. 95 at ¶¶ 70-76. Dr. Seaman also provides evidence to corroborate that the general economic theory is applicable to the Duke and UNC defendants, relying on testimony from former

---

[7] The UNC School of Medicine is located approximately 12 and 30 miles from the Duke University Hospital and Duke Raleigh Hospital, respectively. Doc. 94 at ¶ 16. According to the plaintiff's expert, these facilities are located within the same "commuting zone." *Id.* at ¶ 17.

and current Duke employees about the need to increase salaries to prevent lateral moves. *See, e.g.*, Doc. 93 at 21 (citing Doc. 96-56); Doc. 94 at ¶ 62.

This is a class-wide theory supported with class-wide proof.

### b. The relationship between internal equity structures and faculty compensation.

According to Dr. Seaman, the no-hire agreement prevents one defendant's individual faculty member from receiving a lateral offer from the other defendant and consequently also prevents receipt of a corresponding retention offer from the current employer, which would increase that faculty's salary to retain the employee. She does not seek to prove impact on any particular faculty member in this situation, and instead she will rely on experts who opine that this individual faculty compensation suppression was spread to all faculty through the defendants' internal equity structures.

Dr. Leamer and Dr. Cappelli explain that employers reactively increase compensation in response to a competing offer or to address overall attrition rates and that this general economic theory is applicable to the defendants. *See* Doc. 94 at ¶ 57; Doc. 95 at ¶¶ 65-77. Dr. Seaman provides evidence that both defendants have historically increased salaries for faculty to retain them in the face of competing offers. *See* Doc. 93 at 22-23 (explaining examples supported by Docs. 96-28, 96-29, 96-33, 96-35, 96-46, 96-47, 96-61, 88-64); Doc. 93 at 16-17 (discussing Duke's recruitment of UNC's bone marrow transplant team supported by Docs. 96-62, 96-63, 96-88).

Dr. Seaman also provides evidence that the lack of competing offers and corresponding individual compensation suppression was spread to all faculty members

through the defendants' internal equity structures. Dr. Leamer and Dr. Cappelli explain the general economic theory of how lateral hiring increases compensation for employees throughout an organization when that organization manages employee compensation to maintain parity within employment categories or to achieve compensation relationships between employee categories (e.g., Associate Professors to Assistant Professors). Doc. 95 at ¶¶ 43-49; Doc. 94 at ¶¶ 80-83.

Dr. Seaman provides documentary and testimonial evidence that Duke and UNC maintain internal equity structures for faculty. The evidence shows that the UNC defendants have policies that "set[] out identical salary ceilings across 18 departments by professor level" and expects departments "to work towards or maintain average salary profiles by academic rank …; enable recruitment and retention …; [] promote a good morale and sense of fair treatment amongst the faculty;" and consider "internal equity among groups of otherwise similarly-situated individuals in the [medical school] department." Doc. 151 at ¶¶ 33-39 (summarizing evidence). The UNC defendants also perform annual "Salary Equity Review[s]" to "identify[] instances of potential salary inequity amongst like subsets of faculty" and requires an explanation or remedial plan for any inequality that is discovered. *Id.* at ¶ 39.

While the evidence at Duke is less direct, it shows that the Dean of the School of Medicine "signs off" on all department head compensation decisions. *See, e.g.*, Doc. 151 at ¶¶ 46, 49. For both new faculty and adjustments to current faculty's compensation, there is documentary evidence and testimony to support the assertion that internal equity is considered in setting and adjusting compensation, particularly within each department.

*See, e.g.*, Doc. 151 at ¶¶ 46-51, 54; Doc. 150 at ¶¶ 31, 33, 44-48; Doc. 94 at ¶¶ 91, 93, 97-98, 100; Doc. 95 at ¶¶ 54, 58(d), (e).

Finally, Dr. Seaman provides Dr. Leamer's "sharing" regression analyses that examine how an individual faculty member's compensation moved in relationship to other faculty compensation. *See* Doc. 94 at ¶¶ 102-08, 110-11. This analysis shows that there is a correlation between faculty compensation and provides further support for Dr. Seaman's theory that the defendants managed faculty compensation with internal equity structures.

This is a class-wide theory supported with class-wide proof.

### 2. Damages

Dr. Seaman proposes calculating damages attributable to the no-hire agreement in the same manner for all faculty class members and using common evidence from Dr. Leamer about reduced "returns to seniority." "Returns to seniority" are compensation increases associated with increases in experience, i.e., individual faculty members are typically paid more as they obtain more experience. *See* Doc. 94 at ¶¶ 54, 113, 120. Dr. Leamer's calculations provide estimates (one for UNC faculty and one for Duke faculty) of how much returns to seniority are suppressed for all faculty in the presence of the no-hire agreement. *See, e.g.*, Doc. 94 at Figure 9, ¶ 123; Doc. 150 at ¶¶ 113-116 (Dr. Leamer's explanation of how baseline returns to seniority may be calculated based on returns to seniority experienced by new recruits at previous jobs, or by comparing returns to seniority in the class period to pre-class period).

Specifically, Dr. Leamer conducts regression analyses using common data—payroll and other employment records for all faculty—to estimate the suppressed returns to seniority for faculty at UNC and Duke. Doc. 94 at ¶¶ 115-123. Dr. Leamer applies his regression results to the faculty compensation data—common data—to develop an aggregate class-wide damages estimate for faculty. Doc. 94 at ¶ 125, Figure 12. This analysis is consistent with Dr. Seaman's theory of anti-trust impact to faculty—it purports to measure faculty-wide compensation suppression that is attributable to the no-hire agreement, which is the particular antitrust impact that Dr. Seaman alleges. *See Comcast*, 569 U.S. at 37-38.

The Court finds that Dr. Seaman's proposed method for calculating faculty damages presents common questions for faculty and will be based on proof common to the faculty.

### C. Antitrust Impact & Damages for Non-Faculty

#### 1. Impact

As noted, *supra* at n. 2, Dr. Seaman does not seriously contend that the no-hire agreement applied to non-faculty. She does assert that the no-hire agreement as to faculty and the resulting suppression of faculty compensation spread to all non-faculty through the defendants' internal equity structures. This theory presents common questions for a class composed of non-faculty because proving the theory for a single non-faculty class member would prove it for all.

While the economic theory of internal equity on which Dr. Seaman relies is the same for faculty and non-faculty, *see, e.g.*, Doc. 94 at ¶¶ 45, 79, 82, 84 (Dr. Leamer

explaining economic theory of impact that applies to non-faculty), the evidence is different. The documentary and testimonial evidence of internal equity for non-faculty is specific to non-faculty. *See* Doc. 151 at ¶¶ 27-32, 41-44 (summarizing evidence that both Duke and UNC use rigid step-wise pay tiers for non-faculty that provide a mechanism for spreading compensation affects throughout the non-faculty class). Dr. Leamer's non-faculty sharing regression analysis is similar to the faculty sharing regression, but analyzes different compensation metrics. Doc. 94 at ¶¶ 137, 139 (explaining different analyses for faculty and non-faculty). Further, an additional evidentiary step is required for non-faculty: Dr. Leamer's separate regression analysis that purports to show sharing of compensation impacts between faculty and non-faculty. Doc. 94 at ¶¶ 109, 140. This step connects the non-faculty evidence to the no-hire agreement's alleged impact on faculty compensation.

Dr. Seaman's evidence of antitrust impact for non-faculty based on this generalized compensation suppression theory is common to all non-faculty and will not require separate inquiry for individual non-faculty claims. This evidence consists of expert evidence providing economic theory and statistical analysis that is backed up, in part, by documentary and testimonial evidence. The Court finds that, for a class composed of non-faculty, the issue of antitrust impact presents common questions that can be addressed with common proof.

In addition, Dr. Seaman also contends that the no-hire agreement affected a subset of non-faculty more directly because they missed out on compensation increases associated with lateral moves undertaken in connection with a faculty-lead team. *See*

15

Doc. 109 at ¶ 39; Doc. 93 at 24.  She has not articulated how non-faculty compensation overall, as opposed to at an individual level, would be affected under this theory.  Unlike with faculty, there is no evidence that non-faculty received retention offers or preemptory compensation increases in this context, which compensation increases would then be spread to other non-faculty through the internal equity theory discussed *supra*.  At most, Dr. Seaman asserts that faculty sought compensation increases for non-faculty who undertook lateral moves with them, *see* Doc. 93 at 24,[8] but this assertion only supports individualized impact to those faculty members who would have received increased compensation in a lateral move.  She has not offered any expert analysis specific to this theory that indicates class-wide impact.  While the plaintiff's briefing does not fully flesh out this theory, it only appears to support finding impact to individuals and not to non-faculty as a whole or the class as a whole.  The Court finds that this theory of impact does not present a common question or common proof for non-faculty.

## 2. Damages

Dr. Seaman proposes calculating damages attributable to the no-hire agreement in the same manner for all non-faculty class members and using common evidence.  She relies on Dr. Leamer's analysis, which takes the faculty damages analysis and applies an additional step.  He starts with the estimates of how much returns to seniority are suppressed for all faculty in the presence of the no-hire agreement.  He then passes these

---

[8] The Court notes that this appears to be a bald allegation at this stage.  The documentary evidence cited in support, Doc. 93 at 24 n. 58, does not provide any indication or confirmation that faculty seek compensation increases for non-faculty during lateral moves.

estimates through the sharing regression that he calculated in support of finding that faculty compensation suppression spreads to non-faculty. Doc. 94 at ¶¶ 126-27. Finally he applies the results to common non-faculty compensation data to develop an aggregate class-wide damages estimate for non-faculty. Doc. 94 at Figure 13. Dr. Leamer's calculation of non-faculty damages is consistent with Dr. Seaman's internal equity theory of anti-trust impact to non-faculty. *See Comcast*, 569 U.S. at 37-38.

The Court finds that Dr. Seaman's proposed method for calculating damages for non-faculty class members based on an internal equity theory presents common questions for non-faculty and will be based on proof common to the non-faculty.

She has offered no damages evidence in support of her "lateral move with a team" theory. Moreover, it appears that such evidence would be individual, not class-wide.

### D. Weighing Predominance and Superiority

Finding that an antitrust violation is based on common questions and evidence is not sufficient to establish predominance. Rather, this must be considered in relation to the questions and evidence that will be presented for the antitrust impact and damages elements. *See Windham*, 565 F.2d at 66-72 (upholding district court's determination that antitrust violation issue did not predominate in the face of individual impact and damages issues). Even if common questions and proof would predominate, a court may deny certification if class adjudication is not manageable or would be unfair. *See* Fed. R. Civ. P. 23(b)(3) (requiring class action be the superior method "for fairly and efficiently adjudicating the controversy"); *see also Reiter,* 442 U.S. at 345 (recognizing the district

court's discretionary authority to refuse to certify potentially cumbersome class actions with manageability issues).

### 1. Faculty

Dr. Seaman's theories of violation, antitrust impact, and anti-trust damages present common questions for faculty members and she presents common proof to support her claims. There is no indication that Dr. Seaman's proof for faculty is susceptible to individualized inquiry, that it is so unreliable no juror could believe it, or that it is not probative. The Court finds that, with respect to faculty, common questions will predominate over individualized questions. This Court finds that a class action is the superior method of adjudicating the faculty class member claims because the individual damages are insufficient to warrant individual litigation, there are no related cases pending, the forum is convenient, and a unitary adjudication will be more efficient than individual adjudications. *See* Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615; *Thorn*, 445 F.3d at 319.[9]

---

[9] In their briefing, neither Dr. Seaman nor Duke addressed how class-wide damages, if established, would be allocated to individual class members. The Court has considered this issue and does not anticipate that allocation to individual faculty members would create individual issues that predominate over other faculty damages issues, as it appears. That is because Dr. Seaman's theories of impact and her class-wide damages calculations would support a formulaic class-wide approach to distribution of the aggregate class-wide damages using the common employment data. *See In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 1855980, at *16 (D. Md. May 1, 2013) (noting that at class certification "th[e] Court … recognized [class-wide] options for determining individual damages" following an aggregate damages award); Rubenstein, Newberg on Class Actions § 12:2 (5th ed., Dec. 2017 Update).

The Duke defendants identify individual issues that they contend undermine predominance, but none of these individual issues align with Dr. Seaman's theories of liability. Duke's briefing presumes that each class member is seeking damages based on the impact of enforcing the agreement against the individual class member in particular.[10] But "the choice of the injury to assert is in the plaintiff's hands," American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, 8 (3d ed. 2017), and Dr. Seaman chose to assert theories of class-wide impact, not individual impact. Individual issues arising under a theory of liability that Dr. Seaman does not assert do not defeat predominance because there is no reason to think that those issues will present themselves in the adjudication.

Duke also asserts that Dr. Seaman's proposed common proof is unsupported, insufficient, or otherwise flawed and, therefore, that Dr. Seaman has not established that common issues will predominate over individual issues. *See, e.g.*, Doc. 127 at 27-40 (asserting that internal equity structures have not been established), at 23-27 (asserting that unique competitive relationship between Duke and UNC is not present), at 30-41 (asserting that Dr. Leamer's analysis is flawed but not moving to exclude it). Duke does not argue, and this Court does not find, that no reasonable juror could believe Dr.

---

[10] For example, Duke asserts that individualized proof will be required to show that the agreement actually restrained the movement of each particular faculty member and that each faculty member was embedded in the area such that the agreement affected them. Doc. 127 at 20-21, 26-27; *see also* Doc. 187 at 77-78. The fact that there may be some evidence about individual situations does not defeat predominance because the plaintiff's theory does not require her to prove that the movement of every faculty member was restrained or that every faculty member was embedded in the area. Evidence that this was or was not the case for individuals may well be relevant to support or rebut the assumptions underlying the plaintiff's theories. But this is in effect common evidence, and individual questions will not require resolution.

Seaman's common evidence such that her proffered evidence should be disregarded. Duke's assertions, therefore, go to the persuasiveness of Dr. Seaman's evidence and do not negate the fact that her evidence is common proof.

### 2. Non-Faculty

Dr. Seaman's theories and evidence differ between faculty and non-faculty class members. It is apparent from the briefing on this motion and on the plaintiff's motion to exclude defendants' experts that the inclusion of faculty and non-faculty in the same class is likely to cause significant confusion. Disputes already have arisen as to whether witnesses are talking only about faculty, only about non-faculty, or both. *See* Doc. 163 at 22-23. And there are extra steps required for a finding of anti-trust impact and damages as to non-faculty as compared to faculty; these are not minor steps, but include detailed and complicated expert statistical analyses and additional fact witnesses. Moreover, the evidence as to non-faculty is substantially weaker, at least on this record, since it is based on several inferences-on-inferences; this gives rise to the possibility that the strength of the faculty claim or the weakness of the non-faculty claim might tend to bleed over to the other claim in the jury's mind. Finally, the plaintiff has put forth one theory as to non-faculty that seems to be driven by individualized evidence.

Collectively these problems—different evidence, the likelihood of substantial confusion, potential for unfairness at trial, and the possibility of individual issues as to non-faculty—will make it very difficult to manage the class. Trial of the relatively straightforward faculty claims would be unduly complicated and there is a real potential for unfairness to both the class members and the defendant. For these reasons the Court

finds that including non-faculty in the class would defeat predominance and superiority.[11] *Reiter,* 442 U.S. at 345 (recognizing the district court's discretionary authority to refuse to certify potentially cumbersome class actions with manageability issues).

## II.    RULE 23(a)

Duke does not seriously dispute that Dr. Seaman has met the requirements of Rule 23(a).  As the discussion that follows shows, the record is clear that these requirements have been met as to the faculty class.[12]

As an initial matter, the Court finds that Dr. Seaman is a member of the proposed faculty class.  She worked for the defendant Duke University from 2011 until 2016 as a Medical Instructor and Assistant Professor of Radiology.  Doc. 85 at ¶ 2.  The Court also finds that other members of the proposed faculty class are ascertainable.  The defendants keep adequate records of their faculty and those persons are easily identifiable.  *See* Doc. 94 at ¶ 14, Figure 1 (Dr. Leamer's report identifying other members of the class).

### A. Numerosity

The plaintiff's proposed class includes approximately 5,469 faculty members.  *Id.*; Doc. 93 at 27.  Several thousand persons "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *see Cent. Wesleyan Coll. v. W.R. Grace & Co.*,

---

[11] Non-faculty class members may pursue a separate class action and obtain the corresponding economies of time, effort, and expense, and uniformity of decision.  *See Amchem*, 521 U.S. at 615.

[12] Since the Court has concluded that a non-faculty class is not manageable, the Court need not address the Rule 23(a) requirements as to it.

6 F.3d 177, 183 (4th Cir. 1993) (noting district court's finding "that some 480 potential class members would easily satisfy the numerosity requirement"). The proposed class meets the numerosity requirements of Rule 23(a)(1), and the Court so finds.

### B. Commonality

To satisfy the commonality requirements, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require that all, or even most questions be common and "even a single common question will do." *Dukes*, 564 U.S. at 359.

This case presents at least one question common to the faculty—whether the no-hire agreement existed. *See supra* at pp.7-8. This one common issue is sufficient to meet the Rule 23(a)(2) requirements, *see Dukes*, 564 U.S. at 369, and the Court so finds.

### C. Typicality

To satisfy the typicality requirement, the claims of the named plaintiff must be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The typicality requirement is met where the claims asserted by the named plaintiffs arise from the same course of conduct and are based on the same legal theories as the claims of the unnamed class members." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 65 (M.D.N.C. 2008).

In this case, Dr. Seaman's claims and the faculty class members' claims are based on the same alleged facts and legal theory—that a no-hire agreement existed between the defendants and that the agreement injured the faculty by suppressing their compensation and causing monetary damages. Therefore, this Court finds that the typicality requirement of Rule 23(a)(3) is satisfied.

## D. Adequacy

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). It "serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625 & n.20.

Dr. Seaman has declared that she will fairly and adequately represent the interests of the class. She has provided answers to interrogatories and documents in response to discovery, which shows commitment to the case. Doc. 85 at ¶¶ 5-7.

While the parties have not identified any conflicts among the class members' interests, one concern has arisen. The defendants may attempt to assert res judicata to bar future claims that are based on a theory of individual impact and damages attributable to the no-hire agreement.[13] In the Court's view res judicata should not bar future claims based on theories of individual impact and damages because those individual theories are not included in this certification order and may not be brought in this case. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 880 (1984). The risk of any such conflict also is small because there have not been any other antitrust claims brought against the defendants based on the no-hire agreement. The Court finds that this small risk can be

---

[13] For example, the agreement may have suppressed an individual's compensation under Dr. Seaman's theories of class-wide liability, but the agreement also may have impacted and damaged an individual who missed out on increased compensation associated with a lateral move or lateral move offer. The class-wide and individual theories of impact and damages are not mutually exclusive, but only the class-wide theories are being asserted in this case.

managed via a disclosure in the class notice, *see* Doc. 187 at 10-11 (Dr. Seaman's counsel discussing opt-out notice), or other mechanism.

The Court also reviewed qualifications of proposed class counsel, *see* Docs. 83 and 84, and finds that they meet the requirements of Rule 23(g).

Dr. Seaman is an appropriate class representative and Lieff, Cabraser, Heimann & Bernstein, LLP, and Elliot Morgan Parsonage, P.A., are appropriate class counsel. The Court finds the requirements of Rule 23(a)(4) are satisfied.

## CONCLUSION

Dr. Seaman has met the Rule 23 requirements for certification of a class composed of faculty members. She has met the Rule 23(b)(3) requirements by demonstrating that questions and proof common to the faculty will predominate over any individual questions and proof and that class adjudication is the superior method of adjudication for faculty. All of her asserted theories and proposed proof are common to a class composed of faculty. Inclusion of the proposed non-faculty class members would involve differences in proof and would raise significant manageability and fairness issues so that certification of a class including non-faculty is not appropriate.

Dr. Seaman also has met the Rule 23(a) requirements. She established that she is a member of the faculty class and that the other faculty class members are ascertainable. She has established that a class composed of faculty members satisfies the numerosity, commonality, and adequacy of representation requirements of Rule 23(a)(1), (2), and (4). Dr. Seaman is a member of the proposed class and therefore satisfies the typicality requirement of Rule 23(a)(3).

For these reasons, the Court will certify a class of faculty members.

It is **ORDERED** that:

1. The plaintiff's motion for certification of a litigation class, Doc. 87, is

   **GRANTED, in part,** and the following faculty class is certified:

   > All natural persons employed by Defendants and their co-conspirators in the United States during the period from January 1, 2012 through the present (the "Class Period") as a faculty member with an academic appointment at the Duke or UNC Schools of Medicine. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior executives of Defendants and their co-conspirators who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

2. Plaintiff Dr. Danielle Seaman is appointed class representative.

3. Lieff, Cabraser, Heimann & Bernstein, LLP, and Elliot Morgan Parsonage, P.A., are appointed class counsel.

4. The motion is otherwise **DENIED**.

This the 1st day of February, 2018.

UNITED STATES DISTRICT JUDGE