IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DANIELLE SEAMAN, individually )
and on behalf of all others similarly )
situated, )
  )
             Plaintiffs, )         1:15CV462
  )
      v. )
  )
DUKE UNIVERSITY, et. al, )
  )
             Defendant. )

**MEMORANDUM OPINION AND ORDER OF
UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on Plaintiff Danielle Seaman's Motion to Compel Discovery. (Docket Entry 198.) For the following reasons, the Court will GRANT IN PART and DENY IN PART Plaintiff's motion to compel and order Defendants to respond to Plaintiff's discovery requests as set forth below.

## I. BACKGROUND

The Plaintiff Dr. Danielle M. Seaman ("Plaintiff") has been an Assistant Professor of Radiology at Duke University School of Medicine from 2011 to the present. (Pl.'s Second Am. Compl. ¶ 10 (hereinafter "Compl."), Docket Entry 109 at 5.) In 2015, Plaintiff inquired about a posted opening in the UNC radiology department. (*Id.* ¶ 56.) Via email, the UNC department head told her that he had confirmed that the deans at Duke and UNC had agreed not to permit lateral moves of faculty between Duke and UNC. (*Id.* ¶ 57.) Plaintiff alleges that the defendants, Duke University, Duke University Health Systems, Dr. William Roper, the

1

University of North Carolina at Chapel Hill, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Does 1-20, conspired and agreed that the Duke Defendants ("Duke") would not hire or attempt to hire faculty[1] employed by the UNC Defendants, and vice-versa.[2] (*Id.* ¶¶ 46-49.) Plaintiff alleges that the Defendants historically have had the no-hire agreement, but that the agreed-to hiring restraints were "tighten[ed] up" in 2012 following the Duke Defendants' attempt to recruit the UNC bone marrow transplant physician faculty. (Docs. Supp. Mot. Certify Class, Docket Entry 93 at 17; *see also* Compl. ¶ 59.) According to Plaintiff, the no-hire agreement suppressed compensation for the Defendants' faculty, physicians, nurses, and other skilled medical staff. (Compl. ¶¶ 62-68.)

On August 22, 2016, the undersigned approved the parties' joint motion establishing a period for discovery. (*See* Joint 26(f) Report, Docket Entry 56; Docket Entry 57.) Fact discovery was to conclude sixty days from the Court's ruling on Plaintiff's motion for class certification. (Joint 26(f) Report at 3.) The joint report provided, "[r]eports required by Rule 26(a)(2)(B) and disclosures required by Rule 26(a)(2)(C) are due during the discovery period." (*Id.* at 5.) In early August, 2016, Plaintiff served her first set of interrogatories (Harvey Decl. ¶ 4, Docket Entry 66-1 at 2; *id.* Ex. B, Docket Entry 66-3) and first set of requests for

---

[1] In her complaint, Plaintiff alleges that the no-hire agreement extended to "skilled medical labor, including medical facility faculty." (*See* Compl. ¶ 1.) The Court has since certified the following litigation class: "All natural persons employed by Defendants and their co-conspirators in the United States during the period from January 1, 2012 through the present (the "Class Period") as a faculty member with an academic appointment at the Duke or UNC Schools of Medicine." (Docket Entry 189 at 25.)

[2] The only exception to this alleged agreement was for faculty who received a promotion when they were hired. (Compl. ¶ 47.)

2

production of documents (*id.* Ex. A, Docket Entry 66-2) on Defendants Duke University and Duke University Health Systems (collectively, "Duke"). After lengthy discussions, the parties agreed on search terms to utilize in searching electronically stored data ("ESI"). (*See e.g., id.* ¶¶ 13-24; Flatley Decl. ¶¶ 36-48, Mar. 17, 2017, Docket Entry 70; Defs.' Br. Opp. Mot. Compel, Docket Entry 203 at 6-7 & n.4; *id.* Ex. F, Docket Entry 203-6; Pl.'s Stipulation Withdrawal Pl.'s First Mot. Compel, Docket Entry 73.)

In the motion at issue, Plaintiff moves the Court to compel Duke to produce additional documents and ESI. On June 13, 2017, Plaintiff asked Duke to search the ESI of additional custodians[3]—individuals who had been members of the Duke President's cabinet—from 1993 to the present. (Shaver Decl. ¶ 9, Docket Entry 200; Defs.' Br. Opp. Mot. Compel Ex. E, Docket Entry 203-5 at 5-6.) Duke agreed in part[4], but objected to the bulk of Plaintiff's request as overbroad, unduly burdensome, and not proportional to the needs of the case. (Defs.' Br. Opp. Mot. Compel Ex. E, Docket Entry 203-5 at 5.) In a letter dated January 22, 2018, Plaintiff renewed her request and named seventeen specific custodians that had been members of the cabinet during that time period. (Shaver Decl. ¶ 9.) Duke again objected on January 26, 2018. (*Id.*)

---

[3] ESI custodians are individuals "whose electronically-stored information (emails and other electronic files) is searched for relevant discovery using agreed-upon search terms." (Pl.'s Br. Supp. Mot. Compel at 8 & n.2.)

[4] Duke has provided documents responsive to the agreed-upon search terms for the Chancellors of Health Affairs for the years 2004-2005 and 2010-2016. (Defs.' Br. Opp. Mot. Compel at 10.) In addition, Duke agreed to conduct a reasonable search of hard-copy documents from the archived files of a Dr. Ralph Snyderman, Chancellor for Health Affairs from 1989 to 2004, and has agreed to produce any responsive documents from that review." (*Id.* at 10 n.5.) Duke also indicated that it produced some ESI and/or documents from Drs. Keohane and Mr. Burness's. (*Id.* at 8 n.3.)

Plaintiff's second request is for a complete response to her Interrogatory 11. On November 29, 2017, Plaintiff served her second set of interrogatories and second set of requests for production of documents on Duke. (Shaver Decl. ¶ 10.) In pertinent part, Interrogatory 11 asked Duke to identify meetings and communications between the present and former deans of UNC's medical school and Duke's present and former Chancellors for Health Affairs. (*Id.* Ex. F ¶ 11, Docket Entry 200-6 at 12-13.) Plaintiff also asked Duke to produce documents relating or referring to such meetings. (*Id.* Ex. G ¶¶ 46-50, Docket Entry 200-7 at 5-9.) Duke served its responses on December 29, 2017, objecting, generally, that Plaintiff's interrogatories were "vague, ambiguous, confusing, burdensome, harassing, redundant, and/or [sought] to impose duties or responsibilities upon [Duke] beyond those imposed by the Federal Rules of Civil Procedure." (*Id.* ¶ 10; *id.* Ex. G ¶ 1, Docket Entry 200-7 at 1-2.) Specifically, with respect to Interrogatory 11, Duke objected "on the grounds that it is misleading . . . cumulative . . . overbroad and unduly burdensome therefore not proportional to the needs of the case." (*Id.* Ex. F ¶ 11, Docket Entry 200-7 at 13.) On January 17, 2017, Plaintiff notified Duke that its responses were deficient. (*Id.* ¶ 11.) By letter dated February 12, 2017, Duke confirmed that it would not further respond to Interrogatory 11. (*Id.*)

Plaintiff's third request is for information regarding Duke Expert Witness Dr. Pierre-Yves Cremieux's compensation for his services. Dr. Cremieux's report, filed October 23, 2017, disclosed an hourly rate. (Cremieux Report ¶ 5, Docket Entry 123 at 5.) At his deposition, Dr. Cremieux explained that this rate was paid to Analysis Group, the consulting firm by which he is employed; he refused to disclose his own compensation from Analysis

4

Group,. (Pl.'s Br. Supp. Mot. Compel at 11 (citing Shaver Decl. Ex. B, Docket Entry 200-2 at 41:12-16).) In a November 3, 2017 letter, Plaintiff asked Duke to provide this information, and set forth her argument and relevant authority explaining why such information was required by Federal Rules of Civil Procedure. (Shaver Decl. ¶ 12.) On November 9, 2017, Duke stated that it would not provide the requested information (*id.*), and objected that the information was not relevant and the request was overbroad (Defs.' Br. Opp. Mot. Compel Ex. I, Docket Entry 203-9 at 4).

On February 13, 2018, Plaintiff informed Duke that the parties had reached an impasse as to these three requests; in a letter dated February 17, 2018 Duke again stated its opposition to each request. (*Id.* ¶¶ 9, 11, 12.) Duke invited Plaintiff to meet and confer if she had new grounds for her request for additional information and documents in response to Interrogatory 11 beyond those already provided. (Defs.' Br. Opp. Mot. Compel Ex. I, Docket Entry 203-9 at 3.) Duke also invited Plaintiff to meet and confer to discuss the basis of her request for Dr. Cremieux's compensation and to entertain a more moderate request. (*Id.* at 4; Shaver Decl. ¶¶11-12.)

Between November, 2016 and March, 2017, Duke located and produced more than five million documents composed of ESI and hard-copy data from more than eighty-five custodians. (Flatley Decl. ¶¶ 14 & 21, Mar. 1, 2018, Docket Entry 204 at 5.) On February 1, 2018, the Court granted Plaintiff's motion for certification of a litigation class. (Docket Entry 189.) Fact Discovery thus concludes on April 2, 2018. (*See* Joint 26(f) Report, Docket Entry 56; Docket Entry 57.)

## II. DISCUSSION

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. Under the Federal Rules of Civil Procedure (the "Rules"), "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26. Traditionally, the party opposing discovery bears the burden in a discovery dispute. *See Hughes v. Research Triangle Inst.*, No. 1:11CV546, 2014 WL 4384078, at *2 (M.D.N.C. Sept. 3, 2014) (unpublished) (observing that "district judges and magistrate judges in the Fourth Circuit . . . have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion" (citing *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 243–44 (M.D.N.C. 2010))).

Plaintiff now moves the Court to compel Duke to provide or produce (1) additional documents and ESI; (2) a complete response to Interrogatory 11 and related documents; and (3) information relating to Duke's expert economist's compensation. (Pl.'s Br. Supp. Mot. Compel, Docket Entry 199 at 5-6.)

### 1. Documents and ESI

Under the Rules, any party may "serve on any other party a request . . . to produce and permit the requesting party or its representative to inspect, copy, test, or sample [designated documents or electronically stored information] in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a). "The party to whom the request is directed must respond in writing within 30 days after being served." Fed. R. Civ. P. 34(b)(2)(A). "For each item or

category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B).

Here, Plaintiff first seeks additional documents and ESI. (Pl.'s Br. Supp. Mot. Compel at 5, 13-15.) Specifically, Plaintiff asks the Court to compel Duke to search, using previously agreed-to search terms, the documents and ESI of seventeen individuals who serve or served as Duke President or members of the President's "cabinet" since 1993. (*Id.* at 1, 14.)

Plaintiff bases her request on an August, 2015 *Duke Chronicle* article in which John Burness, Duke's Senior Vice President for Public Affairs and Government Relations from 1991 to 2008, and Nannerl Keohane, Duke's President from 1993 to 2004, confirmed respectively that it was Duke's "general rule" to refrain from "recruiting" from or "avoid[ ] poaching" the UNC faculty. (*Id.* at 7 (citing Shaver Decl. Ex. E, Docket Entry 200-5.) In deposition testimony, Mr. Burness and Dr. Keohane indicated that the "general rule" "came out of senior leadership meetings," (*id.* at 7 (quoting Shaver Decl. Ex A, Docket Entry 203-1 at 24:4-16)) and was an "an understanding as a university, as an administration" (*id.* at 8 (quoting Shaver Decl. Ex. C, Docket Entry 203-3 at 51:9-52:8)). Plaintiff therefore argues that documents and ESI of the "senior leadership," that is the President and his or her "cabinet," will provide circumstantial evidence of the alleged conspiracy, and perhaps, its formation. (*Id.* at 8, 14.)[5]

---

[5] The President's "cabinet" is composed of the Provost, the Executive Vice President, the Secretary of the Trustees, the Senior Vice President for Public Affairs and Government Relations, and the Chancellor for Health Affairs. (Pl.'s Br. Supp. Mot. Compel at 7-8.) Plaintiff has identified seventeen individuals who held these positions between 1993 and the present. (*Id.* at 14.)

Duke counters that, with the exception of the Chancellor for Health Affairs, none of the other administrators had any responsibilities to the medical center or any involvement in recruiting or hiring medical faculty. (Defs.' Br. Opp. Mot. Compel at 6-7 (citing *id.* Ex. B, Docket Entry 203-2 at 36:10-37:14; *id.* Ex C, Docket Entry 203-4 at 35:1-4, 65:10-11).) Duke thus argues, first, that the requested information pertains to "an unpleaded 'broader' conspiracy outside the Duke and UNC medical schools" that exceeds the scope of permissible discovery. (Defs.' Br. Opp. Mot. Compel at 5-9.) Second, Duke argues that the potential relevance of this information is outweighed by the burden that would be imposed on Duke to respond. (*Id.*)[6]

To be within the scope of discovery, a fact must be relevant. That is, "'the fact must be germane to a claim or defense alleged in the pleading for information concerning it to be a proper subject of discovery.'" *Columbian Chem. Co. v. AIG Specialty Ins. Co.*, No. 5:14-CV-166, 2015 WL 12755711, at *3 (N.D.W. Va. Sept. 18, 2015) (unpublished) (quoting *In re PE Corp. Sec. Litig.*, 221 F.R.D. 20, 24 (D. Conn. 2003). A plaintiff's allegations "define the extent of [her] claims in [a] case, and, therefore, the appropriate scope of discovery." *Novak v. Pearlstein*, No. 13-CV-8861, 2016 WL 3586899, at *2 (N.D. Ill. June 24, 2016) (unpublished); *see also, e.g., Shanen v. Assurity Life Ins. Co.*, No. 11-80273-CIV, 2011 WL 13228103, at *6 (S.D. Fla. Sept. 7,

---

[6] Duke further argues that Plaintiff's request is "an improper attempt to reopen an issue resolved in connection with [P]laintiff's earlier motion to compel." (Defs.' Br. Opp. Mot. Compel at 9.) Duke explains that Plaintiff previously "moved to compel discovery of information outside of the medical school in March 2017." (*Id.* at 9 n.4.) As here, Duke opposed the motion because such discovery was outside the scope of Plaintiff's allegation. (*Id.*) "Plaintiff withdrew her motion with prejudice after Duke agreed to certain discovery commitments," not including a search of the now-requested information and documents. (*Id.* (citing *id.* Exs. E, Docket Entries 203-6; Pl.'s Br. First Mot. Compel, Docket Entry 66 at 21-23; Defs.' Br. Opp. First Mot. Compel, Docket Entry 71 at 16-18; Pl.'s Stipulation Withdrawal Pl.'s First Mot. Compel, Docket Entry 73 at 2).)

2011) (unpublished) ("[T]he allegations of the pleadings and the issues in the case determine the scope of discovery."). However, "counsel should be forewarned against taking an overly rigid view of the narrowed scope of discovery. While the pleadings will be important, it would be a mistake to argue that no fact may be discovered unless it directly correlates with a factual allegation in the complaint or answer." *Thompson v. Dep't of Hous. & Urban Dev.*, 199 F.R.D. 168, 172 (D. Md. 2001). In antitrust cases, particularly those involving conspiracy, some courts have permitted even greater latitude than the already liberal Rule 26 standard would ordinarily allow. *See B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, No. 01-2410-JAR, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003) (unpublished) (collecting cases). "Particularly where allegations of conspiracy or monopolization are involved . . . broad discovery may be needed to uncover evidence of invidious design, pattern or intent." *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985) citing (*F.T.C. v. Lukens Steel Co.*, 444 F. Supp. 803 (D.D.C. 1977); *Quonset Real Estate Corp. v. Paramount Film Distrib. Corp.*, 50 F.R.D. 240 (S.D.N.Y. 1970)).

Here, the Court is not prepared to conclude that the information sought is not germane to Plaintiff's claims and therefore beyond outside the scope of permissible discovery. Nevertheless, "[e]ven assuming that th[e] information is relevant (in the broadest sense), the simple fact that requested information is discoverable . . . does not mean that discovery must be had. On its own initiative or in response to a motion for protective order under Rule 26(c), a district court *may* limit [discovery] . . . ." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (emphasis added). Moreover, "[a]s a general rule, under Federal Rule of Civil Procedure 26(b)(2)(C)'s proportionality analysis, 'the court *must* limit the frequency and extent of discovery otherwise allowed by these rules . . . if it determines that . . . the burden or expense

9

of the proposed discovery outweighs its likely benefit.'" *CSX Transportation, Inc. v. Peirce*, No. 5:05-CV-202, 2012 WL 12892735, at *5 (N.D.W. Va. July 18, 2012) (unpublished) (emphasis added) (citation omitted).

Plaintiff argues that her request does not impose an undue burden because "[i]t seeks discovery from a narrow, select group of individuals, using already agreed-upon search terms" some of whom "will not even have accessible ESI . . . further lessening any theoretical burden." (Pl.'s Br. Supp. Mot. Compel. at 14.)[7] However, Plaintiff seeks not only ESI, but also documents.[8] (*Id.* at 5.) Duke has indicated that

> given the 25-year time period requested, the Duke Entities would need to collect hard copy data from the University Archives for some or all of the proposed additional custodians. The process of collecting the hard copy archive data would involve having Duke archivists pull boxes for each custodian form the University Archives. The contents of each box are then digitally scanned by a vendor, converted to a searchable format, and loaded to a document review platform for review and coding by the Duke Entities' attorneys.

(Flatley Decl. ¶¶ 29-30, Mar. 1, 2018.) That some of the custodians do not have email would thus appear to add to Duke's burden as opposed to reducing it.

Based on the foregoing, the Court finds that the burden that would be imposed on Duke to respond in full outweighs the potential relevance. However, the following

---

[7] Duke also declared that "[f]or the custodians who have email accounts, the Duke Entities estimate that they would need to collect, on average, approximately 20 gigabytes of data per custodian, or roughly 120,000 documents per custodian." (Flatley Decl. Mar. 1, 2018 ¶ 28.)

[8] Plaintiff's initial request to Duke was to add the president and the president's cabinet members as ESI custodians. (Pl.'s Br. Supp. Mot. Compel at 8.) However, her motion to compel plainly requests "documents," that is, hard-copy documents in Duke's possession, as well as ESI (*id.* at 5, 13).

10

information and documentation, to the extent Duke has not already provided it or agreed to do so, is proportional to the needs of the case: any documents and ESI from the years 1993 to present responsive to the previously-agreed-to search terms for only those of the seventeen named individuals who held the office of President, Senior Vice President for Public Affairs and Government Relations, or Chancellor for Health Affairs.

### 2. Interrogatory 11

Plaintiff next seeks a full response to Interrogatory 11, which asked Duke to identify meetings and communications between the present and former deans of UNC's medical school and Duke's present and former Chancellors for Health Affairs. (Pl.'s Br. Supp. Mot. Compel at 5, 9-10, 15-17.) She also seeks related documents. (*Id.*)

The Rules provide, "a party may serve on any other party . . . written interrogatories." Fed. R. Civ. P. 33(a)(1). "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). "The responding party must serve its answers and any objections within 30 days after being served with the interrogatories." Fed. R. Civ. P. 33(b)(2). The Rules further authorize "[a] party seeking discovery [to] move for an order compelling an answer, designation, production, or inspection" to discovery requests if "a party fails to answer an interrogatory submitted under Rule 33" or "fails to produce documents or fails to respond that inspection will be permitted— or fails to permit inspection—as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B).

Here, Plaintiff served Duke with her second set of interrogatories and production on November 29, 2017. (Shaver Decl. ¶ 10.) Interrogatory 11 asked Duke to

11

> Identify Meetings and communications that took place since January 1, 1997 involving either Dr. Jeffrey Houpt or Dr. William Roper, on the one hand, and any of Dr. Ralph Snyderman, Dr. Victor Dzau, or Dr. A. Eugene Washington, on the other hand, including a) the date and location of each Meeting or the date and form of each communication; b) the name and job titles of all persons who attended each Meeting or who were included in each communication; and c) the subjects discussed at each meeting or in each communication.

(Pl.'s Br. Supp. Mot. Compel Ex. F ¶ 11, Docket Entry 200-6 at 12.) Plaintiff also requested production of all documents relating or referring to such meetings such as agendas, summaries, and documents circulated before or created during the meetings. (*See Id.* Ex. G ¶ 46-50, Docket Entry 200-7 at 5-8.)

Duke primarily objects on the basis that Plaintiff's request is overbroad in that it makes no distinction as to the subject matter of the meetings and communications. (Defs.' Br. Opp. Mot. Compel at 9.) Duke also argues that these requests are unduly burdensome and not proportional to the needs of the case. (*Id.*) Duke contends that "[t]here is no justification for a second review [of already-searched documents] to identify communications unrelated to the subject matter of [P]laintiff's claims." (*Id.* at 10.)[9] The Court agrees.

Plaintiff relies on *In re Shopping Carts Antitrust Litigation*, 95 F.R.D. 299, 307-8 (S.D.N.Y. 1982) and *Board of Education v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 29 (N.D. Ill.

---

[9] Duke has provided documents responsive to the agreed-upon search terms for present and former Chancellors of Health Affairs, Drs. Washington and Dzau for the years 2010 to 2016. (*Id.* at 10.) In response to former UNC Dean Dr. Roper's testimony that he twice discussed a potential agreement relating to the hiring of medical school faculty with Dr. Dzau, Duke also searched Dr. Dzau's email communications for the years 2004 and 2005; no responsive documents were identified. (*Id.* at 11.) In addition, Duke is currently "conducting a reasonable search of hard-copy documents from the archived files of former Chancellor for Health Affairs Dr. Ralph Snyderman, and agreed to produce any responsive documents from that review." (*Id.* at 10 n.5.)

12

1984) for the proposition that "[t]hese interrogatories are of the sort typically permitted in large antitrust cases." (Pl.'s Br. Supp. Mot. Compel at 15 (alteration in the original) (citation omitted).) However, Duke correctly notes that "[t]he interrogatories at issue in those cases were limited to the subject matter of the alleged wrongdoing—price-fixing and bid rigging." (Defs.' Br. Opp. Mot. Compel at 9 (citing *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. at 307 n.7 (interrogatory requesting "identification of meetings or communications involving another defendant or a competitor discussing prices and price related items for shopping carts"); *Bd. of Educ. v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. at 29 n. 9 (interrogatory seeking information about meetings and communications between defendants and competitors "regarding pricing practices, bids, allocation of customers or territories, terms of sales and market conditions").) The Court therefore concludes that without any distinction as to the subject matter of a meeting or communication, Plaintiff's Interrogatory 11 and her related requests for production are overbroad and unduly burdensome. The Court will therefore deny this request.

### 3. Expert Compensation

Third, Plaintiff seeks information regarding to the compensation Duke is providing its expert, Dr. Cremieux. (Pl.'s Br. Supp. Mot. Compel. at 6, 11-12, 17-18.) Unless excused by the Court, agreement of the parties, or Rule 26(a)(1)(B), parties must disclose certain specified information to the other parties in the litigation within 14 days of their Rule 26(f) conference. *See* Fed. R. Civ. P. 26(a)(1)(A), (C). This includes disclosure of the identity of any witness who will present expert testimony at trial. Fed. R. Civ. P. 26(a)(2)(A). Further, where an expert witness "is one retained or specially employed to provide expert testimony in the case or one

whose duties as the party's employee regularly involve giving expert testimony" the disclosure of that witness must be accompanied by a written report. Fed. R. Civ. P. 26(a)(2)(B). That report must contain, among other things, "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi).

As a preliminary matter, this case does not fit any of the Rule 26(a)(1)(B) exemptions from initial disclosure. (*Compare* Compl., *with* Fed. R. Civ. P. 26(a)(1)(B).) Moreover, the parties agreed that "[r]eports required by Rule 26(a)(2)(B) and disclosures required by Rule 26(a)(2)(C) are due during the discovery period." (Joint 26(f) Report, Docket Entry 56 at 5.) Plaintiff contends that although Dr. Cremieux has provided his hourly rate, this information does not satisfy Dr. Cremieux's burden pursuant to the Rules. (Pl.'s Br. Supp. Mot. Compel. at 17-18.) Plaintiff argues that Dr. Cremieux's compensation is relevant and necessary to an "informed assessment of [Dr. Cremieux's] financial interest, credibility, and potential bias . . . ." (*Id.*) Therefore, Plaintiff now seeks (1) "the total amount Analysis Group has billed in connection with this case, through the date of Dr. Cremieux's deposition," (2) "a breakdown of the proportion of Analysis Group's bills that are attributed to Dr. Cremieux's work, versus any work performed in connection with Dr. Baker's opinion," [10] and (3) "the total income Dr. Cremieux, has earned from Analysis Group, for each of the last three years." (*Id.* at 11-12.)

Duke counters that the request is invasive and facially overbroad and that the information sought is neither required by the Rules nor relevant.[11] (Defs.' Br. Opp. Mot.

---

[10] Dr. Baker is Duke's other expert, who also works for Analysis Group. (Pl.'s Br. Supp. Mot. Compel at 12 n.9.)

[11] Duke further argues that Plaintiff failed to meet her obligation to meet and confer on this issue. (Defs.' Br. Opp. Mot. Compel at 14). "Detailed correspondence outlining the deficiencies in

Compel at 12.) Duke bases its objection on Dr. Cremieux's testimony that "he receives his annual salary from Analysis Group, the consulting firm by which he is employed, in an amount 'based on [his] general contribution to the firm.'" (*Id.* (alteration in the original) (citing *id.* Ex. H, Docket Entry 203-8 at 41:2-12, 53:5-17, 59:2-25.) Duke thus alleges that Dr. Cremieux's compensation from Analysis Group is not relevant because "it is 'unrelated to this case in any specific way,' and is in no way dependent on the testimony that he provided or the outcome of this (or any other) case."[12] (*Id.* (citing *id.* Ex. H, Docket Entry 209-8 at 41:8-9; Cremieux Report ¶ 5, Docket Entry 123 at 5).) Duke therefore opposes this request.

---

discovery responses and the reasons the requesting party needs the requested information can satisfy a party's Rule 37(a) conferral obligations if such correspondence permits sufficient time for the opposing party to respond." *Solais v. Vesuvio's II Pizza & Grill, Inc.*, No. 1:15CV227, 2015 WL 6110859, at *9 (M.D.N.C. Oct. 16, 2015) (unpublished) (citing *Kinetic Concepts, Inc.*, 268 F.R.D. at 244–46; *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 197–98 (N.D.W. Va. 2000)). In addition, "courts have implied a futility exception to the meet and confer requirement. For the futility exception to apply, however, a Court must find any attempt to meet and confer would have been futile; otherwise, a motion to compel must be denied for failure to follow the Rules." *Hurley by Hurley v. Potomac Edison Co.*, No. 3:07CV14, 2008 WL 11344676, at *3 (N.D.W. Va. May 15, 2008) (unpublished) (citing *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 356 (N.D. Ill. 2005); *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 CIV. 7590(DAB)JCF, 1998 WL 67672, at *3 (S.D.N.Y. Feb. 18, 1998) (unpublished); *Reidy v. Runyon*, 169 F.R.D. 486, 489 (E.D.N.Y. 1997)). Here, as noted above, Plaintiff set forth her request, argument, and authority for why such information was required by the Rules in a November 3, 2017 letter. (Shaver Decl. ¶ 12.) On November 9, 2017, Duke stated that it would not provide Dr. Cremieux's compensation. (*Id.*) Plaintiff's February 13 letter informed Duke that the parties had reached an impasse. (*Id.*) On February 17, 2018 Duke again opposed Plaintiff's request, but agreed to meet and confer to discuss the basis for Plaintiff's request or entertain a more moderate request. (*Id.*) Here, "[t]he Court would prefer for counsel to have meaningfully conferred . . . but cannot conclude that Defendants failed to satisfy their conferral obligations." *Solais*, 2015 WL 6110859, at *8. Even if the correspondence was insufficient, the Court finds that any attempt to meet and confer would have been futile. Plaintiff has maintained her position that only the above-requested information "would permit an informed assessment of [Dr. Cremieux's] financial interest, credibility and potential bias . . . ." (Pl.'s Br. Supp. Mot. Compel at 17.) Duke has continuously objected to this request, and offered to meet and confer only to entertain a more modest request. (Defs.' Br. Opp Mot. Compel Ex I, Docket Entry 203-9.) The Court thus agrees with Plaintiff that any additional attempt to meet and confer would have been futile.

[12] Duke correctly notes that "before granting a request for *additional information* relating to an expert's compensation," (Defs.' Br. Opp Mot. Compel at 13 (emphasis added)) some courts have

"Although it may be common for attorneys to consider [the Rule 26(a)(2)(B)] requirement satisfied by the disclosure of the expert's hourly rate, the rule on its face refers to the expert's 'compensation,' not to the expert's billing rate." *Amster v. River Capital Int'l Grp., LLC*, No. 00 CIV. 9708 (DCDF), 2002 WL 2031614, at *1 (S.D.N.Y. Sept. 4, 2002) (unpublished). An expert's compensation is relevant to potential bias; that is why it is required as an initial disclosure. *See Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("[N]o intellectually honest argument can be made that the information sought by plaintiff regarding Dr. [Cremieux's] activities as a defense expert witness is not relevant to bias/prejudice impeachment, and, therefore, within the scope of discovery permitted by Rule 26(b)(1)."). However, "[w]hile there may be cases in which an expert's gross income, and the specific amounts thereof earned by providing services as an expert witness, may be discoverable, this should not be ordered routinely, without a showing . . . why less intrusive financial information would not suffice." *Id.* at 561.

Here, based on the above authority, the Court finds Plaintiff's first two requests—for the total amount Analysis Group has billed in connection with this case and a breakdown of

---

required "the movant to demonstrate a basis for inferring bias unrelated to the expert's compensation; for example, courts require demonstration that the expert has a 'direct financial relationship with one of the parties . . . . or with the parties' attorneys'" (*id.* (alterations in the original) (citing *Langbord v. U.S. Dep't of Treasury*, No. CIV.A 06-CV-05315, 2008 WL 4748174, at *5 (E.D. Pa. Oct. 22, 2008) (unpublished))). Duke's reliance on *Langbord* is misplaced. In *Langbord*, the expert *had* disclosed his compensation to plaintiffs. *Langbord*, 2008 WL 4748174, at *6. Plaintiffs then sought *additional information*—for example, documents regarding the expert's relationship with the defendant auction house and his role in the auction of the subject property, as well as documents concerning the expert's communications with publishers, producers, film makers, or television networks concerning Illegal Tender or the subject property. *Id.* at *1 & n.2. Although plaintiffs asserted that these documents would allow them to determine the extent to which the expert had an economic interest in the outcome of this case that could lead to a potential bias, *id.* at *4, the Court denied this request because the expert had sworn that he did not have a financial interest in the outcome of the litigation other than his compensation as an expert, *id.* at *6.

the proportion of Analysis Group's bills that are attributed to Dr. Cremieux's work—are sufficiently narrow and consistent with the Rule's intent. These figures should show the compensation Duke paid Analysis Group in exchange for Dr. Cremieux's study and testimony. However, Dr. Cremieux testified that his personal income cannot be attributable to any one case, and Plaintiff has made no showing of why his direct income is necessary to prove bias. The Court will thus deny Plaintiff's request for disclosure of Dr. Cremieux's total income.

## III. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Plaintiff's motion (Docket Entry 198) is **GRANTED IN PART and DENIED IN PART**. As set forth above, Defendant Duke shall produce to Plaintiff:

(1) on or before **April 30, 2018**, any documents and ESI from the years 1993 to present responsive to the previously-agreed-to search terms for only those of the seventeen named individuals who held the office of President, Senior Vice President for Public Affairs and Government Relations, or Chancellor for Health Affairs; and

(2) on or before **April 15, 2018**, the total amount Analysis Group has billed in connection with this case, through the date of Dr. Cremieux's deposition, and a breakdown of the proportion of Analysis Group's bills that are attributed to Dr. Cremieux's work.

Joe L. Webster
United States Magistrate Judge

March 21, 2018
Durham, North Carolina