IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


DANIELLE SEAMAN, individually *
and on behalf of all others   *
similarly situated,           *   Case No. 1:15CV462
                              *
            Plaintiff,        *
vs.                           *   Greensboro, North Carolina
                              *   March 12, 2019
DUKE UNIVERSITY and DUKE      *   9:30 a.m.
UNIVERSITY HEALTH SYSTEM,     *
                              *
            Defendants.       *
*******************************


**EXPEDITED TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        DEAN M. HARVEY, ESQUIRE
                          BRENDAN P. GLACKIN, ESQUIRE
                          ANNE B. SHAVER, ESQUIRE
                          YAMAN SALAHI, ESQUIRE
                          Lieff Cabraser Heimann & Bernstein,
                          LLP
                          275 Battery Street, 29th Floor
                          San Francisco, CA 94111-3339

                          DANIEL C. LYON, ESQUIRE
                          Elliot Morgan Parsonage, PA
                          426 Old Salem Road
                          Winston-Salem, NC 27101

For the Defendants:       JAMES P. COONEY, III, ESQUIRE
                          SARAH MOTLEY STONE, ESQUIRE
                          Womble Bond Dickinson (US) LLP
                          One Wells Fargo Center, Suite 3500
                          301 S. College Street
                          Charlotte, NC 28202-6037

                          BRENT F. POWELL, ESQUIRE
                          Womble Bond Dickinson (US) LLP
                          One West Fourth Street
                          Winston-Salem, NC 27101

```
 1                              DEREK LUDWIN, ESQUIRE
                               ASHLEY BASS, ESQUIRE
 2                              Covington & Burling, LLP
                               One City Center
 3                              850 Tenth Street, NW
                               Washington, DC 20001
 4
     For Interested Party:     NICKOLAI G. LEVIN, ESQUIRE
 5                             U.S. Department of Justice
                               Antitrust Division
 6                             950 Pennsylvania Avenue, NW
                               Office 3224
 7                             Washington, DC 20530

 8                             LYNNE KLAUER, ESQUIRE
                               Office of the United States Attorney
 9                             101 S. Edgeworth Street, 4th Floor
                               Greensboro, NC 27401
10
     Court Reporter:           Lori Russell, RMR, CRR
11                             P.O. Box 20593
                               Winston-Salem, North Carolina 27120
12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings reported by stenotype reporter.
          Transcript produced by computer-aided transcription.
25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **THE COURT:** Good morning. |
| 3 | (Simultaneous response from counsel.) |
| 4 | **THE COURT:** Two of the clocks in here have not gone |
| 5 | forward and if I get disoriented -- and I can't really see the |
| 6 | one that is right. So if I get disoriented, I'm sure you-all |
| 7 | will tell me what time it is. I am generally oriented to time |
| 8 | and place, but I'm having a little bit of difficulty with these |
| 9 | clocks. |
| 10 | All right. So we're here on Seaman versus Duke, 15CV462, |
| 11 | for hearing on 8,000 pending motions. We've got a lot to do |
| 12 | and cover today. I have had time to prepare, so read and study |
| 13 | the briefs, and what I -- I want to proceed a little bit |
| 14 | differently today. |
| 15 | Because I have had plenty of time to get ready for the |
| 16 | hearing, I'm going to tell you what I'm inclined to do and let |
| 17 | the person on the short end of the stick tell me why that's |
| 18 | wrong. Some of them, you know, as people who sit up here are |
| 19 | inclined to do, are going to chop the baby up into little tiny |
| 20 | pieces and -- so we may have to hear from you about the |
| 21 | parameters on some of these expert motions. But that's what I |
| 22 | anticipate doing. |
| 23 | So in a second, I'll have everybody tell me who they are |
| 24 | just so I can remember your names and keep you straight. |
| 25 | I want to begin with the two motions Duke has filed |

1  recently asking to -- for permission to file another brief in

2  response to the Government's brief and suggesting I ask the

3  State of North Carolina to file an amicus brief, and I'll give

4  somebody at Duke's table five minutes to address both of

5  those -- one five-minute slot to address both of those.

6      Then we'll turn to the motion where I have the most

7  questions, because I want to get that one in first, and that's

8  the motion to exclude the testimony of Dr. Leamer and -- and

9  then we'll turn to the others, and we'll divide things up by

10 issue.

11     I do anticipate handling Dr. Baker and Professor Hemphill

12 at the same time because it was kind of strange reading those

13 briefs.  You-all took positions that don't completely seem

14 consistent.  You know, the Plaintiff wants to keep out

15 professor -- let's see -- Dr. Baker but let Professor Hemphill

16 in, and there's some of the same problems and the same for the

17 Defendant, at least as I read the briefs.  So we'll do that

18 then.

19     So for Dr. Leamer, my main question -- my first main

20 question is about his calculation of damages and that's what I

21 want to address first because that got not a huge amount of

22 attention in the briefs and it seems to me that the Plaintiff

23 is trying to get damages for time outside the class period.  So

24 I want the Plaintiff to explain to me why that is not the case

25 if it is not because it seems like it is.  So we'll do that

1    first.

2        Then we'll talk about the rest of Dr. Leamer's opinions.

3    I'm inclined to let those in, but I am a bit -- you know, I

4    want to get straight in my head what he's saying about these

5    benchmarks or yardsticks -- you all used different words, I

6    assume it's the same thing -- and be sure I understand what the

7    Plaintiff is going to be presenting to the jury about the UT

8    yardstick, this zero benchmark; why both of those can be

9    reliable when they're pretty far apart.  So I want the

10   Plaintiff to explain that to me, but I'm -- nonetheless,

11   despite those questions, I'm inclined to let his testimony in,

12   so Duke will get a chance to tell me why I shouldn't.

13       Then we'll talk about the per se/rule of reason issue, the

14   immunity issue, and the causation/antitrust impact issue.  On

15   all of those, I'm inclined to rule for the Plaintiff, so Duke

16   can tell me why I shouldn't.  But we'll go through them one by

17   one.

18       I am inclined to rule for the Hospital System on their

19   motion -- I'm calling it in my own mind the participation

20   motion -- because it does not seem to me that the Plaintiff has

21   got enough evidence to keep them in the case, but I'll give the

22   Plaintiff a chance to say why that's not so.

23       On the expert motions, of course, I think the law is pretty

24   clear.  I will not allow any expert to offer opinions about the

25   intent of a party or a witness.  I don't see that this is a

1  case where a witness can offer opinions on legal questions.

2  That said, I think the case law is pretty clear that a witness

3  can testify this evidence is consistent with or corroborates --

4  actually, I don't even like "corroborates."  But this evidence

5  is consistent with these factors that the experts talk about as

6  showing an agreement and such.  We'll work through that.  But I

7  am not going to let any expert get up on the witness stand and

8  make a closing argument.  So I'm not going to let Dr. Baker do

9  it and I'm not going to let Professor Hemphill do it and we'll

10  talk about how they can -- you know, that said, they can

11  clearly discuss the evidence to some extent, but no closing

12  arguments from experts.

13      Nobody should expect more than 15 minutes per issue.  I'm

14  not going to give the Government 15 minutes and the Plaintiff

15  15 minutes on the issues the Government is interested in.  We

16  don't have enough time for that.  But I do want to give people

17  an opportunity to be heard within the bounds of time today.  I

18  do have another matter at three o'clock, so I hope we'll be

19  done by then.

20      Okay.  That's my plan for the day.

21      Who's here for the Plaintiff?

22          **MR. HARVEY:**  Dean Harvey of Lieff Cabraser Heimann &

23  Bernstein for the Plaintiff, Your Honor.

24          **MR. GLACKIN:**  Brendan Glackin, Lieff Cabraser.

25          **MS. SHAVER:**  Anne Shaver, Lieff Cabraser.

1        **MR. SALAHI:**  Yaman Salahi, Lieff Cabraser.

2        **MR. LYON:**  Daniel Lyon, Elliot Morgan Parsonage, local

3   counsel.

4        **THE COURT:**  Okay.  Anybody else here for you-all?

5        **MR. HARVEY:**  No.

6        **THE COURT:**  Okay.  And I did forget -- let's see.

7   Who's going to be talking about what for the Plaintiff?

8        **MR. HARVEY:**  There are four of us ready to argue, Your

9   Honor, on the 10,000 motions that are at issue.  I was planning

10  to take the lead on the per se motion and the Leamer *Daubert*.

11  Mr. Glackin is intending to argue the Dr. Hemphill *Daubert*.

12  Ms. Shaver is going to argue the -- our affirmative motion with

13  respect to Dr. Baker, our response to Duke's motion as to

14  Dr. Cappelli, and Duke's motion for summary judgment on

15  causation.  Mr. Salahi is going to argue the Duke University

16  Health System motion for summary judgment and the state action

17  cross-motions for summary judgment.

18        **THE COURT:**  Thank you.

19     Okay.  Who's here for Duke?

20        **MR. COONEY:**  Jim Cooney with Womble Bond Dickinson.

21        **MS. BASS:**  Ashley Bass, Covington and Burling.

22        **MR. LUDWIN:**  Derek Ludwin, Covington and Burling.

23        **MR. POWELL:**  Brent Powell, Womble Bond Dickinson.

24        **MS. STONE:**  Sarah Stone, Womble Bond Dickinson.

25        **THE COURT:**  All right.  And who is going to argue what

 1  for you-all?

 2        **MR. COONEY:**  We're going to split the arguments

 3  between two of us, Your Honor.  So I will -- going in the order

 4  that Your Honor proposed it, I will be arguing the Dr. Leamer

 5  motion and all those issues.  Ms. Bass will be arguing the

 6  per se/rule of reason.  I will be arguing the state action

 7  immunity, the causation impact, and the DUHS participation

 8  motion.  Ms. Bass will be arguing the Plaintiff's motion about

 9  Dr. Baker, and I will be arguing the motions concerning

10  Dr. Cappelli and Dr. Hemphill.

11        **THE COURT:**  All right.  You-all are going to make it

12  hard for me to do Baker and Hemphill at the same time, but

13  we'll figure that out.  Apparently I saw some similarities that

14  you-all didn't see.  So that's good.  Thank you.

15      And I know we have the Government here.

16        **MS. KLAUER:**  Good morning, Your Honor.  Lynn Klauer

17  from the U.S. Attorney's office.

18        **MR. LEVIN:**  Nick Levin on behalf of the United States

19  Antitrust Division.

20        **THE COURT:**  Okay.  And, Mr. Levin, you'll be

21  talking -- speaking for the Government on the per se issue and

22  the immunity issue?

23        **MR. LEVIN:**  Yes, Your Honor.

24        **THE COURT:**  Thank you.

25      Okay.  So starting with Dr. Leamer, thank you all for your

1   clarity on that.

2      (Document handed to the Court by the law clerk.)

3      **THE COURT:**  Because I don't write very fast, I have to

4   have some assistance on who is arguing what.

5     I want to start, as I say, with Dr. Leamer and I want to

6   first just talk about the damages issue because -- let me find

7   what I wrote down about that.  So the Plaintiff said in their

8   brief in opposition the class members with more seniority

9   experienced greater damages during the class period, but you

10   didn't cite anything for that and didn't explain to me why that

11   is so, and I understood Dr. Leamer's regression model otherwise

12   takes into account total experience outside of, you know, how

13   long you're at Duke.

14     So I don't understand why you get to take that into account

15   twice is kind of what it seems like and it seems like it gives

16   you damages outside the class period.  So that's basically one

17   question, but it seems like it might be the multimillion-dollar

18   question.  So can you address that, please?

19      **MR. HARVEY:**  Sure, Your Honor.  Thank you.

20     Dr. Leamer's damages model calculates damages only during

21   the class period.  Now, how does he do that?  He uses a

22   regression model that takes a number of variables into account

23   to explain total compensation as a function of seniority -- I'm

24   sorry -- returns to seniority while controlling for a number of

25   other variables.

1    Now, let me address one of the first questions you asked,
2  which is, if I am understanding correctly, the model has two
3  experience variables, in a sense -- there's total experience
4  and then there's experience at the institution -- and is that
5  double counting.

6    So the reason why there are two variables there is -- goes
7  to the core of his model actually.  Total experience is the
8  amount of time someone has worked since their highest degree,
9  so since their M.D.  If they have been a practicing doctor for
10 10 years, total experience is 10.  Seniority is a separate
11 variable that measures the length of time at one of the
12 Defendants.  So if they worked at, say, Stanford right out of
13 medical school for 5 years and then moved to Duke, then total
14 experience is 10.  Seniority at Duke is 5.  The reason why you
15 want a control for that is that you want to be able to figure
16 out what is the return to experience at Duke compared to the
17 return to experience anywhere else.

18    Now, Dr. Leamer's opinion is that there should be a -- at
19 least a positive, but no worse than zero, return to experience
20 at the institution because, in addition to someone's general
21 experience, there is added value at being at an institution
22 that is really unique to the medical school faculty as compared
23 to faculty in the rest of the university.

24    And let me explain that in a couple ways.  One, unlike,
25 say, a literature professor, a doctor at the medical school has

1  patients.  Patients increase over time and they're linked to a
2  particular location.  If you move from Los Angeles to the
3  Research Triangle, you're probably not bringing a lot of
4  patients with you.  You also develop expertise that is unique
5  to the hospital.  You learn how to deal with the particular
6  procedures and rules in that hospital, the rules and
7  regulations of North Carolina, as opposed to another state, and
8  so on and so forth.  So one would expect out of the box a
9  positive return to tenure or a positive return to seniority.
10     I'll try to use the term "seniority" because I think it's
11  less confusing in academic context because the word "tenure"
12  has a particular connotation there.
13        **THE COURT:**  Right.  Well, I had to read up on that
14  because I used "seniority" in the class certification order and
15  you-all used different terms in the briefing and then
16  Dr. Leamer explained in one of his reports why he uses return
17  to tenure.  So I think I've got that straight.
18        **MR. HARVEY:**  Yeah, so I -- the way we use the terms
19  "return to tenure" and "return to seniority" here is that
20  they're synonyms.  They mean the exact same thing.
21     Now, how does Dr. Leamer's damages work here in a way that
22  is giving rise to your question about whether he calculates
23  damages outside of the class period.
24     So the inputs into the regression take into account the
25  facts as they exist during the class period.  So, for example,

1  if someone's age is 50 during the class period, that doesn't

2  mean that he's calculating damages all the way to -- from when

3  someone was born.  Because they're 50 years old, the class

4  period isn't 50 years.  It's just during the class period, but

5  the facts on the ground at the start of the class period going

6  to the regression.  So age is an example.

7      Years at the institution is another example.  Now, an

8  individual's -- a class member's number of years at Duke is an

9  input into the regression when the class period starts.  That

10  calculates damages.  There isn't a penny in damages that he

11  adds to that before the class period.  Now, perhaps an

12  example -- I know my friend on the other side --

13        **THE COURT:**  I don't understand that because -- I mean,

14  the Defendant says -- I've forgotten the exact example that

15  they say in their brief, but they say if you've got two

16  50-year-old doctors who have been out of med school 25 years --

17  I can't add -- and one has been at Duke for 5 years and the

18  other one has been there 20 years, the damages aren't the same.

19  Well -- and you're nodding that that's so.

20        **MR. HARVEY:**  Right.

21        **THE COURT:**  I think you agreed with that.

22        **MR. HARVEY:**  Yes.

23        **THE COURT:**  So I don't understand how that doesn't

24  mean that you're -- the people who have been at Duke longer

25  aren't getting damages for the time outside the class period.

1  I think I said that the right way.  If I didn't, I hope you got

2  my meaning.

3          **MR. HARVEY:**  No, I think you said it exactly the way

4  that I think you intended it and I understand the question.

5      Well, an individual with more seniority at Duke has more

6  suppressed compensation --

7          **THE COURT:**  Exactly.

8          **MR. HARVEY:**  -- than someone who is just hired.

9          **THE COURT:**  I appreciate that and that's exactly the

10  problem.

11          **MR. HARVEY:**  Well, let me explain why we view it as

12  evidence in support of our position and it's not a problem at

13  all.

14      So, for example, the conspiracy at issue here, restrained

15  competition in the Research Triangle, it did not, as far as we

16  know, restrain competition as between, say, medical schools in

17  California or Chicago.  So if someone is hired directly from

18  Chicago, they have to be offered enough pay to get them to move

19  to the Research Triangle.  So when they start at Duke, they are

20  unlikely to have significant damages.

21      Compare that person to someone who has been at Duke for 20

22  years.  They're -- for one thing, they have different

23  characteristics to the person who just moved because they're

24  much more embedded in the Research Triangle.  They've been here

25  for 20 years.

1    **THE COURT:**  Right.  But they don't get damages for
2  that time.  I don't understand why -- I mean, it seems like you
3  have to start with not what somebody's -- when did the class
4  period --
5          **MR. COONEY:**  2012, Your Honor.
6          **THE COURT:**  Yeah, 2012, whatever the day is.  It's not
7  what his compensation actually was, or her, on date in 2012 and
8  then you calculate the damages.  Your model seems to say, oh,
9  no, you know, he was damaged before 2012 and we have to take
10  that into account in calculating the damages coming forward.
11  I'm not really -- can you help me?
12          **MR. HARVEY:**  Sure, Your Honor.  We are not including
13  any damages, not a penny in damages, for what that person
14  experienced prior to the class period.  Dr. Leamer's model --
15          **THE COURT:**  You keep saying that, but every time you
16  explain it to me it sounds like you are.
17          **MR. HARVEY:**  I'll do my best, Your Honor.  I must not
18  be explaining as well as I should be.
19          **THE COURT:**  Okay.
20          **MR. HARVEY:**  During the class period -- so, say,
21  January 1, 2012, an individual who has been at Duke for 10
22  years, that person's pay is suppressed more than someone who
23  was just hired on January 1, 2012.
24          **THE COURT:**  Going forward.
25          **MR. HARVEY:**  Going forward.  Absolutely.

1      **THE COURT:**  But that takes into account how it has

2    been suppressed up to that point it seems like.  I mean, I

3    don't understand --

4          **MR. HARVEY:**  Yes, and I don't see that as a problem.

5          **THE COURT:**  Well, I do see that as a problem.

6          **MR. HARVEY:**  Well, could I use the ELMO, Your Honor?

7          **THE COURT:**  Yes.

8          **MR. HARVEY:**  I know my colleague asked for it to be

9    used, and while you asked your question, I drew a diagram.  So

10   I apologize for the crudeness of the diagram.

11     Okay.  So why don't we take it into a different context,

12   which I think may be more helpful.  Suppose this were a toxic

13   tort where we represent a class of people in Flint, Michigan,

14   who have been exposed to lead poisoning.  Say the lead

15   poisoning has been going on for, say, 20 years, but the statute

16   of limitations only gives you damages for the past year.  Now,

17   when you try to -- and then suppose that plaintiffs had an

18   expert that showed that as someone is exposed to more lead over

19   time they suffered more injury.  So at the start of the class

20   period, an individual who is exposed to lead for, say, two

21   years is going to have more injury than someone who is exposed

22   to lead for only two days.  Now, the model takes that into

23   account.  So the shaded box here are the damages during the

24   class period.

25     Now, what Duke is suggesting is that we're somehow adding

from this area here to this number and we're not.  There is not
a penny from this box that is added to this box.  Dr. Leamer is
only calculating damages here during the class period.  Now --

**THE COURT:**  But why is he not -- it sounds like he's
taking experience into account twice for the people who have
been at Duke a long time and I'm not really -- I mean, is the
starting point different?  Explain -- I'm not getting it.  I'm
sorry.

**MR. HARVEY:**  Sure.  So I'm understanding Your Honor to
be addressing two separate issues.

**THE COURT:**  That could easily be.  This is statistics.
Surely there is at least two ways to look at it.

**MR. HARVEY:**  So one is the fact that his regression
has two variables, well more than two, but two we are talking
about.  One is total experience.  The other one is seniority.
Now, that isn't double counting.  That's just controlling for
more things.

So, for example, if the return to experience was, you know,
for every extra year of experience you get another 10 percent
in compensation, okay, that's what that variable return to
experience does.  Now, in order to figure out if there's any
extra compensation that one gets for institution-specific
experience, then that goes to that second variable.  So it's
important to control for a total experience in order to figure
out the returns to seniority.  That's not double counting and

1  Dr. Leamer cites to a number of articles.

2      For example, you know, Dr. Cremiuex -- in his rebuttal

3  report, Dr. Cremiuex does what he describes as an extensive or

4  exhaustive, whatever the word is, study of returns to seniority

5  in academic literature.  All of those models do the same thing.

6  They have an experience variable.  They have a

7  return-to-seniority variable.  It's the common way in labor

8  economics to try to figure out pay for faculty at the

9  university.

10     Duke and UNC do the same thing when they're trying to

11  figure out whether they're paying their faculty equitably,

12  whether, for example, there's a gender disparity in pay.

13  Having those two variables is the common, accepted

14  gold-standard way of trying to figure out pay for faculty.  So

15  that's sort of one question.

16     I think the other question is are we using -- are we

17  somehow increasing damages by trying to figure out, okay,

18  damage experience here, are we then adding that to the damages

19  during the class period.  And we're not.  I think Duke's

20  argument is akin to -- and say we change this example.  Instead

21  of exposure to lead, it's just that if someone is over 80 and

22  they're exposed to the same amount of lead as someone who is

23  20, the person who is 80 may have greater negative health

24  effects than the person who is 20.  Now, the model uses facts

25  that exist before the class period, someone's age.  You know,

1 you're going back 80 years until the person was born, but

2 that's just a figure of how much they were harmed during the

3 class period.

4     So, for example, if Duke were right, going back to this

5 diagram, we would be adding damages from this box to this box

6 and damages would be much higher and we're not doing that.

7 We're not adding a penny from here.  We're only using variables

8 as they exist starting January 1, 2012, putting those variables

9 into his regression and calculating damages.

10        **THE COURT:**  And so what you're saying is -- I tend to

11 oversimplify, but probably I'm not alone in that.  What you're

12 saying is that people who have been at Duke for a while bring

13 more value because of their seniority at Duke and therefore

14 their damages are greater?

15        **MR. HARVEY:**  That is one reason, yes.  They should

16 have more institution-specific value because they've been there

17 for a lot longer.  That's sort of one thing.

18     Another thing is that they've been embedded to a greater

19 degree than someone who just moved there yesterday.  Someone

20 who has been there 20 years --

21        **THE COURT:**  That one seems to me to go against you.  I

22 mean, when you start talking about, oh, you've been embedded

23 there, it sounds like you're talking about damages from the

24 pre-class period to me.

25        **MR. HARVEY:**  No, Your Honor.  It's just if during the

 1  class period you have a child who has been in school in the

 2  Research Triangle, say, for three years, you have a spouse who

 3  is working at a local employer and she has developed a

 4  relationship with that employer, you're a valued member of your

 5  local church, you're a member of civic organizations, on and on

 6  and on, during that class period that person is more locked in,

 7  in a sense, to the Research Triangle than someone who just

 8  arrived yesterday and their clothes are still in their luggage.

 9          **THE COURT:**  But how does that play into the damages?

10  I'm not --

11          **MR. HARVEY:**  Well, Your Honor, there's no --

12          **THE COURT:**  How is that a part of the calculation?

13          **MR. HARVEY:**  It's a separate variable in the

14  regression.  So the returns to seniority is a variable and

15  Dr. Leamer does not make that variable do anything.  The

16  regression just sets it up in a way to say, well, if that

17  variable does something -- does something interesting, the data

18  has to tell us.  He's not imposing any restriction on the data.

19  He's setting up a regression and he puts the data in and he

20  sees what's the result.

21      Now, if it turned out that someone's seniority made no

22  difference, then that variable would be insignificant and it

23  would be zero, but it's not.  It is both negative and

24  statistically significant.  So it tells us something and it

25  goes to our theory of damages.

1    **THE COURT:**  Okay.  All right.  Thank you.

2    **MR. HARVEY:**  Okay.

3    **MR. COONEY:**  Can you leave that up there?  Thank you.

4    **THE COURT:**  All right.  Mr. Cooney.

5    **MR. HARVEY:**  Don't look at any other pages.

6    **MR. COONEY:**  I won't.

7    Your Honor, I think there are several problems with what

8  you just heard and let's begin with the diagram.  If we use the

9  toxic tort example, somebody has been exposed from the

10  beginning of time to here and they've suffered severe brain

11  damage as of the point the limitations period begins, they're

12  not entitled to recover for that serious brain damage.

13    They're only entitled to recover for the incremental damage

14  that occurs during that four-year period.  It doesn't make any

15  difference whether they've suffered severe brain damage

16  previously or just a little bit of damage previously.  It's the

17  incremental damage that begins at -- in 2012 in this case

18  through 2016 and you take the person as you find them.  So if

19  the person comes in brain damaged, you don't take that into

20  account in terms of measuring their damages.  You simply ask

21  what is the incremental damage that's been caused.

22    I think Your Honor is exactly right.  That's the problem

23  with what they've done.  They're not measuring the incremental

24  damage.  They're saying, "These people were damaged for some

25  period of time and we're going to use that to multiply the

1    damages."  And that's the fallacy that they're dealing with.

2        And I'll get to that example in a second, but he also said

3    some things that simply are not true in the record.  First of

4    all, he said that if somebody is at Duke they have more

5    patients.  Well, remember this class includes

6    anesthesiologists.  It includes subspecialists like neonatal

7    intensive-care specialists.  It includes a lot of people who

8    don't have patient followings.  In fact, the vast majority of

9    these people don't have patient followings.  So the fact that

10   they're there for a long time -- if you're an anesthesiologist

11   or a radiologist like Dr. Seaman was or intervention

12   radiologist, people aren't coming to Duke because Dr. Seaman is

13   my radiologist.  So the fact that they're there for a long time

14   doesn't mean you generate a patient population and you become

15   more valuable.  And, in fact, for the vast majority of the

16   class, it's not the case.

17       The other problem he just highlighted is he mentioned that

18   when somebody moves in laterally.  Let's say somebody -- we'll

19   take a 50-year-old radiologist who comes to Duke at the

20   beginning of the class period versus a 50-year-old radiologist

21   who has been at Duke for 10 years.  They're assuming when the

22   50-year-old radiologist comes to Duke at the beginning of the

23   class period that person is paid the market rate for

24   compensation.

25       Under Dr. Leamer's analysis, in Dr. Cappelli's opinion,

1  that market rate is then shared in the department.  So everyone
2  else in the department should then be brought up to the market
3  rate because someone from outside has come in with the market
4  rate and that brings everyone else back up to where they ought
5  to be.  Even Dr. Leamer admitted on deposition that was one of
6  the difficulties, because you have to assume that people coming
7  in from the outside are being paid the market rate; and if you
8  believe his sharing regressions, that then gets transmitted not
9  only within the department but across all the departments,
10 which is why what they're doing on seniority is even worse.
11     Because as we point out on page 12 of the brief -- and Your
12 Honor referred to that -- if we take an example of two
13 physicians -- one joins Duke in 1980, one in 2012.  They're the
14 same age, same specialty, and are being paid the same.  The one
15 in 1980 has more damages.  The damages are multiplied by 36 as
16 opposed to 4.  That just does not make any sense if what we're
17 doing is measuring the increment in damages from 2012 to 2016.
18 And, Your Honor -- Your Honor has identified that as -- as
19 exactly the right issue in this case.
20     Now, Mr. Harvey also talked about the fact that
21 Dr. Cremiuex had done an analysis of returns to tenure across
22 the literature.  No one has ever used returns to tenure to
23 calculate damages.  Dr. Leamer is the first.
24          **THE COURT:**  Well, somebody has to be the first.
25          **MR. COONEY:**  That's true, Your Honor.

1    **THE COURT:** Always, every single time somebody has to
2  be the first. And is there another academic antitrust case
3  like this where damages have been calculated a different way?

4    **MR. COONEY:** I'm not aware of any off the top of my
5  head, but simply because somebody has got to be the first
6  doesn't make it right.

7    **THE COURT:** Well, it doesn't make it wrong either.

8    **MR. COONEY:** That's correct. But I'm trying to −− the
9  academic literature may support returns to tenure in order to
10 analyze, you know, is it a negative, is it a positive, what do
11 those numbers mean. There's no academic literature that says
12 it's also a valid way to calculate damages. So to the extent
13 the academic literature talks about returns−to−tenure analysis,
14 it does so in a different context in the one he's trying to
15 present it and Dr. Cremiuex makes that clear in his report.

16   **THE COURT:** Well, I know we're going to talk about
17 this more when we get to causation, antitrust impact. One of
18 the problems with your brief on that was you kind of ignore
19 that case law out there that says when you're the bad guy,
20 assuming −− and, you know, you have to assume the jury finds
21 you to be the bad guy −−

22   **MR. COONEY:** Yes, ma'am.

23   **THE COURT:** −− when you get to damages.

24   **MR. COONEY:** I'm used to being the bad guy.

25   **THE COURT:** If you're the hypothetical bad guy, the

1  Plaintiff gets a bit more of a break on certainty of damages

2  than in some areas of the law.  I think that's pretty clear.

3  And so --

4          **MR. COONEY:**  But the jury is not permitted to

5  speculate.

6          **THE COURT:**  True.

7          **MR. COONEY:**  We all agree on that.  And there has to

8  be evidence sufficient for them to uphold their burden,

9  evidence sufficient for the Court to have confidence in the

10 verdict.

11     And when we get to causation, what we're going to find is

12 they've excluded huge chunks of compensation over which Duke

13 had no control --

14         **THE COURT:**  Yeah, but you --

15         **MR. COONEY:**  -- as part of that.

16         **THE COURT:**  I'm going to give you a chance to tell me

17 how you think damages ought to be calculated and what the

18 damages ought to be, which as I -- I have not seen anything

19 about that.  So your failure to offer an alternative plays into

20 that, as I understand the case law.

21         **MR. COONEY:**  Well, yes and no.  Certainly Dr. Cremiuex

22 took a look at the returns to tenure.  Dr. Cremiuex, after

23 taking a look at that -- essentially, our experts have

24 concluded there were no damages, so it's not a matter of

25 offering a different model.  And, in fact, when you take a look

1  at Dr. Leamer's model, Dr. Leamer now has six different damages

2  numbers that vary by about $200 million.

3      **THE COURT:**  Right.  I mean, we're going to talk about

4  that in a minute.

5      All right.  So on this one point, anything else you want to

6  say about the statute of limitations?

7      **MR. COONEY:**  No.  I think Your Honor is analyzing

8  exactly what's going on the right way.  He's giving damages for

9  someone being brain damaged at the beginning of 2012 and then

10 using that as a multiplier rather than measuring the

11 incremental effect as of 2012, and you do that simply by

12 comparing two people at the same compensation with the same

13 training.

14     **THE COURT:**  Okay.  And do you have any -- your

15 argument about people who have been there longer have more

16 damages because they're embedded -- I'm just going to use the

17 shorthand phrases.  Your argument against that is a factual one

18 that I heard you make.

19     **MR. COONEY:**  Well, it is -- well, it's both a factual

20 one based on the evidence --

21     **THE COURT:**  Yes.

22     **MR. COONEY:**  -- which is the fact that all these class

23 members are not the same because, in fact, most of them don't

24 have patient followings, but it's also based on the fact that

25 under Dr. Leamer's own sharing regression analysis he assumes

1  that when someone comes in from the outside and gets paid the

2  market rate everyone comes up to the market rate.

3          **THE COURT:**  Over time.

4          **MR. COONEY:**  Yes.  Otherwise, they can't show common

5  impact.  They have to assume it gets shared because, remember,

6  their theory is if only somebody from Carolina could have come

7  in, that would have -- or made offers to people from Duke,

8  those retention offers or that new person coming in would have

9  raised everyone else's salary.  Well, you have that effect from

10 outside too.

11         **THE COURT:**  I have one more question.  I keep trying

12 to cut you off and then I keep asking you questions.  So if I

13 were to rule in your favor on this statute of limitations part,

14 just that part, what implications does that have for the rest

15 of Dr. Leamer's testimony?

16         **MR. COONEY:**  Well, I think at a minimum he's got to

17 recalculate --

18         **THE COURT:**  Yes.

19         **MR. COONEY:**  -- without having that in.  I think in

20 addition -- and we just have to see how he goes about with that

21 recalculation.  I think he's got problems in the sharing

22 regression.  I think he's got problems on the PDC.  But at

23 least as to what we're talking about now, at a minimum he's got

24 to recalculate.

25         **THE COURT:**  But does it undermine -- would it

 1 | undermine his larger approach?

 2 | **MR. COONEY:** Well, again, we get back to what we had

 3 | talked about, which is returns to tenure may be a way of

 4 | looking at respective value in terms of whether it makes sense

 5 | to stay at an institution for another year. But, again, no one

 6 | has ever used this as a damages model. No one has tested it.

 7 | I know we're going to get into benchmarks and, you know, the

 8 | kind of arbitrary zero benchmark. So I think all that plays

 9 | into it, Your Honor.

10 | **THE COURT:** Well, the zero benchmark helps you. It's

11 | way better than the UT benchmark.

12 | **MR. COONEY:** Well, sure. And a minus-two benchmark

13 | would help me even more.

14 | **THE COURT:** Okay. All right. Well, before we get

15 | into that, anything else the Plaintiff wants to say on the

16 | statute of limitations issue?

17 | **MR. HARVEY:** Yes, Your Honor.

18 | The way I understand Mr. Cooney's argument has absolutely

19 | zero basis in antitrust law. The question for calculating

20 | damages in an antitrust case is you take the market infected by

21 | the illegal conspiracy and you figure out how that market would

22 | have behaved had that conspiracy not existed. All right. What

23 | Mr. Cooney says is very different. He said, no, the comparison

24 | is not to a market free of the conspiracy. It's to the

25 | anticompetitive conspiracy before the class period.

1      **THE COURT:** I'm sorry. Say that again. I didn't

2 follow that.

3      **MR. HARVEY:** You know, he said you take the plaintiff

4 as he comes as if the -- the comparison to the class period is

5 whatever was going on in the world before the class period

6 regardless of whether it was -- it was affected by an

7 anticompetitive conspiracy.

8      **THE COURT:** Well, right. I mean, you cannot get

9 damages before the class period.

10      **MR. HARVEY:** There is not a penny in damages, Your

11 Honor, before the class period, but you don't calculate what

12 the world would have been like during the class period by

13 comparing it to -- to a world with the conspiracy in place.

14 The task for the Plaintiff and the jury is to figure out what

15 would the pay have been if the conspiracy did not exist.

16      **THE COURT:** But you only start from the first day --

17      **MR. HARVEY:** Absolutely.

18      **THE COURT:** -- of the class period.

19      **MR. HARVEY:** Absolutely.

20      **THE COURT:** So what are you saying about that because

21 I'm -- I'm not really -- I mean, it sounds like what you're

22 saying is on May 1st, 2012, embedded doctor made $500,000, an

23 unembedded doctor made $700,000, and therefore we have bigger

24 damages for unembedded -- for the embedded doctor who should

25 have been making $700,000 on the first day. If that's what

1  you're saying, that is a problem to me because it sounds like

2  you're giving him $200,000 in damages for what happened before

3  the class period started.  Am I messing things all up?

4       **MR. HARVEY:**  With respect, I would answer that

5  question yes, Your Honor.

6       **THE COURT:**  Yes.  That's okay.  I assumed you thought

7  I was.

8       **MR. HARVEY:**  I'm sorry.  I'll try this again.

9       **THE COURT:**  Okay.

10       **MR. HARVEY:**  And I appreciate the Court's indulgence.

11  I must be doing a horrible job explaining it.

12     At the start of the class period, the question is what --

13  what inputs does Dr. Leamer's regression use to calculate

14  damages --

15       **THE COURT:**  Uh-huh.

16       **MR. HARVEY:**  -- and do those inputs -- and does he do

17  it in a way that takes damages that accrued prior to the class

18  period and add it to damages during the class period.  The

19  answer to that question is absolutely not.

20     The data that he uses to calculate damages did not exist

21  prior to the class period.  He's only using data during the

22  class period.  There is not a penny, not a speck of

23  information, nothing prior to the class period that he is

24  adding to damages during the class period.  He is simply taking

25  the world as it exists starting January 1, 2012, and endeavors

1  to figure out by what amount was this class underpaid starting
2  on that day.

3       **THE COURT:**  Okay.  I mean, the complication here is
4  that the conspiracy, if it existed, existed before the class
5  started.  I mean, I think you certainly believe that, right?
6  Your evidence -- a lot of your evidence predates the class
7  beginning.  So it still seems like -- because of that quirk,
8  how is he taking that into account so that that starting number
9  doesn't get considered too much?

10      **MR. HARVEY:**  Sure, Your Honor.  So this goes to a
11 point Your Honor made earlier, which is that the law is very
12 clear that an antitrust defendant cannot use its own misconduct
13 and say, "Well, our own misconduct goes back a long ways.
14 We've been violating the antitrust laws a long time and so it's
15 hard for you to figure out damages, so that means you get less
16 or you get no damages."

17      That is not what the law says.  The law says -- you know, I
18 believe the Supreme Court since the 1940s has said that basic
19 elementary principles of public policy and justice require that
20 there is a forgiving standard for calculating damages given the
21 vagaries of the marketplace and that we can't know with
22 certainly what would have happened.

23      So here is how those issues manifest in this case.  As Your
24 Honor recalls at class certification, we -- we were struggling
25 with this at the time and we offered alternative ways to deal

1  with this depending upon how the evidence came out.  As the

2  evidence has come out -- and this is in the record -- this

3  actual conspiracy has been going on for decades, decades at the

4  highest levels of the schools.  So that means that Dr. Leamer

5  could not -- as a result of the length and breadth of the

6  misconduct, could not do what is the first choice of an expert,

7  which is to do a before, during, and after analysis with the

8  Defendants' own data.  That's impossible.

9           **THE COURT:**  Right.

10          **MR. HARVEY:**  So what does he do?  He creates a

11 benchmark doing his own study of UT schools because no

12 comparable study exists anywhere in the world -- and the

13 parties agree with that -- of the UT medical schools.  Now,

14 when he does that comparison, that comparison is only with the

15 return to seniority at UT starting January 1, 2012, compared to

16 the return to seniority at Duke and UNC starting January 1,

17 2012, and he takes the difference between the two.  Those are

18 damages.

19    Now, he's not taking anything into account from the UT

20 schools prior to the class period.  He's not taking anything

21 into account at Duke and UNC prior to the class period.  He's

22 just saying the UT benchmark is the best estimate we have of

23 what would the return to seniority be at an academic health

24 center without a no-poach agreement in place.

25          **THE COURT:**  So what do you say about Duke's point that

1  your theory assumes that when an outsider comes in at market

2  compensation that also spreads across the faculty and impacts

3  your damages in -- in a way that Dr. Leamer has not taken into

4  account?  Hopefully I said that reasonably well.

5          **MR. HARVEY:**  Absolutely, Your Honor.

6      Dr. Leamer does take into account -- and let me answer your

7  question directly.  Yes, we do not disagree with Duke that the

8  outside world provides some competition in the Research

9  Triangle.  The Research Triangle is not a hermitically sealed

10  bubble.  At the margins, yes, there is competition; and when

11  someone is recruited from Stanford or the University of Chicago

12  or wherever and comes in, that does place some competitive

13  structure on the pay structure, which is why the pay isn't even

14  lower than it was.

15     So how do we figure out -- you know, how do we take all

16  that into account.  It's in Dr. Leamer's regression.  The data

17  is what the data is.  It's not something that we impose on the

18  data.  It's not a condition on the data.  Even though the

19  damages appear large, compared to the total compensation it's

20  pretty small.  We're talking about a suppression of about

21  8 percent.

22     Now, if it were a hermetically sealed bubble, with this

23  kind of conspiracy one might expect it to be even more than

24  8 percent, but it's not.  There is some competition and we've

25  shown that as competition goes up from whatever source that

1  benefit is shared.  You know, a rising tide lifts all boats.

2  And when competition is taken out of the system, which was the

3  express purpose of the no-poach agreement, then that suppresses

4  pay.

5       **THE COURT:**  Okay.  Thank you.

6       All right.  Otherwise, on Dr. Leamer, I have some --

7  you-all have started talking about this in terms of the

8  benchmark and the yardstick, and I just -- I want to understand

9  a little more about the Plaintiff's position on this zero

10  benchmark and the UT benchmark; and is Dr. Leamer going to come

11  in and tell the jury about both of those things; and how, given

12  their differences, are both reliable enough to come in to -- to

13  evidence.

14       Also, for the Plaintiff, Dr. Leamer says in his merits

15  deposition his premise is that there is impact, not -- and he's

16  not offering an opinion that there is impact.  If you actually

17  read his report, he seems to be offering an opinion that there

18  is impact.  So I'll ask the Plaintiff to address that.  I'm

19  just going to give you-all my questions or most of my

20  questions.  So what's -- what's the deal on that?

21       And then -- so at class certification, Dr. Leamer said that

22  using zero as a benchmark would be a mistake.  I think I

23  understand why he is saying zero is conservative, but I'm not

24  completely sure I understand why zero is picked, as opposed to

25  any other number, as conservative.

1     And then the -- I want -- well, the Defendant has already

2  talked a little bit about the problems that come from being the

3  person found to engage in an antitrust conspiracy, but they

4  might address that a little bit more because -- and then I also

5  had some problems with some of the Defendants' arguments.  I

6  mean, you object to the UT average because it's an average and

7  some are below and some are above.  Well, that's what average

8  means.  So I didn't see the Defendant cite any cases that say

9  use of an average is not allowed in this kind of damage

10 calculation ever.  So given that that's so, I don't understand

11 the argument about some are above and some are below.

12     And the argument Duke makes saying that the UT schools

13 aren't comparable to Duke, I didn't see cases that Duke cited

14 explaining to me about, well, what does that mean in this

15 particular context.  This *Home Placement* case that you-all

16 cited from the First Circuit is entirely different facts and

17 all the other case law on comparable benchmarks seems to be

18 pretty lenient.  This is Supreme Court case law from *Burlington*

19 *Industries*; the *Farmers* case, which is an Eighth Circuit case

20 that the Plaintiff cited; *Bigelow,* et cetera, et cetera, et

21 cetera, as they say.  So if Duke can engage with that issue a

22 bit, that would be helpful.

23     So this is Duke's motion and since I have questions for

24 both of you, I'm going to let Duke go first.  Plus, I think I'm

25 probably going to let Dr. Leamer testify, so anything else you

 1    want to say.

 2        **MR. COONEY:**  And I'll just -- I'll just touch on all

 3    those very quickly.  So on the -- let me pick up with the

 4    averages point first because I think Your Honor raised a good

 5    question.

 6        **THE COURT:**  You might need to get just a hair closer

 7    to that mike so I can hear you a little bit better.

 8        **MR. COONEY:**  I apologize.  Is that better, Your Honor?

 9     So let me begin with the averages first.  The problem with

10    averages is just that.  I mean, if Warren Buffett walks into

11    this room right now, the average wealth of this room is going

12    to increase and, unfortunately, you and I haven't gotten a

13    dollar richer.

14     And so when you have kind of one outlier that -- that

15    fundamentally shifts the averages and miscommunicates to the

16    jury exactly what's going on -- so, for example, at least three

17    of those UT schools -- two of them had -- at least two had

18    negative returns to tenure.  Three may have, depending on which

19    set of years you looked at.  But when you average them all

20    together, because one had very positive returns to tenure, that

21    boosts up this average and one or two points make a tremendous

22    amount of difference in terms of the potential damages the way

23    he's calculating it.

24     And, quite frankly, if you're going to take a benchmark and

25    use an average, as opposed to weighting it and doing a median,

1  you know, it -- it's going to present a false narrative to the
2  jury.
3       THE COURT:  So are you saying that sample size is too
4  small to use an average?
5       MR. COONEY:  I think averages in general.  I think it
6  probably depends more on the distribution than on the sample
7  size.  I mean, obviously, if we had a sample size of five and
8  they were all the same, we could use the average and you
9  wouldn't be miscommunicating anything.  But where you have wide
10 variability, as you did with the UT schools, and now you're
11 just going to smooth it out with an average, you get the Warren
12 Buffett problem.  When Warren Buffett walks in, it's not fair
13 to use the average wealth of this room now to prove what your
14 average wealth is and what my average wealth is.
15      And that is the averages problem, on top of the fact that
16 at least one of the medical schools in the sample size, MD
17 Anderson, isn't a medical school and it doesn't operate a
18 campus-based faculty medical school the way Duke and Carolina
19 do.  It's a -- an advanced, very well-respected tertiary care
20 center that specializes basically in cancer care.  And so
21 you've loaded that into the sample size when it really doesn't
22 reflect at all --
23      THE COURT:  Did you mention that in your briefs?  I
24 don't remember that.
25      MR. COONEY:  We did.

1        **THE COURT:**  You did.  Okay.

2        **MR. COONEY:**  We did.  We mentioned MD Anderson not

3   having a medical school.

4        **THE COURT:**  Okay.

5        **MR. COONEY:**  Or at least a campus-based medical

6   school.  They do training.  They have residents come through,

7   just like any other tertiary care, but it's kind of similar to

8   the Carolinas HealthCare System.  You know, they do residency

9   training, but there's no medical school there, just as there's

10  no medical school based at MD Anderson.

11      So you start taking those into account, plus the relative

12  proximity, or lack thereof, in terms of the movements.  I mean,

13  we really don't know, for example, at UT Southwestern what are

14  the other options in terms of movement; and if there aren't any

15  other options in terms of movement, then that will affect the

16  returns to tenure as well.  The national reputation, say, of UT

17  Southwestern, is Stanford going to be looking to poach from UT

18  Southwestern the way Stanford looks to poach from Duke.

19      Now -- and I understand Your Honor's point about, "Well, at

20  least they put up a benchmark.  You haven't put up any

21  benchmark."  It's really not our burden to show the benchmark

22  and I think the case law is clear that simply picking a bad

23  benchmark isn't permissible because there's no good benchmark

24  and that's really what that comes down to in terms of --

25       **THE COURT:**  Well, is there a good -- what is a good

1  benchmark?

2          **MR. COONEY:**  Well, a good benchmark --

3          **THE COURT:**  I mean, you can't use UC San Francisco and

4  Stanford because that data is not public.  At least somebody

5  told me that somewhere along the way.  I assume that's the

6  case.  So you can't use that so -- which then you would have

7  two that could theoretically poach from each other and

8  presumably had no such agreement, but that data is not

9  available.  So what data is available that they should have

10  used?

11          **MR. COONEY:**  Well, I think that -- that is an issue.

12  My guess is had they looked to New York City, where you've

13  probably got seven medical centers within two or three miles of

14  each other, many of which are state run --

15          **THE COURT:**  Yeah, but you don't have any data yourself

16  about that, right?

17          **MR. COONEY:**  That's correct, Your Honor.  And we

18  don't -- we don't offer that because, again, we're not looking

19  for a benchmark to calculate damages since based on our

20  calculations there are no damages.  And, of course, we deny

21  fundamentally the whole agreement issue, but that's for another

22  day.

23          **THE COURT:**  Right.

24          **MR. COONEY:**  So -- and, again, it gets back to the

25  returns-to-tenure analysis and whether or not you can even use

1    it to generate damages.  And I'm assuming, Your Honor, this

2    might make sense for me to briefly address the zero benchmark

3    versus the UT Southwestern benchmark.

4        We talked about the averages problem.  When you look at the

5    academic literature, the academic literature actually shows

6    that negative returns to tenure are far more common than a zero

7    or a positive return to tenure.  So, you know, why do you pick

8    zero then?  Yeah, zero is more conservative than the average

9    you've generated from a bad benchmark, but simply because it's

10   not as bad as a bad benchmark, there still has got to be some

11   basis for it.

12       And I don't want to confuse two concepts here because we've

13   got one concept that talks about what the jury can award for

14   antitrust damages and the certainty of that, but what we're

15   talking about here is expert testimony, testimony that's going

16   to be presented to the jury as science or economics backing it

17   up, and that standard requires some rigor.  And, literally,

18   Dr. Leamer, when he was asked about why zero, basically said,

19   "Because I said so."

20       **THE COURT:**  Well, he did say that, but a few pages

21   beforehand he had given you a three-page explanation for why

22   zero, so you can't take that one little sentence out of

23   context.

24       **MR. COONEY:**  I understand there's a context to it, but

25   the problem is in light of the academic literature, which

1 showed an abundance of negative returns to tenure in the

2 absence of any agreement to collude, there's simply no rational

3 basis to say, all right, it's zero as opposed to minus one or

4 minus three.  Or taking the averages of the academic

5 literature, they find negative returns to tenure; and that is

6 the central problem with what he's doing as he takes his

7 returns-to-tenure model and is trying to use it for a purpose

8 it wasn't intended, that is, to create a damages model from it.

9         **THE COURT:**  Okay.  Thank you.

10     For the Plaintiff.

11         **MR. HARVEY:**  Let me address first Your Honor's

12 questions, and if I miss anything, please let me know.

13     First, with respect to is Dr. Leamer opining on impact, in

14 his deposition he said that because he was there to testify

15 about his merits report, which attaches his class certification

16 reports as Exhibits A and B.  That's all about impact.  He had

17 established impact prior to that day and he was there to focus

18 on damages.

19         **THE COURT:**  His initial certification.

20         **MR. HARVEY:**  Yes, Your Honor, the sharing regressions

21 and so forth.  That's the impact analysis.

22         **THE COURT:**  So you're going to be offering that at

23 trial too to show impact?

24         **MR. HARVEY:**  We may.  I can't commit with certainty

25 now that -- what exactly we will or will not do at trial.

1      **THE COURT:**  Especially since I'm liable to impose some
2  time restrictions on everybody when we get to trial everybody
3  knows.

4      **MR. HARVEY:**  Absolutely, Your Honor.  And as we
5  discussed at class certification, Plaintiffs have a number of
6  forms of evidence with respect to impact.  Return regressions
7  is one.  The exact mix we do at trial will be to try to make it
8  as economical as possible given the Court's instructions.

9      **THE COURT:**  But you're not going to be offering at
10  trial impact as to nonfaculty, right?

11      **MR. HARVEY:**  Absolutely not, Your Honor.  They're
12  outside of the class.  They're not going to be in the case.

13      **THE COURT:**  Okay.

14      **MR. HARVEY:**  So the other question was, I believe, as
15  to the zero benchmark, what's the basis for that.  Zero -- so
16  Dr. Leamer out of the box, given his study of the industry, his
17  review of the relevant literature, his -- his educated
18  hypothesis is that we should see at least a positive return to
19  seniority if the market is competitive for an academic medical
20  center.

21     So the most conservative estimate of damage you can make
22  given that hypothesis is zero, which is it's not negative, I
23  think it's probably positive, but it's no less than zero.  So
24  that's his hypothesis.  He then tests that hypothesis in a
25  variety of ways, which is what his expert reports are all

1  about.

2      So, for example, looking at the UT schools, before we go to

3  the UT benchmark, what does the UT data tell us?  Well, it

4  tells us that, Mr. Cooney is right, there are two schools that

5  have a negative return to seniority.  But he leaves out that

6  the negative return to seniority is almost microscopic and is

7  statistically insignificant, but the positives are large and

8  statistically significant.  As a matter of statistics, that

9  means that the truth is very likely that it's positive, but

10  it's very unlikely to be negative.  So zero is a conservative

11  benchmark.  That was the state of play when Dr. Leamer filed

12  his initial merits report.

13      Duke then came back and said, "Well, zero is arbitrary.  If

14  you really think the UT schools is a good benchmark, you should

15  use it."  And we took them up on their invitation.

16      He then responded to, one, the fact that Duke provided no

17  alternative; two, that Duke provided no additional data from

18  the UT schools.  Duke really did nothing as a matter of

19  statistical analysis to challenge the validity of any of the UT

20  schools, which Dr. Leamer said, wow, it's gone through the

21  adversarial process and Duke hasn't laid a hand on the UT data,

22  hasn't laid a hand on the UT analysis.

23          **THE COURT:**  Well, they did say that he didn't include

24  a lot of relevant data.

25          **MR. HARVEY:**  Well, what Duke says in its brief is very

1   misleading, Your Honor.  Duke says that Dr. Leamer dropped
2   data, suggesting that he selectively only looked at some of the
3   data, which biased his results.  Absolutely not.  Dr. Leamer
4   took the most conservative approach one can possibly take to
5   maximize comparability, to make it as close as we can possibly
6   get to apples to apples.
7       How does he do that?  Well, first of all, he has the
8   regression at Duke and UNC that controls for a great degree of
9   different variables.  Now, when he goes to UT -- one of the
10  reasons why he selected UT is that, unlike any other source of
11  information, it has all of the data one would need to do the
12  exact same regression, controlling for the same factors to
13  maximize comparability.  Now, the UT schools do not have data
14  for all years at all schools to do that.
15      Now, Dr. Leamer could have said, "Well, I'm going to
16  estimate the missing data to bias -- you know, to juice up the
17  damages."  He doesn't do that.  Instead, he says, "I'm only
18  going to use data that allows as close as we could possibly get
19  to a perfect apples-to-apples comparison."
20      He then takes Duke up on -- really their reports are
21  nothing more than kind of criticism by speculation to say,
22  well, the data -- the missing data is going to bias the
23  results.  Dr. Leamer says, "All right.  If that's your
24  criticism, let me test it."
25      He's the only expert in this case that actually runs

1  statistical tests on this hypothesis; and he finds, one, that

2  the missing data, if anything, vies the damages downward and

3  that if -- he does that in a variety of ways.  One, he imposes

4  a similar restriction, if you take Duke's argument, to Duke and

5  UNC and takes that data out and then does that comparison, and

6  it also establishes damages.

7      So at the end of the day, he establishes in a variety of

8  ways that the lack of perfect data, which is impossible to get,

9  from the UT schools does not bias his damages estimate upward

10  or render it unreliable in any way.

11      Finally, I want to address Mr. Cooney's argument with

12  respect to MD Anderson.  Apparently there is a dispute of fact

13  in this case as to whether MD Anderson is an appropriate

14  comparator to Duke and UNC.  Well, first, with respect to

15  whether MD Anderson is a medical school or not, this is page 14

16  of Dr. Leamer's rebuttal report, which is at DJA 783, headed

17  "UT MD Anderson is a Medical School."  He then quotes from MD

18  Anderson's own website to say it has a comprehensive

19  educational program.  He then continues on --

20          **THE COURT:**  Surely this is -- can't really -- I mean,

21  surely everybody knows whether it's got a med school or not.

22  How can that really be disputed?

23          **MR. HARVEY:**  Well, I think it's because MD Anderson is

24  focused on particular practice areas.  It's focused on cancer

25  as opposed to, say, the wide breadth of --

1          **THE COURT:**  As a hospital.

2          **MR. HARVEY:**  Yes.

3          **THE COURT:**  But, I mean, a med -- okay.  Go ahead.

4    Tell me your evidence.  I have no idea whether it has a med

5    school or not.  But what's your evidence that it does?

6          **MR. HARVEY:**  Here, this again is another quote from

7    the MD Anderson website.  It says:  "The M.D./Ph.D. program is

8    a dual degree program of The University of Texas Medical School

9    at Houston and the MD Anderson UT Health Graduate School."  The

10   MD Anderson UT Health Graduate School grants an MD.  It's a

11   medical school.

12       So unless Your Honor has any further questions on that, let

13   me also address -- you know, the question is, well, is MD -- is

14   MD Anderson an appropriate comparator -- a relevant comparator

15   to help us understand what the market would have been in the

16   absence of the misconduct.  Well, you can't just say it.  You

17   have to look at the data and make the case, and Duke hasn't

18   done that.

19       Our expert has run a number of analyzes with respect to all

20   the UT schools to establish that they are valid with respect to

21   any variable that one could look at and he did that at the --

22   I'll just briefly -- in Figure 1 where he breaks up the

23   different UT schools and compares the mix of degrees with Duke

24   and UNC.  They're comparable.  He compares compensation of

25   assistant professors with M.D. degrees.  Here is MD Anderson.

1 It's right in line with everything else.  Associate professors,

2 MD Anderson right in line with everything else and so on and so

3 forth.

4     At every point Duke and its experts make speculative

5 criticisms that are not backed by the data.  In response,

6 Dr. Leamer looks at the data, runs statistical tests, and

7 refutes each and every one.  And at its base, at the very

8 least, these are cross-points at trial.  These are not bases to

9 exclude his opinion or to grant summary judgment.

10         **THE COURT:**  All right.  If Duke wants a couple of

11 minutes.

12         **MR. COONEY:**  I'll be very brief, Your Honor.

13     I think there are two points.  First, on MD Anderson, what

14 that document shows is the medical school is located at the

15 University of Texas at Houston.  MD Anderson, because it's a

16 specialized hospital, does provide some training.  Med students

17 can go back and forth, but it doesn't maintain a separate

18 medical school the way Duke and the University of North

19 Carolina do.  And if the -- they simply do not have a

20 campus-based medical school at MD Anderson.

21         **THE COURT:**  So what happens if you take out the MD

22 Anderson data?

23         **MR. COONEY:**  Well, it's interesting because MD

24 Anderson actually has the highest positive returns to tenure;

25 and so once you take that out, then -- even using their

1  benchmark, it begins to approach zero at that point because,

2  again, MD Anderson, in terms of return to tenure, is Warren

3  Buffett when you're taking a look at these averages and when

4  you take a look at what the returns to tenure are.

5      The other thing -- and it's important because they use an

6  interesting phrase.  Dr. Leamer says returns to tenure should

7  be positive or at least zero for academic medical centers and

8  he does that because he knows all other return-to-tenure study

9  shows negative returns to tenure are standard in academic

10  centers.  And so he says, well, medical centers must be

11  different than academic centers.  But no one has ever done a

12  study on that.  He certainly hasn't done a study on that.  He's

13  just assuming that medical centers must be different, and that

14  is the central flaw in what he's trying to do with a

15  returns-to-tenure analysis that academically is usually

16  negative and certainly not zero or positive for the vast

17  majority of institutions that have been studied, and we

18  provided a graph of all of those studies in there.

19      And so, again, we get back to the Court is going to permit

20  Dr. Leamer to present this as a matter of expertise and

21  science, and that simply cannot be done based on the state of

22  the literature and what's been going on.

23          **THE COURT:**  Okay.  All right.  One minute.

24          **MR. HARVEY:**  Just one quote.  This is from page 13 of

25  our opposition brief -- our Dr. Leamer opposition brief.  This

1  is from Duke's own expert, Dr. Cremiuex, at page 124, quote:

2  The mechanism by which compensation is set at the medical

3  school is different from and the competitive environment

4  therein is different from what it is for the business school,

5  the history department, the art department, et cetera.

6      That is Duke's own expert saying don't look at other --

7  other academic disciplines to understand the medical school.

8  It's a different thing.  So there's no reason to use these

9  studies of other departments which both Dr. Cremiuex and

10  Dr. Cappelli had confirmed are not from the same time period

11  and do not examine medical schools.

12      Now, the question for a benchmark is you use the most

13  similar comparator.  That's a black letter law.  It's the basic

14  question to ask, is this the most similar or relevant

15  comparator we can look to.  Duke certainly isn't making the

16  argument that the art history department is a more relevant

17  comparator to an academic medical center than the UT schools

18  are because that's, on its face, ridiculous.  So I think

19  everyone agrees that the only available study -- and it's not

20  an assumption.  It's a detailed study of the UT medical

21  schools.  The only available relevant comparator we have are

22  the UT schools.

23          **THE COURT:**  Okay.  I said that first I was going to

24  give Duke five minutes on why they should get to file another

25  brief, and why I should invite the State to submit an amicus

1  brief and then I forgot to do it.  So let's do that and then

2  we're going to take a short break.  So who is going to speak?

3  I think I may have forgotten to ask you who is going to speak

4  on that too.

5       **MR. COONEY:**  I will, Your Honor.  So I'll be very

6  brief on both of those.

7     With respect to the ability to file a short -- and I think

8  we've asked for 3,600 words at maximum -- response to the -- to

9  the Government's brief -- and we may get into some of this when

10 we argue state action immunity.  But the Government is

11 suggesting that there is a market participant exception to the

12 state action immunity doctrine and that -- that has not been

13 presented as -- I guess as clearly or forthrightly until their

14 brief.

15      **THE COURT:**  I thought the Plaintiffs suggested that

16 too.

17      **MR. COONEY:**  They did suggest it, but they did so in

18 the context of both hybrid transactions and what we view as an

19 attempt to resurrect the conspiracy exception to the state

20 action immunity.

21     The Government flat says, "If you're a market participant,

22 it doesn't make any difference what kind of an agency you are

23 with the state.  You don't get state action immunity."  So I

24 think that's an example of one issue some very brief response

25 may be appropriate on.

1    With respect to inviting a -- the State of North Carolina

2  to file an amicus, should it choose to do so, in the interest

3  of candor, I've certainly sent these materials to the Attorney

4  General's office.

5            **THE COURT:**  I mean, they were a party --

6            **MR. COONEY:**  They were.

7            **THE COURT:**  -- at the beginning of this case.  I think

8  they had private counsel at least for Dr. Roper.  I can't

9  remember exactly who was here back then, but certainly it's

10  fair to say the State of North Carolina has known about this

11  litigation since the beginning.

12            **MR. COONEY:**  They did and I think the Government has

13  received actually a letter from the State of North Carolina,

14  which I'm sure it wouldn't object to sharing with the Court,

15  about the Government's position on this.

16    But the fact of the matter is if there is a finding here

17  that UNC, depending on how the Court wants to approach that, is

18  not an immune entity, that has enormous implications across the

19  entire state of North Carolina well beyond the medical schools.

20  There are -- as Your Honor well knows, there are places in

21  North Carolina where the UNC constituent institution, for

22  instance, in Elizabeth City, is the major economic driver.  It

23  dominates the market.  And if suddenly UNC is not going to be

24  immune from the antitrust laws in those smaller venues where

25  it's conducting business, it has enormous consequences for the

 1  university system as a whole.

 2          **THE COURT:**  Well, I guess my question is:  Why are you

 3  suggesting this now?  I mean, we've been talking about immunity

 4  for, it feels like, years and it -- you know, why should -- if

 5  I was going to invite them -- you know, now if I invite them,

 6  what -- they're going to want six or eight weeks.  How much

 7  time do I have to give them?  You all have a trial date.

 8          **MR. COONEY:**  Yes, Your Honor.

 9          **THE COURT:**  Why -- why now?  What's happened now?

10          **MR. COONEY:**  The Department of Justice decided to

11  weigh in on that issue in particular.  We've had conversations

12  with the Department of Justice.  We certainly knew towards the

13  end of last year and the early part of this year they were

14  looking very strongly at rule of reason.  They've -- they've

15  intervened on rule of reason/per se arguments elsewhere in the

16  country, but it's only recently -- and I say recently, you

17  know, about the beginning of February -- where we -- we were

18  given notice they were looking at state action immunity.

19      Now, we didn't know what their position was until we

20  actually got the brief, but we operated under the assumption we

21  probably weren't going to like it even though they didn't

22  communicate it directly to us and that's -- that's what's

23  changed and we wouldn't have suggested that but for the

24  Department of Justice's brief on that subject.

25          **THE COURT:**  Okay.  All right.  Let's take a 10-minute

 1  recess.

 2      (A morning recess was taken from 10:45 a.m. until

 3  10:56 a.m.; all parties present.)

 4          **THE COURT:**  Okay.  I've gotten a little more caffeine

 5  and I'm ready to go.  We'll talk on the -- about the

 6  per se/rule of reason issue next.

 7      I will just say I'm not really inclined to let anybody file

 8  additional briefs, but -- so if there's something you want to

 9  say, you should say it now on that and the immunity issue when

10  we get to that one.

11      And because I'm inclined to rule for the Plaintiff on that,

12  I'll hear from Duke.

13      You know, I ruled on the per se issue and I've tried to get

14  the Fourth Circuit to tell me if I was right or wrong and they

15  were disinclined and I don't really see that anything has

16  changed.  I mean, that's a legal issue, it seems like,

17  primarily.  The -- on the -- I'm sorry.  I'm getting my

18  immunity issue mixed up.  I apologize.  So let me just stop

19  talking, since apparently I haven't had quite enough coffee,

20  and we'll talk about per se/rule of reason and I'll reserve my

21  comments until we get to the immunity issue.

22      And I believe, let's see, it looks like Ms. Bass.

23          **MS. BASS:**  Good morning, Your Honor.  I'm Ashley Bass

24  for the Duke Defendants.

25      The per se standard applies only if the conduct has

1  consistently to be found to be illegal under the rule of

2  reason --

3          **THE COURT:**  So you're going to need to slow down.  I

4  hear Southern.

5          **MS. BASS:**  Okay.

6          **THE COURT:**  Go ahead.

7          **MS. BASS:**  I'll try again.  The per se standard

8  applies only if the conduct has consistently been found to be

9  illegal under the rule of reason and the Supreme Court has

10  consistently pared back what is considered per se conduct.

11          **THE COURT:**  But market allocation agreements have

12  consistently been -- between horizontal competitors have

13  consistently been found to violate -- I mean, they've

14  consistently been found to be per se unreasonable, right?

15          **MS. BASS:**  That is right, Your Honor, but this is not

16  a market allocation agreement.

17          **THE COURT:**  Why not?

18          **MS. BASS:**  In a traditional market allocation case,

19  you have two businesses that are competing for customers.

20  Those businesses agree to cease competing.  In that context, we

21  believe that there is a predictable consequence to what happens

22  to prices when the customers no longer have the two businesses

23  competing for their business.

24      Here you're presented with an antitrust case like no one

25  has ever seen before.  It is a very narrow agreement alleged to

1   exist between two nonprofit institutions.  The agreement did
2   not create a ban on all hiring.  Rather, it only affected
3   certain medical faculty.  It did not apply to initial hires.
4   The Plaintiff admits that their salaries were set
5   competitively.  It did not apply to people who were hired into
6   promotions.
7           **THE COURT:**  So if you had two competitors who competed
8   in the whole state of North Carolina and they agreed to just
9   divide up their customers in Alamance County -- you're not from
10  North Carolina -- Alamance County and Orange County, which are
11  two adjoining counties in North Carolina, and they agreed to
12  compete in the rest of the state, but just in those two; and
13  even more particularly, they only agreed to divide up customers
14  for widgets as opposed to everything else that they sold, then
15  in your view that would not be per se unreasonable?
16          **MS. BASS:**  Again, I don't think that's our case at
17  all.  I mean, these are two nonprofit institutions.  They are
18  not in a traditional business context.  So whatever we might
19  think would necessarily apply in the business context, the
20  Supreme Court has been clear that it has been reticent to apply
21  per se rules to conduct that is outside traditional business.
22          **THE COURT:**  But the Supreme Court has also been clear
23  that the antitrust laws apply to nonprofits, right?
24          **MS. BASS:**  No question about that.  But the question
25  is what standard applies.  So with respect to the Supreme

1  Court, what they found in the *Indiana Federation of Dentists*

2  and the *National Society of Professional Engineers* is that we

3  should be slow to condemn conduct that exists in situations

4  that we're not familiar with; and in those particular cases,

5  that dealt with instances where the conduct clearly could be

6  characterized as horizontal conduct.

7      At issue with *Indiana Federation of Dentists* was basically

8  a ban on a group or boycott-type ban; and similarly on *National*

9  *Society of Professional Engineers,* it was a ban on competitive

10  bidding.  What the courts said in both of cases is:  "Of

11  course, those look like normal horizontal type of agreements

12  that in a normal business context we might say were per se, but

13  we're not going to say that.  We're going to apply the rule of

14  reason."  And what courts since then have said is that we need

15  to be particularly careful in context where it's not just a

16  traditional business.

17      And, indeed, in *United States versus Brown University,* what

18  the Third Circuit held was that nonprofit institutions like

19  academic schools deviate even more from a normal

20  profit-maximizing prototype than the professional services

21  groups that you see in the *Federation of Dentists* case and also

22  in the *Society of Professional Engineers.*

23      Now, you might say, well, this is the Third Circuit.

24  That's not the Supreme Court.  So what does that tell me?

25          **THE COURT:**  Well, actually, what I would ask is where

1  is your evidence from somebody who comes in and is going to get

2  on the witness stand and say, "Duke and UNC entered into a

3  horizontal agreement not to hire each other's faculty in these

4  limited circumstances because" -- and then they give me all the

5  good reasons that they did it.  Who is going to come in and say

6  that?

7          **MS. BASS:**  First off, we would never say that we

8  entered into an agreement.

9          **THE COURT:**  Exactly.

10         **MS. BASS:**  Of course.  But, obviously, there are no

11 requirements under the law that we have to admit a violation of

12 the law in order to explain to you, number one, why we don't

13 think an agreement exists or, number two, what we think the

14 proper rule of law is and why there could be procompetitive

15 efficiencies that could flow from --

16         **THE COURT:**  This is summary judgment, so you have to

17 have some evidence that you entered -- that -- that the

18 agreement has procompet -- let me think.  How would I say this?

19 Maybe you don't have to have evidence that you entered into it

20 for procompetitive reasons, but don't you have to have some

21 evidence and it --

22         **MS. BASS:**  Well, this is not an application for

23 summary judgment.  This is an application regarding what legal

24 standard will apply to the case and the question is whether or

25 not we should be applying the per se standard or whether we

1  should be applying the rule of reason standard.  Those

2  standards will have consequences with respect to, obviously,

3  the case going forward.

4      Now, we think that, with respect to our briefing, we have

5  set forth the nature of how there could be procompetitive

6  efficiencies with respect to either unilateral or joint conduct

7  in this kind of an area where two nonprofit institutions, who

8  are obviously close in space -- they collaborate all the time.

9  They collaborate across a number of dimensions:  Individual

10  faculty, groups of faculty across, writing projects, teaching

11  projects.

12      **THE COURT:**  Doesn't the collaboration and the -- and

13  the horizontal agreement, don't they have to be, like,

14  connected?

15      **MS. BASS:**  No, Your Honor.  That's with respect to the

16  ancillary restraints doctrine and we explained in our brief

17  that the ancillary restraints doctrine actually applies once

18  you've already determined that the conduct is per se.  So once

19  you've determined that the conduct is per se, only then can you

20  say, "Well, was there an ancillary restraint such that we

21  should really actually take a closer look at this and determine

22  if there was an overall good to the conduct?"

23      That's not where we are.  We're at the stage beforehand.

24  We're trying to determine whether or not the rule of reason

25  should apply or whether the per se rule should apply; and in

1  that context, there's no sort of stringencies about what kind
2  of evidence we should be able to offer regarding potential
3  procompetitive benefits that could flow from this type of
4  relationship.

5      And as we've set forth in our briefing, the schools do
6  collaborate all the time; and given that they are not
7  profit-maximizing businesses, they're not in the business to
8  necessarily compete with one another and bump heads.  They're
9  in the business of cooperation.  This school wanted --

10         **THE COURT:**  I want to be sure we're all on the same
11  page.  I perceive that the issue before me is the whole
12  question:  Rule of reason, per se, ancillary.  But what you
13  just said to me a second ago -- a minute ago makes it sounds
14  like you do not think that second part -- if I were to say this
15  is per se, then you examine whether there is an ancillary part
16  of that.  You're saying that's not before me?

17         **MS. BASS:**  I'm not saying that's not before you, but
18  I -- the question I think intended to discuss whether or not
19  our briefs had discussed procompetitive benefits and whether
20  they needed to be tightly tied to the alleged agreement and
21  whether we needed to admit the alleged agreement in order to
22  have that kind of a discussion.  So what I was trying to say
23  was that under the per se rule you really only get to the
24  ancillary restraints discussion once you determine that the
25  conduct is per se.

1          **THE COURT:**  Right.

2          **MS. BASS:**  And so that would be just a variant of

3    deciding whether or not the rule of reason applies or the

4    per se rule applies.  To the extent you were to determine the

5    per se rule applies, we certainly think that we would have

6    evidence to present on the ancillary restraint point as well.

7          **THE COURT:**  That you haven't already put before me?

8    Because I perceive the ancillary restraint issue to be before

9    me.  I'm trying to figure out --

10         **MS. BASS:**  We're not seeking summary judgment here

11   with respect to saying that we win the case.  We're seeking to

12   determine which rule applies.  So the choices are binary.  The

13   choices are either the rule of reason or the per se.  Those are

14   the two choices that we're attempting to get at at the moment.

15   So our position is that this is not a proper case for the

16   per se rule to apply.

17       Judicial experience requires us to be able to determine

18   what rule applies.  This would be the first time that any court

19   has been asked to apply that rule, so that's one of the reasons

20   that just moving just directly into the per se discussion and

21   the ancillary restraint discussion is a little putting the cart

22   before the horse.

23         **THE COURT:**  Okay.  So I'm trying to figure out what

24   I'm being asked to rule on here because you're the party that's

25   moved for summary judgment, not the Plaintiffs.  So is it --

1  it's your position that I should say the rule of reason

2  applies.

3          **MS. BASS:**  Yes, Your Honor.

4          **THE COURT:**  Imagine I don't do that.  Imagine that I

5  say the per se rule applies.  Then at trial are you going to be

6  offering evidence of ancillary restraint?  I mean, I perceive

7  that the Plaintiff has asked me -- while they didn't move for

8  summary judgment themselves, they are also saying there's no --

9  there's no evidence of ancillary restraint.  So they're

10  addressing the whole ball of wax.  Do you see what I'm asking

11  you?

12          **MS. BASS:**  I do.  I would not construe their motion as

13  seeking summary judgment on the issue that there is no evidence

14  to put forth at trial on the issue of an ancillary restraint.

15  I think that, obviously, the issues of procompetitive benefits

16  and the issues that go towards ancillary restraints are very

17  similar and they overlap a good bit.

18      So in our briefing, we obviously focused on the

19  procompetitive benefits because we believe that the rule of

20  reason applies to this case.  So I don't think the Plaintiffs

21  have moved as a matter of law that we are precluded from

22  presenting evidence at trial on ancillary restraints to the

23  extent that Your Honor rules that the per se rule applies.

24          **THE COURT:**  Okay.  Thank you.  I interrupted you.

25  I'll give you a few more minutes here.

1    **MS. BASS:**  So in terms of thinking about the

2    presumptive rule here is the rule of reason, obviously the

3    Supreme Court has significantly pared back on the types of

4    cases that can be considered per se, and here we would submit

5    that the Plaintiffs and the Department of Justice have given

6    you no reason to deviate from the presumption of the rule of

7    reason.  No no-hire or no-solicitation or no-poach case has

8    ever gone as far as it has -- as this litigation.

9         **THE COURT:**  But the cases that are out there -- the

10   most recent cases that are out there all indicate that the

11   per se rule would apply.

12        **MS. BASS:**  In those cases, the courts determined --

13   some of them rejected the per se rule, but the courts

14   determined that the cases could move past the motion to

15   dismiss.

16        This case is in a very different context.  At this point we

17   have to decide what we're going to instruct the jury on as a

18   matter of the merits.  And Plaintiffs and the Department of

19   Justice have offered you no case in this area that has been --

20   reached summary judgment before, that has reached trial or that

21   has reached a court of appeals; and when we don't have

22   experience with a judicial -- with restraint, then judicial

23   experience tells us to not necessarily apply the rule of

24   reason.  I'm sorry.  Not necessarily apply per se.

25        So in this instance, what the Supreme Court tells us is

1   that we need to find cases that repeatedly find that the

2   conduct at issue is illegal under the rule of reason before we

3   treat it as being per se.  Here the Plaintiffs and the

4   Department of Justice have offered you not a single case where

5   a court has made a merits determination or a jury that a

6   no-hire case like this is illegal under the rule of reason.

7        So it would necessarily then not follow that we would apply

8   the per se rule given that the Supreme Court has told us that

9   we need to find repeated instances that conduct is ruled

10  illegal under the rule of reason before applying the per se,

11  and that certainly would be the case in a situation like this

12  where a party has put forth procompetitive benefits and where

13  the situation is atypical.

14       That was part of the reason that the Third Circuit ruled

15  the way it did in *United States versus Brown University.*  It

16  looked at the situation there.  There was no question that the

17  type of aid-based agreements that were going on were considered

18  a type of potential price-fixing and there was no issue between

19  the court -- the court understood that the schools could be

20  doing it for a revenue-increasing purpose.  But yet the Third

21  Circuit said, "We're going to apply the rule of reason because

22  this is not a normal business context where we have businesses

23  that are necessarily trying to maximize profits."  So because

24  of the unusual context of the restraint, the court applied the

25  rule of reason.

1      **THE COURT:**  But here all of the evidence is -- and you

2   correct me if I have overlooked something -- that if there was

3   this conspiracy, they were doing it to reduce their costs,

4   which is the flip side of increase -- you know, dealing with

5   prices.  Here you're talking about employees.  If you're

6   dividing up the market for employees in order to reduce your

7   costs, which increases your profits or at least increases the

8   money available to spend on other things -- and so why is that

9   not a horizontal market allocation?  I'm still not quite

10  following that.

11     **MS. BASS:**  Two reasons.  The first reason is you have

12  to think of the context of the institution; that if the alleged

13  agreement resulted in lower salaries for faculty members, no

14  one at Duke or Carolina was then putting the money in their

15  pockets and taking it home.  This is a larger holistic set of

16  universities.  They have missions and goals that are not about

17  profit maximization.  So for that reason, we can't necessarily

18  assume, even with respect to what the evidence may say, that it

19  necessarily would have resulted in lower salaries for faculty.

20  So I think the first issue is the context of it.

21     Second is that part of the reason that there is a potential

22  anticompetitive effect here is the very narrow way that the

23  Plaintiff is looking at this case.  The Plaintiff looks at it

24  as if it is just Duke and just UNC; and by applying the per se

25  rule, we get to only limit it just to Duke and just to UNC.  We

 1   don't look at the broader competitive consequences of the
 2   potential restraint.  We don't look at all of the very robust
 3   local competition that exists and all of the national
 4   competition that exists by which we might not feel any sort of
 5   an anticompetitive impact from the alleged agreement.
 6        So those are two reasons that it's not necessarily the case
 7   that this alleged agreement was made in order to simply
 8   restrict pay in a way that would have hurt faculty.
 9        **THE COURT:**  That's all the evidence that there is.
10   I'm unfamiliar with any evidence -- and I'm asking you -- that
11   they entered into this agreement for any reason other than to
12   suppress faculty pay.  Is there any such evidence?
13        **MS. BASS:**  I mean, the whole purpose of the rule of
14   reason is not necessarily to prejudge what the evidence will
15   show at trial.  It's to take the -- the situation that we have,
16   the context that we have, which here we have two nonprofit
17   institutions, and then to allow what the presumptive rule would
18   be, which is the rule of reason, to then allow all of the
19   evidence to come in so we can consider all of the competitive
20   effects.  So Your Honor has --
21        **THE COURT:**  But, I mean -- I guess I'm not really --
22   I'm not really understanding your motion then because you could
23   do that and then at the close of the evidence I could say
24   per se because you haven't presented any evidence sufficient to
25   give rise to a rule-of-reason analysis, it's a horizontal

1  market allocation and none of your evidence undermines that.

2      So I don't understand what you're asking me to decide.  I

3  mean, I thought you-all were presenting all of your evidence as

4  to -- not just a straight legal question, but the evidence

5  relevant to the legal question, and it sounds like you're

6  saying something else.

7          **MS. BASS:**  I think that the purpose of the motion was

8  in order to discuss which legal rule would apply.  We certainly

9  set forth evidence that we thought was relevant to that,

10  including what the missions of the schools are, how they do

11  collaborate, and what the potential procompetitive benefits

12  would be.  So I think that information was submitted with our

13  briefs on this issue.

14          **THE COURT:**  Okay.  All right.  Go ahead.  A couple

15  more minutes if there's anything else you want to add.

16          **MS. BASS:**  Your Honor, we would just say again that I

17  think that the -- given that the presumption is that -- the

18  rule of reason, we would think that there would need to be at

19  least a single no-hire or no-poach case that has gone as far as

20  this case has, where there has been a merits determination that

21  it's illegal under the rule of reason.  We don't even have a

22  single case like that.

23          **THE COURT:**  That's because everybody most recently is

24  just like you-all.  There's all this paper evidence of an

25  agreement; and once the court intimates that the per se rule

1    applies, they settle.  I mean, isn't that what happens?

2          **MS. BASS:**  There are many cases that are still

3    pending, Your Honor.

4          **THE COURT:**  Which ones?

5          **MS. BASS:**  Pardon?

6          **THE COURT:**  Which ones are still pending?

7          **MS. BASS:**  There's -- the *Rail Equipment* case is still

8    pending.  There's the *McDonald's* case that's still pending.

9    These are all cases that are just at the motion to dismiss

10   stage.

11         **THE COURT:**  Okay.  So I -- which *McDonald's* -- what's

12   that case?  Did you-all cite that to me?  Was there a motion to

13   dismiss decision?

14         **MS. BASS:**  Yes, Your Honor.  That's the *Deslandes*

15   case.

16         **THE COURT:**  Oh, okay.

17         **MS. BASS:**  So all of those cases are very --

18         **THE COURT:**  But that was a franchise case.

19         **MS. BASS:**  Yes.  All of those cases are very recent,

20   so they're all --

21         **THE COURT:**  But *Deslandes* was a franchise case and

22   while it -- it specifically said if this did not involve

23   franchisee/franchisor, whichever it is, it would be a per se

24   case, right?

25         **MS. BASS:**  Correct, Your Honor.  My point is that

1  there are a number of these types of cases that are just

2  pending.  They haven't reached resolution.

3     And so given that, it would short-circuit the process to

4  simply just call this case per se without allowing at least a

5  single case to go forward that has found the type of conduct at

6  issue here to be illegal under the rule of reason.

7        **THE COURT:**  Okay.  Thank you.

8     For the Plaintiff.

9        **MR. HARVEY:**  First, with respect to what we're

10  deciding today versus down the road, I think Your Honor has it

11  exactly right.  The purpose of today is to figure out what is

12  the standard that will apply at trial.  Both sides have given

13  you whatever evidence they decided to give you on that question

14  and it's submitted for the Court's decision.

15     Secondly, I think the thrust of Duke's argument today is

16  that no-poach agreements are something new and we don't know

17  what they are and we don't know what affects they have, so we

18  should go to trial and do a rule-of-reason analysis before we

19  apply the per se standard.

20     The Supreme Court has rejected precisely this argument for

21  a long time.  I think it was said probably best in the *Maricopa*

22  *County* case, which said that the whole point of the per se rule

23  is that you don't have to redo an entire rule-of-reason

24  analysis every time a blatantly anticompetitive agreement

25  arises in a new industry.

1    I'll agree that applying the antitrust laws in the labor

2  context in this way is relatively new, but it's not that new.

3  I think the landmark enforcement action of the U.S. Department

4  of Justice starting in 2009 against seven high-tech companies

5  started what I would describe as the modern era of this

6  analysis; and since then, many courts in several different

7  circuits have examined at the motion to dismiss stage if

8  plaintiffs can prove that it was a naked restraint -- that is,

9  it wasn't part of some other procompetitive agreement -- then

10  it's a market allocation agreement and it's per se unlawful.

11  That was decided in two cases in the Northern District of

12  California, the *High-Tech* case and the *Animators* case, and

13  actually a third case, the *eBay* case in the Northern District

14  of California.  It was also decided in the *Deslandes* case,

15  which is the *McDonald's* case that counsel mentions.

16    Counsel neglects to say the other part of that decision,

17  which we quote in our brief, which is the court said, well,

18  this would be obviously anticompetitive in a context outside of

19  the franchise context and the court would not hesitate to apply

20  the per se standard.  It was only because of the particular

21  aspects of that franchise agreement.  One, it was ancillary,

22  arguably, in the sense that the agreement was part of the

23  franchise contract.  It was a paragraph within the contract

24  itself.  And so McDonald's -- and we're counsel for plaintiffs

25  in this case.

1    McDonald's is making the argument that the franchisees
2    wouldn't have engaged in this cooperative endeavor but for this
3    assurance that we're going to avoid competition.  So they
4    concede the agreement exists, of course.  It's right there in
5    black and white.  And they argue what the effects are.

6    That's the way this always arises and it's the way it arose
7    in every single case Duke cites in its brief.  In every single
8    case, it's an agreement that the defendant concedes exists and
9    they argue that it was part of some competitive enterprise that
10    required the restraint on competition to do what it did.

11    So I'll address a couple of the cases that Duke's counsel
12    mentioned.  First, in the *Brown* case, according to Duke, *Brown*
13    stands for the proposition that a nonprofit university can
14    violate the antitrust laws in any manner it wants and it's
15    guaranteed a differential rule-of-reason standard of review.

16    Absolutely not.  That's not what that case says.  What that
17    case says is in this particular context, which was a coalition
18    of universities that coordinated the distribution of financial
19    aid, in the university's view, this spread financial aid to
20    more individuals and so it helped more people go to college.
21    That was their argument.  And the Third Circuit said, well, in
22    this context, I think if Duke can prove that -- I'm sorry -- if
23    the coalition of universities can prove that, then the rule of
24    reason standard will apply and so on and so forth.

25    That is very different from this case where, one, Duke

1    insists that the agreement never happened and, two, there is

2    absolutely no evidence in the record, none, that the agreement

3    was necessary or important or part of some collaboration that

4    they mentioned.

5        And quite to the contrary, in our brief we cite -- we asked

6    this question of every witness we deposed.  In every single

7    one, the witnesses said, "I have no idea what you're talking

8    about.  Of course it wasn't."

9        I think perhaps the most insightful was from Dr. Keohane,

10   who is the former president of Duke, where she said, "I'm not

11   aware of any collaboration between any university anywhere in

12   the country that needed a no-poach agreement."  Because, of

13   course, other universities in the country collaborate with each

14   other aside from Duke and UNC.  This is not something unique to

15   the Research Triangle and they don't need no-poach agreements

16   to do what they do.

17       In this particular case, we know that because UNC entered

18   into a consent decree that the misconduct at issue in this case

19   has ended and Duke has not brought any evidence to the table to

20   say, "Well, as a result of the consent decree, we're not able

21   to collaborate as effectively with UNC and so we're not able to

22   do our research as well" or whatever.  There's nothing of that

23   in the record.

24       Another point that counsel for Duke made was that a market

25   allocation agreement should not be per se unlawful unless it

 1   eliminates all competition between competitors.  Now, in Duke's

 2   opening brief, Duke cited to the *United States versus Kemp,* a

 3   district court decision in the District of Utah for that

 4   proposition.

 5        After they served their brief, the Tenth Circuit gave

 6   guidance to the district court that said, "Actually, I don't

 7   think that's right.  You should rethink it."

 8        On remand, the district court, in the supplemental

 9   authority we filed on Friday, did a 180 and said, "I got it

10   completely wrong.  You don't need to seesaw competition between

11   competitors in order for the per se standard to apply.  If

12   you're eliminating competition, however small it is, if it's

13   naked, it's per se unlawful."

14        Finally, with respect to the impact at trial, the −− the

15   decision of the relevant rule to apply certainly is important

16   to decide now because it's very instructive to what the trial

17   will look like, so it's another reason to do it now.

18        Secondly, counsel said that without the rule−of−reason

19   standard they're going to have their hands tied behind their

20   backs and they're not going to be able to argue that

21   competition from other universities restrained the ability of

22   the conspiracy to suppress prices.  That's just not so.

23             **THE COURT:**  No.  They'll be able to argue no antitrust

24   impact and no damages for sure.

25             **MR. HARVEY:**  Exactly, Your Honor.  So unless the Court

1  has any further questions, I'm done.

2          **THE COURT:**  All right.  Does the United States want to

3  weigh in?

4          **MR. LEVIN:**  Yes, Your Honor, and we appreciate the

5  ability to appear here today.

6      We agree with you that the alleged no-poach agreement is a

7  horizontal market allocation between competitors.  I heard Duke

8  say three reasons why it should not be viewed as so:  One,

9  because they would have to cease competing; second, because

10  there are exceptions to the agreement; and, third, because

11  they're nonprofit universities.  None of those are valid bases

12  for not applying the per se rule.

13      First, for their argument that it's only a per se market

14  allocation if they cease competing in the same market, that's

15  been directly rejected by the *Kemp* case he just cited, as well

16  as the Supreme Court opinion in *Palmer.*  That's at 493 –– or

17  498 U.S. 46 at pages 49 and 50.  There the Eleventh Circuit

18  held that the per se rule couldn't apply unless they previously

19  competed in the same market.  The Supreme Court flatly rejected

20  that.  So that's the ceasing competing.

21      For the second point that it's not a market allocation if

22  there's exceptions, again, that has been repeatedly rejected by

23  the courts.  There are often allocations that either don't

24  divvy up an entire market or there's exceptions because people

25  cheat on it.  The courts still always consider them market

1  allocations.

2      An example I would look at is the *Cadillac Overall Supply*

3  case that's cited in our brief.  It involved a customer

4  allocation between garment disposal for -- who make, I'm sorry,

5  uniforms for -- school uniforms and you'll see that there were

6  exceptions.  The agreement was a nonsolicitation.  They were

7  supposed to not solicit each other's --

8          **THE COURT:**  Slow down.  Say again.

9          **MR. LEVIN:**  I'm sorry.  In that case, they agreed not

10  to solicit each other's customers, as well as they also

11  actively tried to discourage their customers from switching,

12  but they did have customers who switched between them.

13      So there are -- there are many cases where there has not

14  been a full divvying up of the market, yet it has still been

15  deemed per se illegal.

16      And then neither Duke's nor University's nonprofit

17  statuses -- their tax status nor the fact that they're

18  universities gives them a free pass from the per se rule.  If

19  they engage in a per se restraint like price-fixing or market

20  allocation, it's per se unlawful.  They allege -- they try to

21  point to their public service attributes, but there's cases

22  where that has been rejected.

23      And I would point the Court to the *Superior Court Trial*

24  *Lawyers* case, which is not cited but found at 493 U.S. 411.

25  That involves federal public defenders who agreed -- who tried

1  to fix the price for their indigent clients and they argued

2  that it would allow them to serve -- if they fix the price,

3  they would get more money, it would allow them to serve them

4  better; and the Supreme Court held, no, it's per se illegal.

5      The *Maricopa* case involved a per se illegal determination

6  for doctors even though they had some public service

7  attributes.  So none of these things are a pass from the per se

8  rule.

9      And one last thing.  They mentioned the *Rail Equipment*

10  case.  That started in our -- as an enforcement action when the

11  defendants agreed to enjoin the unlawful no-poach agreements.

12      So we appreciate your time.

13      **THE COURT:**  All right.  Thank you.

14      And so Duke has told me that if I decide the per se rule

15  applies then there is still a second question about ancillary

16  restraints.  They've talked about the overlap between this

17  procompetitive effects argument that applies to whether or not

18  it's per se or not.  So can you speak to that -- briefly to

19  that argument?

20      **MR. LEVIN:**  Yes.  So the ancillary restraints doctrine

21  will exempt if a -- a restraint that's normally per se illegal

22  from the per se rule if a defendant proves there is a separate

23  legitimate collaboration between the entities and the restraint

24  is reasonably necessary to it.

25      So, for example, in *Polk Brothers* -- that was a Seventh

1  Circuit case by Judge Easterbrook -- two companies decided to
2  build a retail facility and they allocated which companies can
3  sell which product.  The court said that's an ancillary
4  restraint because they both needed the assurance that they
5  would be able to operate in order to get the profit to build
6  the building.

7      There's -- I have -- we have -- they haven't identified any
8  particular collaboration like that here.  We don't know.  The
9  facts are yet to be determined, so we haven't taken the
10 position that they can't, but it does seem to us very hard to
11 establish the ancillary -- that a restraint is ancillary if
12 they also deny its existence because if they needed -- they're
13 achieving whatever collaborative benefits they need to, but
14 they're also saying you don't need the restraint to do that
15 because they don't have one.  So it's very hard to understand
16 how they would satisfy the reasonable necessity defense at --
17 aspect of the ancillary defense at trial.

18     **THE COURT:**  Okay.  Did the Plaintiff want to address
19 that point beyond what the Government said, that argument and
20 the way that the Defendant presented it?

21     **MR. HARVEY:**  The only comment I would make -- I mean,
22 I agree completely with the United States -- is that -- on the
23 question of when do we decide this.  That is also now.  If they
24 want anything other than the per se standard, they have to show
25 that an agreement that they denied ever happened was reasonably

1  necessary to some procompetitive benefit they haven't

2  identified.

3         **THE COURT:**  Okay.

4         **MR. HARVEY:**  And they haven't done so.

5         **THE COURT:**  All right.  Ms. Bass.

6         **MS. BASS:**  Your Honor, cases like *Maricopa* and the

7  *Trial Lawyers* case actually prove our point.  The underlying

8  actors there were acting as actually business entities, as

9  private entities.  They were lawyers that were trying to set

10 the prices by which they would charge for their fees.  So in --

11 and doctors similarly in *Arizona versus Maricopa.*  Those were

12 doctors who were charging the prices-- the maximum prices that

13 they would charge to insurers.  So the whole point is that

14 cases like that, that deal with the business context, are very

15 different than cases like what we have here.

16     My next point would be that --

17        **THE COURT:**  But why from the business context -- I

18 mean, these doctors are employees.  You're talking about how

19 much they get paid.  From their perspective, this is a business

20 context completely and totally.

21        **MS. BASS:**  But that's the teaching of what *Brown* says.

22 And even in *California Dental,* which is a Supreme Court case,

23 *California Dental* recognized that *Brown* was looking at a

24 different context.  It noted that in situations -- *California*

25 *Dental* was all about whether or not we should be applying a

1  more shortened look at certain conduct, whether it should be

2  quick look; and there it cited *Brown* for the notion that the

3  rule of reason was relevant there because the -- the

4  universities had potentially other interests at play beyond the

5  types of interests -- economic self-interests that are at play

6  when it's these societies -- a business context or societies

7  that deal with people who are private actors acting in their

8  own economic self-interest.  That is simply not what Duke and

9  UNC do.  They are not actors that act in their own economic

10 self-interest.  So that's the teaching of *Brown* and the Supreme

11 Court has recognized that.

12         **THE COURT:**  Except all of the evidence in this case is

13 that if there was an agreement it was entered into in order for

14 UNC and Duke to further their economic interests.  Now, I

15 appreciate you've got a lot of evidence that they didn't enter

16 into the agreement, so I'm not ruling on that, obviously, one

17 way or the other.  But I'm trying to figure out what evidence

18 is there that they entered into this agreement for reasons

19 other than their own economic self-interest.

20         **MS. BASS:**  I think the point would be that there are

21 broader missions to the schools and broader context to the

22 schools.  So the issue would be whether or not we should say

23 that the alleged conduct is per se illegal and necessarily

24 would have anticompetitive consequences to it.  In the context

25 of a normal business case, where it's a normal, traditional

 1  market allocation or a customer allocation, then we could say

 2  that we would see necessarily that that's the type of impact we

 3  would expect.  But here the schools have broader missions.

 4  They have broader goals.  The whole purpose of UNC as a state

 5  entity is to take care of --

 6          **THE COURT:**  I'm not hearing you tie that to the

 7  agreement.  I mean, I hear what you're saying, so I'm with you

 8  that hypothetically you could have these two schools.  They

 9  could come in.  They could sit down and talk to each other and

10  say, "Gee, healthcare costs are totally out of control.  We're

11  nonprofits.  In order to be able to provide healthcare to

12  indigent people, we've got to get our" -- I don't know.  Blah,

13  blah, blah.  And then as part of that they agree on this not --

14  no poach.  But you don't have any of that here.  You just --

15  you've got two disconnected things --

16          **MS. BASS:**  I think that's --

17          **THE COURT:**  -- the agreement and these hypo -- these

18  reasons you're talking to me about.  So help me understand why

19  there does not have to be connecting evidence.

20          **MS. BASS:**  Sure.  I mean, the schools recognize that

21  there was a collaborative aspect to them, right.  They

22  recognize that there was a benefit in not necessarily

23  unilaterally engaging in raids against the other schools.

24          **THE COURT:**  An economic benefit to keeping

25  compensation down.

1    **MS. BASS:** Your Honor, there was an overall benefit in
2  the context of things that our experts have talked about, which
3  are like freeriding in terms of not allowing people to -- for
4  one of the schools to recruit a faculty member to the Triangle
5  and then the other school immediately taking the other faculty
6  member. There's a benefit in not having that happen.

7    **THE COURT:** Right. And what's your evidence that's
8  the reason for the agreement?

9    **MS. BASS:** We've offered expert opinion here that has
10  relied on a review of the record and people talking about
11  the -- the interest that people had in not, you know, raiding
12  other faculty at the other institution.

13    **THE COURT:** No. I mean, an expert cannot say what
14  somebody's intent or reason was, I don't think. We're going to
15  talk about that later. So what's your underlying factual
16  evidence that there was a connection?

17    **MS. BASS:** Right. We've cited evidence from the
18  record where the schools have talked about that they wanted to
19  see a growth of both schools, a collaboration of both schools,
20  and not to do things that would necessarily denigrate that
21  relationship unnecessarily.

22    **THE COURT:** Okay. Tell me who -- tell me.

23    **MS. BASS:** It's cited in our papers and we're happy to
24  submit anything on that. It is -- it's the -- that type of not
25  aggressively seeking to raid in order to try to protect the

1    overall --

2        **THE COURT:**  I understand what you're saying.  I'm

3    asking you to direct my attention to the evidence.

4        **MS. BASS:**  Okay.  So the broader collaborative

5    relationship is discussed at page 8 of our brief and that

6    includes cites to the president of Duke, Nan Keohane, also

7    the dean of the Duke Medical -- of the UNC medical school,

8    Dr. Roper.

9        **THE COURT:**  And they connect that to this no-hire

10   agreement?

11       **MS. BASS:**  Within their testimony, they definitely

12   talk about the desire not to raid.  Now, our -- our baseline is

13   that there was not an agreement.

14       **THE COURT:**  Right.

15       **MS. BASS:**  So -- but the whole point is that they have

16   talked about that they had a unilateral interest in not

17   attempting to go out and raid faculty from the other school and

18   that -- again, it enures to the benefit of the collaborative

19   relationship between schools.

20       **THE COURT:**  All right.  I think I understand what

21   you're saying.

22       **MS. BASS:**  Okay.  So in *Brown* -- I think it's

23   important for us to talk a little bit about what the facts were

24   in *Brown* because, yes, there was the public policy aspect of it

25   of potentially spreading helpful aid across the needy students,

1  but the court obviously said there was obviously a price-fixing

2  element to it.

3          **THE COURT:**  A what?

4          **MS. BASS:**  A price-fixing element to it.  So by the

5  schools setting the exact same amount of financial aid that

6  they would offer to any individual student, the schools

7  necessarily also set the amount of aid that they would be

8  receiving -- the amounts of payment they would be receiving in

9  tuition.  They were setting the prices to these students across

10  all of the schools and they were jointly determining how much

11  aid the students would be offered and that joint determination

12  didn't help the students in terms of financial aid.  Each of

13  the joint determinations ratcheted down the amount of financial

14  aid that would be given from public sources to the students,

15  making them pay more.

16      So there was -- in the court's eyes, there was no issue

17  with the fact that, yes, it could possibly be viewed as a

18  horizontal price-fixing agreement and the court acknowledged

19  that potentially increasing revenues could have been at issue.

20  But the court also recognized that given that the schools

21  operated in a nonprofit context, were outside the normal

22  business context, there could have been factors that encouraged

23  these folks to operate in a way that they just wouldn't

24  necessarily operate in a normal business context.  You might

25  not necessarily see the anticompetitive effects that you

1  necessarily would in a business context.

2      So I think *Brown* is a key case and one that the Supreme

3  Court has recognized that rule of reason is the basis then for

4  allowing a more deeper inquiry into these types of issues.

5          **THE COURT:**  All right.

6          **MS. BASS:**  So our brief also sets forth the potential

7  procompetitive benefits, so that is also set forth in the

8  brief.

9      And I think that one of the things the Plaintiff said --

10 they acknowledge that this area of the law, the no-hire area of

11 the law, is a more recent aspect of the law.  I mean, he

12 referenced when the first enforcement action was brought.  That

13 was 2009.  So it's simply not surprising that we don't have

14 enough judicial experience with these types of agreements to

15 necessarily think that they are per se anticompetitive in every

16 situation.  Now, it could be the case that there are naked

17 per se, horizontal, no-poach agreements where it is -- applying

18 the per se rule would be something that would be the

19 consequence of that, but that's simply not what we have here.

20     A lot of what was said here is that we're trying to say

21 that there's exceptions to the agreement and that we're trying

22 to kind of like look at the agreement as being in a limited

23 nature.  That's really not what's going on.  The issue is that

24 this is the way that the Plaintiffs have chosen to plead this

25 agreement.  They have chosen to plead it in the context of a

1  nonprofit situation, where you have two actors who are aren't
2  business actors on either side.
3      **THE COURT:**  Well, they've chosen?  I mean, I don't
4  know what you mean by that --
5      **MS. BASS:**  In the sense that --
6      **THE COURT:**  -- how they've chosen it.  UNC is who UNC
7  is.  Duke is who Duke is.  What do you mean they've chosen?
8      **MS. BASS:**  I mean in the sense that the -- the context
9  of how -- the type of the restraint at issue; that they're the
10 ones that have discussed what the restraint is and the limited
11 nature of the restraint.  They're relying on cases where there
12 were naked market allocation agreements or naked no-poach
13 agreements, but that's not what they've alleged here is the
14 point I was trying to make.  They've alleged something that's
15 much more narrow in terms of who it impacted and they've also
16 alleged it not in a traditional business context.  They've
17 alleged it in a situation where you have two nonprofit
18 institutions that are at issue.
19     **THE COURT:**  Well, they -- okay.  You're acting like
20 they chose the Defendants --
21     **MS. BASS:**  No, that's not what I mean.
22     **THE COURT:**  -- and that it's important to them that
23 you're a nonprofit, which I don't understand that to be the
24 case at all.
25     **MS. BASS:**  No, that's not what I mean, Your Honor.  My

1  point, though, is that you can't then import all of the other

2  cases that we have, either market allocation cases in a

3  business context or no-hire cases that talk about naked, per se

4  no-hire agreements, and import them onto the case that we have

5  here.  We take the case as we have it.

6      And based on the case that we have, given the teachings of

7  *Brown* and the teachings of the Supreme Court, which has

8  repeatedly pared back the per se rule and repeatedly said that

9  the rule of reason should apply to professional organizations

10  and outside of a traditional business context, it's our

11  position that the rule of reason would apply here, especially

12  because -- I noted in my opening presentation that they hadn't

13  offered, the Plaintiffs or the DOJ, a single case that had

14  reached this stage of the merits where a court had applied

15  either a finding that the conduct violated the rule of reason

16  for a no-hire agreement or a finding that per se applies and

17  yet they didn't offer any case to you in their discussion.

18          **THE COURT:**  Okay.  Thank you.

19      All right.  Let's turn to the immunity issue.  As I started

20  to say when I confused myself, I haven't really seen any reason

21  to review my decision on the immunity issue that I tried to get

22  the Fourth Circuit to help me with, the ipso facto, but I'll

23  hear from Duke on that.  We do have a factual record now in

24  terms of the remaining immunity issue and I'm interested in

25  hearing what you-all have to say on this.  I'm leaning towards

1  the Plaintiff on this one, as I indicated.  I think everybody

2  filed briefs on this.

3      So let me hear from the -- from Duke first.

4          **MR. COONEY:**  Your Honor, would you like me to address

5  both ipso facto and then the argument about *Midcal* and *Town of*

6  *Hallie* at the same time?

7          **THE COURT:**  Yes.

8          **MR. COONEY:**  Okay.  I'll be very brief on ipso facto

9  because I appreciated that the Court struggled with that the

10  first time out of the box.  I think the --

11          **THE COURT:**  I did the best I could.

12          **MR. COONEY:**  Your Honor always does.

13      I think the -- the only thing I would add to that in terms

14  of the ipso facto issue is the Government cited a case in their

15  brief, *Deak-Perera against Department of Transportation of*

16  *Hawaii.*  In that case, the Ninth Circuit affirmed a decision

17  finding that the Department of Transportation of Hawaii was

18  sovereign for purposes of being ipso facto immune.

19      And that becomes important when we take a look at the

20  University of North Carolina because the University of North

21  Carolina is a constitutional entity under North Carolina law.

22  When you take a look at the particular provision of our

23  Constitution that establishes the University of North Carolina,

24  it's at Article IX, Section 8, of the North Carolina

25  Constitution.  What it says is that "The General Assembly shall

1  maintain a public system of higher education, comprising The
2  University of North Carolina and such other institutions" as it
3  may establish.  The University of North Carolina was
4  established by the Constitution.  It didn't -- it wasn't a
5  matter of the General Assembly creating the University of North
6  Carolina or -- or will establish.  It already existed and the
7  General Assembly is required to maintain it.
8      That's no different than the Department of Transportation
9  in the -- in the *Hawaii* case because in the *Hawaii* case they
10 said, "Well, the governor is a constitutional officer.  The
11 governor has got to execute the laws and the General Assembly
12 will establish such departments as it deems appropriate and
13 they established the Department of Transportation and that's
14 how the governor works and therefore that exercises sovereign
15 authority."
16     So what we're contending for ipso facto -- and then I'll
17 wind up on that -- is the fact that the University of North
18 Carolina is a constitutional entity means it shares in the
19 sovereignty of the State of North Carolina as surely as the
20 General Assembly or the Executive Branch or the Judicial Branch
21 or the constitutional officers established by the Constitution
22 of North Carolina; and if, indeed, it shares in that
23 sovereignty, then that ought to be enough to establish ipso
24 facto immunity in the same way the Department of Transportation
25 in Hawaii was given ipso facto immunity concerning its airport

1  franchising agreement.

2      Let me go on to the issue that Your Honor did defer from

3  the initial ruling and talk about the standard of review if

4  ipso facto doesn't apply.  So we have essentially two competing

5  standards of review.  We have *Midcal* on the one hand.  We have

6  *Town of Hallie* on the other.

7      What we don't have is a real dispute about what UNC is.  As

8  I said, UNC is not only a constitutional entity.  It's a body

9  corporate in politic.  Its Board of Governors is a body

10  corporate in politic.  The University Health System is a body

11  corporate in politic.

12      And *Phoebe Putney* I think answers the question of review

13  right out of the gate because what *Phoebe Putney* said is when

14  you have this kind of a substate actor -- a body corporate in

15  politic is a political subdivision of North Carolina; and when

16  you have that kind of a political subdivision, you use the *Town*

17  *of Hallie*.  And you do that for a reason, because the

18  University of North Carolina is run by state employees.  It's

19  not run by private actors who are acting under the guise of a

20  state regulatory agency.

21      So when we compare the University of North Carolina, for

22  example, to the dental board -- in the dental board, you had

23  people with dual motives.  On the one hand, the dentists who

24  are on the dental board are supposed to be regulating for the

25  state, but on the other hand, they are running for-profit

1  businesses for themselves.  Here, for better or for worse, all
2  of the UNC employees who were involved in any alleged agreement
3  were state employees.  They have no competing personal
4  interests on that.  They don't get to take home the money that
5  they save.  They don't get bonuses and their shareholders don't
6  get it.
7       And that's exactly what *Phoebe Putney* and the *Town of*
8  *Hallie* talked about is when you -- when we have entities like
9  municipalities and political subdivisions that aren't
10 compromised by these kind of private, self-dealing conflicts
11 that you see in collective rate making or in the dental board,
12 then a *Town of Hallie* standard applies.
13      And all that simply means is Your Honor must then determine
14 was there a clearly articulated legislative policy that
15 contemplated the displacement of competition and it
16 contemplated the displacement of competition as a natural or an
17 ordinary or an inherent result of the policies that were
18 established.  That's the phrase that's used in *Phoebe Putney*,
19 is it natural or is it ordinary or is it inherent.
20      So where do we go for this policy?  How do we contend this
21 was contemplated?  Well, again, we start with the Constitution
22 of North Carolina because in the Constitution of North Carolina
23 it specifically provided that higher education is to be
24 provided for free.
25          **THE COURT:**  So let me ask you.  Under your theory, the

University of North Carolina could call up every other hospital
and medical practice anywhere near any of its hospitals and
medical practices, which go -- are fairly wide-ranging now, and
say, "You know, we would like to enter into a price-fixing
arrangement to increase the money that we get paid by insurance
companies and uninsured people and -- because we would just
like more money to do good things on behalf of the State of
North Carolina." And so they invite everybody in the state of
North Carolina remotely near them to engage in this
price-fixing operation and start charge -- in drug
prescriptions that they fill, et cetera, and hike the prices of
everything. Everybody agrees because you're the State and I
get your immunity if I agree with you, arguably. I appreciate
there's an argument to the contrary.

        **MR. COONEY:** Yes, Your Honor.

        **THE COURT:** But arguably. And so we want to raise the
prices 50 percent. Under your view, that would be okay?

        **MR. COONEY:** No, it would not.

        **THE COURT:** Okay. Why not?

        **MR. COONEY:** And it would not for this reason, because
the -- the alleged agreement here didn't raise prices. It
lowered prices. If you believe what they say, what happened
here is that physicians weren't paid as much. Therefore, the
physician fees that were collected based on that weren't as
much. These two institutions didn't have to pay as much and

1  therefore --

2      **THE COURT:**  Why does that matter logically to what

3  rule applies?

4      **MR. COONEY:**  Because it matters in terms of the

5  legislative intent.  Now, it is --

6      **THE COURT:**  Isn't the legislative intent to run -- to

7  do as much good as possible with the money available here and

8  maybe we're --

9      **MR. COONEY:**  But it's not to raise prices for

10 patients, which is --

11     **THE COURT:**  No, but it's to --

12     **MR. COONEY:**  -- which is what the object of your

13 conspiracy was.  As you put it, it was we want to raise the

14 prices for patients everywhere.

15     **THE COURT:**  But you're doing it because you want to

16 have more money to pay for indigent healthcare or to pay

17 professors more -- there's a good motive -- or whatever.  I

18 mean, you've got a good motive for doing it.

19     **MR. COONEY:**  Right.  But it's not just the motive.

20 It's what the -- what the policy intent would be and when we

21 take a look at -- and you've got to evaluate it for each

22 action.  So it's not -- this isn't a situation where we're

23 saying, well, the mere presence of UNC means that it's clearly

24 articulable and therefore, you know, the scales fall over your

25 eyes.

1    Your Honor still has to ask the question, which I believe
2  you're asking, what is the policy in which you are -- that you
3  are effectuating in which you contend the General Assembly
4  contemplated this would be a natural, ordinary or inherent
5  result.  And when you take a look at what was going on in the
6  wage and salary area between the constitutional requirement
7  that education, as far as practicable, should be free in our
8  constitution, the salary freezes that took place, the salary
9  ceilings that took place, the memoranda from the budget
10 director directing that no increases could take place, it would
11 be a natural, ordinary, and inherent -- inherently foreseeable
12 that UNC is going to have to do something about that.  They
13 can't raise their salaries anymore preemptively.  They can't --
14 the budget has been frozen.  They can't use state funds and
15 so --
16         **THE COURT:**  But they could increase the prices by
17 agreement with everybody else and then have more money to do
18 these things that you just told me about.
19         **MR. COONEY:**  Well, no.
20         **THE COURT:**  No?
21         **MR. COONEY:**  Because what's the policy for them
22 raising their prices?  You would still have to identify an
23 articulable policy by which the General Assembly contemplated
24 UNC would go out and price-fix everything at the highest level.
25    Now, I will say your hypothetical is actually the *Porter*

1  *Laboratories* case in reverse because in *Porter Laboratories*

2  *against the -- against the University of Oklahoma A & M Board*

3  *of Regents,* the university went out and drove laboratory prices

4  basically down to zero and Porter Laboratories sued because it

5  put them out of business.

6      And the Tenth Circuit said, no, that was within the

7  contemplation of the legislature when they permitted the

8  hospital system or the university system to set schedules for

9  testing.  They contemplated that the testing could be at cost

10 or below cost and could put someone out of schedule -- and

11 could put someone out of business like that.

12     So if -- if we flip your hypothetical to there's

13 price-fixing, but UNC says, "Prices are too high.  What we're

14 going to do is we're going to underbid everybody and we want

15 you to agree to underbid with us.  We'll all get more business

16 if we underbid.  The people who join in will get more business

17 because BlueCross will send everything to us if we underbid it

18 because we're going to lower prices for everybody," that might

19 be okay depending on what the articulable legislative policy

20 you can point to is.  That's already been found to be okay by

21 the Tenth Circuit.  So it's not as easy as just simply going

22 out and saying, "Well, if you let them do this here, they can

23 do anything they want."  It's still got to be an

24 action-by-action evaluation based on the circumstances and the

25 policy at that time.

1    So we contend there is a clear policy from the constitution

2  on down to the salary ceilings that were set, which indicated

3  to someone in Dean Roper's position that "I can't go out and

4  raid people because I can't compete with that and what I've got

5  to do is I've got to find a way to keep my faculty within what

6  I've been given so that I can provide competent faculty to

7  teach students and to meet my educational mission, as well as

8  to treat patients."

9    Now, Dean Roper says -- unilaterally he came to the

10  conclusion, "I can't go raid Duke because that will start a war

11  I can't win under these circumstances."

12    They claim, well, that led Dean Roper to have a

13  conversation with Duke and reach the same conclusion, but the

14  point is he reaches the same conclusion.  We know exactly what

15  the inherent, ordinary, natural outcome was; and that inherent,

16  ordinary, natural outcome was "I can't go raid Duke because I

17  don't have the resources to do it and I'll destroy my mission."

18    And we believe that is the policy justification that would

19  permit state action immunity to apply to this agreement under a

20  *Town of Hallie* standard.

21        **THE COURT:**  Okay.  Thank you.

22    For the Plaintiff.

23        **MR. SALAHI:**  Good morning, Your Honor.  Thank you.

24        **THE COURT:**  Good morning.  And move the mike a little

25  closer to you so I can be sure to hear you.

1          **MR. SALAHI:**   Thank you.

2       What we've heard today is an argument that is a radically

3    broad interpretation of the state action immunity doctrine.

4    What we heard is incorrect, in fact.   If the ipso facto

5    immunity defense applies here, it would apply regardless of

6    what the policy was and regardless of what the effect on prices

7    is.   So that is no defense on the ipso facto prong.

8       On the second issue, which has to do with the application

9    of *Midcal* or *Town of Hallie*, the sole distinction between those

10    two cases is whether the active supervision requirement

11    applies, which I'll get to later, but whether or not there is a

12    clear state policy is common between the two tests.

13       We know under *Phoebe Putney,* which is the Supreme Court's

14    most recent pronouncement, that in this case Duke is at least

15    two steps behind what was at issue in *Phoebe Putney.*   In *Phoebe*

16    *Putney,* the state statute explicitly authorized the hospital

17    authorities to purchase other hospitals.   So when the authority

18    did so, it purchased another hospital, it was an exercise of

19    the specific statutory authority.

20       But the Supreme Court said that that was not enough.   The

21    statute needs to not only authorize the specific act, but

22    authorize the specific anticompetitive conduct.   And, in fact,

23    the Supreme Court talks in that case about how there is a

24    materially distinct -- a material difference between public

25    hospital authorities and private hospitals.   It acknowledges

1  that, but it says that that makes no difference for the

2  analysis on whether there's a state intent to displace the

3  antitrust laws.  That's because the legislature is presumed to

4  operate against the backdrop of the antitrust laws.

5      Here all we have are two statutes.  One authorizes UNC to

6  hire employees and set their pay, which is, in fact, identical

7  to a general corporate power.  And we know that because the

8  North Carolina Business Corporations Act says so under a

9  section entitled "General Powers" and the instructive -- the

10 vague instructive to act efficiently and act economically --

11 make an economical use of resources.  That is also a duty owed

12 by private corporations to its shareholders.  So there's no

13 material difference there and it certainly doesn't meet the

14 standard of clarity that is required by *Phoebe Putney* to show

15 that the State of North Carolina, through its General Assembly,

16 contemplated that this directive to lower costs would be

17 pursued through anticompetitive means.

18     If that were the case, you know, we can focus on something

19 other than tuition prices.  We can focus on the UNC bookstore.

20 It could make an agreement with any other bookstore in nearby

21 areas not to still textbooks below a certain price and

22 therefore maximize its own profits.  Its cafeteria could

23 collude with area restaurants not to pay farmers above a

24 certain price for a certain good and thereby reduce their costs

25 further.  There's all kind of mischief that could be achieved

1   here that would result in swallowing proper immunity through
2   what is meant to be a narrow exception.
3       Now, I would like to talk a little bit about -- I can talk
4   about the salary freezes and the salary ceilings if the Court
5   thinks that would be helpful, but otherwise I can address the
6   active supervision and ipso fact prongs.
7               **THE COURT:**  Just tell me whatever you want me to know.
8               **MR. SALAHI:**  Okay.  All right.  Well, what I would
9   note about the salary freezes and the ceilings is that, A, they
10  only come up because there is no statutory basis for a clear
11  state policy.  So what Duke has attempted to do is manufacture
12  one out of the fact that UNC, just like any private entity, had
13  a budget and that that budget operated to have, perhaps,
14  practical constraints on its ability to -- on its ability to
15  compete.  But the fact that there is a practical budgetary
16  constraint imposed on UNC, just like any other private
17  corporation has, does not reflect a legislative intent to
18  actually displace market competition and, in fact, the record
19  here shows the opposite.
20      So we have salary freezes.  In fact, many of them predate
21  the class period, so these are 2009, 2010, 2011.  By the time
22  the class period starts in 2012, those are no longer in place,
23  but we know that those salary freezes actually drew out an
24  exception for the use of non-state funds.  So that's one --
25  that's evidence that, in fact, the State of North Carolina

1  wanted UNC to continue competing, but finding other ways to do

2  it other than the use of state funds during this period of

3  crisis.

4     Two, we know that there were certain exceptions for funds

5  used to retain employees -- faculty in response to

6  counteroffers.  That's the specific issue at issue here in this

7  case.  If -- if it were the case that UNC -- I'm sorry -- that

8  the General Assembly wanted UNC to retain its faculty by

9  entering into no-poach agreements, not recruiting other -- we

10  would expect to see that rather than the specific exception for

11  the use of funds from the president's recruitment and retention

12  fund to match counteroffers and that sort of thing.

13     Finally, I think it's worth noting that these budgetary

14  limits apply only to UNC.  They don't apply to any other

15  universities.  So there's no suggestion from these salary

16  freezes that the General Assembly also wanted Duke to stop

17  competing and offering competitive wages for faculty.  So the

18  no-poach agreement is a complete non sequitur.

19     The same is true for the salary ceilings, also a general

20  corporate practice.  Every company has salary ranges for its

21  employees.  And here the critical thing is that the salary

22  ceilings that have been cited are linked to a market analysis,

23  so they all site the American Association of Medical Colleges

24  for its analysis of what prevailing wages are.  That does not

25  reflect an intent to displace market competition either.

1  They would further only be relevant, arguably, if everybody
2  was already paid at the ceiling and therefore no competition
3  was possible, any further competition, but that's not the case
4  here.  So the mere existence of the ceiling doesn't mean that
5  UNC was forbidden from continuing to compete within those
6  ranges.  In fact, these are ceilings that were set by UNC for
7  the vast majority of the years at issue here and, again, they
8  don't show an intent to limit Duke's competition.

9       **THE COURT:**  Did you want to speak to whether -- if UNC
10 does have immunity, whether Duke gets the benefit of that?

11      **MR. SALAHI:**  Yes, Your Honor, and I think it depends
12 on the basis.  If the Court were to find that UNC were immune,
13 it would depend on the Court's reasoning.  If UNC were ipso
14 facto immune, I think the case law does suggest that the
15 parties that it deals with -- assuming the market participant
16 exception doesn't apply, that the parties it deals with would
17 also be immune; but if the Court were to find that it was
18 immune because there is a clear state policy, an act of
19 supervision is not required for the state entity, that would
20 not necessarily also hold true for Duke University because Duke
21 University could very well still be subject to the active
22 supervision requirement even if UNC were itself exempt.

23      And I don't agree that that is the case, but just to
24 indulge the Court's question.  We know here because the
25 antitrust harm, unlike *Edinboro,* for example, doesn't result

1  from some unilateral policy that is anticompetitive adopted by

2  UNC.  This is a joint policy that Duke was free to join, free

3  to leave at any time.  So the antitrust harm is actually

4  traceable to the conduct of both parties and not solely the

5  state party.

6      On this point for active supervision, there are a couple of

7  points I would like to make, if that would be all right.

8      **THE COURT:**  All right.  You've still got a couple

9  minutes.

10      **MR. SALAHI:**  Okay.  The important thing here is that

11  the active supervision requirement operates to ensure that when

12  the State has delegated its authority to a nonsovereign actor

13  that the nonsovereign actor continues to act in compliance with

14  state policy; and in the *Dental Examiners* case, there is

15  language about this.  It's especially necessary when the policy

16  at issue is defined at such a high level of generality that

17  there is this interstitial space that leaves a lot of room for

18  interpretation in many different ways.  You've got to make

19  sure -- the active supervision requirement makes sure that

20  whoever the actor is, public or private, is continuing to act

21  in the interests of the State.

22      The issue here is not whether or not the university is a

23  public university or a nonprofit university or whether the

24  University of North Carolina employees have a personal private

25  profit motive.  And that goes all the way back to *City of*

1    *Lafayette versus Louisiana Power* where the court talks about,

2    look, there's no reason to expect that a public corporation is

3    going to operate any differently from a private corporation.

4    Even though it doesn't answer to its shareholders, it still has

5    its own narrow economic interests.

6        And the same is true of UNC.  They don't necessarily want

7    to maximize their profit or line their personal profit books

8    with bonuses or that kind of thing, but UNC, as a single

9    institution with a mission only to deliver public education,

10   has certain priorities.  It does want to meet its budget, so it

11   will be naturally inclined to interpret its authority, as Duke

12   has advanced here, in the most expansive and sweeping way

13   possible, which is very likely to conflict with the State of

14   North Carolina's balancing of the public interests because

15   balancing the public interests is not just should I act

16   efficiently or should I not act efficiently.  It's do I act in

17   a way that prioritizes UNC's unilateral perception of what will

18   lower education costs or what will result in a more efficient

19   use of resources to displace market competition in every other

20   way, where both the State of North Carolina and the United

21   States have decided that free competition is the presumptive

22   environment and the presumptive range that we want to operate

23   in.

24       So there is very good language in the *Dental Examiners* case

25   that we are not here to question the good faith of state

1    officers, but we are looking at the structural risk of

2    divergence.  And there is a serious risk of that here where UNC

3    is an active market participant.  It has narrow parochial

4    concerns that are solely limited to the provision of public

5    education and the related activities of the university.

6        That distinguishes this case from *Town of Hallie*.  So *Town*

7    *of Hallie's* holding is not simply any public entity, no matter

8    what, is exempt from the active supervision requirement.  The

9    court only reaches that conclusion after conducting a

10   structural analysis of the features of municipalities and

11   counties that render them less susceptible to diverging from

12   statewide goals.  So I would submit, as we described in our

13   papers, that those key features do not apply here.

14           **THE COURT:**  Okay.

15        **MR. SALAHI:**  Thank you, Your Honor.

16           **THE COURT:**  Does the Government have anything to add?

17        **MR. LEVIN:**  Yes, Your Honor.

18       The state action defense can be raised in suits by the

19   federal government, so it's very important to the United States

20   that its limited nature is respected.  Since *Parker,* the

21   Supreme Court has emphasized time and again that the state

22   action defense is limited and disfavored, and it applies only

23   when the challenged anticompetitive conduct is truly the policy

24   of the state.  The alleged secret conspiracy here between the

25   UNC medical school and its main labor market competitor does

1  not qualify.

2      This Court has indicated it doesn't want to hear that much

3  on ipso facto, so I'll keep it brief to two points.  First, the

4  Supreme Court's opinion in *NC Dental* and *Hoover,* they set up a

5  clear dichotomy between state legislation and decisions of the

6  state supreme court acting legislatively and state agencies.

7  For state legislation and the supreme court, they are

8  undoubtedly exercising sovereign authority, so the analysis

9  ends there.  For other state entities -- and this comes from

10 *Hoover v. Ronwin*.  It says, unlike the state legislature and

11 state supreme court, closer analysis is required for other

12 state entities.

13     UNC is in the latter bucket.  It's not a state legislature

14 or state supreme court, so closer analysis is required to

15 determine whether its conduct is, indeed, the policy of the

16 State of North Carolina.  And what this means is simply under

17 *NC Dental* it's considered a nonsovereign actor.

18     The second point I want to make involves *Deak-Perera,* which

19 the Defendants noted found ipso facto for the Hawaii Department

20 of Transportation.  Its reasoning was it was acting within the

21 source of its authority.  The Supreme Court in *Phoebe Putney*

22 said this is not a valid basis for state action immunity.

23 *Deak-Perera* is no longer good law and should not be followed by

24 this Court.

25     As for clear articulation, the requirement is not satisfied

1  here because there is no North Carolina state policy to

2  displace competition in medical faculty hiring.  While Duke

3  cites various statutes, none show that a no-poach agreement was

4  contemplated and endorsed by the state legislature, which is

5  required under *Phoebe Putney*; and we think, agreeing with

6  everyone, this Court should take guidance from *Phoebe Putney*

7  and its precise holding.

8      The question there was whether the clear articulation

9  requirement was satisfied by an anticompetitive acquisition by

10  a hospital authority.  The Eleventh Circuit held that it was

11  and what it found most important was the hospital authority's

12  ability to acquire other hospitals.  What the Eleventh Circuit

13  reasoned, that granting that acquisition authority that

14  legislature must have anticipated that there would have been

15  anticompetitive consequences.

16      The Supreme Court unanimously reversed.  What it said was

17  the mere authority to acquire hospitals did not show a state

18  legislative policy to make anticompetitive acquisitions because

19  it wasn't the -- making anticompetitive acquisitions wasn't the

20  ordinary or logical result of the acquisition authority.

21      And the same is true here.  Statutes that let UNC save

22  money or let it set -- do various unilateral acts to hire and

23  retain employees, they do not clearly articulate a state policy

24  to allow UNC to enter into a conspiracy with its main labor

25  market competitor to restrict competition in that hiring.

1    They mentioned not raiding Duke; that the legislature might
2    have thought not raiding Duke is a good thing.  That's
3    unilateral action.  It's the agreement that creates the
4    displacement of competition.  There's no displacement of
5    competition if it merely decides who to hire and who not.  This
6    is a very different situation with an alleged conspiracy
7    between UNC medical school and Duke than if just UNC was merely
8    deciding who to hire or who not.
9        Finally, they mentioned -- they relied on the *Edinboro*
10   case.  The *Edinboro* case is a -- very different as pertains to
11   the clear articulation requirement.  We agree with its holding
12   on ipso facto, but what that was going on in *Edinboro* was there
13   was a long history of on-campus residency rules.  Universities
14   often act as the in loco parentis for their students.  What the
15   Third Circuit held was in extending that residency from two to
16   four semesters, it was -- in light of the legislative
17   background, it was clearly foreseeable.  There is no background
18   of no-poach agreements here that the legislature must have
19   contemplated and endorsed, so we think the clear articulation
20   prong is not satisfied.
21       For that reason, we think the Court does not need to reach
22   the active supervision requirement, but if it does, it is
23   applicable here, and it's applicable under the reasoning of *NC*
24   *Dental.*  As everybody points out, it's not controlled by the
25   holding, but we think it is controlled by the reasoning.  What

1  it says is active supervision is an essential condition of

2  state action immunity whenever a nonsovereign actor has an

3  incentive to pursue its own self-interest.  Because UNC is not

4  the state legislature or state supreme court, it's a

5  nonsovereign actor and it has an incentive to pursue its own

6  self-interest in hiring.  As the Plaintiffs pointed out,

7  there's a structural risk here.

8      Finally, I just want to clear up two points related to

9  things that were said earlier, first what our position is on

10 the market participant.  We are not arguing that market

11 participants can never receive protection of state action

12 immunity, which is what was going on in the cases where courts

13 have rejected them.

14     We are arguing two things.  First, we're saying that when a

15 state agency acts as a market participant it's not ipso facto

16 exempt and what that means is you have to go through the

17 analysis; and the second, we argue, is when the state agency is

18 acting as a market participant, it has to show active

19 supervision.  So it isn't establishing a firm market

20 participant exception to state action immunity.  What we're

21 saying is when a state agency like UNC is acting like a market

22 participant, you treat it like a private entity for purposes of

23 *Midcal.*

24     Finally, we don't normally comment on materials that we

25 receive, but I do want to be clear, in relation to the motion,

1  we never received any letters from the State of North Carolina.

2  We received a letter from the University of North Carolina.

3          **THE COURT:**  Okay.

4          **MR. LEVIN:**  Thank you.

5          **THE COURT:**  Thank you.

6      All right.  For the Defendant?

7          **MR. COONEY:**  Your Honor, I'll be brief.

8      First of all, with respect to the clear articulation

9  requirement, I believe the Plaintiff overstates the standard.

10  The case law is clear that there is no -- that there's no

11  requirement the state has to expressly state the action that it

12  intends to displace competition.  In fact, the cases say that

13  no legislature can be expected to catalog all of the

14  anticipated effects of the statute delegating authority.  The

15  court has made it clear that the state doesn't need to lay out

16  the precise way in which competition might be displaced; and,

17  in fact, when the legislature gives the authority and has the

18  policy, the problem may not even exist.

19      And I think the classic example of that is the *City of*

20  *Columbia against Omni* billboards.  In the city of Columbia, one

21  competitor controlled 95 percent of that market.  A new

22  competitor came in and began building more billboards.

23  Everybody complained about all the billboards that were going

24  up, so the City of Columbia used its zoning authority to

25  effectively zone out the competition.  And the contention there

1  was the 95 percent, the monopolist, conspired with the City to

2  impose these restrictions to prohibit the competition.

3     And the Supreme Court found that was not an issue because

4  zoning regulation by itself contemplates some form of

5  displacement of competition, and the fact that it was used to

6  basically create and secure a monopoly was not a problem.

7     And in addition, they said and eliminated what they're

8  trying to get you to -- to buy back into is there's no

9  conspiracy exception to this.  They found that the private

10 billboard company, the monopolist, was entitled to that shared

11 immunity because the -- even though the private billboard

12 monopolist is the one that convinced the City to do precisely

13 that because they wanted private parties to be able to petition

14 government and to deal with government actors to solve problems

15 whether or not the solution was good or not.

16    And so when they tell you that, well, gee, they're entering

17 an agreement with Duke and that means something different and

18 it can't apply to Duke, what they're trying to do is to

19 resurrect the conspiracy exception that the Supreme Court

20 rejected in the *City of Columbia* case.

21    I do think -- I have to agree I think *Phoebe Putney* is

22 directly relevant.  In *Phoebe Putney,* they imposed the *Town of*

23 *Hallie* standard.  That was a quasi-municipal corporation

24 hospital authority.  UNC is at least a hospital authority, if

25 not more than that, given its constitutional status.  So

1 there's no question *Town of Hallie* applies.

2    And I believe the Government respectfully overreads what

3 the -- what the finding was in *North Carolina Dental* because in

4 *North Carolina Dental* they specifically noted the private

5 interests of those dentists who served on the board.  And the

6 duality there wasn't that the board may act in ways, but that

7 these dentists had a private for-profit motive that would

8 interfere with their ability to regulate for the state.

9    Here we have only state employees.  They don't have that

10 dual motive.  For better or for worse, they're acting on behalf

11 of the state.

12    I think *Edinboro College* is also instructive if for no

13 other reason than it cites Your Honor on ipso facto immunity.

14         **THE COURT:**  It must be correctly decided.

15         **MR. COONEY:**  And we agree because under the *Town of*

16 *Hallie* standard that *Edinboro College* used, they took exactly

17 what we're talking about here, which is a -- a contemplation by

18 the General Assembly that certain steps must be taken in

19 certain areas.

20    And in that one, by doubling the amount of time students

21 were required to spend on campus, they collected more student

22 rental fees, more student housing fees; and they put the

23 private competitors for those student housing fees effectively

24 out of business because now they're doubling the length of time

25 the students have to stay on campus and collecting more housing

1  fees because of it.

2  That goes exactly to the analogy you asked me about.  Here

3  they are.  They are effectively using their market power over

4  students to require the students to spend another year in

5  campus housing that they have to pay the proceeds to them.  And

6  we can argue whether that's a good thing or a bad thing, but

7  the one thing we can't argue about under *Edinboro College* is

8  it's an immune thing.  It's not subject to the antitrust laws.

9  And the UNC -- the analogy here when they talked about *Town*

10 *of Hallie* being a municipality, well, we know UNC is a

11 political subdivision.  The Board of Governors is selected

12 through an electoral process.  The General Assembly chooses the

13 Board of Governors.  They elect the Board of Governors.  Of

14 course, the General Assembly is electorally accountable.  So we

15 have electoral accountability going directly into the

16 governments of the UNC system.

17 And, finally, there was a mention about market

18 participation.  I think, again, if you read *Edinboro College*,

19 there's a footnote indicating that the market participant

20 theory has never been adopted by any court and wasn't being

21 adopted in *Edinboro College* by the Third Circuit.  It's never

22 been adopted by the Supreme Court.  There is no market

23 participant exception to immunity.

24 So if the Court, using *Town of Hallie*, believes there's a

25 clearly articulated policy which came not only from the General

 1  Assembly but also from the governor through the state budget
 2  director, who suspended salary increases, and then salary
 3  ceilings, which were below salaries being paid by Duke, and
 4  that was not the -- and the inherent, ordinary or logical
 5  result of that was an agreement to prevent cross-competition so
 6  that UNC could hang on to its faculty, that was reasonably
 7  foreseeable; and we believe that therefore UNC was immune, the
 8  subject of this agreement was -- is subject to that immunity,
 9  and therefore Duke shares in that immunity.
10          **THE COURT:**  Okay.  Thank you.
11          **MR. SALAHI:**  Your Honor, may I have a couple minutes
12  to respond?
13          **THE COURT:**  Okay.
14          **MR. SALAHI:**  Okay.  I'll make it quick.  There are
15  just five points that I would like to make.  I'll make it very
16  brief.
17          **THE COURT:**  First there were two points.  Now it's
18  five points.
19          **MR. SALAHI:**  So with respect to the conspiracy
20  exception language in the *City of Columbus* (sic) case, so that
21  question is not relevant to antitrust liability.  It's relevant
22  to the question of whether there's a clearly articulated state
23  policy; and what it says is that if there's a clearly
24  articulated state policy, the fact that the state policy is the
25  product of a so-called conspiracy doesn't alter the immunity

1  analysis.  And that's because of the Noerr-Pennington doctrine

2  and the fact that every state policy is the result of some

3  lobbying.  So it would eviscerate the doctrine if that were the

4  case.

5      Two, even if the active supervision requirement applies,

6  Duke hasn't raised any evidence that it was actively

7  supervised.  So that's another issue.

8      Three, in *Dental Examiners* on pages 1116 to 1117, the

9  Supreme Court talks about how -- the active supervision

10  requirement, when it applies, is flexible and context specific;

11  but it lays out four key features that are always required.

12  One of these is, and I quote, the state supervisor may not

13  itself be an active market participant.  So that supports our

14  point as well.

15      With regard to *Edinboro,* the critical difference there --

16  and there was a mistake in the description of the case.  It was

17  not the university itself receiving the student funds.  It was

18  not an active market participant.  A separate private

19  foundation was operating the housing complex.  So that's the

20  distinction for purposes of active supervision in this case, is

21  that the university in the Third Circuit was not an active

22  market participant, whereas here it is in the relevant market.

23      And then, finally, with respect to the Board of Governors'

24  role in all of this, Duke has not cited any evidence that the

25  Board of Governors knew of this no-poach agreement or approved

 1   it.

 2       Thank you.

 3           **THE COURT:**  I'm kind of behind schedule here.  It's

 4   not 11:20.  It's 12:20.  So -- and kind of a lot left to do.

 5   I'm -- I think what I would suggest that we do is take about --

 6   take an hour for lunch and then come back and we'll work on

 7   causation.  You know, we're just going to -- we'll just do the

 8   best that we can to get through everything that we have.  The

 9   folks who are coming at 3:00 may have to wait on us a little

10   bit and -- so that's what I think we'll do, unless somebody --

11   yes.

12           **MS. SHAVER:**  Your Honor, may I ask a quick

13   clarification question?  In the roadmap for today that you laid

14   out at the beginning, you indicated that we would be dealing

15   with the motions on Dr. Baker and Dr. Hemphill together because

16   they raised similar issues, and I'm curious as to whether Your

17   Honor meant Dr. Baker and Dr. Cappelli.

18           **THE COURT:**  Well, it -- as I read it -- perhaps I have

19   gotten confused -- both Baker and Hemphill, doctors,

20   professors, whatever they are, you read their reports and you

21   think, "I believe I'm reading a closing argument," both of

22   them.  That is the similarity that I see in the two of them.

23   Now, there are some other overlapping issues about Dr. Cappelli

24   and such, and then there's some little pieces that aren't

25   overlapping.  But when I read Baker and when I read Hemphill, I

1  said, "Are these people the lawyers for Duke and the Plaintiff

2  or are they experts?"  That was just my gut reaction to it.  So

3  that's the similarity that I see.

4         **MS. SHAVER:**  Thank you for the clarification, Your

5  Honor.

6         **THE COURT:**  You-all can tell me why that's wrong as to

7  one of them and right as to the other one, and we'll -- we can

8  talk about that.

9      All right.  Let's be in recess then until 1:20.

10     (A noon recess was taken from 12:20 p.m. until 1:20 p.m.;

11  all parties present except Ms. Klauer.)

12        **THE COURT:**  Okay.  We'll turn to the

13  causation/antitrust impact issue next.  I don't know what my

14  questions are because I left my notebook on my desk.  As soon

15  as he brings it to me, I'll remember what they are.

16     Okay.  I looked over it again over lunch and -- okay.  So

17  as we discuss this, if the Plaintiff can clarify for me, in the

18  class certification there was a lot of discussion about the

19  Plaintiff's theory that the no-hire agreement meant that the

20  Defendants did not have to provide preemptive compensation

21  increases otherwise necessary to ensure employee retention.

22     That, kind of, wasn't really discussed here, so I just want

23  to figure out where that fits in to -- to things and also to

24  ask the Plaintiff if the case rises or falls on evidence of

25  centralized decision-making.  Duke says you must prove every

1  single class member suffered antitrust impact and that average

2  wage suppression is insufficient, and they talk about the *Reed*

3  case and the *Air Cargo* case.  So you-all can -- let me look at

4  the right person there.  If you can address that.

5      And then for Duke, it appeared to me that you were

6  conflating the requirement for common impact with some sort of

7  requirement that there be an intent or plan or purpose to

8  reduce common -- to reduce compensation across the board, which

9  I don't understand that there had to be an intent to have a

10  common impact to every single class member.  So if I'm -- I'd

11  like some help in understanding that because you-all appear to

12  say that there has to be evidence of an intent to reduce

13  compensation across the board.  If you're not making that

14  argument, let me know that.

15      And you also seem to be saying that there has to be

16  evidence that the chancellor used budget meetings to depress

17  compensation across the board or generally or in specific

18  cases.  And so why exactly is that necessary?

19      And then Duke also in the reply brief made what appeared to

20  me to be an entirely new argument about compensation from Duke

21  as opposed to compensation from the private diagnostic clinic

22  and, you know, normally you don't get to make new arguments in

23  a reply brief.  So if you made that argument earlier, somebody

24  needs to point that out to me.

25      And then we can address the role of circumstantial evidence

1  in antitrust cases, which nobody really talked about in

2  general, but the Supreme Court says you can consider it for

3  impact and -- so the parties might want to speak to that.

4       So this is Duke's motion and -- Mr. Cooney.

5           **MR. COONEY:**  Thank you, Your Honor.  I guess to answer

6  your questions or at least be direct about that --

7           **THE COURT:**  You can fit it in wherever, you know, you

8  need to.

9           **MR. COONEY:**  Well, I think maybe taking the last one

10 first because I think that's -- it's an issue that actually

11 combines several things.

12      So the issue about the PDC pay goes directly to the central

13 control element of this because their theory is, whether it's

14 retention pay or however you want to do it, that the central

15 administration at Duke, knowing that there was an agreement in

16 place, was able then to suppress the wage structure of the Duke

17 medical faculty and through that central administration,

18 whether it was through the chancellor or through the dean,

19 that's transmitted across all the departments.

20      And, of course, our response is the budgets are set at the

21 department level; and they contended, yes, but the chancellor

22 and the dean either have the opportunity to review it or do, in

23 fact, review it and therefore that's the centralized control.

24      Their theory doesn't work unless Duke can exercise that

25 kind of control over the medical faculty wages.  If Duke

1  doesn't control the medical faculty wages, it doesn't make any

2  difference what kind of agreement Duke enters into.

3      So that's where the private diagnostic clinic comes in and

4  I think the easiest way to understand this -- and, indeed, the

5  Plaintiffs made that point in their memorandum of law in

6  support of their motion to actually exclude Dr. Baker -- is

7  that at Duke we have what they call total compensation.  There

8  is the academic compensation and there is the clinical

9  compensation and let me give you -- if I could get the ELMO

10  turned on.  So let me zoom this in.  So this is actually from

11  Dr. Leamer's rebuttal report and what you see is he talks about

12  the Duke base salary and he talks about the Duke base plus PDC.

13      **THE COURT:**  Yeah, but what I'm trying to understand is

14  why you didn't make this point in your initial summary judgment

15  briefing.

16      **MR. COONEY:**  Well, it wasn't -- I will concede it

17  wasn't made with the clarity that it was made in the reply.

18  There's no question about it.

19      But it goes to the centralized administration because the

20  centralized administration at Duke does not control the PDC.

21  The private diagnostic clinic, the PDC, it's undisputed, is a

22  separate for-profit entity.  What the PDC does is it bills for

23  the physician services and the physician services gets paid;

24  and since it's a for-profit entity, it distributes all its

25  money at the end of the year to the doctors.  And all of the

1  documents they submitted on these pay plans -- the Department

2  of Surgery, the Department of Anesthesiology -- those are all

3  PDC plans.

4      So in the PDC, you know, you're compensated according to,

5  you know, where you are in terms of your professorship and then

6  the amount of RVUs or work value units that you generate and

7  then any profit at the end of the day that's distributed

8  according to a formula.

9      The reason that becomes important is because of a document

10  they refer to called the Institutional Funds Flow.  So -- and,

11  again, just as you can see, the Duke base, the academic part of

12  a Duke physician's salary, is a small part of the total

13  compensation.  For instance, you can see for an assistant

14  professor the academic part is 23,000.  The Duke -- the total

15  is $223,000.  That's because 200,000 is coming from the PDC,

16  this clinical partnership that the physicians are in.

17      So this is a -- this is actually a chart that they dropped

18  into their brief and it's a busy chart.  But what's important

19  as we consider this argument is when you look at this chart you

20  see -- here's the PDC, of course.  Here's the university's

21  central budget, School of Medicine.  And what you see is there

22  are no fund flows from either the School of Medicine or the

23  university's central budget to the PDC.  There's no contention

24  the PDC was part of any agreement to hire or not hire or not

25  give raises or anything else.  And it's undisputed the lion's

1  share of compensation for medical faculty comes from the PDC.

2      So you need centralized control by Duke over a salary to

3  make a difference, but the Duke University central budget and

4  people who administer that have no control over the PDC.

5          **THE COURT:**  Well, I guess I still don't understand why

6  you didn't make this argument in your initial brief.  It

7  doesn't seem to me to be there and it seems like a pretty big

8  argument that they've had no chance to rebut.  What have I --

9          **MR. COONEY:**  Well -- and, Your Honor, it's part of the

10  centralized administration that we've been fighting about

11  because there is no centralized administrative structure that

12  deals with the lion's share of this -- of the salary that a

13  medical faculty gets.  And certainly if -- if Your Honor feels

14  that we didn't -- obviously, Your Honor does.

15          **THE COURT:**  Well, I'm asking you.  Point me where you

16  did address it so I -- if I'm mistaken, you know, you can --

17  you can tell me.

18          **MR. COONEY:**  Yeah.  So what -- if you'll turn to

19  page 5 of our brief, we begin talking about the Duke medical

20  faculty compensation was determined at the departmental level

21  with respect to both academic, the School of Medicine, and

22  clinical compensation --

23          **THE COURT:**  Yes.

24          **MR. COONEY:**  -- and talked about the fact that the

25  dean of the school --

1       **THE COURT:**  Yes.

2       **MR. COONEY:**  -- basically was a black box in terms of

3  the PDC.

4       **THE COURT:**  Uh-huh.

5       **MR. COONEY:**  And at that point Dean Andrews had no

6  input, had no idea how the PDC set those salaries.  Now, we

7  certainly in our reply quantified that, but that's a

8  quantification.

9       The exhibit I showed you is actually from Dr. Leamer's

10  rebuttal report, so this has not been a secret to either side.

11      And what we were -- what we were pointing out is that

12  you've got two components of a salary, only one of which is

13  subject to any centralized administrative control, and that's

14  the School of Medicine piece; and then in the reply we expanded

15  on that to explain the magnitude of what was being dealt with,

16  the fact that the PDC is a black box.  It's independent, and an

17  agreement between Duke and UNC can't affect what the PDC is

18  doing.

19      **THE COURT:**  So what's the consequence of that

20  argument?

21      **MR. COONEY:**  The consequence of that argument is that

22  Dr. Leamer -- the impact analysis that Dr. Leamer has done and

23  Dr. Cappelli has given a general opinion on combines them both

24  together.  It assumes that there's centralized control over the

25  PDC and that PDC income is impacted in the same way the

1   academic income is.

2          **THE COURT:**  Okay.  But in terms -- what is the -- I

3   mean, thinking about that -- I don't know, this is what I'm

4   asking -- it seems that the result you would want me to impose

5   would be no damages for anything based on compensation from

6   PDC, but that's not what you're saying.  You're saying somehow

7   this problem -- even if you have centralized control over the

8   academic part of the salary, that still means no antitrust

9   impact.  Do you see what I'm saying?  I'm not getting what it

10  means in terms of the motion that's pending in front of me.

11         **MR. COONEY:**  I do, Your Honor, and I apologize for not

12  having been -- for our briefing not being clear and for my not

13  understanding that until just now.

14         **THE COURT:**  Well, that's all right.  This case is

15  complicated and I'm not the quickest study on some of this

16  stuff.

17         **MR. COONEY:**  So I think I've got two responses to

18  that.  So the first goes to exclusion of the PDC income.  We

19  absolutely do believe under Rule 56 you can do that and

20  specifically under Rule 56(g) because under -- Rule 56(g), you

21  know, essentially permits the Court to narrow the issues that

22  are in dispute.

23         **THE COURT:**  Right.  But, I mean, you really didn't

24  explicitly ask me to do that.

25         **MR. COONEY:**  No, we didn't.  But as part of the

1 Court's analysis of a Rule 56 motion, the Court is permitted to

2 take the evidence as it's presented to the Court and then do

3 that 56(g) narrowing to the extent it's appropriate.

4 And I think the second piece of this, which is why it goes

5 to impact as a whole, is the return-to-tenure analysis. The

6 sharing regression analysis that purported to show correlation

7 and therefore common impact is all based on both sources of

8 income when the evidence is a major source of the income isn't

9 subject to this agreement, isn't subject to centralized

10 control.

11 So effectively, once you pull that out, then they don't

12 have a reliable model that can demonstrate common impact

13 because it's been based on the wrong thing. It's been based

14 on, in large part, compensation that comes not from Duke

15 University and that's not controlled by Duke University, but a

16 strictly fee-for-service, for-profit entity that is a separate

17 legal entity and operates separately from Duke University.

18 **THE COURT:** Okay.

19 **MR. COONEY:** Does that --

20 **THE COURT:** Well, it seems like kind of a big thing --

21 **MR. COONEY:** Yes.

22 **THE COURT:** -- to have not mentioned it until the

23 reply brief and so I'm really not -- I'll hear from the

24 Plaintiff on it and then I'll give you another chance maybe, if

25 we have time. Why don't you move on to the rest of the issues.

1          **MR. COONEY:** We did cite that evidence in Footnote 1

2   of the opening brief.

3          **THE COURT:** Yeah, but you didn't tell me why it was

4   important.

5          **MR. COONEY:** Yes, Your Honor.

6          **THE COURT:** I mean in this −− in the way you're

7   telling me now. Obviously, you cited it for a reason, but it

8   doesn't seem like you cited it for the reasons you're telling

9   me now, but maybe I just wasn't understanding the subtleties.

10      All right. Go on to the rest of the points.

11          **MR. COONEY:** Well, I mean, I think Your Honor is

12  actually understanding the central point that I wanted to make

13  in terms of what's going on here, which is at best you've only

14  got centralized control over the academic piece.

15      We would contend even that evidence is not sufficient

16  because while the Plaintiffs hypothesize that, oh, the

17  chancellor, who had to have been aware of this, or the dean,

18  who had to have been aware of this, is using that influence at

19  budget meetings −− and I wasn't here for the argument on class

20  certification, but, you know, I read through the transcript.

21  Mr. Harvey, you know, indicated that the chancellor must have

22  attended every budget meeting to tell everyone, "No, we don't

23  need to raise these," because he knew there was an agreement.

24  There's just no evidence of that.

25      You know, there is anecdotal evidence that the chancellor

1  for some of these years, between 2012 and 2014, Dr. Dzau,

2  attended some of the meetings.  There's no evidence that from

3  2014 to 2016 Dr. Washington, who is the chancellor, attended

4  any meetings.

5      And all of the evidence from Dean Andrews, who was the dean

6  at that point, was basically, you know, "This is a department

7  budget.  I don't see it.  I don't approve it.  The departments

8  do it and it just comes through me and we process it on and I

9  look at it in terms of the overall School of Medicine budget."

10     So, yes, you need centralized control in order to have

11 common impact.  Without centralized control, you do not have

12 common impact.

13         **THE COURT:**  So the whole internal equity theory falls

14 apart without common control?

15         **MR. COONEY:**  Yes, on the academic side.  I mean, on

16 the -- certainly on the PDC side it does.  So if -- if you're

17 being paid, basically, according to your rank and how many --

18 how much fees you generate, then there's no -- there's no

19 reason to worry about internal equity in the sense of, all

20 right, is X being paid as much as Y because we've got objective

21 criteria on which we can measure that.  So internal equity

22 applies when you don't have kind of an objective, all right,

23 you read 20 films versus somebody else who read 10 films.

24     And that could certainly apply on the academic side, except

25 for the fact that the centralized control they posited at the

1  chancellor level, the internal equity wouldn't apply across

2  departments.  In other words, there's no rational way you can

3  say that, well, if the surgeons get a raise or somebody

4  determines there's no internal equity in the Department of

5  Surgery, that means the pediatricians and community and family

6  medicine ought to get a raise too.  There can't be any

7  transmission without some centralized authority and control

8  over it on the academic side, which doesn't exist.

9          **THE COURT:**  Okay.

10         **MR. COONEY:**  So I -- have I answered the Court's

11  issues?

12         **THE COURT:**  I think I hear what you're saying.

13         **MR. COONEY:**  Thank you, Your Honor.

14         **THE COURT:**  Yes.

15     For the Plaintiff.

16         **MS. SHAVER:**  Thank you, Your Honor.  Ann Shaver for

17  the Plaintiff.  The Court had a number of questions for me, but

18  I'll start with the issues just addressed by Duke.

19     We absolutely disagree -- well, first of all, we agree with

20  Your Honor that this was an improper reply argument, so we

21  appreciate the opportunity to rebut it here.  We absolutely

22  disagree that the PDC is a wholly separate, hermetically sealed

23  entity from the School of Medicine and that there is no

24  centralized control over what physicians are paid in the PDC.

25     There is evidence in the record that the centralized

 1   control from the School of Medicine and from the chancellor

 2   reaches total compensation, including the PDC compensation, and

 3   that comes in a couple of forms.  The first is that when a new

 4   faculty member -- and let's just be clear that you can't

 5   practice at the PDC unless you're a faculty member.

 6         **THE COURT:**  Right.

 7         **MS. SHAVER:**  So when a new faculty member comes to

 8   Duke, the chair of that person's department and the dean's

 9   office decide what that person's --

10         **THE COURT:**  Can you just back up a step?  So Duke says

11   in their summary judgment briefing that you seek to prove

12   antitrust impact on a common basis in two ways:  One,

13   centralized decision-making and, two, internal equity.  Is that

14   right?

15         **MS. SHAVER:**  Yes, ma'am.

16         **THE COURT:**  Okay.  And what has happened to this no

17   preemptive compensation increases?  Where does that fit in?

18         **MS. SHAVER:**  That fits into the centralized control.

19   I could start with that, if you prefer.

20         **THE COURT:**  Okay.  And are these two ways that

21   together show antitrust impact or is either one of them alone

22   enough to show antitrust impact?  Just, you know, if you could

23   tell me what your position is on that and then you can say

24   whatever else you want to say.

25         **MS. SHAVER:**  Yes.

1        **THE COURT:**  But I want to be sure I understand that.

2        **MS. SHAVER:**  They are two separate mechanisms by which

3    pay suppression spreads to the class and both were in operation

4    here.

5        **THE COURT:**  Okay.  And together they prove antitrust

6    impact?

7        **MS. SHAVER:**  Yes.

8        **THE COURT:**  So if --

9        **MS. SHAVER:**  But one does not depend on the other.

10       **THE COURT:**  One does not depend on the other.

11       **MS. SHAVER:**  Right.

12       **THE COURT:**  And just hypothetically speaking, if I

13   were to conclude that there wasn't evidence of common

14   decision-making, would you still have enough to get to the jury

15   just based on this internal equity?

16       **MS. SHAVER:**  Yes.

17       **THE COURT:**  Okay.  Now that I know -- I wanted to be

18   sure I understood exactly what the background was.  If you can

19   just give me a little bit of a framework here for what you're

20   going to be saying to the jury --

21       **MS. SHAVER:**  Sure.

22       **THE COURT:**  -- about antitrust impact.

23       **MS. SHAVER:**  Sure.

24     So, Your Honor, our theory of causation -- and you've hit

25   the nail on the head -- has two parts.  One part of our theory

1  of causation is that the centralized control over compensation

2  exercised by the administrations at Duke and UNC meant that

3  they have control over the -- the budget compensations, that

4  is, you know, how much is budgeted for faculty to be paid in a

5  given year; and because of the agreement here, they knew that

6  they did not have to pay faculty as much as they otherwise

7  would have had to.

8       So it's -- it's through that centralized control over

9  budget for compensation that they were able to exercise their

10 influence and suppress those budgets; and as part of that, they

11 did not have to give the preemptive pay increases that

12 employers typically do -- or at least not to the same extent

13 that they normally would have in a competitive marketplace.

14           **THE COURT:**  Okay.

15           **MS. SHAVER:**  All right.  So that's the first part and

16 I'll come back to all of the evidence on that.

17           **THE COURT:**  Yes.

18           **MS. SHAVER:**  Okay.  The second part of our causation

19 theory has to do about internal equity and that is that when

20 you have a -- an administrative pay system like Duke and UNC

21 had here -- that is, you have employees who are organized into

22 titles, they're organized into job families, and they're

23 organized into -- you know, within each of those is a separate

24 type of salary range.  If pay for one of those folks changes,

25 it affects pay for the rest because employers are concerned

1 with maintaining internal equity, that is, a sense of fairness
2 among the employees, and employees also care a great deal about
3 this.

4     So our theory on internal equity is that -- and there's,
5 you know, a lot of evidence in the record from class
6 certification and at this stage that shows that the senior
7 administrators were concerned about, A, if you pay Dr. X more,
8 you're going to have raise the pay of all of the other
9 associate professors there.  Otherwise, we're going to have a
10 riot on our hands.

11     Now, Duke's argument in its briefing here is that
12 Plaintiff's internal equity theory fails because internal
13 equity does not apply across department lines.  They conceded
14 it applies within departments, but they say it doesn't apply
15 across department lines.

16         **THE COURT:**  Or at least you have evidence it applies
17 within departments.

18         **MS. SHAVER:**  Fair enough.  And so I'm prepared to go
19 through today the evidence that it did apply across
20 departments.

21         **THE COURT:**  Well, I mean, I read your brief and you've
22 got the clinical chairs -- the evidence about the clinical
23 chairs and I've forgotten -- there were a couple other
24 categories you had.

25         **MS. SHAVER:**  Yes.

1      **THE COURT:** Yeah, I remember that.

2      **MS. SHAVER:** Yeah. So that's our framework, Your

3  Honor. It has to do with, you know, those two theories of

4  causation.

5      **THE COURT:** Uh-huh. Okay. So now go back to the

6  centralized control.

7      **MS. SHAVER:** Okay. So the centralized control, Duke's

8  dispute with this is its contention that compensation was

9  department specific and totally controlled by department

10  chairs.

11      **THE COURT:** Which sounds just like what they're saying

12  about internal equity.

13      **MS. SHAVER:** Right. So there's a couple of issues

14  with that. We don't contend, Your Honor, that the department

15  chairs play no role in setting compensation. It's not one or

16  the other. It's both. There is a centralized administration

17  that works in tandem with these department chairs to set

18  compensation. So -- but the evidence of centralized control

19  here from the dean's office and the chancellor's office is what

20  it is. It's uncontrovertible. The dean has to approve all new

21  hires and their total compensation. And I'm going to come back

22  to that total compensation piece because that's important when

23  we talk about the PDC. The dean's office determines the set

24  amount for annual faculty pay raises. Any off-cycle

25  adjustments to faculty salaries for any purpose require the

 1  dean's approval.  You know, there's a -- the bottom line I

 2  think is it's a question of fact for the jury to decide whether

 3  they believe this centralized control over pay is enough to --

 4  to transmit pay suppression to the class.

 5     Now, we've also talked about the role of the chancellor

 6  here.  The chancellor comes in because the chancellor was also

 7  a key player in approving departmental compensation budgets, as

 8  well as the total School of Medicine compensation budget.  Duke

 9  has argued that there's no evidence in the record that the

10  chancellor attended these annual budget meetings.  That's just

11  not the case.  Their 30(b)(6) witness Scott Gibson testified

12  that he attended them.

13     The budget meeting notes -- we -- after class

14  certification, we requested that Duke produce to us the notes

15  from each department's annual budget meeting that it holds with

16  the dean and with the chancellor.  Per Scott Gibson's

17  testimony, the chancellor is there.  And they produced those.

18  There's hundreds of them because there's one for each

19  department for each year in the class period.  So we didn't put

20  all of those in the record, but we put enough in the record to

21  show Your Honor that the chancellor is listed as an attendee in

22  those budget meetings.

23          **THE COURT:**  Or at least was invited.

24          **MS. SHAVER:**  Right.  Well, Duke says -- Duke submits,

25  I think, four out of those many hundreds of documents where

1  there were, like, check marks next to people's names, but they
2  haven't offered any witness to say what those means or "I made
3  those check marks and they mean only these people were" -- I
4  mean, there's no -- there's actually -- and their interrogatory
5  responses admit there's no contemporaneous recordkeeping on who
6  attended and who didn't, but in the list of attendees it's
7  clear.  So I think it's at least enough to get to the jury on
8  that.

9      Gibson also testified that the chancellor has to approve
10 the total School of Medicine budget, including all the
11 departmental budgets, and he said, "That's why we have the
12 end-of-the-year budget meeting with the chancellor."  Summary
13 Judgment Appendix, Tab 47.

14     So Duke says -- and this is where we get into the issue of
15 circumstantial evidence which Your Honor raised, which I'm glad
16 for the opportunity to address.  Duke says, well, there's no
17 evidence in the record that the chancellor actually used those
18 budget meetings to suppress compensation.  Well, that -- we
19 don't have a writing from the chancellor that says, "Because we
20 have this agreement, let's not give preemptive wage increases
21 this year.  Let's not increase the budget.  We don't need to
22 because we have this agreement."  Very rarely is there that
23 type of smoking gun evidence in antitrust cases.  I think, you
24 know, my favorite quote on this from the United States Supreme
25 Court in *U.S. v. Falstaff Brewing* is "circumstantial evidence

1  is the lifeblood of antitrust law."

2      What we do have here is evidence that the chancellor knew

3  about the agreement and evidence that the chancellor is

4  participating -- participated in setting the compensation

5  budgets.  We also have expert testimony from our labor

6  economists that a standard employer practice is to reduce

7  turnover raise wages.  So if Duke was not as worried about

8  turnover, it had less incentive to raise wages.

9      We also have documents showing that the senior

10  administrators knew that competition between them would raise

11  pay and those are the e-mails where they say, "Let's not get

12  into raiding each other's faculty because that would just turn

13  into a bidding war.  It basically has the end result of

14  increasing salaries at both institutions."  It's a letter to

15  President Keohane.

16      So our position, Your Honor, is that is a lot of evidence,

17  certainly enough from which a reasonable jury could infer that

18  our mechanism of centralized control over budgets --

19  compensation budgets suppressed pay to the class.

20          **THE COURT:**  Okay.

21          **MS. SHAVER:**  Just turning back briefly because I think

22  the PDC issue ties into this centralized control issue.  Duke's

23  argument is there is no centralized control over PDC salary

24  pay, that it's all separate, and that's most of the pay of the

25  class members.  We contest that.

1    The people who are the chairs of the departments at the
2 School of Medicine are also the chairs of the departments of
3 the PDC.  It's the same person.  When the School of Medicine
4 has its annual budget meeting each year with the chairs of the
5 departments, they're not just talking about School of Medicine
6 pay.  They're also talking about PDC pay and that's why -- I
7 think it's Paul Newman was a witness from the PDC that we
8 deposed and his deposition testimony is in the record talking
9 about his attendance at those meetings because they are
10 talking -- and I think this chart is still up in front of Your
11 Honor.

12         **THE COURT:**  Yes.

13         **MS. SHAVER:**  They're talking about the revenue flows
14 that go from the PDC to the School of Medicine.  It's called
15 the 5B academic transfer.  Part of the money that the PDC makes
16 every year goes to support faculty salaries at the School of
17 Medicine.  So there are fund flows between the two that they
18 have to discuss at those budget meetings.  So the PDC
19 decision-makers are the same functionally as at the
20 School of Medicine.

21    So that's -- that's one way in which the total budget for
22 compensation, it's discussed holistically; and so if the
23 chancellor and the -- you know, the dean and the department
24 heads know of the agreement and they're participating in those
25 budget meetings, that doesn't just affect the university

1  salary.  It affects the total salary.  And let me make two

2  other related points about that.

3      **THE COURT:**  But, I mean, the PDC -- I mean, the

4  doctors who run the PDC are not motivated to suppress

5  compensation.

6      **MS. SHAVER:**  The doctors themselves, absolutely not.

7  No.  One of them is our Plaintiff.

8      **THE COURT:**  So --

9      **MS. SHAVER:**  But the department heads of the PDC, who

10 are making decisions about departmental budgets, obviously in

11 connection with the chancellor and the dean's office and so on

12 and so forth, are.

13     **THE COURT:**  Right.  I mean, I understand how

14 they're -- I guess I'm trying to understand this -- you know,

15 maybe I'm not going to decide it at summary judgment.  It seems

16 like it might be important at trial.  Why do your damages flow

17 from PDC compensation?

18     **MS. SHAVER:**  When the administrators are setting

19 compensation budgets, they are considering total compensation.

20 They're not considering two separate parts.  It's total.

21     And, for example, in the memo that's sent out every year to

22 the departments preparing for the annual budget meetings, they

23 are required to tell the centralized administration benchmarks

24 for their pay based on total compensation, so not a benchmark

25 for just the academic portion or a benchmark for just the PDC

1  portion.  It's a benchmark for the total portion.

2      Another -- I think what really drives this point home is

3  when somebody joins the faculty they are given an offer letter

4  that is signed by the dean that is total compensation.  It's

5  not, "Here's your university compensation and, you know, you'll

6  figure out based down the line what your clinical PDC

7  compensation is going to be."  It's total.

8      And Dean Andrews testified, "That's important.  I have to

9  be involved in those decisions because we need to make sure

10  we've got the budget for it."

11      And the -- the PDC -- I guess the one other point about

12  that is they also decide the split of effort between the two at

13  the outset, so the dean's office and the department chairs.

14  You know, how much of their work is going to be academic at the

15  school, how much of their work is going to be clinical at the

16  PDC, that's decided in advance in cooperation and it informs

17  what their total compensation offer is going to be.

18      So there is centralized control both at the outset of when

19  somebody is hired and annually through these budget meetings

20  over both parts of compensation.  It's not just -- it's simply

21  not the case that there's only evidence of centralized control

22  in the record over the School of Medicine budget.

23      And, you know, to the extent that pay is determined at the

24  department level -- and, again, we don't contest that

25  department chairs play a role in this.  There's ample evidence

1  in the record that the department chairs knew about the
2  agreement.

3          **THE COURT:**  Right.  You don't need to go over there.

4          **MS. SHAVER:**  Okay.  All right.

5      Let me talk about the internal equity piece of it then.  So
6  Duke argues that the internal equity theory does not apply here
7  because internal equity only applied within departments and not
8  among departments, and we think that that is inconsistent with
9  the record evidence.  We cited in our briefing some evidence
10 that internal equity was enforced across department lines.  I
11 know Your Honor said you're familiar with that.  In its reply
12 brief, Duke had some reasons why those weren't valid examples
13 that I would like to respond to, if that's okay.

14          **THE COURT:**  Okay.

15          **MS. SHAVER:**  So we had a document, ECF 96-39, where
16 the dean was comparing the pay of chairs of different clinical
17 departments.  Duke says, well, they just have no peers within
18 their departments.  But that just proves our point that their
19 peers are in other departments and that there is
20 intradepartment equity concerns.

21     The next document is at the joint -- Summary Judgment Joint
22 Appendix, Tab 56.  That's a document where the dean's office is
23 comparing the pay of associate deans and vice deans across
24 departments.  Duke says, well, those people aren't faculty.  We
25 maintain it still shows intradepartmental equity concerns.

1        Lastly, at Summary Judgment Appendix, Tab 57, there's a
2   document comparing the pay of faculty salaries in different
3   clinical departments.  Duke's response on this was confusing.
4   It said they're comparing faculty within the department, but
5   the document says, quote, Can we run an analysis of the Track 3
6   PhDs in the clinical departments, plural, end quote?
7        We also have testimony -- extremely relevant testimony from
8   UNC Chancellor Houpt.  He was asked specifically if he made a
9   retention offer to someone in orthopedics would that have
10  affected compensation outside that department.  He answered
11  yes.  He said it's -- he said, "It's not one-to-one.  If I gave
12  a hundred-thousand-dollar raise to somebody in orthopedics, it
13  doesn't mean I'm going to give a hundred-thousand-dollar raise
14  to somebody in faculty practice."  But he said, quote:  Word
15  spreads among faculty; and if word got out that this had
16  happened, yes, I believe that it would cause the school in
17  general to start coming to my office and asking for more money.
18       We also have expert testimony regarding the relationships
19  between departments.  So Dr. Cappelli opines that departments
20  are part of the same pay structure and they have a relationship
21  to one another that must be preserved in order to maintain that
22  relationship, and that's backed up by evidence in the record.
23  For example, Duke President Keohane testified that there's a
24  pay relationship between departments.  People in law get paid
25  more than people in -- I think she used German language as an

1　example.  Faculty know that and she said, "That is something

2　that we try hard not to disrupt."

3　　So in sum, Your Honor, we believe there is ample evidence

4　to reach the jury on the question of whether internal equity is

5　a mechanism here by which pay suppression was spread among the

6　class.

7　　　　　　THE COURT:  Okay.  Thank you.

8　　Any rebuttal for the Defendant?

9　　　　　　MR. COONEY:  Yes.  I'll be brief, Your Honor.

10　　So let me just go through a couple of points.  For example,

11　Ms. -- the Plaintiff talked about the fact that the dean has to

12　approve --

13　　　　　　THE COURT:  And the mike -- if you can --

14　　　　　　MR. COONEY:  I'm sorry, Your Honor.

15　　　　　　THE COURT:  All of a sudden I realized I wasn't

16　hearing you well.

17　　　　　　MR. COONEY:  So the Plaintiff talked about the fact

18　the dean has to approve new-hire letters.  Now, remember what

19　their own expert said about new-hire letters.  By definition, a

20　new hire is coming in at the market rate.  So their evidence is

21　the dean is approving a market rate hire letter and that that

22　somehow shows centralized control over both the medical school

23　and the PDC to suppress pay.  It can't be both ways.  And, in

24　fact, what the evidence --

25　　　　　　THE COURT:  Well, why not?

1      **MR. COONEY:** Well, because if the dean is approving a

2  market rate and there's internal equity concerns and internal

3  equity is going to spread throughout the department and there's

4  centralized control, then when the dean approves -- and there's

5  no dispute the new hire gets the market rate, then by the same

6  mechanism they claim suppresses pay, that ought to raise

7  everyone's pay. And it does -- and they say it doesn't; and if

8  it doesn't, it's because there's no centralized control by the

9  dean over the lion's share of this compensation.

10      The dean has zero role in setting the PDC compensation. Is

11  she aware of it or was she aware OF it during this time? Sure,

12  in terms of what the new hire was and what was reported out.

13  But the black box that she talks about is how the PDC is

14  setting its salaries, what a work value unit may be worth for a

15  radiologist or a CT scan versus a plain x-ray. There's -- and

16  each department has its own kind of logarithms for that.

17      In addition, she mentioned Scott Gibson at page 67 of Tab 4

18  of the Joint Appendix. It's 67, the deposition. It's SJA 22.

19  Mr. Gibson testified, "The dean does approve offer letters.

20  The offer letters have compensation. Her focus is on the

21  university side of compensation. And what she's looking at is,

22  is it roughly in proportion to the university academic effort?"

23      In other words, if somebody is only going to spend

24  10 percent of their time on the academic side, am I paying them

25  10 percent of that academic salary or should I -- or am I

1  paying them too much on the academic side.  It has nothing to
2  do with what's being set on the PDC side, and that's the
3  essential fiction of trying to pull these two things together
4  and say that somehow there's -- there is -- there's centralized
5  control.

6      It's interesting -- the PDC itself is actually a
7  professional organization of class members for this case and
8  the department chairs have zero reason to suppress pay within
9  the PDC because they get paid from the PDC as well.  A
10 department chair has an academic salary, and he or she also has
11 a PDC salary that pays them to do the PDC work and pays them in
12 work value units in the PDC because they're still practicing
13 medicine too as an academic chair.  So there's -- there's no
14 incentive to suppress any pay on the PDC side and there's been
15 no allegation whatsoever that the PDC was part of any agreement
16 with the University of North Carolina and Duke to suppress pay.
17 So they're missing that third conspirator, so to speak.

18     In addition, the Plaintiff continues to mention a letter or
19 letters that were written to Dr. Keohane during the time she
20 was president of Duke University.  Of course, she left the
21 presidency in the early 2000s.  The letters they've mentioned
22 came from the business school dean.  There are no letters from
23 the medical school dean talking about the same thing and, in
24 fact, there's a completely different line of reporting
25 authority for the healthcare side versus what's sometimes

1  referred to as the campus side.  The campus side is the
2  traditional undergraduate school and the graduate school is
3  except the School of Medicine.  So the provost on the campus
4  side, who is Peter Lang, who they mention a lot, has no
5  responsibility or input whatsoever into the healthcare side and
6  certainly none into the PDC.

7       And that, frankly, goes to at least one of the documents
8  she talked about.  So they had these three documents.  One was
9  for chairs.  One was for vice deans.  Those are obviously
10 leadership positions on the academic side and there's reason to
11 think that Duke on the academic side would want to take a look
12 at how am I paying my deans and how am I paying my vice deans.
13 The chairs aren't even -- they're not even part of the class.
14 They've been excluded from the class.

15      The other -- the other reference is to Track 3 PhDs.  Now,
16 Track 3 PhDs would be people without medical degrees.  So the
17 people without medical degrees, there are about 180 of them or
18 so in the class.  We can refer to them generally as basic
19 sciences.  They don't get any income from the PDC.  They get
20 all their income from the university side.  So if you want to
21 talk about any centralized control, it at best would only apply
22 to 180 people in the class who, because they're not physicians,
23 are obviously not generating fees or part of a medical
24 partnership in the PDC.  So you can't take a look at, for
25 instance, PhDs who may be excluded from the class, unless they

1  hold a certain faculty rank, and then try to apply it across
2  the board as evidence somehow that internal equity is spreading
3  across departments.

4      Now, she is absolutely right.  The department chair on the
5  academic side is also the department chair within the PDC.
6  There's no debate about that.  That's undisputed.  What is
7  disputed and what I think there is no debate -- there shouldn't
8  be a debate about is the testimony is clear the dean on the
9  School of Medicine side has no insight into how the department
10 chairs are setting compensation on the PDC.  Those are done
11 pursuant to the plans.  So --

12         **THE COURT:**  Well, I think you told me you were going
13 to be brief.

14         **MR. COONEY:**  All right.  And I have nothing further to
15 say.

16         **MS. SHAVER:**  Your Honor --

17         **THE COURT:**  Let me ask the Plaintiff one question.
18 Mr. Cooney says that you say that new-hire compensation doesn't
19 spread through internal equity.  Is that right?

20         **MS. SHAVER:**  I'm not sure, Your Honor, that that's
21 right.  I think -- the point that we're making about new-hire
22 compensation is that it is a total compensation package that is
23 centrally determined and it does have an effect on internal
24 equity because if you bring somebody in -- a new hire in at a
25 higher level than the people who are already there at that

 1   level, you're going to have a problem.  And that's even in

 2   the -- that annual budget letter that goes out to the

 3   department chairs on the last page, it even says, you know,

 4   consider issues of equity compression or compression in pay in

 5   that scenario.  So internal equity considerations absolutely

 6   apply to new hires, if I understood Your Honor's question

 7   correctly.

 8           **THE COURT:**  Well, I mean, he -- Mr. Cooney says that

 9   your evidence is that new-hire compensation doesn't spread --

10   does not spread through internal equity.

11           **MS. SHAVER:**  That's not correct --

12           **THE COURT:**  Okay.

13           **MS. SHAVER:**  -- for the reasons that I just said.

14   It's not even supported in the record of Duke's own documents.

15           **THE COURT:**  Okay.  You had a point you wanted to make.

16           **MS. SHAVER:**  If I could have 60 seconds, Your Honor.

17      The point that there's no allegations that PDC is part of

18   the conspiracy, that we're somehow missing this third actor,

19   that ignores what I just said about the fact that the

20   department chairs are the same in both places and that the

21   department chairs knew about the agreement.  And, yes, they had

22   every incentive to suppress compensation and keep compensation

23   budgets lower.

24           **THE COURT:**  At PDC?

25           **MS. SHAVER:**  Yes, at PDC.  Because -- I mean, the

1  total -- first of all, whatever is left over from the PDC is

2  going to go back through that transfer to the School of

3  Medicine.  There's all this pressure coming from the

4  centralized administration to keep budgets down and so, you

5  know, if the department chairs -- and, again, we've got -- we

6  have several documents in the record where people are writing

7  the department chairs saying, you know, "There's a candidate

8  from UNC, but don't worry.  He came to us.  I didn't poach

9  him."  Or "He applied.  We didn't raid."  Things like that

10 show that these department chairs absolutely knew about the

11 agreement and were involved in enforcing it.  So to -- to say

12 that the PDC is somehow external to the conspiracy is a false

13 distinction.

14     The last point I want to make, Your Honor, is Mr. Cooney

15 said that the letters we mentioned about -- you know, that the

16 senior administrators were concerned about competition, raising

17 salaries were just the business school dean, had nothing to do

18 with the School of Medicine.  Not so, Your Honor.  We put in

19 the record this document, UNC Dean Houpt to Duke Chancellor

20 Snyderman.  It's circled there at the bottom.  "If we recruit

21 each other's faculty, we'd only be setting up a bidding war."

22 And that's specifically with respect to medical faculty.

23     So there are several examples of this in the record.  The

24 only point I wanted to make is they're not all external to the

25 School of Medicine.

1    Thank you, Your Honor.

2       **THE COURT:**  Mr. Cooney, why did you tell me that the

3  Plaintiff says new-hire compensation doesn't spread through

4  internal equities?  Or did I misunderstand you?

5       **MR. COONEY:**  I'm glad you asked me that because I

6  probably didn't express myself very clearly.

7    So if their theory is there's centralized control and if

8  the dean is approving a new hire and if their theory of sharing

9  is correct, then that ought to be transmitted to everyone and

10 there should be no pay suppression.

11    So, in other words, they're making both sides of the same

12 argument.  They're saying on the one hand there's this

13 centralized control and the dean is admittedly approving market

14 rates for new hires and worried about bringing everyone else up

15 to that market rate, but somehow these people aren't being paid

16 market rate, that their pay is being suppressed.

17    So either the market rate is not being transmitted, in

18 which case there is no centralized control, or it is being

19 transmitted, in which case there's no common impact.  So I --

20 and that -- that was the point I made inelegantly.  I

21 apologize.

22       **THE COURT:**  I see.  No, no, that's all right.  Thank

23 you for explaining it to me.

24    Did the Plaintiff want to rebut that point?

25       **MS. SHAVER:**  Yes, we do, Your Honor.  My colleague,

1  Mr. Harvey, is eager to.

2          **THE COURT:**  Okay.

3          **MR. HARVEY:**  First of all, there is no market rates --

4  a nationwide market rate for faculty.  The market for faculty

5  is not like the market for wheat.  There isn't one price that

6  is publicly posted that everyone follows.  These are individual

7  negotiations and the forces of internal equity, the forces of

8  top-down control do not happen immediately.  So when

9  competition is taken out of the system by holding its fiercest

10  competitor at bay by a secret agreement, competition goes down

11  and pay goes down.  It doesn't go down to zero.  There is some

12  competition, of course.  And is that fight fair?  That's why

13  damages are 8 percent instead of 30 percent.

14          **THE COURT:**  Okay.  I think I understand that.

15      All right.  Let's move on to the hospital.  This is Duke

16  University Hospital System's motion, which seems to me probably

17  ought to be granted and therefore I just -- to save some time,

18  I'd rather hear from the Plaintiff about why I shouldn't grant

19  it and let's see -- Mr. Salahi.  There you are.  You moved

20  places.

21          **MR. SALAHI:**  Yes.  Thank you, Your Honor, for giving

22  me the chance --

23          **THE COURT:**  And if you can -- let me find my notes on

24  this so I can ask you the question the right way.  So Duke says

25  that mere corporate affiliation is not sufficient to impute

1  liability.  That's true.

2          **MR. SALAHI:**  Yes.

3          **THE COURT:**  You say that formal corporate distinctions

4  are not sufficient to insulate Duke Hospital from liability.

5  Well, they certainly don't automatically insulate them and I

6  would agree with that, but absent something -- you've got to

7  have something else --

8          **MR. SALAHI:**  Uh-huh.

9          **THE COURT:**  -- when they are separate entities and

10  here your evidence -- I appreciate the evidence you pointed

11  out, but it doesn't seem to point out that the actors are

12  acting for the hospital system as opposed to acting for the

13  medical school.  It just seems like -- it seems like they're

14  acting for the medical school.

15          **MR. SALAHI:**  Okay.

16          **THE COURT:**  So that is my main hang-up with what

17  you're saying.  And this *Bestfoods* case from the Supreme Court,

18  which is a CERCLA case and not an antitrust case, but no reason

19  to think they wouldn't follow that -- at least I couldn't think

20  of one, perhaps you can -- seems to pretty much be in Duke's

21  favor.  So now you can speak.

22          **MR. SALAHI:**  Sure.  It might be surprising to hear

23  that the *Bestfoods* case is precisely on point, but it cuts in

24  our favor.

25          **THE COURT:**  I am surprised to hear that.

1    **MR. SALAHI:**  Yes.  What that case says is that courts
2  generally presume that a corporate officer is acting for the
3  subsidiary when acting for the subsidiary.  In a way -- and
4  that was a case I believe on the pleadings and so was the
5  *Girgis* case.  In a way, what -- if you were looking at a
6  situation where we were looking at a board of directors' vote
7  for the subsidiary, we would presume that the directors' vote
8  in that context was for the subsidiary.  It is a rebuttable
9  presumption.  So the court goes on to explain, well, if it was
10  so against self-interest, that might rebut the presumption.
11    Here, though, on summary judgment, it's Duke University
12  Health System that is trying to make the presumption that when
13  Mr. Dzau, when Mr. Snyderman, when the department chairs were
14  acting, they were acting solely wearing a Duke University hat
15  and never wearing a Duke University Health System hat.  For
16  them to prevail on this summary judgment motion, they would
17  have to show that no reasonable jury could conclude that they
18  were also wearing a DUHS hat in this context.
19    **THE COURT:**  Well, the affidavit that they presented
20  from Mr. or Dr. Fulkerson seems to largely -- put aside the
21  conclusory paragraph, which is the second part of paragraph 10.
22  Okay.  That's conclusory.  But the rest of it seems to do that
23  and what have you rebutted that with?
24    **MR. SALAHI:**  Yes, Your Honor.  I would like to walk
25  through some of the record evidence that does rebut that.  At a

1 high level, before I get into the details, there are four

2 levels of evidence that would support a jury conclusion that

3 these actors were actually wearing both hats in this context.

4 It's not one or the other. This is not a situation where we

5 have a board meeting that's clearly isolated from everything

6 else that's going on.

7 So we have got the same leadership at the top. It's Victor

8 Dzau. That's -- his predecessor, Ralph Snyderman. When we

9 look at the Scott Gibson 30(b)(6) testimony, he's talking about

10 these coordinated budget planning meetings. How does he

11 identify the chancellor of health affairs? He identifies him

12 as the person who leads Duke University Health System. So, if

13 anything, the presumption actually cuts that he was acting for

14 the Health System.

15 We've got the same middle management, these department

16 chairs, who Scott Gibson also says live at the interface

17 between the School of Medicine's academic mission and the Duke

18 University Health System clinical mission. These are the same

19 people that Duke University and the Health System have argued

20 are the ones making the hiring decision; and de facto if the

21 department chairs are not hiring people at UNC because of the

22 no-poach agreement, that means that they're not hiring people

23 who are going to be providing clinical services at the Health

24 System.

25 And, actually, that is -- that reminds me of another point

1  I wanted to make, which is that these School of Medicine

2  faculty in the clinical departments are providing services

3  through DUHS even though DUHS is not their formal employer or

4  the person who writes the paycheck.  But that's irrelevant and

5  I can explain why if the Court has questions about that.

6      Other than same leadership, same middle management, and the

7  same physicians, which I've just talked about, we also have

8  this interflow of funds between the two entities and so I

9  think --

10          **THE COURT:**  Well, what is your evidence -- are you

11  agreeing then with DUHS that they did not employ class members?

12          **MR. SALAHI:**  That is correct.  So DUHS is not the

13  technical employer.  Our class members are medical faculty with

14  an academic appointment.  That does not mean that people who

15  were involved in the DUHS system were not also class members.

16  In fact, they were and there's Scott Gibson testimony about

17  that, where he talks about how one group of the hospitalists

18  are people who have at least 10 percent academic duties at the

19  School of Medicine and therefore are involved in both systems.

20  So there's this de facto effect between what is going on at the

21  School of Medicine at the department chair level and at the

22  chancellor level in terms of enforcing the no-poach agreement

23  and the direct impact on who is then at DUHS.  And there's an

24  economic link that provides the motivation.

25      And we cite in our case -- in our brief in the legal

 1   standard section the *Virginia Vermiculite* case, which I think
 2   is a helpful analogue here because we don't have to show that
 3   DUHS supported the conspiracy or acquiesced in it because they
 4   wanted to suppress the wages that they would have to pay
 5   directly.  Different motivations are fine.

 6       In *Virginia Vermiculite,* it was a case involving an
 7   incumbent with a large land owning, large vermiculites, a
 8   mineral deposit, and an upstart wanted to come join the scene.
 9   What the incumbent did was it sold off a large portion of its
10   land and those deposits to a nonprofit environmental
11   organization, who clearly didn't have any sort of motive in
12   depressing vermiculite prices.  It just wanted to -- or
13   inflating, I'm sorry, vermiculate prices.  It just wanted to
14   preserve the resources.  Yet that was enough for antitrust
15   liability.

16       So here DUHS, its motivation is the fact that the Duke
17   school --

18           **THE COURT:**  But the agreement clearly was to suppress
19   or inflate, whichever it was -- I'm having a moment -- the
20   prices.  I mean, the *Vermiculite* case was not about whether
21   they entered into an agreement.  It was about the motive to
22   enter into the agreement.  Here -- right?  I mean, here the
23   question is did they enter into the agreement.

24           **MR. SALAHI:**  Yes, that is a question and I would
25   submit that the jury could reasonably conclude that when

 1   Dr. Dzau and when Dr. Snyderman entered into or continued or

 2   failed to stop the agreement, however you want to look at it,

 3   they were doing that on behalf of both Duke University and Duke

 4   University Health System because of the deep interaction

 5   between the two.

 6       And it's worth noting that their counterpart at UNC is a

 7   unified structure.  If a medical faculty instructor were to

 8   leave the School of Medicine at Duke, they would carry their

 9   whole practice with them and go to UNC.  So there's a direct

10   impact on both entities that gives both of those entities the

11   motive to participate in the conspiracy.

12           **THE COURT:**  So just on a practical level, tell me why

13   this is important.  I mean, why --

14           **MR. SALAHI:**  In terms of the significance to this case

15   or --

16           **THE COURT:**  Yeah.  Why does it matter?  I mean,

17   surely -- are you saying Duke University can't satisfy the

18   judgment so you've got to have somebody jointly and severally

19   liable or -- I mean, why do you have -- I'm just -- why are

20   they here?

21           **MR. SALAHI:**  Yep.  Well, they're here --

22           **THE COURT:**  This is not a legal question.

23           **MR. SALAHI:**  Yes.  I don't know if I can answer

24   exactly the question about whether Duke University can satisfy

25   the judgment.  I don't have insight into that.

1      **THE COURT:**  I'm just using that as an example.

2      **MR. SALAHI:**  Yeah.  But they're here because, based on

3  what we learned through the litigation process, they did

4  participate in the conspiracy and they're a crucial part of

5  that as well.

6      **THE COURT:**  So why isn't PDC here?  I mean, I'm having

7  a little trouble figuring this out.

8      **MR. SALAHI:**  Yep, yep.  So from what we know in the

9  record, PDC participates and de facto sort of implements it

10  from orders that come on down from above.  So that's the

11  chancellor who oversees both DUHS and Duke University.

12      **THE COURT:**  Okay.  Well, I mean, because that's not

13  what the Defendant says.  The Defendant says PDC is its own

14  independent group making its own independent compensation

15  decisions, right?

16      **MR. SALAHI:**  And we disagree.  I'm not saying the

17  evidence on this issue is a slam dunk.  We didn't move on this

18  issue, but it's enough that a jury looking at it could come to

19  one conclusion or another --

20      **THE COURT:**  Okay.

21      **MR. SALAHI:**  -- speaking about DUHS specifically, yes.

22      **THE COURT:**  All right.  Anything else you want to say

23  about that?

24      **MR. SALAHI:**  If I could --

25      **THE COURT:**  I didn't mean to cut you off.

1    **MR. SALAHI:**  Sure.  Well, Your Honor, I do want to

2  point the Court to Tab 65 of the Summary Judgment Appendix,

3  which is an internal "Funds Flow Analysis," and there are ample

4  materials under this tab that demonstrate that DUHS was

5  responsible for transmitting money to Duke University School of

6  Medicine specifically to cover things like recruitment and

7  retention.  May I approach the ELMO?

8    **THE COURT:**  Yes.

9    **MR. SALAHI:**  Okay.  Specifically to cover things

10 like -- so Mr. Cooney has helpfully given me this chart.

11   **THE COURT:**  Which page is it?  What's the page number?

12   **MR. SALAHI:**  So this is Summary Judgment Appendix 316,

13 which is the chart that was just up here a moment ago.

14   **THE COURT:**  Oh.  I thought you said 65.

15   **MR. SALAHI:**  Yeah, so the next tab is Tab 65.  So if

16 you turn to -- and, actually, some of this material Duke

17 University has requested be temporarily sealed.

18   **THE COURT:**  Well, just direct me.  I'm looking at it.

19   **MR. SALAHI:**  So before I put it on the ELMO --

20   **THE COURT:**  I'm sorry.  What?

21   **MR. SALAHI:**  -- we look at SJA 384.

22   **THE COURT:**  I'm looking at the old version, Tab 65,

23 which says "DU/DUHS Ad Hoc Review."  Is that what you're

24 looking at?

25   **MR. SALAHI:**  Yes, that's correct.

1          **THE COURT:**  What's the internal pagination?

2          **MR. SALAHI:**  It's 384 of the Summary Judgment

3   Appendix.

4          **THE COURT:**  I'm sorry.  I'm not asking the question

5   the right way.  The originally appended pages numbers 1, 2, 3,

6   4 --

7          **MR. SALAHI:**  So are we looking at the ECF number or

8   are we looking at the Summary Judgment Appendix number?

9          **THE COURT:**  No, no.

10         **MR. SALAHI:**  I apologize, Your Honor.

11         **THE COURT:**  I apologize.  This is what I'm looking at

12  right here.  It's in this book you-all gave me back a few weeks

13  ago preliminarily.

14         **MR. SALAHI:**  So would that be 9 of 20 at the bottom?

15         **THE COURT:**  Oh.  They stopped the page numbers at 7.

16  Section 2.1, is that what you're looking at?

17         **MR. SALAHI:**  Yes, Section 2.1.

18         **THE COURT:**  All right.  I'm with you.  Sorry.

19         **MR. SALAHI:**  And so we see a chart there that

20  demonstrates the funding from Duke University Health System to

21  the School of Medicine.

22         **THE COURT:**  Yes.

23         **MR. SALAHI:**  It gives us the totals.  On the very next

24  page, there is a comment that says:  "Academic Support

25  increases...relate entirely to clinical departments and reflect

1  one-time funding for new chairs in Medicine, Orthopedics, and

2  Radiology...."

3      Flipping through this exhibit further on section -- the

4  chart labeled Section 2.3 --

5          **THE COURT:**  Yes.

6          **MR. SALAHI:**  -- it talks about payments for services

7  of clinical faculty.  So this is money that DUHS transmits to

8  the School of Medicine for the work performed by the clinical

9  faculty.  I'm not going to say the number just because it's

10  temporarily under seal.

11          **THE COURT:**  Well, it's not particularly important, I

12  wouldn't think, the exact amount wouldn't be at this point.

13          **MR. SALAHI:**  Right.  And then the next page shows a

14  listing of how much support is provided financially for

15  particular clinical departments.  That's Section 2.4.

16          **THE COURT:**  And this matters --

17          **MR. SALAHI:**  This matters because it explains why when

18  Dr. Dzau or Dr. Snyderman were acting to perpetuate the

19  agreement with UNC they would have been doing so for both the

20  hospital system and the university.

21          **THE COURT:**  All right.

22          **MR. SALAHI:**  All right.  Thank you, Your Honor.

23          **THE COURT:**  You always say you're going to be brief,

24  Mr. Cooney, but if you want a minute, I will keep tabs.

25          **MR. COONEY:**  Yes, ma'am.  If we take a look at the

1  institutional fund flow, it's important to understand that Duke
2  University Health System is the hospital.
3          **THE COURT:**  That's why I kept calling it the hospital
4  at the beginning.  Yeah, I figured that part out.
5          **MR. COONEY:**  And that's fine.  And here it's a remnant
6  of the fact that this case initially involved nonfaculty nurses
7  and the nonfaculty nurses are employed by the Duke University
8  Health System.  That's why they initially sued the Duke
9  University Health System.
10     Now, to the extent the hospitalist for the Duke University
11  Health System has a significant faculty component, they're
12  actually on the Duke medical faculty; and most of, if not all
13  of, the hospitalists and primary care physicians employed by
14  the Duke University Health System are excluded from the class.
15  They're not in the class.
16     So when we look at the fund flows, what we're really
17  talking about is the fact that -- you know, the medical
18  director of the Department of Neonatology is on the faculty at
19  Duke.  He or she is going to provide medical directorship
20  services and get paid for that.  That's what the services flow
21  is back and forth when we look at that.  We see there's an
22  academic transfer from the health system to the School of
23  Medicine, and then they share allocated overhead as well.
24     But there's not a single -- there's nothing coming from the
25  university's central budget to the Health System, and the only

1  thing that goes between the School of Medicine and the Health
2  System are charges for the services that are provided.
3      So they're -- they're -- it -- the record is clear the
4  hospital doesn't employ anyone.  The hospital couldn't have
5  been part of an agreement to suppress wages because it wouldn't
6  have worked.  There's no way the hospital could have suppressed
7  wages because it wasn't in control of the wages.  So the theory
8  doesn't make any sense.
9      If you -- if you believe Dr. Dzau isn't telling the truth
10 when he said there was no agreement and, in fact, there was an
11 agreement, it can only be an agreement on behalf of the School
12 of Medicine because there would be no reason to agree on behalf
13 of Duke University Health System because they don't have any
14 control over the salaries anyway.  It's not on their budget.
15         **THE COURT:**  The academic salary.
16         **MR. COONEY:**  Yeah, yeah.
17         **THE COURT:**  Okay.  I was just making sure I
18 understand.
19         **MR. COONEY:**  You're exactly right.
20         **THE COURT:**  All right.  Thank you.
21     Do you want to rebut that narrowly?
22         **MR. SALAHI:**  Narrow point is that whether they have
23 control over the salaries is irrelevant to whether they can be
24 held liable for the antitrust violation.  Under *Virginia*
25 *Vermiculite,* they just need to acquiesce in the agreement

1  knowing that it has anticompetitive effects; and we've shown

2  that based on the direct involvement at three levels, the

3  senior leadership and the middle management.

4      Thank you, Your Honor.

5      **THE COURT:**  All right.  Let's turn to the experts now,

6  these three other experts -- Dr. Cappelli, Dr. Baker -- and I

7  guess Professor Hemphill also has a doctorate in economics

8  so -- there's a number of overlapping issues, but then there's

9  a bunch of individual issues.  So I don't really know the best

10 way to do this.  I think you-all had divided it up with the

11 same person talking about Dr. Cappelli and --

12     **MR. GLACKIN:**  Your Honor, Ms. Shaver will address

13 Dr. Cappelli and also the motion to exclude Dr. Baker we filed

14 on the basis of his lack of qualifications.  I'll be responding

15 to Duke's motion to exclude Professor Hemphill's testimony, and

16 to the extent we want to have a conversation or Your Honor

17 would like to have a conversation about sort of the general

18 rules of road on expert testimony, to the extent that

19 implicates Dr. Baker, I'll address that also.

20     **THE COURT:**  Okay.  So maybe I'll just talk about all

21 three of them.  I don't know.  Well, maybe I'll just let

22 you-all talk about them rather than trying to figure out how to

23 tell you what my concerns are.  I mean, I think -- you know, I

24 have some concerns.  I want to be sure people talk within their

25 expertise.  I want to be sure that they aren't talking about

1    somebody's intent.  I want to be sure they're not talking about

2    legal issues, like these plus factors.  I mean, that seems to

3    be something courts talk about, not economists or labor market

4    people.  So I'm not really sure why that comes in.  I want to

5    be sure that experts are not going to be making closing

6    arguments from the witness stand, which a lot of what

7    Professor Hemphill and Dr. Baker say seem to me to be.

8        Dr. Baker didn't -- as I understand it, he has an opinion

9    that there was no antitrust impact, right?

10        **MS. BASS:**  Your Honor, Dr. Baker's role was to respond

11   to Dr. Cappelli.  So Dr. Cappelli's opinion is that there is

12   antitrust impact in this case based on his views of internal

13   equity and embeddedness.

14        **THE COURT:**  Right.

15        **MS. BASS:**  So Dr. Baker's view then was to examine

16   Dr. Cappelli's opinions, examine the record, and come to his

17   own conclusion about whether or not Dr. Cappelli was correct.

18        **THE COURT:**  Okay.  So, I mean, I understand why

19   Dr. Baker can come in and say that a lot of Dr. Cappelli's

20   assumptions are incorrect, they don't accurately reflect the

21   market for medical school faculty, et cetera.  But to the

22   extent he wants to come in and say there is no impact, I

23   question whether he ought to be able to do that because he

24   didn't do any study.  I mean, he just -- that's -- there's no

25   methodology at all in that conclusion that he made or at least

1   that's what it seemed to me to be, subject to hearing from

2   you-all.

3       So -- anyway, those are sort of my general observations.

4   Why don't we just do them one at a time and we'll start with

5   Dr. Cappelli and it's -- that is the Defendants' motion.

6           **MR. COONEY:**  Yes.  And, quite frankly, Dr. Cappelli

7   and Dr. Baker could probably -- as Ms. Shaver suggested before

8   we broke, can --

9           **THE COURT:**  I'm sorry.  I can't hear you.

10          **MR. COONEY:**  I'm sorry.  Dr. Cappelli and Dr. Baker,

11  as Ms. Shaver suggested before we broke, probably could almost

12  be considered together.

13          **THE COURT:**  I'm good with that if it's going to be the

14  same person, though it's opposite people's motions.  So we'll

15  just -- if you want to start out with -- I don't care.  Just go

16  ahead.  I'm obviously going to let you-all talk until we run

17  out of time or I get tired of listening to you, so, you know

18  proceed.

19          **MR. COONEY:**  Let me try to put them both together and

20  then, to the extent I screw anything up, I'm going to ask

21  Ms. Bass to fill in for me, if that's all right.

22          **THE COURT:**  Okay.

23          **MR. COONEY:**  So, essentially, Dr. Cappelli came in and

24  said, "Well, I'm an expert at labor economics."  He didn't

25  perform any particular study but ended up giving an opinion

1 that because of the way labor markets work this would be

2 transmitted. And he has no particularized expertise and didn't

3 familiarize himself with -- with the medical market, so we

4 question whether he's got the basis to do that.

5      And so what happened is Dr. Baker came in and said, "I've

6 read this opinion and I've gone out and I've looked at some

7 things. So if, in fact, faculty are embedded at Duke, then

8 the -- the departure rate at Duke ought to be low because the

9 theory is you're stuck. You can't go anywhere." And so

10 Dr. Baker takes a look at that and generates some charts. "All

11 right. When I take a look at faculty leaving Duke and faculty

12 leaving Carolina, it doesn't look any different than the range

13 of faculty leaving anywhere."

14      Then he takes a look at, all right, faculty departures

15 outside of Duke, you know, is there really a national market.

16 In fact, people leave and come outside of North Carolina to

17 Duke all the time. And he puts together that exhibit.

18      So what Dr. Baker was effectively doing is saying, "If

19 Dr. Cappelli is right that there's got to be common impact,

20 then we ought to see certain things and I'm not seeing those

21 things when I look at the data. And so based on my opinion,

22 this data is inconsistent with an opinion that there is common

23 impact because you ought to see these things play out."

24      Now, I understand the Court's concern about giving an

25 expert opinion on something that is an ultimate issue for the

1  jury to decide and it kind of goes to Dr. Hemphill as well, but

2  I think what Dr. Baker has done is he's provided a series of

3  pedagogical points that you ought to see A, B, C, D, and E; and

4  when I go out and look at the data, the data is inconsistent

5  with A, B, C, D, and E.

6       **THE COURT:**  So I understand that.  I mean, I

7  understand what you're saying.  If he comes in and does that --

8  I mean, he's an economist, right?

9       **MR. COONEY:**  Yes, ma'am.

10       **THE COURT:**  He's not a labor economist.  He doesn't

11  have the experience that Dr. Cappelli has.  I understand what

12  you're saying there.  But he seems to do a lot more than that

13  in his report.

14       **MR. COONEY:**  Well, there's no question parts of his

15  report may go beyond what the Court feels comfortable with in

16  terms of the expressions of opinion, but at the core his

17  opinion is basically he is familiar with the way in which

18  academic medical centers operate.  I would contend in that core

19  he's certainly perhaps more qualified than somebody who is an

20  expert in labor markets in general.

21       **THE COURT:**  Yeah, he teaches first-year med students

22  one class that they tangentially talk about compensation.  I

23  mean, I have a bit of a problem with that.  I mean, am I wrong?

24  That's what his most recent experience is.

25       **MR. COONEY:**  Well, yeah, in terms of teaching, but

1  he's embedded in both faculties so, obviously, he's interacting

2  with a medical faculty on a daily basis.

3      **THE COURT:**  Yeah, so -- I mean, but he doesn't have

4  any -- for a bunch of stuff that he says it does not seem like

5  he has data.  It seems like he has his thoughts, which aren't

6  based on labor economics or any sort of economic theory.

7      They're -- you know, he said that because faculty can be

8  induced to relocate, colluding to suppress opportunities for

9  faculty to change jobs locally does not have an effect on

10 competition.  I understood him to say that.  Well, he doesn't

11 have -- I did not understand him to have any basis for that

12 other than that's just his thoughts after living in the

13 academic world for a while.

14     **MR. COONEY:**  Well, again, I think based on the data he

15 takes a look at it and presents tables on.  So if, in fact, it

16 had an impact on competition -- again, their theory is if

17 people are stuck because there's no competition, they've been

18 embedded and they're being paid below market rates, you know,

19 the -- the tabular data he presents simply doesn't bear that

20 out.

21     Now, should he be expressing that particular opinion in a

22 somewhat different format, that -- absolutely if -- to the

23 extent the Court has an issue with him making a blanket

24 statement like that as opposed to "Here's what this data says

25 and here's what you ought to see."

1    **THE COURT:** Uh-huh.

2    **MR. COONEY:** And I certainly understand that's where

3 the Court is going probably with all of these witnesses to a

4 certain extent, is it's a here's what you ought to see if one

5 side or the other is correct.

6    **THE COURT:** Right. I mean, that's why some -- a lot

7 of Dr. Cappelli's views are probably going to come in, because

8 he says, "This is what you would expect to see if you" --

9 whatever those three categories are. They all start with C.

10 "You know, you fit it into one of those and this is what I'm

11 talking about in this academic theory."

12    **MR. COONEY:** And then Dr. Baker comes back and says,

13 "I've looked at this data and I'm not seeing X, I'm not seeing

14 Y, and I'm not seeing Z, and this would be inconsistent with

15 the opinion that there would be impact across because we ought

16 to see this effect."

17  I think that's a very standard approach really on behalf of

18 both experts. You know, he puts out a theory. Now, he

19 didn't -- there's no -- it is a theory. He hasn't done a

20 particularized study to say, "Yes, and the data show X, Y, and

21 Z." But Dr. Baker has, in fact, come back and said, "Well,

22 except I'm not seeing effects across a number of tables that I

23 ought to see effects on," and leave it up to the jury. The

24 jury could conclude, well, the fact that you don't see effects

25 doesn't mean anything or they could conclude, you know, if

1  there are no effects, there's no impact.

2  **THE COURT:** So you-all said in your brief that

3  Dr. Baker had published widely on compensation systems and you

4  cited me to his résumé, which attached, you know, I don't know,

5  150 articles, but you didn't tell me which ones had to do with

6  compensation systems. The Plaintiff says there's just one and

7  it's 20 years old and -- I mean, I want -- he does -- his

8  expertise -- his expertise has to correlate with his opinions.

9  You don't let physicists come in here and testify about art

10  history. So -- to use a ridiculous example. So, I mean, he

11  clearly is not a labor compensation systems person, right?

12  **MR. COONEY:** Right. That's certainly not the focus of

13  his research.

14  **THE COURT:** Uh-huh.

15  **MR. COONEY:** But he -- given his knowledge, education,

16  training, and experience, he's certainly capable of going out

17  and gathering the data and saying, "Does this data match or

18  meet what you would expect to see?"

19  **THE COURT:** Right. And I understand that part of your

20  argument. I guess I just have -- he seems to kind of go beyond

21  that, so that's why I think I said at the beginning I suspect

22  all of these people are going to sit in front of the jury if

23  you call them and offer some things as a part of exploring --

24  **MR. COONEY:** No, I understand exactly what you --

25  because, quite frankly, it's the same issue, I would say, on

1  steroids for Mr. -- or Dr. Hemphill, who, you know, when you

2  read what he's doing -- Your Honor indicated he may be giving

3  closing argument. I think he's giving instructions to the

4  jury. He's telling the jury what the requirements are to find

5  an agreement, and then he's putting a bunch of documents the

6  jury is fully capable of analyzing for themselves and giving a

7  legal conclusion that these documents mean there's an

8  agreement.

9       **THE COURT:** Well, I mean, but one of the things

10  Dr. Baker does is say Dr. Cappelli's conclusions are not

11  supported by the evidence. I mean, that's a closing argument.

12       **MR. COONEY:** Right. And he should be more specific

13  about that. He could say his conclusion in this regard is not

14  supported by this particular table or this particular evidence.

15  I mean, he certainly can say, "If Dr. Cappelli says X, we

16  expect to see Y and the evidence does not support that."

17       **THE COURT:** Right. I don't disagree with you about

18  that. But moving beyond that, if -- if he just wants to point

19  to certain evidence as supporting the opposite conclusion

20  without -- I mean, you could do that, and no doubt will, in

21  closing argument. I don't -- I'm trying to figure out what he

22  brings to the table when he marshals the evidence.

23       **MR. COONEY:** Because he's also gathering the data to

24  begin with. For example, I -- yeah, he gathers the data on,

25  you know, departure rates for various medical schools across

 1  the country.  Now, I need an expert to do that.

 2          **THE COURT:**  Yes.

 3          **MR. COONEY:**  So it -- and I can talk about it in

 4  closing, but I need an expert to say, "All right.  Here's what

 5  these mean.  Here's how I gathered them.  Here's what we ought

 6  to see if he's right.  I don't see it here."

 7          **THE COURT:**  Okay.

 8          **MR. COONEY:**  And, Ms. Bass, do you have anything?

 9          **MS. BASS:**  Not unless Your Honor has some specific

10  questions on Dr. Baker.

11          **THE COURT:**  No, I think -- let me hear from the

12  Plaintiff.  Well, did you say everything you wanted to say

13  about Dr. Cappelli?  Pardon me.  If I can go back to Duke for a

14  moment because I think I started with Dr. Cappelli.

15          **MR. COONEY:**  Yeah.  And I think I began to say what I

16  wanted to and I think Your Honor indicated how she viewed it

17  and I'm not sure --

18          **THE COURT:**  Well, I didn't want to cut you off if you

19  had something you wanted to add.

20          **MR. COONEY:**  No, you've never cut me off, Your Honor.

21  You've always given me an opportunity to say it, but I also

22  don't want to flog a dead horse either.

23          **THE COURT:**  All right.  Thank you.

24      All right.  Now for the Plaintiff.

25          **MS. SHAVER:**  All right.  Thank you.

1    I'll start with Dr. Baker since that was our motion to
2  exclude and we moved to exclude him on the basis of his
3  qualifications.

4    Dr. Cappelli, a labor economist, came in and said, "Here
5  are some principal foundational processes that we study in the
6  field of labor economics; and those are internal equity, worker
7  embeddedness, and operations of centralized pay systems.  I've
8  looked at the record evidence in this case and I see all of
9  this evidence.  It's consistent with it.  It shows me that they
10  were, in fact, in operation here."  And because of his
11  background as a labor economist, he's qualified to make those
12  opinions.

13    All right.  So Dr. Baker comes in and says, "No, those
14  mechanisms don't apply to medical faculty."  The problem is
15  he's not qualified to offer that opinion.

16           **THE COURT:**  Well, so that may be.  Okay.  They
17  don't -- those mechanisms don't apply to medical faculty.  If
18  he comes in and says that, maybe you're right.  But why
19  can't -- but he could come in and say -- I mean, he's a PhD
20  economist.  They've learned the same things generally, broadly
21  speaking.  I don't mean they learn exactly the same things.
22  But why can't he come in and say, "If Dr. Cappelli is right,
23  one would expect to see X and one does not see X"?  Why could
24  he not do that?

25           **MS. SHAVER:**  So if you're referring to Dr. Baker's

1  data that counsel just referred to --

2          **THE COURT:**  Well, then I actually wrote down before we

3  ever got in here that.

4          **MS. SHAVER:**  Right.  So his lack of qualifications are

5  illustrated by the way that he looks at that data and the

6  conclusions that he draws from it, and Cappelli says as much in

7  his rebuttal report.

8      So, for example, his opinion about embeddedness, Baker

9  says, "I see that in the record here Duke and UNC faculty do go

10  to other schools across the country, so embeddedness doesn't

11  operate here."  Now, that's a total misinterpretation of the

12  principle of embeddedness.  As Cappelli says, embeddedness does

13  not prevent relocation.  It restrains it.

14      So, yeah, if the offer is good enough to go to Stanford,

15  obviously people do relocate to Stanford.  His point is that --

16  and he cites the literature on this -- that next to

17  compensation, embeddedness is the most important factor that

18  employees take into consideration when they're choosing an

19  employer.  So it is not a total bar to relocation, but it is a

20  restraint on relocation.  And that is why the agreement here

21  between the two local employers to restrain competition would

22  have had such an effect on pay.

23      So that's one example of where Dr. Baker's lack of

24  expertise and knowledge on these foundational principles of

25  labor economics leads him to present these studies -- you know,

1  these data runs that he's done that don't actually show what

2  he's saying that they show.

3      And, you know, the case law is strong with warnings about

4  the potentials of experts to mislead the jury because they tend

5  to have impressive qualifications and juries give, you know, a

6  lot of deference to experts, but if they're not qualified, they

7  can be quite misleading.  We think that's the case with

8  Dr. Baker here.  I mean, he -- he -- you know, he opines that

9  internal equity does not exist across departments, but he says

10 he doesn't know anything about internal equity.

11      **THE COURT:**  Well, right.  I mean, that would be one

12 thing perhaps he couldn't say.

13      **MS. SHAVER:**  Right.

14      **THE COURT:**  But I don't know.  He said, for example --

15 let's see what I wrote down exactly about this.  He said if --

16 as I understood him, Dr. Baker said if Dr. Cappelli is right

17 about internal equity, you would expect to see compensation of

18 similarly ranked doctors in the same department cluster around

19 the same compensation.  That's not a quote.  That's my

20 rewording of what he said.  But they don't.  They vary widely.

21 So why is that not admissible?

22      **MS. SHAVER:**  Well, Cappelli comes back and says

23 Dr. Baker -- on that exact point, Dr. Baker is comparing apples

24 to oranges.  He should be looking at base salary in that

25 example, but instead he's taking into -- of course faculty

1   compensation is going to range depending on how many hours

2   somebody works in a clinic, right?  Somebody who works 5 hours

3   is not going to get paid the same as somebody who works 15

4   hours, and Dr. Baker -- you know, Cappelli says in his rebuttal

5   report Dr. Baker has confused these concepts.  He's not looking

6   at the right standard of comparison here, which would be their

7   base pay.  He's looking into the total, the incentive

8   compensation for, you know, units worked versus the base pay.

9         **THE COURT:**  Is that the same thing as what you get

10  paid by the med school and what you get paid by PDC?

11        **MS. SHAVER:**  Somewhat, but not entirely, Your Honor,

12  no.

13     So for each point that Dr. Baker makes, Dr. Cappelli comes

14  back and says, "This is at odds with standard economic theory

15  in my field."  And the Court's gatekeeping function at this

16  stage -- right, this is why qualification is not an issue for

17  the jury to decide, but it's an issue for the Court to decide.

18  It's part of the Court's gatekeeping function because expert --

19  the qualifications of an expert have to do with the

20  admissibility of the evidence.  If the expert is not qualified

21  to form those opinions, then the evidence is not admissible.

22     I would also like to respond to a couple of points about

23  Dr. Cappelli, unless the Court has more questions on Dr. Baker.

24        **THE COURT:**  No.

25        **MS. SHAVER:**  Okay.  So Duke makes three arguments

1  about Dr. Cappelli.  One goes to his qualifications.  I won't

2  spend time there, unless the Court would like me to, but I

3  think Dr. Cappelli is eminently qualified to offer his opinions

4  in this case.

5      So Duke makes the point that Cappelli replies on

6  assumptions and speculation about competition here that are not

7  founded in the record.  That's not -- that's not the case.

8      Duke says he totally discounted the presence of local

9  competition -- private hospitals, private clinics -- where some

10  faculty go.  He actually specifically analyzed the sources of

11  local competition here.  He said, "Yes, there is competition

12  for faculty from local sources."

13      But that's a different labor market.  The labor market for

14  medical faculty is different from the labor market for

15  nonacademic jobs.  The wage setting that happens in private

16  practice doesn't affect the wage setting of the universities

17  because there is no way universities could afford to keep up

18  with that.

19          **THE COURT:**  He says it doesn't affect it at all?

20          **MS. SHAVER:**  It doesn't affect it because -- it

21  affects it to the extent that if a medical faculty receives an

22  offer from a private clinic, Duke or UNC may say, "We can raise

23  your pay a bit to match it."  But they're never going to be

24  able to go to the levels of a private hospital.

25      And, you know, at the summary -- the *Daubert* Joint

1  Appendix, Tab 26, here's an e-mail from Dean Nancy Andrews:

2  "There are many fields where people equivalent to our faculty

3  members earn more in the private sector.  I won't allow salary

4  increases to try to match private hospitals.  It doesn't make

5  sense.  Either they see nonfinancial benefits to being in a

6  university and accept salaries or they leave our faculty."

7      That's support for what Dr. Cappelli is saying here about

8  local competition.  He takes –- he doesn't ignore it.  It

9  doesn't rest on faulty assumptions, but he explains why the

10 labor markets are different.

11     All right.  The second thing, they say he ignored national

12 competition, other universities outside the region that

13 recruit.  Not so.  He even cites examples in his report of Duke

14 and UNC making counteroffers from national sources.  But his

15 point here is two-fold.  Competition doesn't have to be

16 eliminated entirely to have an effect on wages, okay.  So it's

17 not a matter of either/or.  It's a matter of degree.  And also

18 that, due to embeddedness, competition between Duke and UNC

19 would have the most effect on wages for faculties, so more than

20 national offers, because embeddedness restrains, not prevents,

21 relocation.

22     So, again, there's no faulty assumptions here.  There's

23 just nuance as to how the local and national competition

24 operates, which Cappelli is qualified to analyze due to his

25 expertise in labor economics.

1    Lastly, Duke says that Cappelli relies on unsupported

2  assumptions about internal equity.  Not so.  He relies on

3  evidence in the record that faculty do share information.

4  Again, UNC Chancellor Houpt:  Word spreads among faculty.

5         **THE COURT:**  Right.  I understand that part.

6         **MS. SHAVER:**  Okay.

7         **THE COURT:**  So -- but he says, for example, in his

8  rebuttal report:  "My review of the evidence leads me to the

9  conclusion that Duke and UNC had a no-poach understanding."  I

10  mean, that -- that doesn't seem admissible to me.  Why do you

11  think that -- that exact statement is not -- that doesn't seem

12  like an economic expert opinion.  That seems like "I have

13  evaluated the evidence for you, Jurors, and here's the

14  conclusion that you should reach because I have evaluated the

15  evidence for you."

16         **MS. SHAVER:**  Yeah.  Your Honor, we're not going to

17  offer Dr. Cappelli to opine as to the existence of the

18  agreement.

19         **THE COURT:**  Okay.

20         **MS. SHAVER:**  If Your Honor wanted to strike that

21  sentence from Dr. Cappelli's report, we don't take issue with

22  it.

23         **THE COURT:**  All right.

24         **MS. SHAVER:**  He -- my -- when I looked at Duke's

25  motion on this point, they pointed to specific paragraphs of

1  Dr. Cappelli's report that they said impermissibly usurp the
2  role of the jury.  When I looked at those paragraphs, I didn't
3  see it and here's why.

4      They point to the paragraphs where he cites Dr. Roper's
5  testimony that Dr. Roper told his department chairs not to
6  pursue Duke's people because competition would raise pay.  He
7  doesn't cite to that for the proposition that there was an
8  agreement.  He cites to it to show how that supports his theory
9  of antitrust impact, that -- you know, don't raid these people
10 because it's going to have the end result of raising pay.
11 That's the point that he makes there.  He does provide the
12 evidence he's relying on, but it's not asserted for the purpose
13 of proving the agreement.

14      **THE COURT:**  Okay.  But, I mean, Duke does make the
15 point that he -- Dr. Cappelli makes these various statements
16 that it is more credible to see this agreement as a no-hire
17 agreement that is occasionally violated than as a
18 no-solicitation agreement frequently enforced.  He makes -- and
19 he says -- they say that he cannot opine on how the jury should
20 interpret the agreement.  That seems to -- that makes sense to
21 me.  Do you disagree with that?  They made that argument in
22 their brief.

23      **MS. SHAVER:**  Right.  What Dr. Cappelli was opining on
24 there specifically, he was rebutting Duke's expert's opinion
25 that the agreement was merely no solicitation and not no poach,

1   so it couldn't have had very much impact because, as counselor

2   agreed earlier, there were lots of exceptions.  It really

3   wasn't a no-poach agreement.  In their view, it was a

4   no-solicitation agreement, so no impact.

5       And Dr. Cappelli's response was there's a lot of management

6   literature on this topic; and in the management literature, "no

7   solicitation" means this, "no poach" means that; and in my

8   view, the evidence here supports the fact that it's a no-poach

9   agreement.  So it was a very -- just for the limited purpose of

10  rebutting that testimony.

11          **THE COURT:**  So if I don't let Dr. Baker offer that

12  opinion, then you don't need Dr. Cappelli.

13          **MS. SHAVER:**  That's exactly right on that narrow

14  issue, yes.  That's exactly right.

15          **THE COURT:**  Okay.

16          **MS. SHAVER:**  The last thing they take issue with is he

17  says that the no poach -- that Dr. Cappelli says the no-poach

18  agreement restricted hiring and suppressed pay, citing to

19  evidence in the record where Duke and UNC officials say that it

20  restricted hiring.

21      Again, he's not citing that evidence about it restricting

22  hiring for the purpose of establishing an agreement.  He's

23  citing it to -- for the proposition that it -- this restraint

24  on competition affected pay because the officials said things

25  like "it will lead to a bidding war" and "it has the effect of

1    raising pay at both of our institutions," things like that.  So

2    it's helping the jury interpret the documents where the import

3    in terms of antitrust impact isn't necessarily clear from the

4    face of the document.  So his testimony there -- Dr. Cappelli's

5    opinions there are about establishing impact, not about

6    establishing that an agreement existed.

7              **THE COURT:**  Okay.  Thank you.

8              **MS. SHAVER:**  Thank you.

9              **THE COURT:**  I'll give you -- first, before I let Duke

10   speak again, I do have something set at three o'clock.  It is

11   United States against Gariba.  Who is here for the -- you're

12   Mr. Gariba?

13             **MAN IN AUDIENCE:**  Yes, ma'am.

14             **THE COURT:**  Okay.  We're running a little bit behind.

15   Just stick with me and I will get to you as soon as I can.

16        And who is here for the Government?

17             **MAN IN AUDIENCE:**  Steve Baker, Your Honor.

18             **THE COURT:**  All right.  I'll be with you-all shortly.

19   I know that you're here.  I have not forgotten you.  I'm just a

20   little behind.

21        All right.  What does Ms. Bass or Mr. Cooney want to say?

22             **MS. BASS:**  So, Your Honor, with respect to

23   Dr. Cappelli, he reaches a very far-ranging conclusion in the

24   case.  He reaches the conclusion that suppressing the hiring or

25   recruiting of any class member would lead to suppressing the

1  pay of all class members and he reaches that conclusion even
2  though he doesn't have any background or experience with
3  academic medical centers and he admits that.

4      So with respect to Dr. Baker, what Dr. Baker, who has spent
5  25 years in an academic medical center studying academic
6  medical centers and actually being an expert in healthcare
7  economics with all of the themes that are kind of at the
8  fundamental core of that, including physician compensation --

9          THE COURT:  Tell -- show that to me, that he's an
10 expert in physician compensation.  I don't see that.

11         MS. BASS:  It's really endemic in all the work that he
12 does.  He's an expert in healthcare economics, so healthcare
13 economics runs the gamut of understanding how hospital systems
14 work, how hospital systems are funded, how academic medical
15 systems work, how ultimately doctors are paid.  So all these --

16         THE COURT:  Yes, but you have not directed my
17 attention to anything other than what the Plaintiff pointed
18 out, that one article 20 years ago about I think it was gender
19 compensation.  And -- I mean, I don't know.  I'm not going to
20 go read all these articles, but you just skim through the
21 titles of them and they don't sound like they have anything to
22 do with physician compensation or physician compensation
23 systems or labor economics and compensation systems.  So I'm
24 asking you to point me to that.

25         MS. BASS:  So there's a number of articles that

1  counsel is pointing me here to that would appear to impact

2  physician pay systems.  I would have to go back and read all of

3  them in order to represent to Your Honor necessarily what each

4  one of them says.  My understanding, though, is that they all

5  have the basis of them -- of being about healthcare economics.

6       And as Dr. Cooney -- I'm elevating you.  As Mr. Cooney was

7  mentioning earlier, what -- the whole role of what Dr. Baker

8  was trying to do here is to take Dr. Cappelli's -- his basic

9  proposition in this case and then what he would expect based on

10  his experience in academic medical centers and the research

11  that he has done in healthcare economics and test that.

12       He didn't offer an opinion simply based off of his

13  experience.  He went and he looked at the data, and he looked

14  at the hire and departure rates for schools, academic medical

15  centers, and he looked at the median payment for different

16  categories of doctors, like people who are in pediatrics or

17  orthopedics, and he looked at what their pay was.  So he

18  collected all of that data in order to inform his opinions

19  about whether or not the opinions of Dr. Cappelli seemed to be

20  right.

21       And so what Plaintiff's counsel said is that he reached

22  incorrect conclusions based off of his analysis of the data,

23  but at the core of what Dr. Cappelli is saying is that Duke and

24  UNC are unique and that you would expect to see things in --

25  with respect to Duke and UNC in terms of embeddedness and in

1  terms of internal equity based on the fact that they have this
2  uniqueness being so close to one another and that when people
3  come here they don't want to leave.

4      All Dr. Baker said is, "Well, that's fine.  We'll test
5  that.  Let's look at the hire and departure rates.  Let's look
6  at -- see if they seem different than what you see at other
7  universities.  Let's look at the pay.  Let's see if it seems
8  very out of whack with what you would see at other
9  universities."

10     So that's all Dr. Baker has tried to do here is to offer
11 his opinion based off the data that he's been able to collect
12 and prepare as to whether or not Dr. Cappelli's ultimate
13 conclusion makes sense in this case.

14         **THE COURT:**  Okay.  Thank you.

15     All right.  Let's turn to professor, doctor, whatever he
16 goes by, Hemphill.  I guess he's a law school professor, but he
17 has a PhD in economics, right?

18         **MR. GLACKIN:**  That's correct, Your Honor.

19         **THE COURT:**  Okay.  So this is the Defendants' motion
20 there and he -- he does appear to kind of make a closing
21 argument there in his report.  That's not to say that some of
22 the things he says would not be helpful to a jury.  In at least
23 one place he did appear to offer an opinion on whether an
24 agreement existed.  I was not too sure about that part.

25     So let me just hear from you-all on this without trying

 1  to -- if you're mostly arguing about Figure 1, that kind of

 2  depends on what he gets up on the witness stand and says and

 3  how he uses it, it seems to me.  If he's just going to make a

 4  closing argument, he can't do that; but if he's going to go

 5  through and explain how these materials fall into various

 6  categories in economic studies, to use a nontechnical term, you

 7  know, maybe that's okay.

 8      So who's talking about this for Duke?

 9          **MR. COONEY:**  I am --

10          **THE COURT:**  Okay.

11          **MR. COONEY:**  -- Your Honor, and Exhibit 1 I think is a

12  great place to start.

13      So Exhibit 1 are the -- the documents that they rely on to

14  show this history of collusion and what they want --

15  essentially what Dr. Hemphill has done is taken these documents

16  and said, "Aha, this proves there's an agreement."  And in the

17  process is also -- you know, under the guise of expert

18  testimony, is really telling the jury, "Here's what you need to

19  look for in order to conclude" --

20          **THE COURT:**  What's wrong with that?  I mean, he's an

21  economist and he says, "If you study these -- study this world,

22  you look at coordination.  You look at incentive compatibility.

23  You look at these things."

24          **MR. COONEY:**  Enforcement.

25          **THE COURT:**  Whatever --

1    **MR. COONEY:**  Right.

2        **THE COURT:**  -- all they are.  And these documents --

3    these -- by putting them into categories for the jury, isn't

4    that helpful to them?

5        **MR. COONEY:**  Well, I think it depends on how the

6    question ultimately is asked.  So if the question is asked "Is

7    this consistent with enforcement?" and he says, "Yes, it would

8    be consistent with enforcement," that's one thing.  Is this

9    proof of enforcement and therefore "I conclude since there was

10   enforcement there's an agreement," that's -- that's something

11   very different, indeed.

12       And what -- what we were concerned about is that

13   Dr. Hemphill, who really doesn't give an opinion on impact or

14   damages -- he's just there to talk about an agreement -- is

15   effectively trying to instruct the jury on here are the

16   elements of an agreement when that instruction is going to be

17   coming from the Court in terms of what the jury needs to

18   evaluate to determine whether there's an agreement.

19       Now, I recognize there -- there may be a gray area between

20   the point where he's saying, "Generally speaking, here's what a

21   collusive agreement looks like and here's what the elements

22   are," and instructing the jury, "If these elements exist, you

23   could -- you can conclude there's an agreement."

24       And our contention is he's doing a lot more of the latter

25   than of the former, and it really struck me that -- even though

1  he says he's acting as a PhD expert, that he was really being

2  an expert in the law and -- and, you know, usurping the role of

3  the Court and instructing the jury what the legal principles

4  are in order to determine whether an agreement existed or not.

5      **THE COURT:**  So you would not have any problem if he

6  came in here and said, "For collusion to be feasible, it must

7  satisfy three economic conditions:  One, it must be profitable.

8  Two, it requires the schools to coordinate or be able to

9  coordinate a collusive outcome and, three, it must be incentive

10 compatible"?  So there's no problem with that --

11     **MR. COONEY:**  Right.

12     **THE COURT:**  -- right?

13     **MR. COONEY:**  I think as a general proposition as an

14 economist, based on the economic literature, he can say, "Yes,

15 in my opinion these three things" --

16     **THE COURT:**  And then he could say, as he says in

17 paragraph 12, "The evidence of communications is consistent

18 with efforts to overcome the coordination and incentive

19 compatibility problems."  That would be okay?

20     **MR. COONEY:**  Yeah, consistent, that's right.

21     **THE COURT:**  Consistent with.  Then, let's see, he

22 says, "As for likely impact of the collusion outcome, as a

23 matter of economic theory, I would expect that a no-poach

24 understanding would reduce faculty pay for the same reasons

25 underlying the conclusion that collusion is profitable."

1       **MR. COONEY:**  That ought to be out.

2       **THE COURT:**  That's your problem.

3       **MR. COONEY:**  That's one of many.

4       **THE COURT:**  Okay.  Well, I'm just reading the summary

5  of his opinions and trying to, you know, get a grip on the big

6  picture here.

7       **MR. COONEY:**  Because he purported at deposition to say

8  that, you know, he hadn't studied impact, he hadn't studied it.

9  He was just saying, "I would expect -- there's an agreement and

10  as a result of the agreement, I would expect to see pay

11  suppressed."  He can't give either of those opinions.

12      That's why they have Dr. Leamer, who did a study to

13  determine whether or not there was -- you know, a sharing

14  regression to determine whether or not there was common impact

15  and a damages study to determine whether or not in fact pay was

16  suppressed.

17      And saying as a matter of theory pay is suppressed, that

18  doesn't aid the jury in anything.  It certainly -- he's

19  certainly not qualified based on any data to go ahead and give

20  that opinion, so they're --

21      **THE COURT:**  All right.  So you're mostly concerned

22  about the second part of his report -- his merits report --

23      **MR. COONEY:**  Yes.

24      **THE COURT:**  -- which is the class was likely paid

25  less.

1      **MR. COONEY:** Yes.

2          **THE COURT:** The first part, the economic evidence is

3  consistent with a no-poach understanding, depending on how the

4  question is asked, you may or may not have a problem.

5          **MR. COONEY:** Correct, Your Honor.

6          **THE COURT:** If phrased appropriately, okay, but it's

7  the second part.

8          **MR. COONEY:** Right.

9          **THE COURT:** Okay.

10         **MR. COONEY:** And to the extent he also gives opinions

11  on intent --

12         **THE COURT:** Right.

13         **MR. COONEY:** -- the existence of an agreement.

14         **THE COURT:** Yeah.  I already expressed my concerns

15  about his testimony about these plus factors in those terms.

16         **MR. COONEY:** And certainly we've got concern about him

17  taking documents -- and the jury is fully capable of looking at

18  themselves.  I mean, these are written in English and lots of

19  times the English is plain.  At least they've contended it's

20  plain.

21         **THE COURT:** Well, you have Dr. Baker do the same darn

22  thing.

23         **MR. COONEY:** Well --

24         **THE COURT:** I mean, really?

25         **MR. COONEY:** And as long as we're beaten with the same

1  stick, that's all I'd ask.

2        **THE COURT:**  You are going to have the same rules

3  applied.  I can assure you they will apply the same way both

4  ways.

5        **MR. COONEY:**  Thank you, Your Honor.

6        **THE COURT:**  I'm sorry.  I didn't mean to argue with

7  you.

8        **MR. COONEY:**  No, no.  I'll turn it over to Mr. Glackin

9  because I know time is running short.

10       **THE COURT:**  All right.  So it sounds like maybe you

11 can mostly focus on his testimony there is an agreement.

12 You're not going to ask him that, right?

13       **MR. GLACKIN:**  Correct, Your Honor.  So I've

14 actually -- I mean, I've done this once.  I've seen it done

15 twice and -- in addition to the time I did it, and what you do

16 hear a lot of, you hear the word "consistent" an awful lot

17 coming out of the witness's mouth.

18       **THE COURT:**  Okay.

19       **MR. GLACKIN:**  I'm actually not sure legally that

20 that's necessary, but I do think that that is where other

21 judges have been most comfortable in terms of the evidence

22 coming in, and I think that's fine.

23    So, yes, the phraseology will be either -- I will be asking

24 him the question:  "And is that consistent with collusion or

25 consistent with competition" or something like that.  Or I will

1  say, "What is the significance of that to you, Dr. Hemphill?"

2      And he will say, "Well, it is consistent with collusion" or

3  "It's inconsistent with competition."

4      That will be the -- that ought to be the general modus of

5  the examination, I would imagine.  That's the -- as I said, it

6  seems to be more or less common practice in courts that are

7  hearing this kind of testimony.

8          **THE COURT:**  Right.  Okay.  And then what about paid

9  less?

10         **MR. GLACKIN:**  So, Your Honor, I guess the problem I

11  have with this is this was not a subject of their motion.  The

12  only reference they made to this testimony in their motion is

13  they dropped a single footnote where they said, "By the way,

14  Dr. Hemphill shouldn't be allowed to testify about impact

15  because he didn't do a study."

16      They didn't offer any citations to law or real argument.

17  In my opinion, they didn't even carry their burden as moving

18  parties, quite frankly.  You cannot make -- you cannot seek to

19  exclude an entire back half of an expert's report based on a

20  footnote.  And, consequently, we didn't address it because we,

21  frankly, overlooked it because it was in a footnote.

22      In their rebuttal, they very -- I'll just withhold the

23  pejoratives.  In their rebuttal, they point this out and they

24  say, "Oh, by the way, the Plaintiffs didn't address this

25  argument that we made in a footnote and so therefore we win and

1  Dr. Hemphill's whole opinion about impact ought to be
2  excluded."

3      So I don't think this is before the Court properly because
4  I don't think they've carried their burden; but if you would
5  like me to address it on the fly, what I would say is that I
6  don't think there's anything at all odd about an expert
7  economist saying that "as a matter of economic theory, I would
8  expect that if you -- if you withdraw or limit the competition
9  that is within an economic system, you are going to see an
10 effect on the prices."  That's not a controversial point, I
11 think, although of course they are free to controvert it with
12 their own economist.

13     And, again, I have seen on multiple occasions economists
14 offer that kind of testimony not based on a data analysis but
15 simply as a matter of economic theory.  It is what it is,
16 frankly.  I mean, if there's not much more behind it than
17 theory, it only has so much impact with the jury, but it is
18 corroboration of -- from -- it is corroboration from someone
19 who is an expert with particular expertise in antitrust theory
20 to the data analysis that's being performed by Dr. Leamer, who
21 is also an economist but who has -- you know, is more of a
22 statistical, data-focused economist.

23     So the two -- both opinions are proper.  They're not
24 duplicative of one other.  Rather, they're complementary and
25 they're both completely normal in the context of a trial of an

1  antitrust matter.

2  **THE COURT:**  Okay.

3  **MR. GLACKIN:**  With respect to a few of the other

4  questions --

5  **THE COURT:**  So do I understand from what you just said

6  that if I give you-all two weeks to try this case -- let me

7  give you-all a heart attack and I'll just say two weeks --

8  then, you know, you're -- this whole thing, the class was

9  likely paid less as a result of the no poach, is going to be

10  five minutes?  I mean, what you just told me is --

11  **MR. GLACKIN:**  Yeah, it's extremely short.  I mean, I

12  think that --

13  **THE COURT:**  I wasn't trying to hold you to five

14  minutes.

15  **MR. GLACKIN:**  Okay.  As long as you're not holding me

16  to five, Your Honor.

17  **THE COURT:**  No, no, I'm not holding you to five.

18  **MR. GLACKIN:**  I'll stand here all day.  No, I'm just

19  kidding.

20  **THE COURT:**  Yeah, I'm talking about proportionately.

21  **MR. GLACKIN:**  Yes, I think that's right.  I also think

22  that at this stage of the proceedings, when we have the

23  particular focus we have on the experts, it's easy to imagine

24  that the experts are going to be the superstars of the trial.

25  They're not going to be the superstars of the trial.  It's

1  going to have to be the percipient witnesses.  That's who the

2  jury is going to listen to the most and believe the most.  So,

3  you know, the experts --

4          **THE COURT:**  Well, as to whether or not there's an

5  agreement.

6          **MR. GLACKIN:**  Certainly as to whether or not there's

7  an agreement, but I think that they will also pay a lot of

8  attention to the percipient witnesses and the documents and

9  what they say about the purposes of the agreement, and that

10 will be persuasive or not.

11         **THE COURT:**  All right.  But you've got to show

12 class-wide antitrust impact and the only way --

13         **MR. GLACKIN:**  Well, we do have to call experts,

14 unfortunately, Your Honor.  It is necessary.  But I guess what

15 I'm trying to convey is that at this stage sometimes it feels

16 as though they assume an outsized importance relative to the

17 trial.  I would expect Dr. Hemphill's testimony overall to be

18 most of a morning on direct and I would expect his cross to be

19 comparable and then I would expect him to be off the stand,

20 assuming Your Honor's trial days are sort of standard, probably

21 sometime in the middle of the afternoon.  I wouldn't expect any

22 of these experts -- I would not want any of them to take a lot

23 more time than that one way or the other.

24         **THE COURT:**  All right.

25         **MR. GLACKIN:**  Shall I move on?

1          **THE COURT:**  Yes.  And finish up.

2          **MR. GLACKIN:**  And finish up.  Exactly, Your Honor.

3      So I'm going to briefly address the issue about intent and

4  the issue about the law.  We are not going to ask any expert

5  what that expert -- what that expert's opinion is about what

6  somebody was thinking on any particular day.

7      They've identified four instances where there's kind of

8  what I would say some "intenty" language in Dr. Hemphill's

9  report or in deposition -- in his answers to questions that

10  they asked him at deposition, frankly, and I would say in all

11  those cases it's not a case of an expert opining about

12  anybody's intent.  This is an economist trying to talk like a

13  human being rather than an economist.

14      You know, there's a way to express the concepts that he's

15  expressing in strictly economic terms that involve using a lot

16  of phrases like incentives and rational actors.  I think that

17  in this world where we've given constitutional rights to

18  corporations, we're also entitled to anthropomorphize them a

19  little bit for the benefit of the jury and talk like human

20  beings.

21      That's really the only reason that -- you know, if

22  Dr. Hemphill says, "Well, in my opinion, if there weren't an

23  agreement, Duke would be concerned about hiring from the

24  incoming recruiting from UNC."  When he says "concerned," he's

25  not saying, "I've looked into the mind of an HR professional at

1   Duke and I'm reading their mind."  He's using that as a
2   shorthand to say a rational actor in Duke's position would take
3   steps to preempt hiring that was incoming from UNC or something
4   like that.  In any event, to the extent there's an issue at all
5   there, I would trust it's something we could work out, you
6   know, in the trial itself and not something that needs to be
7   the subject of a *Daubert* order.

8        With respect to the law, so this is -- their motion here is
9   focused on four particular paragraphs, 46 to 49, of
10  Dr. Hemphill's report and exclusively on the issue of the plus
11  factors -- his reference to plus factors.  Again, I would say
12  no expert is every going to or should be allowed to tell the
13  jury what to do or what the law is, but it's not the case that
14  experts can never talk about the law.

15       The Fourth Circuit made that clear in *United States versus*
16  *Offill,* what a name, O-f-f-i-l-l.  And what the Fourth Circuit
17  said in *Offill,* relying on the Second Circuit's decision in
18  *Bilzerian,* is that in most cases that's true.  Experts don't
19  talk about the law, but there are certain complex legal
20  regimes, like securities or the insurance industry, where it's
21  kind of impossible for the expert not to talk a little bit
22  about the law.

23       And I guess you can see where I'm going next, which is to
24  say that there -- at the very minimum, antitrust is at least as
25  complicated as securities.  In my opinion, quite a bit more so.

1  And it also suffers from the fact that the legal standards

2  themselves are derived from economics, so it's very hard for an

3  economist to even talk about his own expertise, areas that are

4  classic economic issues, without seeming to get into the area

5  of the law.

6      I think there's nothing wrong with Dr. Hemphill, you know,

7  organizing his testimony and simply making it comprehensible to

8  the jury underneath the factors that the jury may have to

9  consider at the end of the day.  But if what the Court is

10  concerned about is the Court and if the Defendant don't like

11  him saying courts have arrived at these plus factors, I am fine

12  with him not referring to courts having done it, as long as

13  we're not going to get an argument that there's no basis for

14  these factors or that they're crazy or that he should have

15  looked at other factors.

16          **THE COURT:**  Right.  I mean, he has to talk about -- it

17  has to flow from his expertise as an economist, right, his

18  testimony?

19          **MR. GLACKIN:**  Correct.  But these plus factors -- you

20  know, the *Processed Egg* decision makes this point about how

21  antitrust law and antitrust economics are sort of inextricably

22  linked together.  I mean, the factors that he's talking -- the

23  factors that courts talk about didn't actually originate with

24  the courts.  You know, they originated with courts considering

25  testimony from expert economists on when they should and

 1   shouldn't infer the existence of an agreement from

 2   circumstantial evidence, and over time those have morphed into,

 3   you know, depending on what circuit you're in, seven, eight or

 4   nine different possible plus factors.

 5          **THE COURT:**  Right.  But that is a summary judgment

 6   standard to not -- or maybe a 12(b)(6) standard.  I mean,

 7   whether or not some evidence is sufficient and how a court

 8   might analyze sufficiency of the evidence to prove an agreement

 9   is not necessarily what you tell the jury about the law or what

10   a court necessarily tells the jury about the law, and it's not

11   necessarily a way for an expert to communicate or an excuse for

12   an expert to communicate legal principles to the jury.  Maybe I

13   didn't say that very clearly.

14          **MR. GLACKIN:**  No, I understood you perfectly.  I just

15   have to respectfully disagree --

16          **THE COURT:**  Okay.

17          **MR. GLACKIN:**  -- because the so-called plus factors

18   you could certainly instruct a jury on.  You could certainly

19   instruct a jury that in determining whether or not there is an

20   agreement, there are certain factors that you may -- certain

21   categories of circumstantial evidence from which you may make

22   that inference.

23      And, in fact, I have read the model in the ABA jury

24   instructions and if you look at the notes to instruction --

25   Section 1, 2 -- Instruction 2, parallel conduct, it talks

 1  about -- it says in the notes that it doesn't define -- it

 2  doesn't list the plus factors that should be given in a case

 3  where parallel conduct is at issue because it's going to be up

 4  to the court to figure out which ones are appropriate for

 5  instruction.

 6        **THE COURT:**  Well, I mean, plus factors apply -- or

 7  came up in cases where you have parallel conduct and people

 8  were trying to prove agreements where you just have parallel

 9  conduct plus.  Well, that's not really this case.  You've got

10  direct evidence of a -- of a -- of a conspiracy here, right?

11        **MR. GLACKIN:**  Your Honor is completely correct that

12  the -- the plus-factor analysis is one that is really suited to

13  a parallel conduct case and ultimately might not be very

14  well-suited to this case.

15      You know, what I would suggest is -- I would -- if it would

16  comfort anyone, I would be happy, as I said, to take the

17  reference to courts out of the testimony as long as -- as long

18  as no one is going to attack him for sort of having invented

19  these factors out of his head.  If he gives the testimony -- I

20  mean, I think it's acceptable -- I think it's still admissible

21  testimony.  It's not -- it's only four paragraphs of his

22  report.  It wouldn't be very time-consuming in the trial.  And

23  then if it's appropriate to give an instruction on it, we have

24  the evidence; and if it's not, we don't get the instruction and

25  we don't argue it.

1        **THE COURT:**  Well, how is it helpful to have him go

2   over it as opposed to whoever is making your closing argument?

3   I mean, what is it that you need an expert for?

4        **MR. GLACKIN:**  Well, the -- it gets back to the fact

5   that these factors, which are, you know, actions against

6   self-interest, for example, derive from economics; and so what

7   we get out of it is if I stand there and tell the jury, "Well,

8   you know, Duke acted against its economic interest and so you

9   should infer an agreement from that," well, that's just me, the

10  lawyer, talking.  There's only one person they trust less than

11  the experts, Your Honor, and that's me.

12       If -- the thing that Dr. Hemphill adds is he can tell the

13  jury -- he can tell the jury that "as an economist, I would

14  expect Duke to act a particular way; and if they don't act

15  that -- or anyone, any company; and if a company acts against

16  its rational self-interest, if its actions are only consistent

17  with collusion, that is something that to me, as an economist,

18  if I were studying this situation outside of the courtroom" --

19  and believe it or not, cartels are mostly studied outside the

20  courtroom.  "If I was studying this situation outside the

21  courtroom, that's something I would look at and I would analyze

22  and" --

23       **THE COURT:**  That makes sense.  I mean, I don't have

24  any real problem with what you just said.

25       **MR. GLACKIN:**  All right.  Great.

1          **THE COURT:**  Okay.  Thank you.  I think I asked you to

2   finish up earlier and then I kept asking you questions, so I'm

3   going to keep quiet and give you two minutes.

4          **MR. GLACKIN:**  Your Honor, do I need to address the

5   point about documents because that was the only thing left on

6   my agenda, so to speak?

7          **THE COURT:**  It's been a long day.  If you think you

8   need to address it, you go ahead.

9          **MR. GLACKIN:**  Well, I mean, as Your Honor said, many

10  of the experts are relying on documents here to make sort of

11  the -- I should say the economists are relying on documents to

12  score qualitative points of one kind or another.  I don't --

13  you know, we on this side of the aisle, so to speak, don't

14  think there's something wrong with that categorically.  I think

15  that, again, that's fairly normal.

16      Again, an economist studying a cartel or an anticompetitive

17  agreement outside of the courtroom, the first thing they're

18  going to look at is not the data.  It's going to be the

19  documents.  The people who studied the Shughart institute

20  wanted to see the minutes of how the place was run.  So it's

21  completely normal and acceptable for an economist to study

22  documents in studying collusion.

23      And if we're agreed on the -- the overall opinion here

24  about whether or not something is consistent with collusion or

25  competition is admissible, then the only question left is do

1  those documents -- is it reasonable for him to rely on them;

2  and if it is reasonable for him to rely on them, then it's

3  certainly reasonable for him to talk about the materials he's

4  relied on in coming to his opinions.

5      And I would submit that this is the path that you see in

6  the antitrust cases that we cited in our brief on this matter:

7  *Titanium Dioxide, Urethanes,* also *Processed Egg.*  And the cases

8  the Defendants have cited, which are a Title VII case, I

9  believe, products liability cases, it's just a whole different

10 kettle of fish in terms of what those experts were being asked

11 to do compared to what we are asking our experts to do.

12          **THE COURT:**  Okay.  Thank you.

13          **MR. GLACKIN:**  I'll submit on that.  Thank you.

14          **THE COURT:**  Any brief rebuttal?

15          **MR. COONEY:**  No, Your Honor, but thank you for the

16 opportunity.

17          **THE COURT:**  Okay.  I'm going to try to get back to

18 you-all pretty quickly because you do have a trial date and I

19 think I -- I think I gave myself until sometime in April in my

20 own timeline to get you decisions so you-all -- if I let the

21 case go to trial, so you-all would have time to do the trial

22 prep.

23      It's certainly possible you'll get a decision and not an

24 opinion first because they're two separate processes of

25 reaching the right decision and then writing something to

1 explain it.  So as soon as I've reached a decision, I'll

2 probably give you a grant or denied, opinion to follow.  An

3 opinion will eventually follow before the trial.

4     And for the experts, you know, we may have to -- I may not

5 be able to do that, but for the -- the summary judgment parts

6 of it, I think I should be able to do that pretty quickly,

7 certainly within three or four weeks at the latest in terms of

8 a result.

9     And that's about all I have to say.  Does anybody have any

10 logistical issues or other things you want to raise?

11         **MR. HARVEY:**  Your Honor, I know it's been a very long

12 day and I apologize for this, but would it be possible to very

13 briefly go back to the statute of limitations damages issue?  I

14 felt I wasn't fully prepared for your question at the time.

15         **THE COURT:**  I don't have a clock.  All right.  I see

16 the secondhand.  I'm giving you one minute.

17         **MR. HARVEY:**  Thank you.

18     We went back and looked at all the papers that Dr. Cremiuex

19 cites in his exhaustive study.  All of the papers that discuss

20 the impact of seniority are set up in exactly the way that

21 Dr. Leamer's model is, with a variable for total experience and

22 a variable for total seniority.  That is how everyone who

23 studies it does it.

24     So if we are required to change the data, which is what

25 granting that motion would do, we would have to change the

1  dataset.  We would have to go back and change the total

2  seniority from what it actually is in the real world to

3  something else.  It would be akin to saying that if someone's

4  age is 50 in the regression, we have to pretend they were born

5  on January 1, 2012.  We have to pretend that they got their

6  M.D. on January 1, 2012.  It doesn't make any sense given how

7  the regression works.

8          **THE COURT:**  Okay.  Thank you for explaining that to

9  me.  I actually appreciate that because I had a question -- I

10 think I asked and you-all -- neither one of you addressed it,

11 which is what are the implications.

12     Does Plaintiff -- does Duke want to say anything about

13 that?

14         **MR. COONEY:**  Well, again, I think the problem is we're

15 mixing apples and oranges here.  I mean, he's talking about the

16 returns-to-tenure analysis, which is not a damage analysis.

17 It's simply a measure of what Dr. Leamer claims is going to be

18 an indication of whether or not there's adequate competition

19 for a particular thing.  Then they morph it into a damages

20 model, which is what the problem is.

21         **THE COURT:**  Okay.  And that's what you said to me this

22 morning.

23         **MR. COONEY:**  Yes, ma'am.

24         **THE COURT:**  All right.  I've got you, I hope.

25     Okay.  Any other logistical or housekeeping matters?  No.

1  All right.

2      For the matter that was set for three o'clock, Mr. Gariba,

3  I'm just going to take a real short break and we'll let these

4  folks clear out and then we'll come back and take care of your

5  matter and Mr. Baker.

6      So counsel in this matter are excused and court is in

7  recess for 15 minutes.

8      (Proceedings concluded at 3:33 p.m.)

9

10

11              **C E R T I F I C A T E**

12      I, LORI RUSSELL, RMR, CRR, United States District Court
    Reporter for the Middle District of North Carolina, DO HEREBY
13  CERTIFY:

14      That the foregoing is a true and correct transcript of the
    proceedings had in the within-entitled action; that I reported
15  the same in stenotype to the best of my ability and thereafter
    reduced same to typewriting through the use of Computer-Aided
16  Transcription.

17

18  _Lori Russell_

19  Lori Russell, RMR, CRR        Date:  4/18/19
    Official Court Reporter
20

21

22

23

24

25