IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DANIELLE SEAMAN, individually )
and on behalf of all others similarly )
situated, )
)
            Plaintiff, )
)
            v. )       1:15-CV-462
)
DUKE UNIVERSITY and DUKE )
UNIVERSITY HEALTH SYSTEM, )
)
            Defendants. )

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

    In this antitrust class action, the Court has approved a settlement between the employee class members and defendants Duke and Duke University Health System.[1] The settlement requires Duke to pay $54,500,00 and will also result in significant injunctive relief. Plaintiffs' counsel asks for attorney's fees of $18,166,666.67, 30% of the common fund. Counsel also seeks $3,320,066.35 in reimbursement for costs. Plaintiff Danielle Seaman also seeks a service award in the amount of $125,000.

    The Court is familiar with this case and the work of plaintiffs' counsel, which the Court has taken into account. It has reviewed Class Counsel's request and the supporting evidence, as well as attorney's fees and class representative awards from similar cases. For the reasons stated, the Court will grant the motion.

---

[1] For ease of reading, this Order will generally refer to the defendants collectively as "Duke."

I.  **Background**

In June 2015, Dr. Seaman, the plaintiff and class representative, sued Duke and others under the Sherman Act and North Carolina law, alleging that Duke had entered into an unlawful agreement with the University of North Carolina to prevent lateral hiring of certain medical employees in order to eliminate competition and suppress compensation. *See* Doc. 109. Dr. Seaman sought monetary and injunctive relief on behalf of herself and the class. *Id.* at 25–26.

In October 2015, Duke moved to dismiss in part on grounds of the state action immunity doctrine. Doc. 30. Though this motion was denied, the denial was "without prejudice to renewal of state action immunity questions at summary judgment after development of a factual record." Doc. 39 at 1. The Court certified the question for interlocutory appeal, but the United States Court of Appeals for the Fourth Circuit denied the defendants' petition. Doc. 50; Doc. 51. Thus, a potentially dispositive immunity defense was present through the entirety of the case, even as class counsel advanced significant time and expense to litigate it.

Discovery was thorough and costly. Defendants produced over 430,000 pages of documents and over 28,000 data files related to employee compensation. Doc. 369 at 11–12. Class Counsel met-and-conferred with defense counsel over the course of months to understand the data and assemble it into a single dataset for analysis.

Class Counsel retained three experts who offered opinions in support of Dr. Seaman's motion for class certification and later to prepare for trial. *Id.* at 12. Dr. Seaman's experts provided 12 reports in total, over 680 pages, and sat for 5 depositions.

*Id.* Dr. Leamer and his team also gathered and analyzed over 505 files of public University of Texas compensation data to establish a damages benchmark. *Id.* Class Counsel advanced nearly $3 million—the vast majority of the approximately $3.3 million in out-of-pocket costs for which they seek reimbursement—to cover the cost of the expert work and analysis. *See* Doc. 369-5. In addition to expert discovery, Class Counsel deposed 15 witnesses from Duke and UNC. Doc. 369 at 12.

At the time Dr. Seaman moved for class certification, Doc. 87, she also moved for a settlement limited to injunctive relief with the UNC defendants. Doc. 81. The Court approved that settlement. Doc. 185. Thereafter, only Duke remained in the case, and Duke vigorously opposed class certification. *See* Doc. 127.

The Court granted Dr. Seaman's class certification motion as to medical faculty and denied the request as to other proposed class members. Doc. 189. Thereafter, the parties pursued additional discovery to prepare the case for summary judgment and trial.

Duke then moved for summary judgment, Doc. 285, and to exclude expert testimony. Doc. 286. After the parties had completed briefing and argued these motions and while these motions were still pending, the parties engaged in settlement negotiations, the Department of Justice became involved in those negotiation, and ultimately the parties and the Government entered into the settlement agreement.

## II. <u>Analysis</u>

### A. <u>Fees</u>

In a class action, the court may award reasonable attorney's fees and nontaxable costs as authorized by law or by agreement. Fed. R. Civ. P. 23(h). In a common-fund

3

case such as this, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). District courts in the Fourth Circuit "overwhelmingly" prefer the percentage method in common-fund cases, *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016), and "the vast majority of courts of appeals now permit or direct district courts to use" this method. DAVID F. HERR, MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. May 2019 Update); *id.* at n. 483, n. 484, n. 485 (listing cases by circuit).

While the motion for attorney's fees is uncontested by the defendants or any class member, the Court acts as a fiduciary of the class, *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019), and will not rubber-stamp a motion for attorney's fees simply because no opposition has been voiced, *see Berry v. Schulman*, 807 F.3d 600, 617 (4th Cir. 2015) (stressing "the importance of addressing fee requests fully and carefully"). The touchstone is whether the award is reasonable. Fed. R. Civ. P 23(h).

To determine the reasonableness of the fee award, the Court begins by considering the twelve factors identified in *Barber v. Kimbrell's, Inc.*: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional

relationship between attorney and client; and (12) attorney's fees awards in similar cases." 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989)). The Court also has conducted a lodestar cross-check that compares the requested contingent fee award against a fee calculated based on hours spent at prevailing market rates. *See Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 467 (D. Md. 2014) ("The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar.").

    1. ***Barber* Factors**

Class Counsel request attorney's fees of one-third of the common fund, or $18,166,666.67. Doc. 367 at 2. Contingent fees of one-third are common in this circuit in cases of similar complexity. *See Phillips*, 2016 WL 2636289, at *6; *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007); *see also Boyd*, 299 F.R.D. at 464 (noting attorney's fees awarded under the percentage of the fund method "are generally between twenty-five (25) and thirty (30) percent of the fund."). In this complex case, with a high risk for Class Counsel, numerous contested issues, and a positive settlement for the class members, there is more than sufficient reason to support a one-third contingent fee.

An award of one-third is also common in antitrust class actions. *See, e.g., In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-cv-00361, 2018 WL 2382091, at *5 (E.D.

5

Va. Apr. 18, 2018) (collecting cases); *In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) (one-third of $835 million settlement); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (one-third of $163.5 million settlement); *In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), MDL 1285, 2001 WL 34312839, at *10–11 (D.D.C. July 16, 2001) (one-third of $365 million settlement).

Class Counsel obtained a good result for the class, with significant monetary and nonmonetary relief. The excellent result obtained is "the most critical factor in determining the reasonableness of a fee award" and further supports finding the requested fee reasonable. *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010) (internal quotation omitted).

While summary judgment motions were still pending at the time of the settlement, it seemed likely that the case would survive those motions and proceed to trial. Class Counsel had prepared the case well enough that the Department of Justice became interested in participating in the settlement and in the scope of the injunctive relief. The settlement amount results in an average payout of approximately $10,000 per Class member, a very significant recovery.

In addition to the monetary recovery, Class Counsel obtained significant injunctive relief against Duke and UNC. Class Counsel have not asked the Court to factor the value of the injunctive relief into the common fund, though there is some authority to do so. *See, e.g.*, *In re: Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2013 WL 11319243, at *13–14 (S.D. Fla. Aug. 2, 2013) (adding valuation of injunctive relief to size

of constructive common fund before applying percentage-of-the-fund method); *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405 (CM), No. 14-cv-8714 (CM), 2015 WL 10847814, at *15 (S.D.N.Y. Sept. 9, 2015); *Chieftain Royalty Co. v. XTO Energy Inc.*, No. CIV-11-29-KEW, 2018 WL 2296588, at *4 (E.D. Okla. Mar. 27, 2018); *Cecil v. BP Am. Prod. Co.*, No. 16-CV-00410, 2018 WL 8367957, at *4–5 (E.D. Okla. Nov. 19, 2018). But this meaningful nonmonetary relief is relevant to the reasonableness of the fee requested. *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 481 (D. Md. 2014).

The Class also appears satisfied with the settlement and the results obtained by Class Counsel. Only seventeen class members out of 5400 have chosen to opt out, and no objections were made. Doc. 359 at ¶ 6; Doc. 373 at ¶ 11. The absence of any objections to the settlement indicates that "counsel have achieved a superior result for the class and weighs in favor of their requested award." *Decohen,* 299 F.R.D. at 481 (approving settlement and award where class members submitted no objections).

That is not to say the case was without risk. From the beginning, the plaintiff and Class Counsel had a number of hurdles to overcome. *See* discussion *infra*. Class Counsel and the plaintiff still faced significant risks at the time of the settlement. In particular, though plaintiff's experts provided damages estimates ranging from $125 million to $315 million (of which $54.5 million represents 17% to 44%), Duke argued that these included damages from outside the Class Period, Doc. 330-7 at 16–17, and that class member income from the Private Diagnostic Clinic[2] should not have been included. Had Duke

---

[2] Somewhat oversimplified, PDC is the private practice Duke professors join and through which they treat patients outside the hospital.

succeeded in both respects, damages would have been reduced to a range of $18.4 million to $32 million—in which case $54.5 million would represent between 170% to 296% of estimated damages. And there was some chance Duke's pending motion for summary judgment would have been granted in whole or in part. Doc. 285. Finally, had the case gone to trial, there was a risk the jury would rule against the class on liability or harm.

Class Counsel are experienced in employment, antitrust, and class action cases, having brought and successfully resolved similar cases in the past.[3] Class Counsel successfully defended against two motions to dismiss, were largely successful at class certification, and have now procured two settlement agreements against UNC and Duke, respectively. *See* Doc. 39; Doc. 108; Doc. 189; Doc. 83-1; Doc. 359-1.

Class Counsel also agreed to prosecute this case on contingency despite several known risks. In particular, unlike many other antitrust class actions, this case did not follow a government investigation or enforcement proceeding that might have given some confirmation of the scope of misconduct. Instead, at the outset Dr. Seaman had only an email from a mid-level administrator at the UNC Department of Radiology to support her allegations. Doc. 369-7. Class Counsel faced the risk that the e-mail would turn out to be pretextual, that the alleged no-poach agreement would have a very

---

[3] *See, e.g.*, *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-2509-LHK, 2014 WL 10520478 (N.D. Cal. May 16, 2014); *In re: Railway Indus. Emp. No-Poach Antitrust Litig.*, MDL No. 2850, 2019 WL 2542241 (W.D. Pa. June 20, 2019); *Houston v. Papa John's Intl., Inc., et al.*, 3:18-cv-00825-JHM-RSE (W.D. Ky.); *Deslandes v. McDonald's, LLC, et al.*, No. 1:17-cv-04857 (N.D. Ill.); *Conrad v. Jimmy John's Franchise, LLC, et al.*, No. 18-cv-133-MJR-RJD (S.D. Ill.); *Blanton v. Domino's Pizza Franchising, LLC, et al.*, No. 18-cv-13207-VAR-DRG (E.D. Mich.); *Ogden v. Little Caesar Enters., Inc.*, No. 18-cv-12792-DML-RSW (E.D. Mich.).

limited scope, or that impact and injury could not be established. Further, Class Counsel's risks were not limited to a loss of attorney time, but also substantial out-of-pocket expenses. These significant risks—and Class Counsel's agreement to take the case on contingency—also weigh in favor of the award.

The attorneys and staff have worked over 12,500 hours since it began. Doc. 369 at ¶ 8. The time spent was reasonable for the tasks and work performed. They have also spent over $3 million from their own pockets litigating this case. Doc. 369-4. This was time and money the attorneys could have directed to other simpler and less risky opportunities. *See* Doc. 369 at ¶ 14. Class Counsel's time commitment is not over yet, as additional work will be required to implement the settlement and oversee the notice process. Additionally, this case has been ongoing for over four years, throughout which Class Counsel has had to comply with court-enforced deadlines that imposed additional limits on their ability to take on other work.

Finally, while there is no direct evidence to suggest this case was undesirable, the number of firms willing to take-on a complex and time-consuming case such as this which posed significant risks—and on a contingent basis no less—is no doubt small. This is particularly likely to be true here, where the suit was initiated before a government investigation into the antitrust allegations.

An attorney's fee equal to one-third of the common fund ($18,166,666.67) is reasonable, based on the resources Class Counsel advanced, the quality of Class Counsel's work, the results obtained, the risks and obstacles Class Counsel faced, and fees awarded in similar antitrust cases.

2. **Lodestar Cross-check**

Courts often use the lodestar method to cross-check the reasonableness of a percentage fee. *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 759–60 (S.D.W. Va. 2009) (collecting cases). To determine the lodestar, courts multiply the reasonable hourly rate for each attorney by the number of hours reasonably expended. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). When the lodestar method is used as a cross-check, courts need not "exhaustively scrutinize[ ]" the hours documented by counsel, and "the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

Generally, a reasonable rate is determined by looking at the local market rate. *See Burrs v. United Tech. Corp.*, No. 1:18-CV-491, 2019 WL 1430258, at *1 (M.D.N.C. Mar. 29, 2019). However, a higher rate can be appropriate for matters involving complex issues requiring specialized expertise. *See Kruger v. Novant Health, Inc.*, No. 1:14CV208, 2016 WL 6769066, at *4 (M.D.N.C. Sept. 29, 2016). Additionally, the use of current as opposed to historical market rates is appropriate to account for the delay in payment to counsel. *See Daly v. Hill*, 790 F.2d 1071, 1081 (4th Cir. 1986); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 478 F. Appx. 54, 60 (4th Cir. 2012).

When fees are awarded based on the lodestar, not as a comparison, a prevailing plaintiff may justify an award of extra-community hourly market rates if "the complexity and specialized nature of the case . . . mean that no attorney, with the required skills, is available locally, and the party choosing the attorney from elsewhere

10

acted reasonably in making the choice." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994). Here, because of the complexity of the case it is reasonable to look beyond local rates in calculating the reasonable rate for a lodestar comparison. While antitrust lawyers exist locally, as noted above there are not many firms willing to handle a high-risk matter requiring the resources, time, and skill this case demanded. While experienced local counsel was involved, non-local counsel handled the majority of the work. Duke also relied on non-local counsel, *see, e.g.,* Doc. 30, throughout this case. Given the complexity and risk involved, it is reasonable to use a non-local hourly rate to calculate a reasonable rate for purposes of the lodestar comparison to the percentage fee.

Here, Class Counsel provided evidence of an hourly rate of between $590 and $900 for the primary partners on the case (over 85% of the time billed in the $590-$610 range); between $395 and $510 for the primary associates, staff attorneys, and contract attorneys on the case; and $280-$390 for paralegals and other support staff. Doc. 369-2. These rates are in line with hourly rates used for Class Counsel in other cases. *See*, *e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 793–94 (N.D. Ohio 2010); *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322, 1326–27 (W.D. Wash. 2009); *Fleming v. Kemper Nat. Servs., Inc.*, 373 F. Supp. 2d 1000, 1012 (N.D. Cal. 2005).

The Court has reviewed Class Counsel's time summaries, which cover more than

12,500 hours over the course of four years. Doc. 369-2; Doc. 369-3. Class Counsel testifies that they "paid considerable attention to ensuring that each . . . attorney on the file had a specific area of focus; that there was no duplication of efforts . . .; and that projects were assigned to experienced lawyers who could effectively and efficiently execute the work this case demanded." Doc. 369 at 2. While the Court's observations during the several oral arguments are limited, this testimony is consistent with those observations. Some of counsel's time was spent on pursuing an unsuccessful class certification motion covering different persons than are in the certified class. *See* Doc. 381. But that time was small in the larger scheme of things. Furthermore, the legal and factual issues overlapped, and these efforts also provided some benefits to the certified class.

The time Class Counsel spent on the case is reasonable considering the complexity and number of issues presented; the extensive and contentious discovery; the efforts expended in preparation for and through comprehensive summary judgment and *Daubert* briefing; and the significant degree of trial preparation already underway.

An award of one-third of the common fund, or $18,166,666.67, represents a lodestar multiplier of less than just under 2.9 on a total lodestar through July 16, 2019 of $6,353,566.50. Doc. 369 at 6. The multiplier is only marginally higher if the time spent on the unsuccessful class is removed. And this does not take into account the time Class Counsel spent in support of final approval of the Duke Settlement, and the additional hours that will be required to supervise settlement distribution and to ensure that Duke and UNC comply with their injunctive relief

obligations under the settlements. Thus, the lodestar multiplier will ultimately be smaller. *See id.* at 8.

Class Counsel's zealous advocacy, despite the resources required and the risks involved, supports the multiplier. "Courts have found that lodestar multipliers ranging from 2 to 4.5 demonstrate the reasonableness of a requested percentage fee." *Phillips*, 2016 WL 2636289, at *8; *see also Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md. 2013) (noting that the lodestar multipliers "on large and complicated class actions have ranged from at least 2.26 to 4.5"). A 2.89 multiplier is reasonable and appropriate here.

B. **Expenses**

Under Rule 23(h), a trial court may award nontaxable costs that are authorized by law or the parties' agreement. Fed. R. Civ. P. 23(h). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Krispy Kreme*, 2007 WL 119157, at *3 (internal quotation and citation omitted).

Here, Class Counsel requests reimbursement of expenses in the amount of $3,320,066.35. Doc. 367. The most significant expense—over $2.9 million—went to expert fees. Doc. 369-4. The expert-related costs are reasonable in light of the needs and complexities of this case. Dr. Seaman retained three prominent economists to opine on the economic indicia of collusion; on how Defendants' internal pay systems and structures would have spread the effect of the no-poach agreement to all Class Members; and on complex economic models to estimate damages (including developing an independent benchmark for damages based on data from the University of Texas). *See* Doc. 369 at 12;

13

Doc. 369-5. The expert opinions were necessary for Dr. Seaman to meet her burden at class certification, summary judgment, and then at trial. Doc. 369 at 12. Without it, Dr. Seaman would not have had a basis to estimate damages or prove Class wide antitrust impact. The expert opinions clearly benefited the Class.

The Court had some concerns about requiring the class members to pay expert costs incurred to support claims raised on behalf of another potential class made up entirely of other people. While the costs were reasonable in amount and it was reasonable to pursue the claims of these potential class members, it is not a given that the class members here should have to pay those costs. However discovery and investigation required for these claims arose largely out of the same common core of facts and legal issues, and class counsel have shown that the work of the experts which focused on the unsuccessful class had potential benefits to the class as certified and in fact provided some of those benefits. Moreover, the part of the experts' bills associated with the claims of the unsuccessful proposed class are a quite small part of the total. *See* Docs. 382; Doc. 383 Doc. 384.

The remaining costs and expenses are reasonable and legitimate costs associated with prosecuting the case, such as travel, telephone, postage, delivery services, settlement costs, legal research, depositions, and so on. Doc. 369-4.

The Court finds that Class Counsel's cost reimbursement request is fair and reasonable.

C. **Class Representative**

It is common for courts to compensate class representatives for work done on behalf of the class, "to make up for reputational risk undertaken in bringing the action, and . . . to recognize their willingness to act as a private attorney general." *Berry*, 807 F.3d at 613 (citation and quotation omitted); *see, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Dr. Seaman's request for a $125,000 service award is fair and reasonable. Dr. Seaman devoted many hours of her time advancing this litigation by participating in litigation strategy, discovery, settlement negotiations, and mediation. Doc. 369 at 14. She was present for hearings on Defendants' motions to dismiss, her motion for class certification, and the parties' motions for summary judgment. Her commitment to the case and the class was significant.

Just as importantly, Dr. Seaman put her professional career on the line when she came forward. Employees often face unique pressures and a risk of retaliation by current or prospective employers when they sue their employers. *See*, *e.g.*, *In re High-Tech*, 2015 WL 5158730, at *17 (approving $100,000 service awards where named plaintiffs received considerable media coverage and were likely to be viewed as "troublemakers" by future employers); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997) (recognizing that in an employment case, "the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril"). Dr. Seaman told the Court at the

Fairness Hearing that her relationships with Duke administrators have been affected as a result of her leadership role in this case. Her role has been widely publicized. Doc. 369 at 15. Indeed, there has been significant publicity about Dr. Seaman's role in this case; links to the litigation are among the first results for her name on Internet search engines, and coverage in the local press has been significant. Dr. Seaman's exposure and the risk she faces weigh in favor of an appropriate service award here.

The amount of the service award is proportionate to the other Class Members' recoveries. Dr. Seaman's service award is approximately 12.5 times larger than each class member's average recovery, and the size of the award is comparable to that in other cases. *See In re High-Tech*, 2015 WL 5158730, at *18 (approving service awards 14-21 times greater than average class member award); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (approving $125,000 service award in $163.5 million settlement); *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194 (CM), 2010 WL 4877852, at *8, *26 (S.D.N.Y. Nov. 30, 2010); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 290, 333 n.65 (3d Cir. 2011) (en banc) (affirming antitrust class action settlement providing for service awards), *cert. denied,* 566 U.S. 923 (2012); *see also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 service payments to each of four representative plaintiffs); *Beck, et al. v. Boeing Co.*, Case No. 00-CV-0301-MJP, Doc. 1067 at 4 (W.D. Wash. Oct. 8, 2004) (awarding $100,000 service payments to each named plaintiff); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011

WL 4478766, at *12–13 (E.D. Okla. Aug. 16, 2011) (awarding $100,000 service awards to employee class representatives for assuming risk of retaliation), *report and recommendation adopted*, 2011 WL 4475291 (E.D. Okla. Sept. 26, 2011).

Finally, none of the red flags related to service awards arise here. First, the relief to the rest of the class is not perfunctory, as each class member's recovery averages approximately $10,000, and they will all benefit from robust injunctive relief. Second, Dr. Seaman's service award is not conditioned on her support for the settlement. *Berry*, 807 F.3d at 613–14.

In light of Dr. Seaman's contributions to the case, the risks she faced and will continue to face, the reasonable ratio between her service award and other Class Members' recovery, and comparable service awards in similar cases, the Court concludes that the $125,000 request is fair and reasonable.

III. **Conclusion**

The Court finds that Class Counsel's uncontested motion for attorney's fees, attorney's expenses, and service award for the class representative is well-supported and reasonable. Accordingly, it is **ORDERED** that:

1. Class Counsel's motion for attorney's fees, reimbursement of costs, and service award for the class representative, Doc. 367, is **GRANTED**.

2. Class Counsel is entitled to an attorney's fee of $18,166,666.67, to be paid from the settlement amount, which is a common fund.

3. Class Counsel shall be reimbursed for expenses of $3,320,066.35, which are to be paid from the settlement amount.

4. A service award of $125,000 shall be paid to Dr. Danielle Seaman, also to be paid from the settlement amount.

This the 25th day of September, 2019.

_____
UNITED STATES DISTRICT JUDGE